UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GEORGE GALGANO,

                              Plaintiff,

        -v-

COUNTY OF PUTNAM, NEW YORK;
PUTNAM COUNTY DISTRICT
ATTORNEY'S OFFICE; TOWN OF CARMEL,
NEW YORK; TOWN OF CARMEL POLICE
DEPARTMENT; ADAM LEVY; ANDRES
GIL; HEATHER ABISSI; HENRY LOPEZ;
LOURDES GONZALEZ; MICHAEL T.
NAGLE,

                              Defendants.

Case No. 16-CV-3572 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances:</u>

Richard Weill, Esq.
Boies, Schiller & Flexner LLP
Armonk, NY
*Counsel for Plaintiff*

Lewis R. Silverman, Esq.
Caroline Beth Lineen, Esq.
Joshua Matthew Goldstein, Esq.
Silverman and Associates
White Plains, NY
*Counsel for Defendants County of Putnam and the Putnam County District Attorney's Office*

Robert J. Pariser, Esq.
Michael E. Longo, Esq.
Jordyn Leigh Aronowitz, Esq.
*Counsel for Defendants Town of Carmel, Town of Carmel Police Department, and Michael Nagle*

Michael A. Miranda, Esq.
Miranda Sambursky Slone Sklarin Vervenioits, LLP
Mineola, NY

*Counsel for Individual Defendants Adam Levy, Andres Gil, Heather Abissi, Lourdes Gonzalez, and Henry Lopez*

Richard B. Epstein, Esq.
Virginia & Ambinder, LLP
New York, NY
*Counsel for Individual Defendants Adam Levy, Andres Gil, Heather Abissi, Lourdes Gonzalez, and Henry Lopez*

KENNETH M. KARAS, District Judge:

Plaintiff George Galgano ("Galgano" or "Plaintiff") brings this Action against the County of Putnam ("Putnam County"),the Putnam County District Attorney's Office ("PCDAO"), the Town of Carmel ("Carmel"), the Town of Carmel Police Department ("Carmel Police Department"), former Putnam County District Attorney Adam Levy ("Levy"), Assistant Putnam County District Attorney Andre Gil ("Gil"), Assistant Putnam County District Attorney Heather Abissi ("Abissi"), Putnam County District Attorney's Office Investigator Lourdes Gonzalez ("Gonzalez"), Putnam County District Attorney's Office Senior Investigator Henry Lopez ("Lopez"), Carmel Police Department Detective Sergeant Michael T. Nagle ("Nagle," and collectively "Defendants") alleging violations of federal and New York state law. (*See generally* Am. Compl. (Dkt. No. 72).) Plaintiff brings thirteen claims: (1) federal claims under 42 U.S.C. § 1983 against all Defendants for the unlawful seizure of Galgano's communications from June 7, 2014 through July of 2014; (2) federal claims under 42 U.S.C. § 1983 against all Defendants for malicious prosecution; (3) federal claims under 42 U.S.C. § 1983 against all Defendants for denial of due process; (4) New York state law claims against all Defendants for malicious prosecution; (5) federal claims under 42 U.S.C. § 1983 against all Defendants for the unlawful search of Galgano's home, offices and motor vehicle and the seizure of his computers and electronic storage devices; (6) federal claims under 42 U.S.C. § 1983 against all Defendants for the unlawful search and seizure of Galgano and the ensuing seizure of his cellular phone;

(7) federal claims under 42 U.S.C. § 1983 against all Defendants for the unlawful search of Galgano's computers, cellular phone, and electronic storage devices; (8) federal claims under 42 U.S.C. § 1983 against Defendants Levy and Nagle for retaliation in violation of the First Amendment; (9) New York state law claims against all Defendants for defamation; (10) New York state law claims against all Defendants for abuse of process; (11) New York state law claims against all Defendants for failure to intercede; (12) federal claims under 42 U.S.C. § 1983 against Defendants Putnam County, Putnam District Attorney's Office, Carmel, Carmel Police Department, Levy, Gil, Abissi, and Lopez for supervisory liability; and (13) federal claims under 42 U.S.C. § 1983 for conspiracy against the Individual Defendants. (*See generally* Am. Compl.)

Before the Court are three Motions To Dismiss. The first is filed on behalf of Putnam County and the PCDAO (the "Putnam County Defendants"). (Cty. Notice of Mot. (Dkt. No. 139); Cty. Mem. of Law in Supp. of Mot. To Dismiss ("Cty. Mem.") (Dkt. No. 141); Decl. of Lewis R. Silverman, Esq. in Support of Cty. Mot. To Dismiss ("Silverman Decl.") (Dkt. No. 140).) The second is filed on behalf of Carmel, Carmel Police Department, and Nagle ("Carmel Defendants"). (Carmel Notice of Mot. (Dkt. No. 143); Carmel Mem. of Law in Supp. of Mot. To Dismiss ("Carmel Mem.") (Dkt. No. 145); Decl. of Robert J. Pariser, Esq. in Support of Carmel Mot. To Dismiss ("Pariser Decl.") (Dkt. No. 144).) The third is filed on behalf of Levy, Gil, and Abissi ("Putnam County Prosecutors") and Gonzalez and Lopez ("Putnam County Investigators," and together with the Putnam County Prosecutors, "Putnam County Individual Defendants.") (Cty. Individual Notice of Mot. (Dkt. No. 147); Cty. Individual Mem. of Law in Supp. of Mot. To Dismiss ("Cty. Individual Mem.") (Dkt. No. 149); Decl. of Michael A. Miranda, Esq. in Support of Cty. Individual Mot. To Dismiss ("Miranda Decl.") (Dkt. No. 148).) For the reasons that follow, the Motions are granted in part and denied in part.

## I. Background

The following facts are taken from the Amended Complaint and are accepted as true for the purposes of this Motion. (Am. Compl.)[1]

### A. Factual Background

Plaintiff is a criminal defense attorney based in Westchester County, New York. (*Id.* ¶ 32.) Galgano's law firm, Galgano & Associates, employed three full time attorneys, including Eric Sharp ("Sharp"), a senior associate at the firm, and Stefanie Capolongo ("Capolongo"), the assistant and office manager. (*Id.* ¶ 35.)

Plaintiff alleges this action originated as a personal feud between Levy and Putnam Sheriff Donald Smith ("Smith"). (*Id.* ¶¶ 36–42.) On March 20, 2013, Smith charged Alex Hossu ("Hossu"), Levy's live-in trainer, with a sex offense. (*Id.* ¶ 36.) The resulting public clashes over the prosecution and media coverage was the subject of extensive civil litigation between Levy and Sheriff Smith. (*Id.* ¶ 37.) "[I]n retaliation against Sheriff Smith," Levy charged Lani Zaimi ("Zaimi")—a local restaurant owner, vocal Smith political supporter, and member of Sheriff Smith's Advisory Board—with sexually assaulting a waitress named M.A. (*Id.* ¶ 38–39.) According to Plaintiff, the Zaimi prosecution served not only to vindicate Levy, but also was designed to distract from the Hossu prosecution controversy and to discredit Smith. (*Id.* ¶ 41.)

Galgano and Sharp represented Zaimi, and through that representation, Galgano found himself in the middle of the feud between Levy and Smith. (*Id.* ¶¶ 40, 42.) Galgano "vigorously defended his client." (*Id.* ¶ 43.) As part of the defense, Galgano chose to investigate whether

---

[1] The Amended Complaint is 78 pages long and contains 355 paragraphs. This facts section is accordingly lengthy.

M.A. was coerced into changing her initial account given to Nagle—that she engaged in consensual sex with Zaimi in exchange for $200—to implicate Zaimi as the behest of the PCDAO and Carmel Police Department. (*Id.*) In February 2014, the jury trial began, and Galgano's defense of Zaimi included arguments that Nagle and Levy coerced M.A. to change her story. (*Id.* ¶ 47.) During this trial, Galgano cross-examined M.A. for several days and caused her to become visibly upset. (*Id.* ¶ 63.) Galgano also spent three days vigorously cross-examining Nagle. (*Id.*) In addition to numerous court filings regarding police and prosecutorial misconduct, Galgano publically challenged Levy and the Carmel Police Department for alleged misconduct. (*Id.* ¶¶ 44, 46, 48.) After six days of deliberations, the jury was unable to reach a verdict and the trial ended in a partial acquittal and a mistrial as to the remaining counts. (*Id.* ¶ 64.) Vindicated, Galgano told the media that M.A. "wasn't a victim at the hands of Mr. Zaimi" but rather "was victimized by law enforcement in this case." (*Id.* ¶ 49.) Galgano further explained that that M.A. was coerced to lie and to inculpate Zaimi for a crime he did not commit by the Carmel Police Department and PCDAO because of Zaimi's association with Smith. (*Id.*) In response, the Town of Carmel Police Chief Michael Cazzari ("Cazzari") made a public statement that Carmel "detectives did an unbiased investigation and followed the evidence and made the appropriate charges." (*Id.* ¶ 50.)

Galgano's successful defense of Zaimi and public criticism of the prosecution and police "agitated and embarrassed" the Carmel Police Department, PCDAO, Levy, and Nagle, and created a motive to discredit both Zaimi and Galgano. (*Id.* ¶ 53.) Plaintiff alleges Levy conspired with the other Defendants "to create publicity prejudicial to Zaimi by fabricating an allegation that he sexually assaulted a different waitress named Kimberly Lorusso [("Lorusso")] in November of 2012." (*Id.* ¶ 54.) Initially, both Galgano and Zaimi readily cooperated with the

investigation.  (*Id.* ¶ 55.)  However, "[a]fter a limited investigation that failed to follow any of their own internal case enhancement protocols . . . Defendants arrested Zaimi and immediately launched a media campaign to disseminate the fabricated allegation," allegedly to contaminate the jury pool  (*Id.* ¶ 56.)

Galgano tried to determine if Lorusso, like M.A., had been "coerced or improperly incentivized to falsely implicate Zaimi."  (*Id.* ¶ 58.)  He hired defense investigator Andrew Kuchta ("Kuchta") to identify and obtain statements from potential witnesses.  (*Id.* ¶ 57.)  Quincy McQuaid ("McQuaid"), the boyfriend of Lorusso's sister, Lia Lorusso ("Lia"), was one such witness identified by Kuchta.  (*Id.* ¶ 59.)  Galgano spoke with McQuaid to attempt to ascertain Lorusso's intentions and why she had falsely accused Zaimi of assaulting her.  (*Id.* ¶ 60.)  "Galgano's suspicion that the Lorusso charges were fabricated was based upon (a) the timing of the new complaint; (b) the similarity of the new complaint with one of the proffered bad acts in the M.A. case that was ruled inadmissible; (c) the fact that Kimberly Lorusso waited 18 months to come forward; (d) the fact that months after the purported sexual assault in November 2012, Kimberly Lorusso inexplicably applied for and accepted a job with Zaimi; (e) the fact that Kimberly Lorusso made the new complaint only hours after her first day of work; (f) the fact that the video surveillance footage contradicted the criminal allegations; and, (g) the fact that the Defendants went through great efforts to rush to judgment so that they could publicize the new arrest on the eve of the jury selection in the M.A. case."  (*Id.* ¶ 61.)  "Galgano paid McQuaid for his time spent assisting with the investigation, but never once offered to pay anyone in exchange for Kimberly Lorusso declining to testify or to influence her testimony against Zaimi."  (*Id.* at 62.)  Indeed, "[d]uring the course of his dealings with McQuaid and Lia,

Mr. Galgano repeatedly stated that all their conversations with Kimberly Lorusso and her family members had to be recorded." (*Id.*)

As part of the plot to discredit Galgano and prevent him from representing Zaimi, Defendants initiated an investigation against Galgano. (*Id.* ¶ 67.) Not only were Defendants seeking "vengeance" for Galgano's public attacks and court filings, (*id.* ¶ 68), Defendants were also motivated to prevent Galgano from representing Zaimi at his retrial because M.A. refused to testify if Galgano was serving as defense counsel, (*id.* ¶ 67). Defendants then "fabricat[ed] allegations that Galgano conspired with McQuaid to bribe, tamper with, and intimidate . . . Lorusso." (*Id.* ¶ 69.) The "unlawful and vindictive 'investigation' . . . last[ed] eighteen months." (*Id.* ¶ 70.) "It involved the second highest-ranking member of the Town of Carmel Police Department (Lieutenant Brian Karst [("Karst")]) and every member of the Town of Carmel Police Department's Detective Division, of which Nagle (the third highest-ranking member of the Town of Carmel Police Department) is Chief." (*Id.*) According to Plaintiff, "[s]uch a commitment of manpower, particularly for a police department as small as the the [sic] Town of Carmel Police Department, could not have been accomplished without the knowledge and approval of the Town of Carmel Police Department's chief policymaker." (*Id.*)[2] Additionally, "the Town of Carmel Police Department, the [PCDAO], the New York State Police, and the New Burn (North Carolina) Police Department formed an inter-agency Task Force, also an act necessitating policymaker approval by all participating agencies." (*Id.*) "The 'investigation' was directed by [Levy]," (*id.*), who was personally involved in virtually every decision made during

---

[2] Plaintiff also alleges that as part of this "investigation," Karst traveled to New Burn, North Carolina, where Lorusso was currently residing. (Am. Compl. ¶ 71.) According to Plaintiff, "[o]ut-of-state travel is yet another action which could not have been effected without the knowledge and approval of a Town of Carmel Police Department policymaker." (*Id.*)

the investigation, (*id.* ¶ 161). Levy became obsessed and consumed by his personal desire to exact vengeance against Galgano for his public criticism of Levy, Assistant District Attorney Pascale, and Nagle. (*Id.*) Levy referred to Galgano as his "trophy," and advised his subordinates at the PCDAO that Galgano needed to be punished and prosecuted using any and all means necessary. (*Id.*)

On April 30, 2014, Levy, Gonzalez, and Karst met with Donna Cianflone ("Cianflone"), the mother of Lorusso and Lia. (*Id.* ¶ 72.)[3] Prior to the meeting, Cianflone contacted Gonzalez to inform her that Galgano had contacted McQuaid in order to gather information about Lorusso. (*Id.*) According to Plaintiff, Defendants took this opportunity and fabricated a claim that there was a conspiracy to bribe Lorusso. (*Id.* ¶ 73.) At the meeting, "Defendants and Carmel Police Lieutenant Karst conducted a 'controlled call'—a telephone call supervised and recorded by law enforcement—between Cianflone and McQuaid." (*Id.* ¶ 74.) "During the call, Cianflone made the unprompted solicitation that Kimberly would not testify against Zaimi if she received compensation." (*Id.*) Plaintiff alleges he was never mentioned during the April 30, 2014 controlled call. (*Id.* ¶ 75.)

The day after the meeting, May 1, 2014, Gil submitted an application for a court order authorizing the installation and use of a pen register and "trap and trace" device, and the collection of cellular site location information, on McQuaid's cell phone ("May 1, 2014 McQuaid Application"). (*Id.* ¶ 76.)[4] Gil's sworn application stated that "Mcquaid [sic], George

---

[3] Plaintiff alleges that Cianflone and her sister were friends with relatives of M.A. (*Id.* ¶ 72.)

[4] A "pen register" is an electronic device that allows investigators to see outgoing numbers called from a particular telephone line. (*Id.* ¶ 76 n.1.) A "trap and trace" device is an electronic device that allows investigators to see incoming numbers that have made calls to a particular telephone line. (*Id.* ¶ 76 n.2.)

Galgano, and Lani Zaimi are about to commit the offense of Bribing a Witness." (*Id.* ¶ 77.)

Further, Gil attested that during the April 30, 2014 controlled call, McQuaid had "indicated that

the money was coming from the defendant [Zaimi] and his lawyer was a go between." (*Id.*)

Plaintiff alleges that Gil knew this statement was false. (*Id.*) The application also included a

sworn affidavit from Gonzalez, stating that the April 30, 2014 controlled call had implicated

Galgano as the "go between" in a witness tampering conspiracy. (*Id.* ¶ 78.) Plaintiff alleges that

both Gil and Gonzalez knew that this statement, too, was false. (*Id.*) Rather, the call "contained

no mention of Mr. Galgano, let alone any assertion that he was a go between in a bribery

scheme." (*Id.* ¶ 79.) The judge granted the May 1, 2014 McQuaid Application for the pen

register. (*Id.* ¶ 80.) And, going forward, the May 1, 2014 McQuaid Application and its alleged

falsities "was incorporated by reference into all subsequent eavesdropping applications submitted

in connection with the Defendants' investigation of Mr. Galgano." (*Id.*)

On May 5, 2014, Gil conducted another controlled call between Cianflone and McQuaid.

(*Id.* ¶ 81.) During the call, "Cianflone—upon information and belief, at the behest of the

Defendants—doggedly attempted to elicit statements from McQuaid implicating Mr. Galgano in

the alleged bribery scheme." (*Id.* ¶ 82.) For example, while Cianflone discussed who could

arrange a payment for the bribe she was soliciting, she said, "I think I know who you're talking

about. His name starts with a 'G,' right?" (*Id.*) However, McQuaid denied Galgano's

involvement, responding that Galgano was "very professional" and opining that, "I don't think

he ever in his right mind would risk any kind of—getting disbarred or any of that [expletive]

over this [expletive]." (*Id.* ¶ 83.) On May 6, 2014, Gonzalez and Lieutenant Karst conducted

another controlled call between Cianflone and McQuaid. (*Id.* ¶ 84.) Galgano was not mentioned

during the call.  (*Id.*)  And, on May 8, 2014, Lopez and Gil conducted another controlled call between Cianflone and McQuaid.  (*Id.* ¶ 85.)  Again, Galgano was not mentioned.  (*Id.*)

Around May 8, 2014, Galgano listened to a recording that McQuaid provided of his conversation with Cianflone.  (*Id.* ¶ 86.)  At this time, Galgano learned "McQuaid made questionable statements to Cianflone and was discussing that Kimberly Lorusso might be able to receive money if she declined to testify."  (*Id.*)  "Galgano immediately sent McQuaid a series of urgent text messages, imploring him to correct any misimpression that anyone was being bribed."  (*Id.* ¶ 87.)  Galgano wrote: "This is [expletive] important.  I don't want these people to think that they are being physically threatened or that anyone is giving them money not to testify. You need to clear that up . . . . Nobody is in the Albanian mafia, nobody is getting killed or hurt and nobody is getting money in exchange for not testifying."  (*Id.*)  He also told McQuaid that "we need to clean it up today."  (*Id.*)  On May 9, 2014, Galgano sent McQuaid another text saying: "I don't think that you understand, but when you listen to those tapes of her mother and you, you make it seem like Kim is dealing with a dangerous guy and if she cooperates and testifies that she could get hurt.  You make it seem like you spoke to a client of mine who is offering her money not to testify.  This is a huge [expletive] problem that needs to be cleared up."  (*Id.* ¶ 88.)  Galgano further explained, "if you won't meet with me to clear it up, I have to go to [the] DA and explain this whole situation in order to make sure that we don't get jammed up."  (*Id.*)

On May 14, 2014, Gil submitted another application for a court order authorizing the installation and use of a pen register and "trap and trace" device, and the collection of cellular site location information, this time for Galgano's cell phone ("May 14, 2014 Galgano Application").  (*Id.* ¶ 89.)  Plaintiff alleges Gil's sworn application falsely characterized the

recordings of the controlled calls as confirming a bribery conspiracy between McQuaid, Zaimi, and Galgano. (*Id.* ¶ 90.) Gonzalez also submitted an affidavit claiming that "the information at hand verifies McQuaid's assertion that Galgano is involved," however, Plaintiff alleges this was "demonstrably and materially untrue" because "Gonzalez knew that McQuaid had never made any such assertion and there was no evidence of Mr. Galgano's involvement." (*Id.* ¶ 91.) The court granted the May 14, 2014 Application for the pen register. (*Id.* ¶ 92.)

Also on May 14, 2014, Levy applied for a warrant authorizing the interception of communications involving McQuaid's cell phone ("May 14, 2014 McQuaid Application"). (*Id.* ¶ 93.) Plaintiff alleges that in a supporting affidavit, Gonzalez provided the court "an astoundingly misleading version of the 'facts' underlying the theory of a conspiracy between McQuaid and Mr. Galgano." (*Id.*) Specifically, "Gonzalez used ellipses and selective deletions and additions of text to knowingly misrepresent to the Court" regarding what took place during the May 5, 2014 controlled call. (*Id.* ¶ 94.) Gonzalez included the following exchange:

> Cianflone: This attorney guy, I think his name starts with a G, you told me so.
>
> McQuaid: He's very professional, I know of him, but I know him, he is very good, but he is very expensive . . . He's not looking to get disbarred for some kind of bullshit . . . She's got to give me a number and I'll bring it to him.

(*Id.*) However, according to Plaintiff, "[n]o such conversation took place" and this is not an accurate account of the conversation. (*Id.* ¶ 95.) Rather, "Defendants pasted together snippets of the longer conversation to create the false impression that Mr. Galgano was involved in illegal conduct." (*Id.*) The actual transcript stated:

> Cianflone: So, you know what, this, *this attorney guy, I think* I know who you are talking about. *His name starts with a G,* right? He –
>
> McQuaid: [Inaudible]

11

Cianflone: Yeah, *you told me* his name.  I remember.  Okay. He's, he's – I think he's, you know, probably talking to your friend.  It might not be your friend.  It's probably him that initiated all this.

McQuaid: Nah.  No, *he's very professional.*  I mean he's a rottweiler when it comes down to it if he can expose anything he's gonna do it.  *I know of him, but I don't know him.*

Cianflone: Right.  Right.

McQuaid: But I know *he's very good and he's very expensive.*

Cianflone: Oh.

McQuaid: (Inaudible) He's very good.  Now, he – *I don't think he ever in his right mind would risk any kind of –getting disbarred or any of that shit over this bullshit.*  So, (inaudible) I'm sure he probably had a conversation (inaudible).

Cianflone: Right.

McQuaid: And I'm still not sure (inaudible) or whatever the fuck he said.  Maybe that guy said something to him.

Cianflone: Oh, right.

McQuaid: (Inaudible.)

Cianflone: I don't know these people so I'm kinda a little confused, but it doesn't matter 'cause I don't know them.  So, I'm not really, you know, quite sure.  But I think I know –

McQuaid: (Inaudible.) It's as simple as this, if the (inaudible) let me know.  If you don't want to get involved - - -

Cianflone: Huh?  You know what, I'll text -- I'll text Kimmie.  Uhm –

McQuaid: I just think if she's down here (inaudible), you know.

Cianflone: All my kids owe me money, Quincy.  Everybody owes me money.

McQuaid: I know.  I know.  But (inaudible).

Cianflone: Wait.  Wait.  Hold on one second.  Hold on one sec.  Hold on.  Okay, I was losing the cover to my phone.  I'm sorry.  Uhm, I'm sorry.  What'd you say?

McQuaid: Well, I was just thinking down there she -- (inaudible).

Cianflone: (Sighing.) Well, you know what, I don't think so because -- I, I don't know.  I don't think she's working, so I don't think she's working.  And if she's working, she's supporting him.  What else is new?  And all his bad habits.

McQuaid: Yeah.

Cianflone: So.

McQuaid: (Inaudible.)

Cianflone: She what?

McQuaid: (Inaudible.)

Cianflone: Oh, please.  I don't even want to know, Quincy. I can't.  It stresses me out too much.

McQuaid: (Inaudible.)

Cianflone: Okay. All right.

McQuaid: (Inaudible.)

Cianflone: Okay.  Kimmie just -- all right. And she -- and I'll tell you.  She's going to probably want -- say to you, well, you know, what, what kind of numbers are we talking.  I think that, that's –

McQuaid: *She's gotta give me a number and* (inaudible.)[5]

(*Id.* ¶ 97.)  The court authorized the eavesdropping warrant on McQuaid's cell phone.  (*Id.* ¶ 99.) Accordingly, Defendants wiretapped McQuaid's cell phone and monitored Galgano's communications with McQuaid.  (*Id.* ¶ 100.)

On May 27, 2014, Gil submitted a sworn Progress Report, as required by the court, "which provided a false, misleading account of the events related to the execution of the May 14, 2014 Eavesdropping Warrant."  (*Id.* ¶ 102.)

---

[5] Only the italicized portions were included or paragraphed into the warrant application. (*Id.* ¶ 97 n.3.)

On June 6, 2014, Levy applied for a warrant authorizing the interception of communications from Galgano's cell phone ("June 6, 2014 Galgano Application"). (*Id.* ¶ 103.) Plaintiff alleges "Levy was desperate" because "[i]t had been over a month since Cianflone, at the request of Defendants, solicited a bribe from McQuaid, to wit, that if her daughter was paid $5,000.00, she would not testify against Zaimi. Yet, every time Cianflone initiated a call to McQuaid to see if the $5,000.00 demand was acceptable, McQuaid avoided the issue." (*Id.*) Plaintiff further alleges that, by this time, Lorusso has already testified before the grand jury. (*Id.* ¶ 22.) Again, Levy "made knowingly false statements" in the application, including that communications intercepted as a result of the wiretap on McQuaid's phone "reveal that McQuaid and Lia are conspiring with Galgano to offer a bribe to and engage in conduct meant to influence and persuade Kimberly Lorusso from testifying against Zaimi in Putnam County Court." (*Id.* ¶ 104.) Nagle also submitted a sworn affidavit in support of the June 6, 2014 Galgano Application "rife with perjury," including the repetition of the "knowingly false claim that recorded controlled calls demonstrated that McQuaid had 'offered money in exchange for Kim's testimony' and that 'the money is coming from Zaimi through his lawyer Galgano as a go between.'" (*Id.* ¶ 105.) According to Plaintiff, the controlled calls in fact "demonstrated that neither McQuaid nor Mr. Galgano ever made a bribe offer to Cianflone or Kimberly Lorusso," and "notwithstanding Kimberly Lorusso and Cianflone's repeated monetary demands and concerted effort to solicit a bribe offer from McQuaid, he refused to make one." (*Id.* ¶ 106.) The court authorized Defendants to eavesdrop on Galgano's cell phone seven days a week, twenty-four hours a day, (*id.* ¶ 107), and from June 7, 2014 through July 2, 2014, Defendants intercepted over three thousand private audio and text message conversations between Galgano and his clients, as well as private conversations with his wife, doctors, other attorneys, colleagues and

other friends and family members, (*id.* ¶ 108). Plaintiff alleges that the wiretap on his phone failed to provide Defendants "with *any* evidence of his wrongdoing." (*Id.* ¶ 109.)

From May 14, 2014 through June 6, 2014, Defendants intercepted hundreds of communications over McQuaid's phone revealing that he and Lia were using, purchasing, and trafficking heroin and crack cocaine on a daily basis. (*Id.* ¶ 101.) These intercepts also indicated that Galgano was only using McQuaid and Lia to investigate and "develop a defense for his client, secure consent recordings to prove Mr. Zaimi's innocence, and uncover prosecutorial misconduct by the Defendants." (*Id.*)[6] Because "the wiretap on McQuaid's phone established that McQuaid was assisting Mr. Galgano in his investigation of the charges against his client Zaimi, and the official corruption underlying the fabrication of these charges, the Defendants decided to threaten and coerce McQuaid into being a witness against Mr. Galgano." (*Id.* ¶ 109.) Furthermore, based on intercepts on McQuaid's phone, "the Defendants knew that McQuaid and Lia had scheduled a meeting to obtain narcotics" on June 25, 2014. (*Id.* ¶ 110.) On June 25, 2014, Lopez, Nagle, and Karst surveilled Lia and McQuaid, and after observing McQuaid purchase narcotics in Yonkers, New York, Defendants stopped his vehicle in Westchester County and searched it, finding illegal drugs inside. (*Id.*) Defendants detained Lia, "who was incoherent after shooting multiple bags of heroin in her arm," and McQuaid, "who was bleeding from his arm as a result of a recent heroin injection," and brought them to the State Police barracks, where they were interrogated. (*Id.*) Defendants questioned McQuaid for hours and obtained a written statement from him that described Galgano's interest in interviewing Lorusso

---

[6] In May 2014, a grand jury refused to indict Zaimi for the alleged 2012 sexual assault against Kimberly Lorusso. (*Id.* ¶¶ 100, 178.) However, Galgano believed he could not ethically represent Zaimi in the wake of "tremendous media attention demonifiying him as a criminal, and, as a result, was forced to refund over $100,000 in legal fees he had received." (*Id.* ¶ 179.)

"[be]cause he felt that the D.A. and [d]etectives were being crooked and putting words in her mouth and he wanted to find out if that was true." (*Id.* ¶ 111.) There was no mention of Galgano participating in a bribery scheme or any other illegal activity, but instead McQuaid expressly denied the allegation that Galgano had enlisted or asked him to bribe or tamper with Lorusso. (*Id.* ¶¶ 111–112.)

Lia's written statement alleges that while on speaker phone in McQuaid's car, Galgano stated that if Lorusso was willing to take money not to testify against Zaimi, it could be a big payday for everyone. (*Id.* ¶ 113.) Plaintiff alleges "[t]his statement was knowingly false and was included in the written statement at the insistence of the Defendants who knew that Mr. Galgano never suggested or advised McQuaid or Lia that there could be a big payday for everyone if Kimberly Lorusso was willing to take money." (*Id.*)

Plaintiff alleges that after their arrest, McQuaid and Lia agreed to cooperate with the Defendants. (*Id.* ¶ 114.) Defendants released both McQuaid and Lia from custody in Westchester County without filing any Westchester County charges, despite the fact that Defendants observed both McQuaid and Lia in possession of heroin in Westchester County, and similarly observed McQuaid operating a motor vehicle in Westchester County while under the influence of heroin. (*Id.*) Plaintiff alleges that no Putnam County or Carmel law enforcement officials could grant such immunity on a Westchester County matter without the involvement, knowledge, and approval of Putnam County and Carmel policymakers. (*Id.*)

In Nagle's affidavit submitted to the court providing a progress report on the monitoring of Galgano's communications, Nagle "falsely suggested that McQuaid had implicated Mr. Galgano and was going to wear a wire to corroborate the inculpatory account that he provided to the police on June 25, 2014." (*Id.* ¶ 115.) Nagle further lied and stated that text message

communications between Galgano and his salt water coral distributor were actually conversations involving narcotics. (*Id.*) Plaintiff avers "Nagle knew or should have known" this fact "was false." (*Id.*) Defendants never arranged a meeting between McQuaid and Galgano, allegedly "because they knew that any recorded exchange would not create evidence inculpating Mr. Galgano in any crime and would, in fact, demonstrate what McQuaid had told them—that Mr. Galgano was actually investigating his client's case and his belief that the police and prosecutors were fabricating evidence and suborning perjury." (*Id.* ¶ 116.)

On June 29, 2014, Nagle summoned McQuaid to the Carmel Police Department, where "Gonzalez then conducted a lengthy, videotaped interview of McQuaid" with "Nagle remaining a short distance away." (*Id.* ¶ 117.) The two and-a-half hour interview took place in the middle of the night, and McQuaid repeatedly told Gonzalez that Galgano was not involved in any bribery scheme. (*Id.*) However, during the interview, Gonzalez repeatedly "lied" and told McQuaid that Galgano had given his girlfriend Lia heroin after she completed her drug rehabilitation program in May. (*Id.* ¶ 118.) Plaintiff alleges Defendants threatened Lia that she needed to corroborate the story in order to see her daughter and avoid prison. (*Id.*) Despite Defendants' tactics, McQuaid repeatedly refused to implicate Galgano in any wrongdoing. (*Id.* ¶ 119.) At 2:23 a.m., Gonzalez and McQuaid left the interview room for approximately 34 minutes, while Nagle waited outside the interview room. (*Id.* ¶ 120.) During this time, McQuaid was not video-recorded and his interactions with Defendants Gonzalez and Nagle were not documented. (*Id.*) At approximately 2:57 a.m., McQuaid returned to the interview room and according to Plaintiff "suddenly changed his entire story." (*Id.* ¶ 121.) "In response to the very first question posed by Defendant Gonzalez, McQuaid stated that when Mr. Galgano first approached him it was to discuss the idea of paying Kimberly Lorusso not to testify against

Zaimi." (*Id.*) This answer was in contradiction with the "countless communications that [Defendants] unlawfully intercepted in the months prior," and "the intercepted text messages and text messages that were physically present in McQuaid's cellular phone that he voluntarily provided to the Defendants," but were then "destroyed and deleted." (*Id.* ¶ 124.) Plaintiff alleges that McQuaid admitted in a series of letters that his statements inculpating Galgano in the bribery conspiracy were untrue and that Defendants "coerced, threatened, and incentivized him to lie." (*Id.* ¶ 125.)

Also on June 29, 2014, Lopez interviewed Lia at the Carmel Police Department. Lia's interview was also videotaped and, according to Plaintiff, shows Lopez explicitly telling her what to say about her dealings with Galgano. (*Id.* ¶ 126.) In the video, Lia is visibly under the influence of drugs. (*Id.*) Plaintiff alleges that approximately twenty times during the interview, Lopez prefaces statements to Lia with phrases like "you told me the other night . . . ," "you told me before . . . ," "Let me refresh your recollection . . . " (*Id.*) Lia, clearly incapacitated, responds, "Did I?" "I'm trying to think," "I hate that I can't think," "I'm just trying to remember. I'm so confused." (*Id.*)

On July 2, 2014, despite an "utter lack of evidence," Defendants applied for search warrants to search Galgano's home, office, and vehicle ("July 2, 2014 Search Warrants"). (*Id.* ¶ 130.) In support of the warrants, Nagle submitted an affidavit, which "improperly substituted his subjective conclusions for evidentiary facts" and merely contained "self-serving conclusory statements." (*Id.* ¶ 132.) According to Plaintiff, the applications "were so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." (*Id.* ¶ 133.) The affidavit repeated the "knowingly false claim that recorded telephone calls established that Mr. Galgano acted as 'a go between' to facilitate Zaimi's bribery of Kimberly Lorusso." (*Id.*

¶ 134.)  Additionally, the affidavits included a number of other knowingly false claims, including: that "Galgano had 'devised a plan' to travel to North Carolina to confront Kimberly and bribe her; that Mr. Galgano had met with McQuaid and Lia and 'directed' them to bribe Kimberly in exchange for her agreement not to testify against Zaimi; that Mr. Galgano had 'promised' to provide McQuaid and Lia with an apartment and 'a big payday for everyone' if Kimberly could be bribed successfully; and that the investigation had unearthed proof that Mr. Galgano had used private Facebook credentials to gain unauthorized access to Kimberly's communications and had met with McQuaid and Lia 'to plan and discuss the furtherance of the conspiracy.'"  (*Id.*)  Nagle's affidavits also falsely alleged that Defendants had intercepted a telephone call between McQuaid and Kimberly on June 7, 2014—while McQuaid was physically inside Mr. Galgano's home—during which McQuaid "tells Kimberly there is compensation in it for her if she does not come to New York and testify."  (*Id.* ¶ 135.)  However, no such conversation occurred, and Nagle knew as much.  (*Id.* ¶ 136.)  The affidavit also failed to include the fact that McQuaid was recorded telling Lorusso that there would not be any compensation for her if she didn't testify, or that McQuaid had informed Defendants that Galgano had not sought to bribe anyone.  (*Id.* ¶ 139.)  Plaintiff alleges that because of Galgano's cross-examination and public embarrassment of Nagle during the Zaimi trial, Nagle purposefully lied in his warrant affidavits so that he could exact vengeance against Galgano, interrupt his investigation into government misconduct, and disqualify Galgano from continuing to represent Zaimi in his criminal cases.  (*Id.* ¶ 138.)[7]

---

[7] Nagle was one of two Town of Carmel detectives who interviewed M.A. when she admitted that her sexual exchange with Zaimi was consensual.  (*Id.* ¶ 138.)

Plaintiff further alleges the July 2, 2014 Search Warrants were defective, because: they did not specify the crime or crimes to which the items to be seized purportedly related; they authorized an "all records" search of a home or business without satisfying the necessary, constitutional prerequisites for such a massive intrusion; and neither warrant was "addressed to a police officer whose geographical area of employment embraces or is embraced or partially embraced by the county of issuance," as required by New York Law. (*Id.* ¶ 141.) Plaintiff alleges that "any properly trained police policymaker, reviewing these warrants and warrant applications prior to authorizing [the search], would have recognized their patent defects, including the fact that they were lacking in any competent indicia of probable cause." (*Id.* ¶ 144.)

On July 2, 2014, law enforcement officers, including Nagle, Gonzalez, and Gil, executed the search warrants at Galgano's home and office. (*Id.* ¶ 143.) Levy directed Gil before and during the search. (*Id.*) Also present were numerous members of the Carmel Police Department, including Karst and the entire Carmel Police Department's Detective Division, which Plaintiff alleges is the type of "commitment of police manpower which would have required approval by a Town of Carmel Police Department policymaker." (*Id.* ¶ 144.)

Law enforcement officials, including some Defendants, seized computers, hard drives, and files, among other materials, from Galgano's office, including numerous communications and documents allegedly "protected by the attorney-client and work product privileges." (*Id.* ¶ 147.) Prior to the search, "Defendants tipped off the local media, who heavily covered the searches," and thus "broadcast to Galgano's clients and prospective clients that their confidences were not safe from the prying eyes of law enforcement." (*Id.*) After entering the office, "Nagle immediately subjected Mr. Galgano to a warrantless search," and "his cellular phone and other

personal items were forcibly removed from his pockets in front of his employees." (*Id.* ¶ 153.) Galgano was placed in a separate room during the search and was prohibited from communicating with his employees or leaving the office suite. (*Id.*) Galgano's employees were prohibited from leaving the premises unless they submitted to body searches. (*Id.* ¶ 150.) Members of the search team threatened Capolongo, telling her that she better talk to them and "help herself," and Defendants brought Capolongo to the copy room where Gil intimidated her and demanded that she provide his investigative team with information. (*Id.* ¶ 151.) Gil also directed members of the search team to bring Sharp into the copy room, where similar threats were made. (*Id.*) Plaintiff alleges that "[a]s a direct result of the law office search, two of the three attorneys working for the Galgano firm resigned." (*Id.* ¶ 152.) Additionally, after seizing Galgano's van, Gonzalez asked Galgano's personal driver to disclose conversations that he may have overheard while at work. (*Id.*)

Defendants also ransacked Galgano's home, seizing security surveillance footage of the interior of Galgano's home, which covered the bedrooms. (*Id.* ¶ 148.) In the months following the search, Plaintiff's daughter "repeatedly asked if the police were coming back to her home to take her things," and "routinely asks if the mall security guards are there to get her and her family"—seeing this effect on his family has caused Galgano emotional distress. (*Id.* ¶ 149.)

The "unlawful search . . . turned up no evidence of Mr. Galgano's involvement in any witness tampering or bribery conspiracy." (*Id.* ¶ 154.) However, the removal of the computers and electronic storage device in his professional offices "completely disabled Mr. Galgano's law firm and his other businesses." (*Id.*) Clients at Galgano & Associates terminated their engagements with the law firm, and many clients demanded their files and refunds of retainer fees paid for legal services. (*Id.* ¶ 155.) Old Republic, Greenlight Title Agency's exclusive

underwriter, terminated its agency agreement with Galgano's company as a result of the search. (*Id.*)  The Galinn Fund refused to invest with Galgano, causing him to resign as its Managing Member.  (*Id.*)  Plaintiff alleges that rather than seeking a subpoena, Defendants chose to raid Galgano's home and offices "to unnecessarily publicize their investigation in order to ensure maximum harm" and to publically discredit Galgano before he could receive the due process of law, and to instill fear in others who spoke out, or might speak out, against Levy, all to buoy Levy's sinking popular support in the Putnam community.  (*Id.* at 156–57.)

The search of Galgano's professional offices did, according to law enforcement officers, reveal controlled substances in Sharp and Galgano's constructive possession.  (*Id.* ¶ 158.)  As a result, Galgano and Sharp were arrested and arraigned in Westchester County.  (*Id.*)  But, over a year later, the charges against Galgano were dismissed.  (*Id.* ¶ 159.)  The Westchester County District Attorney's Office stated in court filings that it had "conducted an extensive review of the evidence and a painstaking review of the search warrant and supporting application" for Galgano's office, and concluded that it could not proceed with a prosecution because it could not successfully defend against claims that there was no probable cause for the issuance of the warrants, "which were supported by affidavits that contained materially false statements."  (*Id.*)  Specifically, the Westchester prosecutors cited issues with the "reliability as to the allegations" in Nagle's affidavit "regarding the verbatim content of the recorded communications," noting that the communications in question "were preserved on tape recordings" and did not bear out Defendants' characterizations.  (*Id.* at 160.)

On or about August 13, 2014, Galgano learned that Defendants were withholding critical reports and exculpatory evidence from Zaimi.  (*Id.* ¶ 163.)  Specifically, Galgano learned that on January 29, 2014, Lorusso made a written statement to a Putnam County Sheriff's deputy who

determined that no crime had been committed based upon her written and oral complaint against Zaimi. (*Id.*) Based upon the withholding of these critical reports, on August 14, 2014, the Zaimi court granted Galgano's request that Levy and Assistant District Attorney Pascale "explain why they should not be ordered to read the Supreme Court's decision in *Brady v. Maryland*." (*Id.* ¶ 164.)

Despite having "no proof" of Galgano's alleged witness tampering or bribery, Defendants sought his indictment before a Putnam County grand jury. (*Id.* ¶¶ 165–66.) The only evidence against Galgano was the false testimony of McQuaid and Lia. (*Id.* ¶ 166.) To substantiate his claim that he was not participating in any illicit conspiracy, Galgano exercised his statutory rights under New York law to advise the grand jurors that witnesses were available to testify as to Galgano's genuine belief that the Defendants were engaged in criminal wrongdoing in the Zaimi case. (*Id.* ¶ 167.) These witnesses included an Assistant United States Attorney in the Southern District of New York, an Assistant District Attorney from the Westchester County District Attorney's Office, and a Senior Investigator with the New York State Police. (*Id.*) On August 20, 2014, Mr. Galgano was indicted on charges of bribing a witness, tampering with a witness, and conspiracy. (*Id.* ¶ 168.) Shortly thereafter, Levy made a motion to disqualify Galgano as Zaimi's defense attorney. (*Id.*)

Galgano surrendered himself the next morning. (*Id.* ¶ 169.) Plaintiff alleges he was "held in custody for more than eight hours while Levy purposefully delayed his arraignment in order to coordinate a 'perp walk' with the local media, and finalized the unprecedented press conference he would conduct immediately after the arraignment." (*Id.*) One of Galgano's attorneys asked if Galgano could be brought to court through the back entrance of the courthouse so as to avoid a second televised "perp walk," but Karst smiled and stated, "I have others I need

to answer to." (*Id.*)[8]  The day after Galgano's indictment, Levy circulated a written press release stating: "When Galgano's plot became known, officers and investigators from the Carmel Police Department and New York State Police joined prosecutors from the [PCDAO] and opened an investigation," and: "Local and State law enforcement officers pooled their resources and combined good old-fashioned police work with state-of-the art investigatory techniques that resulted in the defendant's arrest." (*Id.* ¶ 170.)  Levy told reporters that "Galgano's actions strikes [sic] at the heart of the integrity of the criminal justice system . . . Galgano tried to stack the deck in his client's favor by offering money and making other statements that would assure the witness would not come to court to testify.  This is a crime." (*Id.* ¶ 173.)  Levy also told a reporter from the Putnam County Courier that Galgano "violated the law by stepping over the ethical line of lawfully representing a client.  The law was broken and [Galgano] will be held accountable." (*Id.* ¶ 174.)  Plaintiff alleges that Levy knew that in reality, Galgano's arrest resulted from a grand jury indictment that he procured through gross misconduct on the part of his office and Nagle, (*id.* ¶ 171), and that Levy knew that Galgano never offered money or made any statements to assure that Lorusso would not testify, (*id.* ¶ 175).

Following the seizure of Galgano's electronic devices containing tens of thousands of privileged communications with his clients, Galgano successfully restrained the Defendants from conducting subsequent searches of the devices.  (*Id.* ¶ 180.)  He also moved to dismiss the indictment against him.  (*Id.*)  On January 28, 2015, the County Court of Putnam County issued a decision and order dismissing Galgano's indictment.  (*Id.* ¶ 181.)  The court held the evidence presented to the grand jury was legally insufficient to support any of the crimes charged,

---

[8] Plaintiff alleges that during Galgano's bail application at the arraignment, Gil unlawfully disclosed the subject matter of an intercepted communication and knowingly made the false statement that Galgano threatened to shoot a prosecutor.  (*Id.* at 172.)

characterized the grand jury process as "defective," and held that "the cumulative effect of numerous evidentiary and other errors," mandated dismissal of the indictment. (*Id. ¶* 181, 183.)[9] The court characterized Galgano's prosecution as a "rare case" where prosecutorial error and misconduct also required dismissal of the indictment. (*Id.* ¶ 181.) Among the errors was Defendants' failure to advise the grand jury of Galgano's request that they hear from federal and state law enforcement officers. (*Id.* ¶ 183) The court also ruled that the repeated mischaracterizations of audio recordings through the testimony of Nagle, and the introduction of fraudulent transcripts prepared by Gil, mandated dismissal of the case. (*Id.*) The court noted that these transcripts included inculpatory statements never made and failed to include exculpatory statements that were clearly audible on the recordings. (*Id.*) Further, the court found that neither the countless text messages, audio intercepts, and consent recordings, nor any other grand jury evidence, corroborated McQuaid's grand jury testimony. (*Id.* ¶ 184.) The court granted the Defendants leave to further investigate the case against Galgano and present the case to another grand jury. (*Id.* ¶ 185.)

Over Galgano's objection, the court then vacated the injunction prohibiting the search of the computers and electronic storage devices seized on July 2, 2014. (*Id.*) Levy then issued a press release falsely suggesting that an appellate court had validated the seizure of Galgano's property, an attempt to further damage Galgano's professional reputation and to undermine whatever confidence remained in his clients. (*Id.* ¶ 186.) Galgano sent a letter on May 13, 2015 seeking reconsideration of the decision vacating the injunction preventing further searches of the

---

[9] In a separate decision on the same date, the County Court of Putnam County also dismissed the indictment against Eric Sharp. (*Id.* ¶ 181.) Plaintiff alleges that "the decision to indict Eric Sharp was motivated by a desire to have him 'flip' and falsely implicate Mr. Galgano for crimes he did not commit." (*Id.* ¶ 182.)

electronic devices seized during the raids. (*Id.* ¶ 187.) The letter detailed the lies sworn to by Gil, Levy, Gonzalez, and Nagle in the eavesdropping and search warrant applications, and Plaintiff alleges the letter provided Defendants with actual knowledge of the problems with the search warrant applications and an opportunity to prevent the continued violations of Galgano's constitutional rights. (*Id.* ¶¶ 187–188, 191.) However, instead of investigating Galgano's perjury allegations, Abissi advised Galgano's defense attorneys that her office was going to file disciplinary charges against Galgano and continue to rely on the faulty warrants in investigating Galgano for other crimes. (*Id.* ¶¶ 189–190.) After the dismissal of the first indictment, Plaintiff alleges that Gil admitted that he created the inaccurate transcripts of the recordings and that he personally drafted Nagle's fraudulent affidavits. (*Id.* ¶ 192.) However, despite having an opportunity to, none of the PCDAO's employees prevented Nagle from submitting the false statements in support of the warrants. (*Id.*)

Following the dismissal of the first indictment, Plaintiff alleges Putnam County First Assistant District Attorney Lisa Ortolano ("Ortolano") sought to reinvestigate the case against Galgano, and reviewed all the existing evidence. (*Id.* ¶ 193.) Previously, the investigation was led by Levy, with Gil and Abissi answering to him, (*id.*), but Levy then placed the matter in Ortolano's hands, (*id.* ¶ 194). After months reviewing the facts and reinterviewing McQuaid and Lia, Plaintiff alleges Ortolano "ultimately concluded that there was no defense to the claims of perjury and misconduct by the Defendants who secured the eavesdropping and search warrants." (*Id.* ¶ 195.) Further, on April 2015, Ortolano advised Levy that McQuaid's current account of his dealings with Lorusso, Cianflone, and Galgano was inconsistent with his prior account and his testimony before the first grand jury. (*Id.* ¶ 196.) McQuaid allegedly told Ortolano that he had lied and had only implicated Galgano at the insistence of Levy, Lopez, Gil, and Gonzalez

and with the understanding that he would benefit from those lies.  (*Id.*)  Indeed, Defendants had rewarded McQuaid for retracting his initial account that had exculpated Galgano, and after agreeing to testify against Galgano, McQuaid was granted special privileges while serving a 12-year prison sentence for a Westchester County armed robbery.  (*Id.* ¶ 197.)  Following her "re-investigation," Ortolano informed Levy that McQuaid was simply not credible and that it was impossible to obtain "a lawful indictment" against Galgano charging him with the previously dismissed criminal counts.  (*Id.* ¶ 198.)  As a result of refusing to participate in the conspiracy against Galgano, Ortolano was subjected to discipline and verbal abuse.  (*Id.* ¶ 199.)

On April 9, 2015, jury selection in the Zaimi retrial regarding the alleged M.A. assault was scheduled to begin.  (*Id.* ¶ 200.)  With the indictment dismissed, Galgano appeared with trial counsel.  (*Id.*)  However, M.A. was unwilling to testify and Levy requested a hearing to determine whether Galgano caused M.A. not to appear, which could have permitted the prosecution to offer her sworn testimony at the first trial as evidence at the retrial.  (*Id.*)  The trial court summarily denied Levy's application after finding that the conduct Levy had complained of was in all respects proper and was nothing more than a defense attorney defending his client.  (*Id.*)  Notwithstanding the absence of his key witnesses, Levy advised the court that he was going to proceed with the prosecution.  (*Id.* ¶ 201.)  As jury selection proceeded, Levy directed Abissi to file a petition for a writ of prohibition in the appellate court.  (*Id.*)  To secure stay of the trial, Levy submitted a perjurious affidavit to the appellate court directly contradicting his statements to the trial court by stating that his office could not go forward without M.A. and that if the stay was not granted, he would have to dismiss the case against Zaimi.  (*Id.*)  Levy also allegedly took

the petition as an opportunity to defame Galgano and unlawfully disclosed intercepts and communications that were completely irrelevant to Levy's application. (*Id.* ¶ 202.)[10]

On May 15, 2015, Ortolano disclosed to Galgano's attorneys that, in an interview, McQuaid had contradicted his previous statements implicating Galgano and that Lia had recanted previous statements inculpating Galgano that she had given to Lopez. (*Id.* ¶¶ 204–05.) More specifically, Ortolano disclosed that Lia had stated that "Galgano never asked her to offer Kim money in exchange for not testifying in the case against Lani Zaimi." (*Id.* ¶ 206.) Lia later told Galgano directly, during a recorded telephone conversation, that "[t]hey forced all that on me" and that "it took me months and months and months of them down my throat to try to get them to believe that none of it—that it was bulls***and they just didn't want to hear it. They wanted to hear what they wanted to hear." (*Id.* ¶ 207.) Galgano's defense team also obtained letters that McQuaid wrote to Lia from jail in winter and spring of 2015 describing how Defendants were "trying to get us to say stuff that wasn't true like George gave you drugs and payed [sic] us to tamper Kim." (*Id.* ¶ 208.) McQuaid also wrote that the police had "made" him inculpate Galgano falsely and that "the truth is [Galgano] didn't ask [me] to try and pay them." (*Id.*) McQuaid's letters also described "dates" arranged by Defendants in exchange for McQuaid's cooperation, during which McQuaid and Lia were brought to the PCDAO from jail for sexual liaisons. (*Id.* ¶ 209.)

---

[10] These statements included allegations that Galgano: "(a) Violated court orders by disseminating a transcript of M.A.'s interview with Carmel detective Kunz and Nagle; (b) Tainted the jury pool with a negative perception of the District Attorney; (c) Was ordered by the Zaimi court to refrain from making 'further unsupported claims regarding the District Attorney'; (d) Acted unethically and violated the Model Rules of Professional Conduct by speaking to the media about the Zaimi case; (e) Engaged in a course of conduct to attack Assistant District Attorney Pascale by filing a motion characterizing her as unethical and 'baselessly accusing her of Brady and Rosario violations;' and (f) Publicly attacked the [PCDAO] as part of a pervasive course of conduct causing M.A. to be demoralized and unwilling to testify." (*Id.* ¶ 202.)

To further "blow the whistle" on Defendants' misconduct, Ortloano prepared a written memorandum to Levy explaining that the search warrants and eavesdropping applications in Galgano's case were obtained through materially false and perjurious submissions to the court. (*Id.* ¶ 210.)  She advised Levy that the Galgano case should not be re-presented to the grand jury because there was no reliable basis for the charges.  (*Id.*)  This allegedly enraged Levy, who told Ortolano that she could continue to work for him only if she "(1) retracted her previous memorandum and wrote a new one supporting the charges against Mr. Galgano; (2) agreed to defend the validity of the fraudulent warrants; and (3) personally re-presented the case against Mr. Galgano to a second grand jury."  (*Id.* ¶ 211.)  Ortolano refused, and resigned from her position as a Putnam County prosecutor.  (*Id.* ¶ 212.)  Levy then assigned Abissi to replace Ortolano on the Galgano case, and they agreed to suspend Ortolano's ongoing reinvestigation "into the true facts."  (*Id.* ¶ 213.)

On June 15, 2015, Galgano appeared in court with attorney William Aronwald for the Zaimi case involving Lorusso.  (*Id.* ¶ 216.)  At that time, there was no indictment pending against Galgano.  (*Id.*)  Levy caused a trial subpoena to be served upon Galgano, and "[n]otwithstanding Defendant Levy's refusal to make a good faith offer of proof, Mr. Galgano was ordered to leave the courtroom."  (*Id.*)  On June 19, 2015, Galgano filed an Order to Show Cause to quash the subpoena, and Galgano was permitted to return to the courtroom.  (*Id.*)

On June 26, 2015, one of Galgano's defense attorneys met with Levy and Abissi.  (*Id.* ¶ 217.)  During this meeting Levy allegedly acknowledged the problematic nature of the bribery conspiracy case against Galgano, however Levy was of the belief that Galgano was a "dirty lawyer" and stated that he was continuing to search through the electronic storage devices and investigating other crimes he believed Galgano committed.  (*Id.*)  Levy suggested that Galgano

waive his speedy trial rights until September 30, 2015, so that Levy could complete his investigation. (*Id.*) Plaintiff alleges that Levy requested this extension of time to secure a second indictment because he knew that without a delay any subsequent indictment would be dismissed likely right before the election. (*Id.* ¶ 218.) Galgano refused to waive his rights. (*Id.*)

Following Ortolano's termination, Levy, Gil, and Abissi presented the Galgano case to a second grand jury. (*Id.* ¶ 219.) According to Plaintiff, they had even less evidence against Galgano this time, as McQuaid's new grand jury testimony directly contradicted his earlier grand jury testimony. (*Id.*) Nonetheless, on July 10, 2015, Galgano was again charged with bribing a witness, tampering with a witness, conspiracy, and criminal impersonation. (*Id.* ¶ 220.)[11] Defendants also indicted Capolongo, Galgano's assistant, hopeful that by doing so, the Defendants might secure further false statements against Galgano. (*Id.* ¶ 221.) However, like Sharp, Capolongo refused to engage in plea discussions that required her to make false statements implicating Galgano in crimes he did not commit. (*Id.* ¶ 225.) Having failed to secure cooperation from McQuaid, Sharp, and Capolongo, in August 2015, Levy and Abissi turned to Zaimi, and offered to dismiss the rape charges against him if he testified against Galgano. (*Id.*) Zaimi rejected the offer because he did not have "any information which would be helpful or beneficial in the [PCDAO]'s investigation." (*Id.*)

---

[11] The charge for criminal impersonation alleged Galgano and Capolongo criminally impersonated Kuchta, the defense investigator hired by Galgano. (*Id.* ¶ 223.) The basis for this charge was that Galgano and/or Capolongo sent an e-mail to a friend of M.A. seeking information about her character and the facts of the alleged assault. (*Id.*) However, Plaintiff alleges Defendants knew that Kuchta had authorized them to use his e-mail account to communicate with this potential witness. (*Id.* ¶ 224.) However, like McQuaid and Lia, Defendants threatened Kuchta and manipulated his account of events in order to pursue a fraudulent case against Galgano and his assistant. (*Id.*)

Galgano and Capolongo both moved to dismiss the indictment. (*Id.* ¶ 226.) In a written decision dated October 26, 2015, the County Court of Putnam County again found "an absence of proof that George Galgano was a co-conspirator or in any way involved in any wrongdoing. . . . In sum, there is no evidence whatsoever that George Galgano intended to confer, intended to offer to confer, or intended to agree to confer a benefit upon Kim Lorusso for her failure to testify." (*Id.* ¶ 227.) Furthermore, the Court found that "there is no evidence that an accomplice intended to confer, intended to offer to confer, or intended to agree to confer, a benefit upon Kim Lorusso for her failure to testify. Nor is there any evidence that an accomplice intended to tamper with Kim Lorusso by intimidating or attempting to intimidate her." (*Id.*) The court also noted that "on numerous occasions during the [g]rand [j]ury proceedings, [McQuaid] explained that the taped conversations give the false impression that he had threatened or offered compensation to Kim Lorusso not to appear in the grand jury or trial." (*Id.* ¶ 228.) Further, the court held that that "none" of the wiretap evidence collected by the Defendants and submitted to the grand jury "included Galgano as a party or provided even minimal corroboration of an agreement by him to engage in criminal conduct." (*Id.* ¶ 229.) The Court noted the intercepted text messages "say nothing at all about whether Galgano intended to bribe or tamper with Kim Lorusso. Indeed, to the contrary, they suggest not only that he was not the genesis of the conspiracy to tamper with and/or bribe Kim, but that, once provided with taped evidence that someone seemed to have committed those acts, he not only did not support them but affirmatively directed that any misunderstanding of those acts be corrected immediately." (*Id.*) The court also noted that the prosecution "surprisingly" engaged in much of the same misconduct that caused the first indictment to be dismissed. (*Id.* ¶ 230.) Levy filed a notice of appeal from the October 26, 2015 order, allegedly for "political purposes, so that the prosecution

of Mr. Galgano could continue until after" the election.  (*Id.* ¶ 260.)  However, following the November 3, 2015 election, on November 16, 2015, Levy's office withdrew the notice of appeal. (*Id.*)

"In 2015, Defendant Levy was a two-term incumbent District Attorney who was being challenged for re-nomination by Republican candidate Robert Tendy."  (*Id.* ¶ 244.)  During a debate on October 26, 2015, the day the decision was released dismissing the second indictment of Plaintiff, Tendy criticized Levy for his handling of the Galgano case, explaining that, Judge Zuckerman, a well-respected jurist, had written an 89-page paper excoriating the PCDAO for what they did during the Galgano grand jury, and cited over 40 mistakes before dismissing the indictment.  (*Id.* ¶ 249.)  Tendy also criticized Levy for the allegations that McQuaid and Lia were inexplicably allowed to spend time together to corroborate their stories.  (*Id.*)  During that same debate, Levy was asked to respond to questions regarding the multiple dismissals of Galgano's indictments and the allegation that he allowed McQuaid and Lia to engage in sexual relations in the PCDAO's conference room in exchange for their agreement to fabricate evidence against Galgano.  (*Id.* ¶ 245.)  Notwithstanding the fact that only hours before, the court ruled that there was no evidence that Galgano engaged in any wrongdoing, Levy maintained that Galgano was a criminal and called him a "co-conspirator of McQuaid."  (*Id.* ¶ 246.)  Levy also stated Galgano was good friends with his political opponent, Tendy, which Plaintiff alleges was false because Galgano had never met or even talked to Tendy until well after the election.  (*Id.*) Plaintiff alleges Levy made these false statements to discredit his opponent's statement that the Levy's investigation and prosecution of Galgano was a "travesty of justice."  (*Id.* ¶ 246)

In response to further criticism from Tendy regarding the egregious mistakes in the prosecution of Galgano and Levy's policy and practice of targeting personal and political foes,

(*id.* ¶ 250), Levy stated that the first dismissal of Galgano's indictment was due to "procedural errors and not problems with facts or evidence . . . It wasn't intentional or malicious," (*id.* ¶ 251). Plaintiff alleges that these statements were defamatory, because the January 28, 2015 order dismissing the indictment in fact focused on the absence of legally sufficient evidence to support Galgano's commission of the charged offenses, and the basis for the dismissal was not the several procedural errors in Levy's presentation alone, but the complete failure to offer evidence of Galgano's guilt. (*Id.* ¶ 252.) Additionally, Levy issued a press release on PCDAO letterhead and circulated it to persons and newspaper outlets including The New York Law Journal, a widely distributed daily newspaper read by Galgano's peers and legal colleagues, commenting on matters concerning evidence purportedly heard by both grand juries in the Galgano cases and the court's decision dismissing the indictment. (*Id.* ¶¶ 255–56.) Plaintiff alleges this press release included multiple false and defamatory statements about Plaintiff, (*id.* ¶ 256), characterizing him as an "unscrupulous attorney" who "disavow[ed] [his] ethical responsibilities in favor of using intimidation of and tampering with sex offense victims . . . ." (*Id.* ¶ 259). Plaintiff alleges these statements were false, and Levy knew them to be false when he published them. (*Id.*)

The court did not grant Levy leave to present Galgano's case to a third grand jury. (*Id.* ¶ 253.) Nonetheless, Levy and Abissi continued to "investigate" Galgano for other criminal offenses, which involved subpoenas Galgano issued to secure Levy's and Assistant District Attorney Pascale's phone records. (*Id.*) Through these records, Galgano was able to establish that Pascale possessed written text message communications with various prosecution witnesses in the Zaimi trial that she had failed to disclose in violation of New York Law. (*Id.*) As part of the new "investigation," Levy and Abissi subpoenaed Galgano's criminal defense attorneys, his

defense investigator, and other attorneys and friends of Mr. Galgano in an effort to harass and damage Galgano and to elicit communications that were protected by attorney-client privilege. (*Id.* ¶ 254.)  Ultimately, Galgano was never indicted in connection with this "investigation." (*Id.*)

Plaintiff alleges that Putnam County, the PCDAO, the Town of Carmel, the Town of Carmel Police Department, and Levy failed to train and supervise Levy's subordinate Assistant District Attorneys, as well as the police officers participating in the Galgano investigation, regarding the difference between criminal and innocent conduct under circumstances present in this case; how to conduct a proper interrogation that elicits voluntary, truthful statements and not involuntary, false statements; the proper requirements for trap-and-trace, pen register, and eavesdropping warrants; the proper requirements for a search warrant; the proper execution of a search warrant; the proper conduct of grand jury proceedings; the evidence required to lawfully indict for the crimes charged; and the prosecutor's duty to disclose exculpatory evidence.  (*Id.* ¶¶ 232, 233.)[12]

Further, Plaintiff alleges that after the court dismissed the initial indictment against Galgano because of a lack of sufficient grand jury evidence and due to gross misconduct before the grand jury, Levy failed even to train and supervise his subordinates against repeating the very same misconduct.  (*Id.* ¶ 235.)  Defendants Putnam County, the PCDAO, Carmel, and the Town of Carmel Police Department similarly failed to train or supervise its officers from repeating this

---

[12] Plaintiff alleges that since September 2007, Putnam County had been litigating a § 1983 action brought by a person wrongfully convicted of murder, and wrongfully imprisoned for 16 years, as the result of a false confession improperly obtained by a Putnam County police officer.  (*Id.* ¶ 234 (citing *Deskovic v. City of Peekskill*, 894 F. Supp. 2d 443 (S.D.N.Y. 2012).)  Despite the $41,650,000 jury verdict against it, Putnam County took no steps to train its police officers, including District Attorney Investigators and local police officers, to conduct interrogations properly.  (*Id.*)

same illegal conduct.  (*Id.*)  The same misconduct was repeated when the District Attorney re-presented his case against Galgano before a second grand jury.  (*Id.*)  Plaintiff further alleges that this was not the first time this type of misconduct occurred.  (*Id.* ¶ 239–240.)[13]  Rather, Levy had a pattern and practice of unlawfully pursuing investigations and securing indictments against persons whom he perceived to be a threat to his popular support in the Putnam County community and implemented a policy to investigate and prosecute his political enemies.  (*Id.* ¶ 240.)  When members of his staff refused to engage in these improper pursuits, they were punished and verbally abused by Levy, and ultimately resigned or were terminated.  (*Id.* ¶¶ 237, 241.)

Plaintiff alleges that all significant investigative and prosecutorial decisions in the Galgano case were either made or approved by Levy personally.  (*Id.* ¶ 231.)  Levy allegedly applied for all of the eavesdropping warrants and approved all search warrant applications, and on the one occasion when an eavesdropping warrant required retroactive amendment while Levy was absent from the jurisdiction, Levy personally designated the Assistant District Attorney to make such application in his absence.  (*Id.*)  Levy also personally supervised all grand jury proceedings in the Galgano case, and appeared at all significant court proceedings.  (*Id.*)

Plaintiff alleges that Putnam County only began to institute proper training after Levy, Gil, and Abissi left office.  (*Id.* ¶ 236.)  Levy's successor, District Attorney Robert Tendy, announced: "In the past two years, we have had more than a handful of indictments dismissed. They weren't my cases but my goal is to stop that; it's gotten way out of control.  How it got that

---

[13] More specifically, Plaintiff alleges that Putnam County and the Town of Carmel have a history of bringing baseless witness intimidation charges.  (*Id.* ¶ 239 (citing *McGee v. Doe*, 568 F. App'x 32 (2d Cir. 2014), *as amended* (July 2, 2014)).)  In 2006, Putnam County commenced a witness intimidation prosecution against defense investigator Patricia McGovern, investigating a Carmel homicide.  (*Id.*)

way is not relevant—we are fixing it and it's going to get fixed very quickly.  Everyone is getting the training they need." (*Id.*)  These new training programs included "grand jury training programs" and "ethics training programs." (*Id.*)

Plaintiff alleges that as a result of Defendants' action, he suffered loss of liberty and significant economic, physical, and emotional injuries. (*Id.* ¶ 263.)  His ability to secure gainful employment and income has been severely impaired, as has his earning power and ability to support himself and his family by Defendants' destruction of his professional reputation and disruption of his law practice and related businesses. (*Id.* ¶ 264.)  Plaintiff avers that "[n]othing can undo the reputational damage he has sustained." (*Id.* ¶ 265.)  Additionally, Plaintiff incurred substantial legal fees defending against the malicious and meritless investigations and criminal charges that Defendants pursued against him. (*Id.* ¶ 266.)  Plaintiff was held in custody for over eight hours before his first Putnam County arraignment as a result of the investigations and criminal charges, and was required to make a number of appearances in Putnam County Court in connection with the prosecution Defendants concocted. (*Id.* ¶ 267.)  He alleges he suffered severe emotional and mental anguish, pain, and humiliation as a result of being investigated for, and charged with, crimes he did not commit and subjected to gross and illegal invasions of his home, office, and personal effects, and he continues to suffer mental anguish, suffering from sleeplessness and preoccupation about Defendants' violations of his privacy, the integrity of his home, and the well-being of his daughters and wife. (*Id.* ¶ 268.)

B.  Procedural History

Plaintiff filed the Complaint on May 13, 2016. (Compl. (Dkt. No. 1).)  After the Parties stipulated to an initial extension for Defendants to answer or otherwise respond to the Complaint, (Dkt. No. 20), Defendants requested numerous extensions, (Dkt. Nos. 22, 29, 34, 48), which the

Court granted, (Dkt. Nos. 27, 32, 35, 50). On June 27, 2016 Carmel Defendants filed a pre-motion letter indicating the grounds on which they sought to move to dismiss. (Dkt. Nos. 30, 31.) On June 20, 2016, Plaintiff filed its opposition to the request. (Dkt. Nos. 36, 37.)[14] On July 26, 2016 Putnam County Defendants filed a pre-motion letter, (Dkt. No. 49), which Plaintiff opposed on July 29, 2018, (Dkt. No. 51). On August 10, 2016, Putnam County Individual Defendants filed a pre-motion letters, (Dkt. Nos. 55, 56), which Plaintiff opposed, (Dkt. No. 59).

On August 8, 2016, Putnam County Individual Defendants sought a stay of proceedings pursuant to 50 U.S.C § 3932 due to the deployment of Gil to active military service. (Dkt. No. 52.) Putnam County Defendants and Carmel Defendants joined the request, but requested the stay apply to all Defendants. (Dkt. No. 54.) Plaintiff opposed the stay requests. (Dkt. No. 58.)

On September 13, 2016, the Court held a pre-motion conference. (Dkt. (entry for Sept. 13, 2016).) The Court denied Defendants' Motion to Stay the case pursuant to 50 U.S.C. § 3932 as to all Defendants except Gil. (*Id.*) The Court reserved decision on Gil's Motion, pending further briefing. (*Id.*) The Court adopted a briefing schedule for the Motions To Dismiss, but gave Plaintiff until September 20, 2016 to advise the Court whether Plaintiff wished to file an Amended Complaint. (Dkt. No. 65.) On September 20, 2016, Plaintiff submitted a letter with a proposed schedule for submitting the Amended Complaint, as well as a briefing schedule for the Motions To Dismiss, (Dkt. No. 68), which the Court granted, (Dkt. No. 69). On October 14, 2016, Plaintiff filed his Amended Complaint. (Am. Compl.)

Following additional letters from the Parties, (Dkt. Nos. 71, 73, 76), on November 15, 2016, the Court stayed the action as to all Defendants, (Dkt. No. 78.) The stay was lifted on

---

[14] During this time, various letters were also exchanged regarding who would represent Putnam County Individual Defendants. (Dkt. Nos. 40, 41, 43, 45, 46.)

August 17, 2017 following Gil's return from duty.  (Dkt. No. 122.)  On September 6, 2017, the Court adopted a new briefing schedule for the Motions To Dismiss.  (Dkt. No. 124.)

In accordance with the Courts' modified briefing scheduling, (Dkt. No. 129), on November 17, 2017, Putnam County Defendants filed their Motion and accompanying papers, (Cty. Notice of Motion; Cty. Mem.; Silverman Decl.), Putnam County Individual Defendants filed their Motion and accompanying papers, (Cty. Individual Notice of Motion; Cty. Individual Mem.; Miranda Decl.), and Carmel Defendants filed their Motion and accompanying papers, (Carmel Notice of Motion; Carmel Mem.; Pariser Decl.).[15]  On December 17, 2017, Plaintiff submitted his opposition and accompanying papers.  (Pl.'s Mem. of Law in Opp'n to Motion To Dismiss ("Pl.'s Mem.") (Dkt. No. 155); Decl. of George F. Carpinello, Esq. ("Carpinello Decl.") (Dkt. No. 156).)[16]  On January 17, 2018, Putnam County Defendants filed their reply, (Cty. Reply Mem. of Law in Supp. of Mot. To Dismiss ("Cty. Reply Mem.") (Dkt. No. 163)), Putnam County Individual Defendants filed their reply and accompanying papers, (Cty. Individual Reply Mem. of Law in Supp. of Mot. To Dismiss ("Cty. Individual Reply Mem.") (Dkt. No. 163); Reply Decl. of Michael A. Miranda ("Miranda Reply Decl.") (Dkt. No. 168)), and Carmel Defendants filed their reply, (Carmel Reply Mem. of Law in Supp. of Mot. To Dismiss ("Carmel Reply Mem.") (Dkt. No. 165)).[17]

---

[15] The Court granted Carmel Defendants, (Dkt. No. 133), Putnam County Defendants, (Dkt. No. 150), and Putnam County Individual Defendants, (Dkt. No. 187), leave to file briefs in excess of the 25 page limit.  The Court regrets this decision.

[16] The Court granted Plaintiff's request to file a 75-page brief to respond to Defendants' numerous pages of briefing.  (Dkt. No 154.)

[17] The Court granted Carmel Defendants, (Dkt. No. 161), Putnam County Defendants, (Dkt. No. 160), and Putnam County Individual Defendants, (Dkt. No. 162), leave to file reply briefs in excess of the 10 page limit.

II.  Discussion

A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his [or her] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and internal quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.* (alteration and internal quotation marks omitted).  Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous

departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of New York*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

### B. Claims Against Putnam County Defendants

Putnam County Defendants move to dismiss Plaintiff's Amended Complaint, arguing that: (1) the PCDOA is a non-suable entity; (2) Plaintiff failed to allege the existence of any policy or practice that caused the alleged harms under *Monell v. Department of Social Services*, 436 U.S. 658 (1978); (3) the Due Process claim should be dismissed; (4) the supervisory liability and failure to intercede claims should be dismissed; and (5) the Court should decline to exercise supplemental jurisdiction over the remaining state law claims. (*See generally* Cty. Mem.)

#### 1. Claims Against the PCDAO

Putnam County Defendants argue that all claims against the PCDAO should be dismissed because it is a non-suable entity. (Cty. Mem. 7.) Plaintiff argues that the Court should retain jurisdiction over the PCDOA until discovery has been completed, and that Plaintiff can maintain

a suit against the Putnam County District Attorney in his official capacity.  (Pls.' Mem. 5.)  To begin, Putnam County Defendants are correct that "New York district attorneys' offices are considered non-suable entities because 'the office of the district attorney is not a legal entity distinct from the district attorney himself.'"  *Bryan v. New York*, No. 14-CV-8305, 2015 WL 4272054, at *3 (S.D.N.Y. July 13, 2015) (quoting *Sash v. City of New York*, No. 05-CV-1544, 2006 WL 2474874, at *4 (S.D.N.Y. Aug. 11, 2006) (collecting cases)).  Thus, all claims against the PCDAO are dismissed.[18]  If Plaintiff wishes to initiate a cause of action against the Putnam County District Attorney in his official capacity, Plaintiff should do so in the Second Amended Complaint.[19]

### 2. *Monell* Claims Against Putnam County

Putnam County argues that the six causes of action against it in Amended Complaint should be dismissed for failure to allege a municipal policy, custom, or practice that caused the alleged constitutional violations.  (Cty. Mem. 7.)

---

[18] As Putnam County Defendants note, any discovery issues that may arise can be dealt with at the time through the Court's subpoena power, pursuant to Rule 45 of the Federal Rules of Civil Procedure.  Plaintiff cites no case law for the proposition that the Court may retain jurisdiction over a non-suable entity in the happenstance that discovery issues arise.

[19] The Court notes, however, that such a suit may be barred by the Eleventh Amendment.  *See Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993) ("To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Scalpi v. Town of E. Fishkill*, No. 14-CV-2126, 2016 WL 858955, at *9 (S.D.N.Y. Feb. 29, 2016), *appeal dismissed* (June 3, 2016) ("With respect to . . . official-capacity claims, [the plaintiffs], as the district attorney and assistant district attorney, are entitled to Eleventh Amendment immunity against suit."); *Sharp v. Morgenthau*, No. 08-CV-5919, 2010 WL 339767, at *4 (S.D.N.Y. Jan. 25, 2010) ("[A] suit for money damages against a district attorney or his or her assistant district attorneys, in their official capacities, is actually a suit against New York State, and is barred by the Eleventh Amendment.").

"Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell*, 436 U.S. at 691. Thus, "to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008). The fifth element reflects the notion that a *Monell* defendant "may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997); *see also Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right."). In other words, a municipality may not be liable under § 1983 "by application of the doctrine of respondeat superior." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (italics omitted).

A plaintiff may satisfy the "policy, custom, or practice" requirement by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted); *Patterson v. County of Oneida*, 375 F.3d 206, 226–27 (2d Cir. 2004) (describing methods of establishing *Monell* liability). Moreover, a plaintiff also must establish a causal link between the

municipality's policy, custom, or practice and the alleged constitutional injury. *See City of Okla. v. Tuttle*, 471 U.S. 808, 824 n.8 (1985) ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a *constitutional* violation. There must at least be an affirmative link between[,] [for example,] the training inadequacies alleged, and the particular constitutional violation at issue." (plurality opinion)); *see also Roe*, 542 F.3d at 37 (holding that "a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the moving force behind the alleged injury" (internal quotation marks omitted)); *Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at *12 (S.D.N.Y. Mar. 26, 2015) ("[T]here must be a direct causal link between a municipal policy or custom and the alleged constitutional deprivation" (internal quotation marks omitted)); *Johnson v. City of New York*, No. 06-CV-9426, 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (noting that "a plaintiff must establish a causal connection—an affirmative link—between the [municipal] policy and the deprivation of his constitutional rights" (internal quotation marks omitted)).

Normally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the municipality." *Tieman*, 2015 WL 1379652, at *12 (alteration and internal quotation marks omitted); *see also Tuttle*, 471 U.S. at 823–24 ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." (plurality opinion)); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation.").

There are at least two circumstances that courts have expressly identified as constituting a municipal policy: "where there is an officially promulgated policy as that term is generally understood," and "where a single act is taken by a municipal employee who, as a matter of [s]tate law, has final policymaking authority in the area in which the action was taken." *Newton*, 566 F. Supp. 2d at 271. "A municipal 'custom,' on the other hand, need not receive formal approval by the appropriate decisionmaker," *id.*, but "may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law," *Kucharczyk v. Westchester County*, 95 F. Supp. 3d 529, 539 (S.D.N.Y. 2015) (internal quotation marks omitted). "To prevail on this theory of municipal liability, . . . a plaintiff must prove that the custom at issue is permanent and well-settled." *Tieman*, 2015 WL 1379652, at *16.

"Municipal liability may also be premised on a failure to train employees when inadequate training 'reflects deliberate indifference to . . . constitutional rights.'" *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009) (quoting *City of Canton v. Harris*, 489 U.S. 378, 392 (1989)). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Only where a plaintiff can demonstrate that a municipality's failure to train "amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact" will a policy or custom actionable under § 1983 be established. *Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y. 1996) (internal quotation marks omitted); *see also Connick*, 563 U.S. at 61 (same); *Canton*, 489 U.S. at 388 (same). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410. To establish deliberate indifference, a plaintiff must demonstrate that: (1) "a policymaker knows to a moral certainty

that her employees will confront a given situation"; (2) "the situation either presents the employee with a difficult choice of the sort that training . . . will make less difficult or that there is a history of employees mishandling the situation"; and (3) "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992) (internal quotation marks omitted). "[D]emonstration of deliberate indifference requires a showing that the official made a conscious choice, and was not merely negligent." *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012).

"[W]here . . . a city has a training program, a plaintiff must . . . 'identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation.'" *Wray v. City of New York*, 490 F.3d 189, 196 (2d Cir. 2007) (some internal quotation marks omitted) (quoting *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 129 (2d Cir. 2004)). "The plaintiff must offer evidence to support the conclusion that the training program was inadequate, not '[t]hat a particular officer may be unsatisfactorily trained' or that 'an otherwise sound program has occasionally been negligently administered,' and that a 'hypothetically well-trained officer' would have avoided the constitutional violation." *Okin*, 577 F.3d at 440–41 (quoting *Canton*, 489 U.S. at 390–91).

"A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (internal quotation marks omitted). This is because "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*

At the same time, however, the Supreme Court in *Connick* reaffirmed the viability, in limited circumstances, of the "single-incident" theory of liability envisioned in *Canton*. *See id.* at 63–65 (holding the particular claim at issue did not fall "within the narrow range of *Canton's* hypothesized single-incident liability"); *see also Canton*, 489 U.S. at 390 n.10 (outlining single-incident theory of liability). Under the single-incident theory, a municipality can be found to be deliberately indifferent based on a single constitutional violation where "the unconstitutional consequences of failing to train [are] so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick*, 563 U.S. at 64. Violation of constitutional rights must be a "highly predictable consequence" of the failure to train. *Id.* (internal quotation marks omitted). "Thus, deliberate indifference may be inferred where the need for more or better supervision to protect against constitutional violations was obvious, but the policymaker failed to make meaningful efforts to address the risk of harm to plaintiffs." *Cash v. Cty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) (alteration, citations, and internal quotation marks omitted).

Of the four categories among which a *Monell* plaintiff must establish, Plaintiff alleges the second, third, and fourth categories apply to Putnam County—actions taken by a municipal policymakers, (Pl.'s Mem. 6); conduct so consistent and widespread to constitute custom; (*id.* at 10), and a failure to train employees, (*id*. at 12). The Court addresses each in turn.[20]

---

[20] Since "municipalities do not enjoy immunity from suit—either absolute or qualified—under § 1983," the claims against Putnam County are not barred by prosecutorial immunity. *Pinaud v. Cty. of Suffolk*, 52 F.3d 1139, 1153 (2d Cir. 1995) (quoting *Leatherman v. Tarrant Cty. Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 166 (1993)).

### a. Conduct of Policymaker

Plaintiff has failed to plausibly allege District Attorney Levy was a government official responsible for establishing municipal polices that caused the violations of Galgano's constitutional rights. Plaintiff alleges that, as District Attorney, Levy was acting as a Putnam County "policymaker" for investigative and prosecutorial decisions, (Am. Compl. ¶ 24), and "was in charge of" and "personally involved in virtually every decision" in the Galgano investigation," (*Id.* ¶ 161). Putnam County Defendants argue that Levy was acting as a representative of the State, and not as a county policymaker, when engaging in the alleged unconstitutional conduct. (Cty. Mem. 12.)

"Where a plaintiff relies not on a formally declared or ratified policy, but rather on the theory that the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law." *Jeffes v. Barnes*, 208 F.3d 49, 57–58 (2d Cir. 2000); *see also Baity v. Kralik*, 51 F. Supp. 3d 414, 437 (S.D.N.Y. 2014) (same). Thus, in order for Putnam County to be liable for Levy's actions, Plaintiff must plausibly allege that Levy "was a policymaker with respect to the particular issue involved here." *Baity*, 51 F. Supp. 3d at 437 (internal quotation marks omitted). This "inquiry is dependent on an analysis of state law." *McMillian v. Monroe Cty.*, 520 U.S. 781, 786 (1997); *see also Myers v. Cty. of Orange*, 157 F.3d 66, 76 (2d Cir. 1998) ("We first ask whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue, an inquiry that will necessarily be dependent on the definition of the official's functions under relevant state law." (internal quotation marks omitted)). In *Baez v. Hennessy,* 853 F.2d 73 (2d Cir. 1988), the Second Circuit determined that "[w]hen prosecuting a criminal matter, a district attorney in New York State . . . represents the [s]tate not the county," *id.* at 77, and consequently ruled that "a district

attorney's misconduct in prosecuting an individual could not give rise to municipal liability." *Walker,* 974 F.2d at 301 (describing the holding of *Baez*); *see also Peterson v. Tomaselli*, 469 F. Supp. 2d 146, 169 (S.D.N.Y. 2007) ("With respect to district attorneys, only where they act as county officials, as opposed to state officials, can they provide a basis for municipal liability.").[21] However, in *Gentile v. County of Suffolk*, 926 F.2d 142 (2d Cir. 1991), the Second Circuit limited *Baez* by ruling that a New York municipality could be held liable, in a § 1983 malicious prosecution claim, when a county district attorney had a "long history of negligent disciplinary practices regarding law enforcement personnel, which gave rise to the individual defendants' conduct in promoting the malicious prosecution of plaintiffs." *Id.* at 152 n.5. Accordingly, "[w]here a district attorney acts as the manager of the district attorney's office, the district attorney acts as a county policymaker." *Walker*, 974 F.2d at 301 (noting that, in that case, it was undisputed that "the county district attorneys within [New York] City have final, discretionary authority to implement training and supervision within their own office"). Consequently, as long as a plaintiff's "claims center not on decisions whether or not, and on what charges, to prosecute but rather on the administration of the district attorney's office," *Ying Jing Gan*, 996 F.2d at 536, there can be liability against a county for an alleged malicious prosecution. *See id. J. Walker*, 974 F.2d at 301; *Gentile,* 926 F.2d at 152 n.5. Here, therefore, Putnam County cannot be found

---

[21] Plaintiff argues a district attorney is not a "state officer." (Pls.' Mem. 17.) In arguing so, Plaintiff oddly suggests *Baez* ignored the New York Court of Appeals decision in *Kelley v. McGee*, 443 N.E.2d 908 (N.Y. 1982), which held that a district attorney is not a "state officer" for purposes of New York state compensation law. (*Id.* at 912) However, *Baez* cites *Kelley* twice before reaching the conclusion that "[w]hen prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State not the county." *Baez*, 853 F.2d at 77. The Second Circuit has since continued to hold that while district attorneys are generally "local county officers," "New York courts recognize a narrow exception to this general rule when a prosecutor makes individual determinations about whether to prosecute violations of state penal laws." *Myers*, 157 F.3d at 77.

liable for any allegations in the Amended Complaint relating to Levy's decision to prosecute Galgano. *See Norton v. Town of Brookhaven*, 47 F. Supp. 3d 152, 161–62 (E.D.N.Y. 2014) ("[A] county cannot be liable for the acts of a district attorney related to the decision to prosecute or not prosecute an individual," because "[w]hen prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State, not the county." (internal quotation marks omitted)); *Jones v. City of New Yew*, 988 F. Supp. 2d 305, 317 (E.D.N.Y. 2013) (holding the city "is not a liable party" where "the function at issue . . . is inextricably connected with prosecution of criminal cases").

Thus, the Court is left to determine whether any allegations against Levy relate to conduct that occurred while he was asking as a "manager" of the PCDOA. *See Ying Jing Gan*, 996 F.2d at 536 (noting that for "claims centering not on decisions whether or not, and on what charges, to prosecute but rather on the administration of the district attorney's office, the district attorney has been treated not as a state official but rather as an official of the municipality to which he is assigned"). Other district courts in the circuit have considered "building management, maintenance decisions, or discrimination against employees" as the types of decision for which "the district attorney can be considered a municipal actor" for purposes of *Monell* liability. *Jones*, 988 F. Supp. 2d at 316. Plaintiff brings no such allegations against

Levy.[22]  Thus, Plaintiff cannot sustain a *Monell* claim on the basis that Levy was a policymaker.[23]

### b.  Widespread and Persistent Custom

Plaintiff alleges the conduct alleged was so persistent and widespread that it constituted a custom.  (Pl.'s Mem. 10.)  Specifically, Plaintiff alleges that Putnam County was on notice of Levy's targeting of political enemies due to the media criticism and public sanction by the courts of the prosecutors' conduct.  (Am. Compl. ¶¶ 37, 46, 241.)

Under the third category of *Monell* claims, "an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law," *Brown*, 520 U.S. at 404, which is to say, that it is a "longstanding practice or custom which constitutes the standard operating procedure of the local government entity," *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (internal quotation marks omitted); *see also Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) (noting that a municipality's custom "need not be memorialized in a specific rule or regulation"); *Jeffes*, 208 F.3d at 61 (discussing *Jett*).  Therefore, a plaintiff may establish municipal liability by demonstrating that a municipality "indirectly caused the misconduct of a subordinate municipal employee by

---

[22] Plaintiff does cite to various examples of district attorney conduct that has been deemed "administrative" by other Courts, such as decisions regarding protection of police cooperators and initiation of misconduct proceedings against attorneys, (Pl.'s Mem. 7); however Plaintiff fails to explain which of Levy's alleged actions in the 355-paragraph Amended Complaint are analogous to the conduct in these cited cases.  Plaintiff is represented by counsel, and the Court will not connect the dots for him.

[23] The Court recognizes, and discusses in more detail below, that prosecutors are entitled to absolute prosecutorial immunity while engaging in prosecutorial functions, but are not entitled to such immunity while engaging in investigative or administrative functions.

acquiescing in a longstanding practice or custom which may fairly be said to represent official policy." *Miller v. County of Nassau*, 467 F. Supp. 2d 308, 314 (E.D.N.Y. 2006). To prevail on this theory of municipal liability, as noted, a plaintiff must prove that the custom at issue is permanent and well-settled. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (noting that the Supreme Court "has long recognized that a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage with the force of law'" (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970) (internal quotation marks omitted))); *Davis v. City of New York*, 228 F. Supp. 2d 327, 346 (S.D.N.Y. 2002), *aff'd*, 75 F. App'x 827 (2d Cir. 2003) (explaining that "[w]idespread means that [the unconstitutional acts in question] are common or prevalent throughout the [government body]; well-settled means that the [unconstitutional acts in question] have achieved permanent, or close to permanent, status"). As the Supreme Court emphasized in *Monell*, Congress enacted § 1983 to impose liability on municipalities "because of the persistent and widespread discriminatory practices of state officials," and out of recognition that such practices could become "so permanent and well settled as to constitute a 'custom or usage' with the force of law." 436 U.S. at 691 (citation and internal quotation marks omitted).

Here, Plaintiff's reliance on Levy's conduct as to Zaimi and Plaintiff are insufficient to allege a widespread practice. This Court has previously rejected a Plaintiff's reliance on thirteen prior allegedly similar incidents of excessive force as sufficient to allege a widespread practice, given the hundreds, if not thousands, of arrests made during the four year time period. *See Tieman*, 2015 WL 1379652, at *16. Here, the Court finds allegations of two politically motivated prosecutions insufficient to plausibly allege a "common or prevalent" practice. *See*

*Davis*, 228 F. Supp. 2d at 346; *see also R. Walker*, 2014 WL 1259618, at *3 (holding that the allegation that ten similar complaints were filed against New York City in the ten preceding years was insufficient to state a claim because the "paltry number of complaints (none resulting in an adjudication of liability), spread over a period so long in a city so large, hardly suggests the frequency or pervasiveness of the purported custom that is required to state a *Monell* claim"). Thus, Plaintiff fails to state a *Monell* claim for relief against the Putnam County on the theory that PCDAO has a custom of prosecuting political enemies so widespread to have the force of law.

<u>c. Failure to train</u>

Plaintiff also alleges Putnam County failed to properly train its employees on the type of investigation at issue here, namely, the duties of a criminal defense attorney defending a client in a pending case and the investigative steps they may take in preparing their client's defense. (Pl.'s Mem. 12.) Plaintiff also alleges Putnam County failed to sufficiently train its employees on "proper conduct of grand jury proceedings." (Pl.'s Mem. 15.)

Considering that a "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. 51, 61 (2011); *see also Tuttle*, 471 U.S. at 822–23 ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*." (plurality opinion)). Such bare assertions here fail to satisfy the "policy and custom" requirement necessary to impose liability on Putnam County. *See Stoeckley v. Cty. of Nassau*, No. 15-CV-514, 2015 WL 8484431, at *2 (E.D.N.Y. Dec. 9, 2015) ("[W]hile it may be true that § 1983 plaintiffs cannot be expected to know the details of a municipality's training programs prior to discovery, this does not relieve them of their obligation under *Iqbal* to plead a facially

plausible claim." (alterations and internal quotation marks omitted)); *Calderon v. City of New York*, 138 F. Supp. 3d 593, 613 (S.D.N.Y. 2015) ("[T]he Second Circuit has indicated that some non-conclusory allegation as to deficient training programs is necessary at the pleading stage." (italics omitted)), *on reconsideration in part*, No. 14-CV-1082, 2015 WL 6143711 (S.D.N.Y. Oct. 19, 2015).

"To state a claim for municipal liability based on failure to train, [a] [p]laintiff . . . must allege facts that support an inference that the municipality failed to train its [employees], that it did so with deliberate indifference, and that the failure to train caused his [or her] constitutional injuries." *Tieman*, 2015 WL 1379652, at *22. Thus, "mere allegations of . . . inadequate training and/or supervision are insufficient to demonstrate the existence of such a custom [under *Monell*] unless supported by factual details." *Id.* at *13; *see also Maynard*, 2013 WL 6667681, at *4 ("Conclusory allegations that there was such a policy or custom, without identifying or alleging supporting facts, is insufficient to state a claim."); *Simms v. City of N.Y.*, No. 10-CV-3420, 2011 WL 4543051, at *2 n.3 (E.D.N.Y. 2011) (noting that "courts in this district have generally required that plaintiffs provide more than a simple recitation of their theory of liability, even if that theory is based on a failure to train"), *aff'd*, 480 F. App'x 627 (2d Cir. 2012).

In the instant Action, Plaintiff provides a list of areas where Putnam County allegedly failed to train individuals in the PCDAO, however, Plaintiff does not specify how the training policy was deficient as to each area listed. (Am. Compl. ¶ 233.) *See Wray*, 490 F.3d at 196 (requiring a Plaintiff to "identify a specific deficiency . . . and establish that that deficiency is closely related to the ultimate injury"). For example, while the Amended Complaint outlines various flaws with the PCDAO investigation and prosecution of Galgano, Plaintiff merely asserts

these occurred as a result of improper training. (Am. Compl. ¶ 233.)[24] Such conclusory

allegations are insufficient to state a *Monell* claim. *See Santos v. N.Y. City*, 847 F. Supp. 2d 573,

577 (S.D.N.Y. 2012) ("Because the existence of a municipal policy or practice, such as a failure

to train or supervise, cannot be grounded solely on the conclusory assertions of the plaintiff, [the

plaintiff's] claims against the [c]ity are dismissed with prejudice." (citation omitted)); *Johnson*,

2011 WL 666161, at *4 (finding the plaintiff's "unsupported conclusory allegation that the [c]ity

failed to train the individual [d]efendants" insufficient to establish municipality liability);

*Bradley v. City of New York*, No. 08-CV-1106, 2009 WL 1703237, at *3 (E.D.N.Y. June 18,

2009) ("The [c]omplaint's conclusory, boilerplate language—that the [c]ity 'failed to adequately

train, discipline, and supervise' employees and 'failed to promulgate and put into effect

appropriate rules and regulations applicable to the duties and behavior' of its employees—is

insufficient to raise an inference of the existence of a custom or policy, let alone that such a

policy caused [the] [p]laintiff to be arrested without probable cause." (alterations and citation

omitted)). The Amended Complaint thus lacks factual material from which the Court could

reasonably infer that Putnam County indeed failed to train its employees. *See McAllister v.

N.Y.C. Police Dep't*, 49 F. Supp. 2d 688, 705 (S.D.N.Y. 1999) ("Conclusory allegations of a

municipality's pattern or policy of unconstitutional behavior are insufficient to establish a

Monell claim, absent evidence to support such an allegation.").

---

[24] Plaintiff points to statements by newly elected District Attorney Tendy following his election, noting that "[e]veryone is getting the training they need," and alleges that Tendy implemented new training programs for "grand jury training programs" and "ethics training programs." (Am. Compl. 236.) However, these statements lack any specificity or detail regarding the deficiencies in the prior training programs and how they led to the alleged constitutional violations against Plaintiff.

Nor can Plaintiff succeed on the "single incident" theory of liability. In *Connick*, the Supreme Court held that "[f]ailure to train prosecutors in their *Brady* obligations does not fall within the narrow range of *Canton*'s hypothesized single-incident liability." *Connick*, 563 U.S. 51, 64. The Court contrasted between the hypothetical in *Canton* of training armed police officers on use of deadly force, where "in the absence of training, there is no way for novice officers to obtain the legal knowledge they require," with training prosecutors, because, "in stark contrast, legal training is what differentiates attorneys from average public employees." *Id.* (alterations and internal quotation marks omitted.) "In light of th[e] regime of legal training and professional responsibility," including law school, bar examination, continuing education requirements, on the job training and supervision, and character and fitness standards, the Supreme Court concluded that "recurring constitutional violations are not the obvious consequence of failing to provide prosecutors with formal in-house training about how to obey the law." *Id.* at 66. Thus, the Court can conclude that the prosecutors here were "not only equipped but . . . also ethically bound to know" lawful investigative techniques and how to present evidence to the grand jury. *Id.* 66–67. In fact, the investigation done by Ortolano shows the ADAs were properly trained. "A district attorney is entitled to rely on prosecutors' professional training and ethical obligations in the absence of specific reason, such as a pattern of violations, to believe that those tools are insufficient to prevent future constitutional violations in the usual and recurring situations with which the prosecutors must deal." *Id.* at 67 (alterations and internal quotation marks omitted). Thus, Plaintiff has failed to plausibly plead Putnam County's liability on the basis of a failure to train its prosecutors. Because Plaintiff has failed to adequately allege that Putnam County acted pursuant to an official policy, custom, or practice, the first cause of action for unlawful seizure of Plaintiff's communications; the second cause of

action for malicious prosecution under § 1983; the third cause of action for denial of due process; the fourth cause of action for malicious prosecution under New York state law; the fifth cause of action for unlawful search of Plaintiff's home, offices, and motor vehicle, and the seizure of his computers and electronic storage devises; the sixth cause of action for unlawful search and seizure of plaintiff and cell phone; the seventh cause of action for unlawful search of Plaintiff's electronic devices; the tenth cause of action for abuse of process under New York state law; the eleventh cause of action for failure to intercede; and the twelfth cause of action for supervisory liability against Putnam County are dismissed.

## C. Claims against Putnam County Individual Defendants

Putnam County Individual Defendants move to dismiss Plaintiff's Amended Complaint, arguing that: (1) the Putnam County Individual Defendants are entitled to prosecutorial immunity; (2) the Putnam County Individual Defendants are entitled to qualified immunity; (3) the ninth cause of action for defamation against Levy should be dismissed; (4) the thirteenth cause of action for § 1983 conspiracy claim should be dismissed; (5) the tenth cause of action for abuse of process should be dismissed. (*See generally* Cty. Individual Mem.) The Court addresses each in turn.

### 1. Prosecutorial Immunity

It is well established that prosecutors are entitled to absolute immunity from civil suits for damages under § 1983 when "function[ing] as advocates for the state in circumstances intimately associated with the judicial phase of the criminal process." *Bernard v. Cty. of Suffolk*, 356 F.3d 495, 502 (2d Cir. 2004) (internal quotation marks omitted); *see also Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995) ("Prosecutorial immunity from § 1983 liability is broadly defined, covering virtually all acts, regardless of motivation, associated with the prosecutor's function as

an advocate." (alteration and internal quotation marks omitted)).  However, not every action

performed by a prosecutor is "absolutely immune merely because [it was] performed by a

prosecutor."  *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993).  Rather, a prosecutor's

entitlement to absolute immunity turns on "the capacity in which the prosecutor acts at the time

of the alleged misconduct."  *Zahrey v. Coffey*, 221 F.3d 342, 346 (2d Cir. 2000).  Thus, to

determine whether a prosecutor's conduct is entitled to absolute immunity, courts must apply "a

functional approach, which looks to the nature of the function performed [by the prosecutor]."

*Buckley*, 509 U.S. at 269 (citation and internal quotation marks omitted); *see also Van de Kamp

v. Goldstein*, 555 U.S. 335, 342 (2009) ("To decide whether absolute immunity attaches to a

particular kind of prosecutorial activity, one must take account of [] 'functional'

considerations . . . .").  Notably, "the initiation and pursuit of a criminal prosecution are

quintessential prosecutorial functions."  *Shmueli v. City of New York.*, 424 F.3d 231, 237 (2d Cir.

2005) (citing *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)).

Generally, whether a prosecutor "may be sheltered by absolute immunity from liability

for [his conduct] turns on whether or not [his conduct] occurred in the course of his role as an

advocate."  *Hill*, 45 F.3d at 662.  This protection covers such acts as "initiating a prosecution and

presenting the case at trial" or at other court proceedings, *id.* at 661; *see also Smith v. Garretto*,

147 F.3d 91, 94 (2d Cir. 1998) ("A prosecutor enjoys absolute immunity for acts taken in

initiating a prosecution and in presenting the [s]tate's case, whether at a trial, a preliminary

hearing, or a bail hearing." (citations and internal quotation marks omitted)), as well as "the

professional evaluation of the evidence assembled by the police and appropriate preparation for

its presentation at trial or before a grand jury after a decision to seek an indictment has been

made[,]" *Buckley*, 509 U.S. at 273; *see also Hill*, 45 F.3d at 661 (noting that prosecutors are

"immune for conduct in preparing for [prosecutorial] functions," including "evaluating and organizing evidence for presentation at trial or to a grand jury, or determining which offenses are to be charged" (citations omitted)).  Absolute immunity also protects "the knowing presentation of perjured testimony to a grand jury, without any prosecutorial involvement in its earlier inducement."  *Bernard*, 356 F.3d at 506.  Furthermore, it is well established that a prosecutor's motives for actions that are deemed to be within his or her role as an advocate are irrelevant to the granting of absolute immunity.  *See Shmueli*, 424 F.3d at 237–38 (holding that absolute immunity is "not affected by allegations that improperly motivated prosecutions were commenced or continued pursuant to a conspiracy"); *Bernard*, 356 F.3d at 503 (holding that "once a court determines that challenged conduct involves a function covered by absolute immunity, the actor is shielded from liability for damages regardless of the wrongfulness of his motive or the degree of injury caused"); *Pinaud v. Cty. of Suffolk*, 52 F.3d 1139, 1148 (2d Cir. 1995) ("[W]hen the underlying activity at issue is covered by absolute immunity, the plaintiff derives no benefit from alleging a conspiracy." (internal quotation marks omitted)).

In contrast, "[w]hen a [prosecutor] functions outside his . . . role as an advocate for the People, the shield of [absolute] immunity is absent."  *Hill*, 45 F.3d at 661.  Specifically, "[w]hen a prosecutor performs the investigative functions normally performed by a detective or police officer, it is neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other."  *Buckley*, 509 U.S. at 273 (internal quotation marks omitted); *see also Smith*, 147 F.3d at 94 ("[W]hen a prosecutor . . . performs the investigative functions normally performed by a detective or police officer, he is eligible only for qualified immunity." (internal quotation marks omitted)).

Although the line between a prosecutor's acts as an advocate and as an investigator is often "difficult to draw," *Zahrey*, 221 F.3d at 347, "[t]he key . . . is the degree to which the specific conduct at issue is 'intimately associated with the judicial phase of the criminal process,'" *DiBlasio v. Novello*, 344 F.3d 292, 300 (2d Cir. 2003) (quoting *Imbler*, 424 U.S. at 430). In assessing how closely connected a prosecutor's conduct is to the judicial phase of the criminal process, the timing of the conduct is relevant, but not dispositive. *See id.* at 300–01; *see also Genzler v. Longanbach*, 410 F.3d 630, 639 (9th Cir. 2005) ("The timing of evidence gathering is a relevant fact in determining how closely connected that conduct is to the official's core advocacy function in the judicial process . . . ."). For example, the Supreme Court has observed that absolute immunity is unavailable for investigative conduct that takes place before probable cause has been established: "[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Buckley*, 509 U.S. at 274; *see also Zahrey*, 221 F.3d at 347 n.2 (explaining that *Buckley* "suggests that a prosecutor's conduct prior to the establishment of probable cause should be considered investigative"). The converse is not necessarily true, however. "[A] determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards." *Buckley*, 509 U.S. at 274 n.5. The Second Circuit has distinguished between "preparing for the presentation of an existing case," on the one hand, and attempting to "furnish evidence on which a prosecution could be based," on the other hand—making clear that only the former entitles a prosecutor to absolute immunity. *Smith*, 147 F.3d at 94. Notably, the mere fact that a prosecutor might later convene a grand jury and obtain an indictment does not serve to cloak his or her prior investigatory actions with the protection of absolute immunity. *Buckley*, 509 U.S. at 275–76

("That the prosecutors later called a grand jury to consider the evidence this work produced does not retroactively transform that work from the administrative into the prosecutorial.").

"[D]istrict courts are encouraged to determine the availability of an absolute immunity defense at the earliest appropriate stage, and preferably before discovery . . . because an absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity." *Deronette v. City of New York*, No. 05-CV-5275, 2007 WL 951925, at *4 (E.D.N.Y. Mar. 27, 2007) (alterations and internal quotation marks omitted). "However, the Second Circuit has held that, 'when it may not be gleaned from the complaint whether the conduct objected to was performed by the prosecutor in an advocacy or an investigatory role, the availability of absolute immunity from claims based on such conduct cannot be decided as a matter of law on a motion to dismiss.'" *Varricchio v. County of Nassau*, 702 F. Supp. 2d 40, 65 (E.D.N.Y. 2010) (quoting *Hill*, 45 F.3d at 663). Accordingly, the Court addresses each Defendant's claims for prosecutorial immunity in turn.

### a. Putnam County Prosecutors Levy and Gil

Plaintiff alleges that Levy performed numerous investigative functions that are not shielded by absolute immunity, including knowingly fabricating evidence and submitted false applications and supporting affidavits to obtain unlawful eavesdropping and search warrants, (Am. Compl. ¶¶ 89–107), as well as making knowingly false statements to the press, (*id.* ¶¶ 257–58). More specifically, Plaintiff alleges that Levy "was personally involved in virtually every decision that was made during the investigation," (*id.* ¶ 161); Levy personally applied for all eavesdropping warrants, (*id.* ¶ 231); Levy made false statements under oath in his applications for warrants, (*id.* ¶ 104); and Levy continued his campaign of harassment after the second indictment was dismissed by using subpoenas to forcibly interrogate Galgano's lawyers,

investigators, and friends under the guise of a new, unrelated, and ultimately abandoned investigation, (*id.* ¶¶ 253–254). Plaintiff alleges Gil made false statements under oath in support of the May 1, 2014 warrant application, (*id.* ¶¶ 77, 79), and submitted doctored transcripts of the controlled calls in support of the warrants and drafted Nagle's fraudulent affidavits, (*id.* ¶ 192). The Court assesses each of the allegations in turn.

The Supreme Court has held that a "prosecutor's appearance in court in support of an application for a search warrant and the presentation of evidence at that hearing [are] protected by absolute immunity." *Kalina v. Fletcher*, 522 U.S. 118, 125–26 (1997); *see also Van de Kamp*, 555 U.S. at 343 (reaffirming that prosecutorial immunity applies "when a prosecutor . . . appears in court to present evidence in support of a search warrant application" (citation omitted).). However, where the prosecutor acts as a complaining witness in support of a warrant, that conduct is not protected by prosecutorial immunity. *See Van de Kamp*, 555 U.S. at 343 (noting "that absolute immunity does not apply . . . when a prosecutor acts as a complaining witness in support of a warrant application" (citations omitted)). Here, Plaintiff has alleged that Levy not only presented evidence to the Court in support of a warrant, but also acted as a complaining witness when he swore under penalty of perjury in support of the warrant. (*See* Miranda Decl. Ex. F ("May 13, 2014 Levy Aff.") (Dkt. No. 148).) Similarly, Plaintiff alleges Gil submitted a sworn application for the warrant that contained known falsehoods, and thus also acted as a complaining witness. (Am. Compl. ¶ 76.) Such conduct is not protected by absolute immunity. *See Van de Kamp*, 555 U.S. at 343 (no immunity when acting as a "complaining witness in support of a warrant application"); *Kalina*, 522 U.S. at 119 ("Petitioner was acting as a complaining witness rather than a lawyer when she executed the certification 'under penalty of perjury,' and, insofar as she did so, § 1983 may provide a remedy for respondent . . . Testifying

about facts is the function of the witness, not of the lawyer." (alterations omitted)); *Liffiton v. Keuker*, 850 F.2d 73, 77 (2d Cir. 1988) (finding sufficient claims that the defendant "submitted false affidavits in support of the application . . . for the wiretap warrant, and subsequently submitted an application for extension of the wiretap, again using false affidavits"); *see also Buckley*, 509 U.S. at 275 (holding that fabricating evidence before probable cause has been established is not covered by absolute immunity); *Hill*, 45 F.3d at 662 ("[Absolute] immunity does not protect efforts to manufacture evidence that occur during the investigatory phase of a criminal case."); *Watson v. Grady*, No. 09-CV-3055, 2010 WL 3835047, at *17 (S.D.N.Y. Sept. 30, 2010) (noting "the Supreme Court and the Second Circuit have held that prosecutors are not protected by absolute immunity for fabricating evidence if they acted in an investigatory role").[25] Thus, Levy and Gil are not entitled to prosecutorial immunity for Plaintiff's allegations that they submitted false affidavits and applications in support of the warrants.[26]  Additionally, Plaintiff's allegations regarding allegedly defamatory statements made by Levy to the media are not

---

[25] Putnam Individual Defendants argue they are entitled to witness immunity.  However, "witness immunity is lost when the witness acts as a 'complaining witness'—that is, when the witnesses' role was not limited to merely providing testimony, but instead involved initiating the prosecution such that the witness can be deemed to have commenced or continued the proceedings against the plaintiff within the meaning of malicious prosecution law." *Anilao v. Spota*, 774 F. Supp. 2d 457, 507 (E.D.N.Y. 2011) (collecting cases); *see also White v. Frank*, 855 F.2d 956, 958–59 (2d Cir.1988) ("[There is a] subtle but crucial distinction between two categories of witnesses with respect to their immunity for false testimony.  Those whose role was limited to providing testimony enjoyed immunity; those who played a role in initiating a prosecution—complaining witnesses—did not enjoy immunity.").

[26] Oddly, Putnam Individual Defendants rely on the January 28, 2015 Putnam County Court decision by Justice Zuckerman dismissing the first indictment as evidence there was a legitimate basis for the first prosecution, which they characterize as holding "Levy's office had established every element of each offense for which [P]laintiff had been charged and for which the grand jury had presented a true bill."  (Cty. Individual Mem. 17 (quoting Miranda Decl. Ex. L ("Jan. 28, 2015 Putnam County Court Decision") 4 (Dkt. No. 148)).)  However, the page they cite as supporting that characterization contains no such claim.  (*See* Jan. 28, 2015 Putnam County Court Decision 4.)

protected by prosecutorial immunity. *Van de Kamp*, 555 U.S. at 343 ("absolute immunity does not apply . . . when the prosecutor makes statements to the press" (citations omitted)).[27]

However, as Defendants correctly point out, Levy is protected by absolute immunity for his evaluation of the evidence and subsequent decision to indict Plaintiff. *See Kalina*, 522 U.S. at 130 (finding that the defendant prosecutor's "determination that the evidence was sufficiently strong to justify a probable-cause finding[] [and] her decision to file charges" "involved the exercise of professional judgment" and were protected by absolute immunity); *Williams v. City of New York*, No. 06-CV-6601, 2009 WL 3254465, at *10 (E.D.N.Y. Oct. 9, 2009) ("[E]valuating evidence and deciding whether to initiate a prosecution are exactly the sort of actions for which absolute immunity shields prosecutors from liability."); *Bhatia v. Gaetano*, No. 06-CV-1771, 2008 WL 901491, at *3 (D. Conn. Mar. 31, 2008) (finding that the decision to institute a prosecution "after considering the weight of evidence in the case," despite evidence that witnesses were lying, was protected by absolute immunity). Moreover, Levy is protected by absolute immunity for Plaintiff's allegations regarding misconduct during the grand jury proceedings. *See Burns v. Reed*, 500 U.S. 478, 490 (1991) (noting that in 1923 the Supreme "Court affirmed a decision by the . . . Second Circuit . . . [which] held that the common-law [prosecutorial] immunity extended to a prosecutor's conduct before a grand jury"); *Peay v. Ajello*,

_____

[27] Levy and Gil are also not entitled to prosecutorial immunity based on the fact that investigation of Galgano occurred as part of the ongoing prosecution of Zaimi. (Cty. Individual Mem. 28–29; Cty. Individual Reply Mem. 1–2.) In regard to investigations of different crimes against the same defendant, the Court has previously noted that "if searching for evidence of crimes not charged in an indictment, the prosecutor only can claim qualified immunity." *Deskovic v. City of Peekskill*, No. 07-CV-8150, 2009 WL 2475001, at *14 (S.D.N.Y. Aug. 13, 2009) (citing *KRL v. Moore*, 384 F.3d 1105, 1113 (9th Cir. 2004) (holding that prosecutor's collateral investigation into different crime did not merit absolute immunity, as it "went beyond any legitimate preparation to prosecute [the defendant] for . . . the . . . crimes charged in the indictment")). Such an argument clearly extends to search for evidence of different crimes against different defendants.

470 F.3d 65, 67–68 (2d Cir. 2006) (conferring absolute immunity on prosecutor who allegedly conspired to present false evidence at trial); *Shmueli*, 424 F.3d at 237 ("A prosecutor is . . . entitled to absolute immunity despite allegations of his 'knowing use of perjured testimony' and the 'deliberate withholding of exculpatory information.'" (quoting *Imbler*, 424 U.S. at 431 n.34)); *Deskovic v. City of Peekskill*, No. 07-CV-8150, 2009 WL 2475001, at *15 (S.D.N.Y. Aug. 13, 2009) (finding the prosecutor "absolutely immune for allegedly procuring false scientific evidence . . . and then presenting it at trial").

The fact that Plaintiff alleges that Levy fabricated charges against him in order to create and manufacture a high-profile case to gain media attention and to advance his reelection campaign does not impact the absolute immunity analysis. *Shmueli*, 424 F.3d at 237 (noting that "a defense of absolute immunity from a claim for damages must be upheld against a § 1983 claim that the prosecutor commenced and continued a prosecution that was within his jurisdiction but did so for purposes of retaliation"); *Pinaud*, 52 F.3d at 1148 (noting that "absolute immunity covers virtually all acts, regardless of motivation, associated with the prosecutor's function as an advocate" (alterations and internal quotation marks omitted)).

To the extent Plaintiff's failure to train claims involve investigative functions, those, too, are not protected by prosecutorial immunity. In *Van de Kamp*, the Supreme Court held that matters of supervision and training related to "the prosecutor's basic trial advocacy duties" are prosecutorial, not administrative. 555 U.S. at 346. Accordingly, the Supreme Court considered training related to the *Giglio* and *Brady* decisions entitled to prosecutorial immunity. *Id.* Here, Plaintiff alleges that Levy failed to train and supervise subordinate ADAs:

> regarding the difference between criminal conduct and innocent conduct under
> circumstances present in this case; how to conduct a proper interrogation that elicits
> voluntary, truthful statements and not involuntary, false statements; the proper
> requirements for trap-and-trace, pen register, and eavesdropping warrants; the

> proper requirements for a search warrant; the proper execution of a search warrant; the proper conduct of grand jury proceedings; the evidence required to lawfully indict for the crimes charged; and the prosecutor's duty to disclose exculpatory evidence.

(Am. Compl. ¶ 232.) The Parties fail to parse these various allegations to argue which involve "basic trial advocacy duties" and which relate to "investigative functions." To the extent these claims relate to training on submitting proper complaining witness affidavits with warrant applications and engaging in proper investigative techniques, those claims are upheld. *See Hill*, 45 F.3d at 662 (noting prosecutorial immunity does not extend to fabrication of false evidence that occurs during the investigatory phase of a criminal case). However, the claims regarding grand jury proceedings, the evidence required to indict for crimes charged, and the duty to disclose exculpatory evidence are related to the judicial phase of the criminal process, and are basic trial advocacy duties that are covered by prosecutorial immunity. *See id.* at 661–62 (noting prosecutorial immunity extends to conduct before a grand jury, initiating a prosecution and determining which offense to charge, and failure to disclose *Brady* material).

Because the Court finds that Levy is absolutely immune from liability for the conduct alleged by Plaintiff as to the decision to indict Plaintiff and any conduct before the Grand Jury, the Court dismisses any causes of action or claims reliant on those facts. Plaintiff should clarify in an Amended Complaint the extent to which investigative conduct forms the basis for the second and fourth causes of action for malicious prosecution, *Shmueli*, 424 F.3d at 238–39 (dismissing malicious prosecution claim based on absolute immunity); the third cause of action for due process violations, *Zanfardino v. City of New York*, 230 F. Supp. 3d 325, 335 (S.D.N.Y. 2017) (dismissing § 1983 "due process violations" claim where prosecutor allegedly ignored evidence in custody of NYPD detectives, malicious prosecution claim, and Brady violation claim against prosecutor based on absolute immunity); *O'Neal v. City of New York*, 196 F. Supp. 3d

421, 432 (S.D.N.Y. 2016), *aff'd*, 679 F. App'x 16 (2d Cir. 2017) (dismissing fair trial claim

based on absolute immunity); the eighth cause of action for First Amendment retaliation,

*Hartman v. Moore*, 547 U.S. 250, 261–62 (2006) (holding a § 1983 claims for retaliatory

prosecution under the First Amendment "will not be brought against the prosecutor, who is

absolutely immune from liability for the decision to prosecute"); and the thirteenth cause of

action for § 1983 conspiracy, *Peay*, 470 F.3d at 68–69 (affirming dismissal of claim against

prosecutor for § 1983 conspiracy based on absolute immunity). For now, it suffices to conclude

that any conduct involving advocacy is shielded by prosecutorial immunity. However, because

Plaintiff also alleges investigative conduct by Levy and Gil as part of the basis for these claims,

these causes of action are not dismissed in their entirety.

### b. Putnam County Prosecutor Abissi

Plaintiff's allegations against Abissi are somewhat less clear. Plaintiff alleges that after

the first indictment was dismissed, Abissi advised Galgano's defense attorneys that the PCDAO

was going to file disciplinary charges against Galgano. (Am. Compl. ¶ 189.) Plaintiff also

alleges that Abissi planned to conduct prospective searches and seizures of Galgano's property

(in addition to the searches supported by allegedly false statements by Levy, Gil, Gonzalez, and

Nagle), (*id.* ¶ 190), but it is unclear whether those searches were carried out. Additionally,

Plaintiff alleges that after the second indictment was dismissed, Abissi continued to investigate

Plaintiff for other criminal offenses, (*id.* ¶ 253), and as part of the investigation, Abissi

subpoenaed Galgano's criminal defense attorneys, his defense investigator, and other attorneys

and friends of Galgano, and that these subpoenas were designed to harass and damage Galgano

and to elicit communications that were protected by attorney-client privilege, (*id.* ¶ 254).

Abissi's alleged conduct is protected by prosecutorial immunity to the extent it involved

"deciding whether to bring charges and presenting a case to a grand jury or a court, along with the tasks generally considered adjunct to those functions, such as witness preparation, witness selection, and issuing subpoenas," which all constitute prosecutorial functions. *Simon v. City of New York*, 727 F.3d 167, 171 (2d Cir. 2013). Although unclear what constitutional violation is alleged to have occurred in conducting the new investigation or what conduct Abissi specifically engaged in outside requesting subpoenas, Plaintiff's allegations regarding a potentially improper motive are covered by prosecutorial immunity. *See Shmueli*, 424 F.3d at 237–38 (absolute immunity applies to claims prosecution was done with improper motive); *Pinaud*, 52 F.3d at 1148 (same). Thus, all of the claims against Abissi are dismissed.

### c.  Putnam County Investigators Gonzalez and Lopez

Plaintiff alleges that Gonzalez made false statements in affidavits in support of warrant applications for McQuaid's cell phone, (Am. Compl. ¶¶ 78–79, 91, 93–99), which were later incorporated by reference into subsequent eavesdropping applications, (*id.* ¶ 80), and coerced McQuaid and Lia into making false statements during an interrogation, (*id.* ¶¶ 113, 118). Plaintiff alleges Lopez improperly interrogated Lia. (*Id.* ¶ 126.) Plaintiff also alleges that Gonzalez and Lopez failed to intercede on Plaintiff's behalf. (*Id.* ¶ 191.)

Regarding the allegedly false statements in Gonzalez's affidavits submitted for the May 1, 2014 Application and the May 14, 2014 Application, for the same reasons explained above as to Levy and Gil, Gonzalez is not entitled to prosecutorial immunity. *See supra* Section II.C.1.a.

Gonzalez and Lopez are also not immune for allegedly coercing false testimony from McQuaid and Lorusso during the pre-indictment investigatory period. *See Crews v. Cty. of Nassau*, 996 F. Supp. 2d 186, 215 (E.D.N.Y. 2014) (holding that "to the extent it is alleged that [the] ADA [defendant] questioned [a witness] and coerced a false statement implicating [the]

plaintiff, he was assisting police in the investigation of an unsolved robbery. Accordingly, the doctrine of absolute immunity would not shield [the] ADA [defendant] from liability in a false arrest claim for his participation in allegedly coercing [the witness] to implicate [the] plaintiff." (collecting cases)); *see also Buckley*, 509 U.S. at 275 (1993) (absolute immunity does not cover "a prosecutor's fabrication of false evidence during the preliminary investigation of an unsolved crime"); *Morse v. Fusto*, No. 07–CV–4793, 2013 WL 4647603, at *6 (E.D.N.Y. Aug. 29, 2013) ("A prosecutor who fabricates evidence in his investigative role, to whom it was reasonably foreseeable that such evidence would later be used in his advocacy role before the grand jury, is equally liable for an ensuing deprivation of liberty.")). *O'Neal*, 196 F. Supp. 3d at 430, upon which Defendants rely, is not analogous. There, the court found an investigator was entitled to prosecutorial immunity for an interview that occurred two weeks before trial and ten months after the indictment, and explicitly distinguished cases where "the allegedly actionable statements or fabricated evidence in those cases predated the plaintiff's indictment and did not constitute activity that was preparatory to a defendant's protected trial or grand jury testimony." *Id.* at 430–31.[28] Here, Gonzalez and Lopez's conduct all occurred prior to indictment as part of the investigation into potential charges. Thus, they are not entitled to absolute immunity.

---

[28] Putnam County Investigators argue that they cannot be liable for malicious prosecution because they did not "initiate" the prosecution. (Cty. Individual Mem. 38.) However, Plaintiff's allegations that Gonzalez and Lopez submitted false affidavits in support of the warrants and coerced witness into incriminating Galgano suffice to satisfy the "initiation" element of a malicious prosecution claim. *See Tommy Hilfiger Licensing, Inc. v. Bradlees, Inc.*, No. 99-CV-4677, 2002 WL 737477, at *3 (S.D.N.Y. Apr. 25, 2002) ("[W]here a party is responsible for providing false information or manufactured evidence that influences a decision to prosecute, he may be held liable for malicious prosecution." (internal quotation marks omitted)); *Mazza v. City of New York*, No. 98-CV-2343, 1999 WL 1289623, at *6 (E.D.N.Y. July 13, 1999) (noting that "a person who does not file a complaint commencing a criminal proceeding" nevertheless "may be found to have instituted the proceeding for malicious prosecution purposes when the person plays an active role in the initiation and continuation of criminal proceedings" against the party claiming malicious prosecution).

## 2. Qualified Immunity

Putnam County Individual Defendants argue that even if they are not entitled to prosecutorial immunity, they are nonetheless shielded by qualified immunity. (Cty. Individual Mem. 31; Cty. Individual Reply Mem. 11.) "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "[Qualified] immunity protect[s] government's ability to perform its traditional functions . . . by helping to avoid unwarranted timidity in performance of public duties, ensuring that talented candidates are not deterred from public service, and preventing the harmful distractions from carrying out the work of government that can often accompany damages suits." *Filarsky v. Delia*, 566 U.S. 377, 389–90 (2012) (second alteration in original) (citation and internal quotation marks omitted). Qualified immunity shields a defendant from standing trial or facing other burdens of litigation "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001) (internal quotation marks omitted).

The Supreme Court has held that when evaluating an asserted qualified immunity defense, a court may begin by examining whether a reasonable officer in Defendants' position would have believed his or her conduct would violate the asserted constitutional right. *See Pearson*, 555 U.S. at 236 (overruling *Saucier v. Katz*, 533 U.S. 194 (2001), and explaining that judges are no longer required to begin by deciding whether a constitutional right was violated but are instead "permitted to exercise their sound discretion in deciding which of the two prongs of

the qualified immunity analysis should be addressed first").  The Supreme Court has further

instructed that "[t]o be clearly established, a right must be sufficiently clear that every reasonable

official would [have understood] that what he is doing violates that right.  In other words,

existing precedent must have placed the statutory or constitutional question beyond debate."

*Reichle v. Howards*, 566 U.S. 658, 664 (2012) (second alteration in original) (citations and

internal quotation marks omitted).  Furthermore, "the right allegedly violated must be

established, not as a broad general proposition, but in a particularized sense so that the contours

of the right are clear to a reasonable official."  *Id.* at 665 (citations and internal quotation marks

omitted).  Otherwise stated, to determine whether a right is clearly established, courts must

determine "whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the

Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would

have understood that his conduct was unlawful."  *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d

Cir. 2011).

Given that "qualified immunity is not only a defense to liability, but also provides

immunity from suit," a court should resolve a "defendant's entitlement to qualified

immunity . . . 'at the earliest possible stage in litigation.'"  *Lynch v. Ackley*, 811 F.3d 569, 576

(2d Cir. 2016) (quoting *Pearson*, 555 U.S. at 231–32).  "[U]sually, the defense of qualified

immunity cannot support the grant of a Rule 12(b)(6) motion," but a district court may grant a

Rule 12(b)(6) motion on the ground of qualified immunity if "the facts supporting the defense

appear on the face of the complaint." *McKenna v. Wright*, 386 F.3d 432, 435–36 (2d Cir. 2004)).

As a result, "a defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a

motion for summary judgment must accept [that] . . . the plaintiff is entitled to all reasonable

inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *Id.* at 436 (internal quotation marks omitted).

Putnam County Individual Defendants argue they are entitled to qualified immunity on the first cause of action for unlawful seizure of Galgano's communications from June 7, 2014 through July of 2014; second and fourth causes of action for malicious prosecution; fifth cause of action for unlawful search of Galgano's home, offices and motor vehicle and the seizure of his computers and electronic storage devices; sixth cause of action for unlawful search and seizure of Galgano and the ensuing seizure of his cellular phone; seventh cause of action for unlawful search of Gargano's computers, cellular phone, and electronic storage devices because probable cause is a complete defense as to all of these claims, and Putnam County Individual Defendants had arguable probable cause to proceed against Plaintiff. (Cty. Individual Mem. 31.) Plaintiff argues that because Levy, Gil, Lopez, and Gonzalez fabricated evidence, they are not protected by qualified immunity. (Pl.'s Mem. 35.)

"In the case of allegations to which probable cause is a complete defense . . . the Second Circuit has defined the standard of qualified immunity as one of arguable probable cause." *Hudson v. Cty. of Dutchess*, No. 12-CV-5548, 2015 WL 7288657, at *8 (S.D.N.Y. Nov. 16, 2015) (internal quotation marks omitted). "Arguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well established law." *Cerrone v. Brown*, 246 F.3d 194, 202–03 (2d Cir. 2001) (emphasis in original) (internal quotation marks omitted). In other words, an officer is entitled to qualified immunity if (1) "it was objectively reasonable for the officer to believe that probable cause existed," or (2) "officers of reasonable competence could disagree on whether the probable cause test was met."

*See Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991); *see also Hudson*, 2015 WL 7288657, at *8 (same).

"[T]he issuance of a warrant by a neutral magistrate, which depends on a finding of probable cause, creates a presumption that it was objectively reasonable for the officers to believe that there was probable cause . . . ." *Golino*, 950 F.2d at 870. "To rebut that presumption, a plaintiff must make a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit and that the allegedly false statement was necessary to the finding of probable cause." *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 466 (S.D.N.Y. 2008) (internal quotation marks omitted); *see also Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991) ("A plaintiff who argues that a warrant was issued on less than probable cause faces a heavy burden."); *Merriweather v. City of New York*, 12–CV–5258, 2015 WL 57399, at *7 (S.D.N.Y. Jan. 5, 2015) ("Where a magistrate has determined that an affidavit presented to him provides probable cause for the issuance of a warrant, the person challenging the warrant must make a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard to the truth, made a false statement in his affidavit and that the allegedly false statement was necessary to the finding of probable cause." (alterations internal quotation marks omitted)).

Here, Plaintiff alleges that Levy, Gil, and Gonzalez made false statements under oath in affidavits used to support the June 6, 2014 Galgano Application, and thus misled the judge into issuing the warrant. More specifically, Plaintiff alleges that Levy, Gil, and Gonzalez made knowingly false misrepresentations in the May 14, 2014 Galgano Application to install and use a pen register and "trap and trace" device, and to collect cellular site location information on

Galgano's cell phone.  (Am. Compl. ¶¶ 89–91.)  Plaintiff also alleges that in the May 14, 2014

McQuaid Application, Levy and Gonzalez provided false statements, (*id.* ¶ 93), which were later

incorporated by reference into all subsequent eavesdropping applications in connection with the

Galgano investigation, (*id.* ¶ 99).  Plaintiff also alleges that Levy made knowingly false

statements in the June 6, 2014 Galgano Application, including statements that communications

intercepted as a result of the wiretap on McQuaid's phone "reveal that McQuaid and Lia are

conspiring with Galgano to offer a bribe to and engage in conduct meant to influence and

persuade Kimberly Lorusso from testifying against Zaimi in Putnam County Court."  (*Id.*

¶¶ 103–04.)  Thus, Plaintiff has sufficiently alleged that Levy, Gil, and Gonzalez conspired to

illegally obtain the electronic surveillance warrants on Galgano's phone and submitted false

affidavits in support of each subsequent application.  Fabrication of evidence is not objectively

reasonable or a subject over which reasonable law enforcement officials could disagree, and

Levy, Gil, and Gonzalez are therefore not entitled to qualified immunity as to these claims.  *See*

*Liffiton*, 850 F.2d at 77 ("[T]he complaint clearly alleges that the wiretaps were illegal because

the warrant was issued on the basis of false affidavits, and that [the defendant] intentionally

secured the invalid warrant.  Such an action is [not] objectively reasonable under clearly

established law, entitling him to qualified immunity.); *see also Dufort v. City of New York*, 874

F.3d 338, 354 (2d Cir. 2017) (denying summary judgment on qualified immunity grounds where

the plaintiff "established a dispute of material fact as to whether the [d]efendants intentionally

withheld or manipulated key evidence during his arrest and prosecution" because "[s]uch a

'knowing' violation of his Fourth and Fifth Amendment rights would, if proven, be enough to

overcome the protection of qualified immunity); *Zahrey*, 221 F.3d at 355 ("It is firmly

established that a constitutional right exists not to be deprived of liberty on the basis of false

evidence fabricated by a government officer."); *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) (denying qualified immunity for claims of fabrication of evidence because conspiring to fabricate evidence "violates an accused's clearly established constitutional rights, and no reasonably competent police officer could believe otherwise"); *Blake v. Race,* 487 F. Supp. 2d 187, 214 (E.D.N.Y. 2007) (denying qualified immunity because plaintiff "created a material issue of fact as to whether the defendants participated in the fabrication of evidence to establish probable cause to arrest and prosecute" the plaintiff); *Mejia v. City of New York*, 119 F. Supp. 2d 232, 273 (E.D.N.Y. 2000) (rejecting qualified immunity defense and noting that "one who gives false information to a prosecutor that he knows will induce a prosecutor to commence or continue proceedings against a plaintiff, knowingly violates the law and is not entitled to qualified immunity for his actions"); *see also Jones v. Parmley*, 465 F.3d 46, 62–64 (2d Cir. 2006) (denying summary judgment on qualified immunity on state law malicious prosecution claim, noting that where "the record plainly reveals the existence of genuine issues of material fact relating to the qualified immunity defense[,] . . . New York courts are no different" from federal courts).[29]

---

[29] Putnam County Individual Defendant's blame Nagle for any problems with the search warrants on Galgano's home, office, and vehicle and argue that Gil, Gonzalez, and Levy relied in good faith on the issuance of that warrant in conducting the search. (Cty. Individual Mem. 43–44.) This claim fails. "An officer's reliance on a judge's probable-cause determination [must] be 'objectively reasonable.'" *Conroy v. Caron*, 275 F. Supp. 3d 328, 351 (D. Conn. 2017) (quoting *United States v. Leon*, 468 U.S. 897, 922–23 (1984).) This is one such circumstance where Gil, Gonzalez, and Levy "ha[d] no reasonable grounds for believing that the warrant was properly issued," *id.* (quoting *Leon*, 468 U.S. at 922–23), because they allegedly were involved in fabricating the evidence that served as the basis for those warrants. Thus, "with respect to the qualified immunity defense, 'where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable, . . . the shield of immunity will be lost.'" *Id.* (alteration omitted) (quoting *Malley* v. Briggs, 475 U.S. 335, 344–45 (1986)).

### 3. Third Cause of Action – Denial of Due Process

Defendants' only argument as to the Due Process claim is that it is duplicative with the malicious prosecution claim. (Cty. Individual Mem. 23.) Courts in the Second Circuit have long treated malicious prosecution and fair trial claims as separate causes of action. *See Garnett v. Undercover Officer C0039*, 838 F.3d 265, 278 (2d Cir. 2016) (noting that "fair trial claims cover kinds of police misconduct not addressed by false arrest or malicious prosecution claims") (citing *Ricciuti*, 124 F.3d at 130); *see also Brandon*, 705 F. Supp. 2d at 276 (noting that the Second Circuit has permitted "claims for both malicious prosecution and a denial of his right to trial based on the same alleged fabrication of evidence") (internal citation omitted)); *McCaffrey v. City of New York*, No. 11-CV-1636, 2013 WL 494025, at *12 (S.D.N.Y. Feb. 7, 2013) (treating plaintiff's malicious prosecution and fair trial claims as separate constitutional torts). Thus, the Court declines to dismiss Plaintiff's third cause of action on this basis.

### 4. Ninth Cause of Action – Defamation Under New York State Law

Levy argues the one year limitations period for defamation claims bars any claim based on statements made prior to May 13, 2015. (Cty. Individual Mem. 44.) Specifically, Levy argues the claims based on the April 21, 2014 press release, (Am. Compl. ¶ 170), and the July 14, 2014 press conference, (*id.* at ¶ 173), fall outside the limitations period. Plaintiff argues the exception for "reissued" or "republished" statements applies. (Pl.'s Mem. 39–40.)

#### a. Time Barred Claims

The statute of limitations in New York for defamation is one year from the date of the publication of the statement. N.Y. C.P.L.R. § 215(3). However, "[a]n exception to the single publication rule applies when a defamatory statement is 'reissued' or 'republished,' which gives rise to a new limitations period." *FTA Mkt. Inc. v. Vevi, Inc.*, No. 11-CV-4789, 2012 WL 383945, at *7 (S.D.N.Y. Feb. 1, 2012). Plaintiff alleges in his opposition to the Motion that

"Levy's defamatory remarks were repeated many times, including after May 13, 2015, giving rise to a new limitations period each time." (Pl.'s Mem. 40 (citing Am. Compl. ¶¶ 202, 256).) The Court agrees with Levy, (Cty. Individual Reply Mem. 13–14), that Plaintiff's allegations lack specificity as to how and when the statements made prior to May 13, 2015 were repeated. Indeed, many of Plaintiff's allegations in the Amended Complaint leave the Court to speculate on when the statements were even made. (*See* Am. Compl. ¶ 186 (alleging defamatory conduct in press release on unspecified date after July 2, 2014); *id.* ¶ 259 (alleging defamatory conduct in press release on unspecified date).) However, Plaintiff does alleges defamatory conduct after May 13, 2015 that is within the limitations period, the merits of which the Court will address below. More specifically, Plaintiff alleges that after the Putnam County Court dismissed the second indictment on October 25, 2015, Levy issued a written press release commenting on matter before the grand jury, and made false and defamatory statements about Galgano. (*Id.* ¶¶ 253–56.) This claim is timely.

### b. Levy's Press Release

A plaintiff must plead four elements to state a claim of defamation: "(1) a false and defamatory statement concerning the plaintiff; (2) publication by the defendant of such a statement to a third party; (3) fault on the part of the defendant; and (4) injury to the plaintiff." *Tucker v. Wyckoff Heights Med. Ctr.*, 52 F. Supp. 3d 583, 597 (S.D.N.Y. 2014). Specifically, a defamatory statement is one that "exposes an individual to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace," or one that would "induces an evil opinion of one in the minds of right-thinking persons," and that deprives the plaintiff of "confidence and friendly intercourse in society." *Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 177 (2d Cir. 2000) (alteration and internal quotation marks

omitted).  However, "statements of opinion are not defamatory; instead, they receive absolute protection under the New York Constitution."  *Tucker*, 52 F. Supp. 3d at 597 (internal quotation marks omitted).  This is "[b]ecause only assertions of fact are capable of being proven false [and] a defamation action cannot be maintained unless it is premised on published assertions of fact."  *Torain v. Liu*, No. 06-CV-5851, 2007 WL 2331073, at *2 (S.D.N.Y. Aug. 16, 2007) (internal quotation marks omitted), *aff'd*, 279 F. App'x 46 (2d Cir. 2008).

Levy argues that the statements in the press release were statements of opinion, and thus entitled to absolute protection.  (Cty. Individual Mem. 45.)  The New York Court of Appeals has identified three factors that help inform the Court's determination on that issue: "(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact."  *Torain*, 2007 WL 2331073, at *2 (quoting *Brian v. Richardson*, 660 N.E.2d 1126, 1129 (N.Y. 1995)).  However, "even if a statement is one of opinion, it will nonetheless be actionable if it implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it—i.e., it is a mixed opinion."  *Id.* (internal quotation marks omitted).

Here, Levy's statement as a prosecutor criticizing the dismissal of the second indictment and discussing the weight of the evidence presented to a *secret* grand jury proceeding is a mixed opinion, because his statements clearly "implied that [his] opinion [was] based on undisclosed facts not know[n] to the listener."  *Id.* at *3.  Specifically, Levy's statements regarding "additional corroborative physical evidence of Galgano's guilt," the omission of "evidence of

George Galgano's other crimes and bad acts, because they were hel[d] to be unduly prejudicial," and that "[t]he grand jurors understood the complex nuances of this conspiracy," (Am. Compl. ¶ 256), suggests Levy—and the grand jurors—had access to information unknown to the reader regarding Plaintiff's guilt. Thus, Levy is not entitled to absolute protection as these statements were mixed opinions. *See, e.g.*, *Arts4All, Ltd. v. Hancock*, 773 N.Y.S.2d 348, 352 (App. Div. 2004) (holding that defendant's opinions were actionable as slander per se because they "impl[ied] that defendant . . . knows undisclosed, detrimental facts about" how plaintiff's business was run); *Kelleher v. Corinthian Media, Inc.*, 617 N.Y.S.2d 726, 727 (App. Div. 1994) (finding that the plaintiff had a valid claim of defamation per se because defendants' statements were "mixed opinion" rather than protected "pure opinion"). The Motion is therefore denied as to the defamation claims.

### 5. Tenth Cause of Action – Abuse of Process

Putnam County Individual Defendants argue the one-year limitations period for abuse of process claims brought under New York law bars any claim based on conduct occurring prior to May 13, 2015. (Cty. Individual Mem. 49.) Plaintiff argues the cause of action did not accrue until the underlying action that was the basis for the claim was terminated in Plaintiff's favor, in this case, on November 16, 2015. (Pl.'s Mem. 45–46.)

The Parties agree that statute of limitations for a New York state abuse of process claim is one year. *See Borison v. Cornacchia*, No. 96–CV–4783, 1997 WL 232294, at *1 (S.D.N.Y. May 7, 1997) ("[A]ll appellate courts . . . recognize that a claim for damages for an intentional tort such as abuse of process is subject to the one-year limitations period."). However, there is a dispute as to when the cause of action accrued. This Court has previously rejected the contention that an abuse of process cause of action accrues on the date a conviction was reversed. *See*

*Dellutri v. Vill. of Elmsford*, 895 F. Supp. 2d 555, 563 (S.D.N.Y. 2012).  This is because "[o]rdinarily, a claim for abuse of process accrues at such time as the criminal process is set in motion—typically at arrest—against the plaintiff."  *Id.* (quoting *Duamutef v. Morris*, 956 F. Supp. 1112, 1118 (S.D.N.Y. 1997); *see also Anderson v. Cty. of Putnam*, No. 14-CV-7162, 2016 WL 297737, at *3 (S.D.N.Y. Jan. 22, 2016) (same).  Accordingly, Plaintiff's claims accrued at the time of his arrest in July 2014, and is time barred.

### 6.  Thirteenth Cause of Action – Conspiracy

Putnam County Individual Defendants argue Plaintiff has failed to allege a claim for conspiracy, because the Amended Complaint contains only conclusory allegations of a conspiracy.  (Cty. Individual Mem. 49.)

A § 1983 conspiracy claim requires "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."  *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999); *see also Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002) (same); *Deskovic v. City of Peekskill*, 894 F. Supp. 2d 443 (S.D.N.Y. 2012) (same). "[C]onspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence."  *Pangburn*, 200 F.3d at 72 (internal quotation marks omitted).  To state a conspiracy claim, Plaintiff "must provide some factual basis supporting a meeting of the minds."  *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) (internal quotation marks omitted).  Thus, Plaintiff must "make an effort to provide some details of time and place and the alleged effects of the conspiracy . . . [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end."

*Warren v. Fischl*, 33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999) (citations and internal quotation marks omitted).

Plaintiff alleges that the conspiracy (1) began "in response to the adverse rulings from the Zaimi court and Mr. Galgano's public criticism of the Town of Carmel Police Department, the [PCDAO], and Defendants Levy and Nagle's handling of the investigation and prosecution," (Am. Compl. ¶¶ 53–54); (2) took place in Putnam County through the joint efforts of the Carmel Police Department and the PCDAO, (*id.* ¶ 170); and (3) was accomplished through the creation of "fabricated, perjurious and/or otherwise inadmissible testimony and evidence that was designed to accomplish the Defendants' unlawful goal of violating Mr. Galgano's Constitutional rights and tarnishing his good name in the community," (*id.* ¶ 171). Plaintiff also alleges that when Ortolando refused to participate in the conspiracy, the Putnam Individual County Defendants retaliated against her and she ultimate resigned. (*Id.* ¶ 199.)

Based on these allegations, Plaintiff has sufficiently alleged the existence of a conspiracy to discredit Plaintiff to further Levy's political prospects and secure victory in the feud between Levy and Sheriff Smith. "[T]his is not a case where evidence shows that the defendants merely worked together, or communicated generally with each other." *Deskovic*, 894 F. Supp. 2d at 466 (collecting cases). Rather, Plaintiff has alleged the foundation of Defendants' plan to discredit Plaintiff as well as a number of "overt acts which [D]efendants engaged in which were reasonably related to the promotion of the alleged conspiracy." *Mitchell v. Cty. of Nassau*, 786 F. Supp. 2d 545, 565 (E.D.N.Y. 2011) (internal quotation marks omitted); *see also Hill v. City of New York*, No. 03-CV-1283, 2005 WL 3591719, at *5 (E.D.N.Y. Dec. 30, 2005) ("Given that a jury may rationally infer that the defendant officers participated in a conspiracy to cover-up

unconstitutional acts, summary judgment is not appropriate on [the] plaintiff's conspiracy claim.").  Thus, the Motion to Dismiss the conspiracy claims is denied.

### D.  Claims Against Carmel Defendants

Carmel Defendants move to dismiss Plaintiff's Amended Complaint on several grounds: (1) that Carmel Police Department is a non-suable entity; (2) that Nagle is entitled to qualified immunity; (3) that all thirteen claims should be dismissed for failure to state a claim.  (*See generally* Carmel Mem.)  The Court addresses each in turn.

#### 1.  Claims against Carmel Police Department

For the same reason the Court dismissed the claims against the PCDA, Plaintiff's claims against the Carmel Police Department are dismissed.  *See supra* Section II.A.1.  *Hall v. City of White Plains*, 185 F. Supp. 2d 293, 303 (S.D.N.Y. 2002) (noting that "under New York law, departments which are merely administrative arms of a municipality, do not have a legal identity separate and apart from the municipality and cannot sue or be sued").

#### 2.  Qualified Immunity

Plaintiff alleges Nagle submitted sworn affidavits rife with perjury to procure warrants against Galgano.  (Pl.'s Mem. 48.)  More specifically, Plaintiff alleges Nagle submitted a sworn affidavit in support of the June 6, 2014 Galgano Application for an eavesdropping warrant that repeated the knowingly false claim that recorded controlled calls demonstrated that McQuaid had "offered money in exchange for Kim's testimony" and that "the money is coming from Zaimi through his lawyer Galgano as a go between."  (Am. Compl. ¶ 105.)  Plaintiff further alleges that Nagle's affidavits in support of the search warrants "contained an astonishing array of other falsehoods, including a claim that Mr. Galgano had 'devised a plan' to travel to North Carolina to confront Kimberly and bribe her; that Mr. Galgano had met with McQuaid and Lia and

'directed' them to bribe Kimberly in exchange for her agreement not to testify against Zaimi;

that Mr. Galgano had 'promised' to provide McQuaid and Lia with an apartment and 'a big

payday for everyone' if Kimberly could be bribed successfully; and that the investigation had

unearthed proof that Mr. Galgano had used private Facebook credentials to gain unauthorized

access to Kimberly's communications and had met with McQuaid and Lia 'to plan and discuss

the furtherance of the conspiracy.'" (*Id.* ¶ 134.) According to Plaintiff, all of these averments

were knowingly false. (*Id.*) Additionally, Nagle's affidavits also falsely alleged that Defendants

had intercepted a telephone call between McQuaid and Kimberly on June 7, 2014—while

McQuaid was physically inside Mr. Galgano's home—during which McQuaid "tells Kimberly

there is compensation in it for her if she does not come to New York and testify." (*Id.* ¶ 135.)

Again, Plaintiff avers "Nagle knew that no such conversation ever occurred." (*Id.* ¶ 136.)

Finally, Nagle made false statements alleging Galgano's text message communications involved

narcotics, which Nagle know to be false. (*Id.* ¶ 115.)

    For the same reasons the Court refused to find that Levy, Gil, and Gonzalez were entitled

to qualified immunity for their alleged false statements submitted in support of the warrants, *see*

Section II.C.2, the Court denies Nagle's Motion to dismiss on the basis of qualified immunity.

### 3. First Cause of Action – Unlawful Seizure of Galgano's Communications from June 7, 2014 through July of 2014; Fifth Cause of Action – Unlawful Search of Galgano's Home, Offices and Motor Vehicle and the Seizure of his Computers and Electronic Storage Devices

    Carmel Defendants argue the first and fifth causes of action against Nagle should be

dismissed, because he did not knowingly make false statements in support of the warrant

application. (Carmel Mem. 21, 27.)

    To challenge that a search warrant, a Plaintiff must allege that "(1) the affiant knowingly

and intentionally, or with reckless disregard for the truth," made false statements or omission in

his application for a warrant, and (2) such statements or omissions were "necessary to the finding of probable cause." *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). "[A] plaintiff must make a 'substantial preliminary showing' that the affiant knowingly and intentionally, or with reckless disregard for the truth, made a material false statement in applying for the warrant." *Calderon*, 138 F. Supp. 3d at 604. "Unsupported conclusory allegations of falsehood or material omission" cannot support a challenge to the validity of the warrant; rather, the plaintiff must make "specific allegations" supported by an offer of proof. *Id.* (internal quotation marks omitted).

As to the first *Franks* element, it is insufficient for a plaintiff to allege that there were *errors* in the affidavit, as "misstatements or omissions caused by 'negligence or innocent mistake[s]'" do not establish falsity or reckless disregard. *United States v. Rajaratnam*, 719 F.3d 139, 153 (2d Cir. 2013) (quoting *Franks,* 438 U.S. at 171). Instead, it must be alleged that any misrepresentations or omissions were "designed to mislead, or that [they were] made in reckless disregard of whether they would mislead." *Id.* at 154 (quoting *United States v. Awadallah,* 349 F.3d 42, 68 (2d Cir. 2003)) (emphasis omitted). Plaintiff has sufficiently alleged that various statements in Nagle's affidavits were false; however, it is a closer call whether Plaintiff has alleged that Nagle "knowingly and intentionally, or with reckless disregard for the truth," made the false statements. The Court finds Plaintiff has sufficiently alleged that Nagle had access to the true content of the recorded conversations, and instead knowingly or with reckless disregard for the truth inserted numerous false claims into the search warrant application. The sheer volume of falsities plausibly suggests that it was unlikely these statements made it into the warrant application by mistake or negligence, but rather, consistent with Plaintiff's other allegations in the Amended Complaint, were part of Nagle's concerted effort to target Plaintiff.

(*See* Am. Compl. ¶ 105 (listing false claims in June 6, 2014 Galgano Application); *id.* ¶ 134 (outlining list of false claims in the search warrant application).)  Thus, the inference is properly drawn that Nagle either knew and intentionally made the false statement, or exhibited reckless disregard for the truth in the application.  Accordingly, Nagle's Motion To Dismiss the first and fifth causes of action is denied.

### 4.  Sixth Cause of Action – Unlawful Search and Seizure of Galgano and the Ensuing Seizure of His Cellular Phone

Carmel Defendants argue that Plaintiff's sixth cause of action for unlawful search and seizure during the execution of the search warrant at his office fails because Plaintiff was lawfully detained and the search was reasonable.  (Carmel Mem. 29.)  However, as explained above, taking Plaintiff's allegations as true, there was no probable cause to search Plaintiff's office.  Accordingly, the principle that officers may "detain the occupants of the premises while a proper search is conducted," *Michigan v. Summers*, 452 U.S. 692, 705 (1981), "does not avail [D]efendants, because [Plaintiff] has adequately pled that the search was unlawful, and detention during the execution of an unlawfully obtained search warrant is actionable under § 1983," *Calderon*, 138 F. Supp. 3d at 610 (collecting cases).  Thus, Carmel Defendant's Motion is denied as to the sixth cause of action.

### 5. Second and Fourth Causes of Action – Malicious Prosecution

Carmel Defendants argue Plaintiff's second cause of action for malicious prosecution under federal law and fourth cause of action for malicious prosecution under New York state law should be dismissed because Plaintiff has failed to allege the proceeding terminated in his favor. (Carmel Mem. 23–24.)

The Fourth Amendment protects individuals from criminal prosecution based on the "perversion of proper legal procedures."  *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 117 (2d Cir.

1995) (quoting *Broughton v. State*, 37 N.Y.2d 451, 457 (1975)). The elements of a malicious prosecution claim under [§] 1983 are "substantially the same as the elements under New York law." *Boyd v. City of New York*, 336 F.3d 72, 75 (2d Cir. 2003) (quotation marks omitted); *Brooks v. Panas*, No. 14-CV-4835, 2016 WL 614684, at *3 (E.D.N.Y. Feb. 16, 2016) (same). To state a claim of malicious prosecution, a plaintiff must allege four elements: (1) that the defendant commenced or continued a criminal proceeding against him; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding; and (4) that the proceeding was instituted with malice. *See Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir. 2003); *accord O'Brien v. Alexander*, 101 F.3d 1479, 1484 (2d Cir. 1996). As with the false arrest claim, "[t]he existence of probable cause will defeat a claim of malicious prosecution." *Fabrikant v. French*, 691 F.3d 193, 215 (2d Cir. 2012).

Regarding the second element, favorable termination, Carmel Defendants contend there are two ways to establish termination: "(1) an adjudication of the merits by the tribunal in the prior action, or (2) an act of withdrawal or abandonment on the part of the party prosecuting the prior action." *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 607 (E.D.N.Y. 2017) (internal quotation marks omitted). On October 26, 2017, the Putnam County Court dismissed the second indictment against Galgano, and did not grant leave to re-present to another grant jury. (Miranda Decl. Ex. Q ("Oct. 26, 2017 Putnam County Court Decision") (Dkt. No. 148).) Carmel Defendants note that "Levy appealed the Order dismissing the second indictment, albeit later withdrawn." (Carmel Mem. 25; *see also* Carmel Reply Mem. 10–11 ("Following election of a new District Attorney, the notice of appeal was withdrawn on November 16, 2015.").) The appeal was withdrawn, and the decision not to continue prosecuting the charge, was made by the new District Attorney, following Levy losing reelection. Thus, the Court is mystified as to the

basis of Carmel Defendants' argument that Plaintiff has not satisfied the "withdrawal or abandonment" prong of establishing termination in Plaintiff's favor. (Am. Compl. ¶ 227.) Thus, Plaintiff has sufficiently alleged the proceeding was terminated in favor of Plaintiff and the Motion is denied as to the malicious prosecution claims.

### 6. Third Cause of Action – Due Process

Carmel Defendants argue that Plaintiff third cause of action should be dismissed because Plaintiff has failed to allege either a substantive or procedural due process violation. (Carmel Mem. 26–27.) Second Circuit law supports Plaintiff's ability to allege a claim for denial of a fair trial. In *Garnett*, the Second Circuit recognized a procedural due process cause of action for damages where "an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." 838 F.3d at 279. The Second Circuit further has held that "a [§] 1983 claim for the denial of a right to a fair trial based on an officer's provision of false information to prosecutors can stand even if the officer had probable cause to arrest the [§] 1983 plaintiff." *Id.* at 277–28. Here, Plaintiff has alleged Nagle created false information and fabricated evidence to deprive Plaintiff of due process and a fair trial in violation of the Constitution, thus, the Court denies Carmel's Motion to dismiss the due process claim.

### 7. Eighth Cause of Action – Retaliation In Violation of First Amendment

Carmel Defendants argue the retaliation claim must be dismissed as to Nagle, because Nagle did not take adverse action against Plaintiff, nor did he induce Levy to prosecute Plaintiff. (Carmel Mem. 32–33.)

"To state a First Amendment retaliation claim . . . , a plaintiff must allege '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" *Dolan v. Connolly*, 794 F.3d 290, 294 (2d. Cir. 2015) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d. Cir. 2009)). Because prosecutors are absolutely immune from liability for decisions to prosecute, claims under § 1983 are typically not brought against the prosecutor. "Instead, the defendant will be a nonprosecutor, an official, like an inspector . . . who may have influenced the prosecutorial decision but did not himself make it, and the cause of action will not be strictly for retaliatory prosecution, but for successful retaliatory inducement to prosecute." *Hartman*, 547 U.S. at 261–62. To proceed with such a claim, a plaintiff "must show that the nonprosecuting official acted in retaliation, and must also show that he induced the prosecutor to bring charges that would not have been initiated without his urging." *Id.* at 262. Here, Plaintiff has pled himself out of such a claim against Nagle, as the Amended Complaint alleges Levy investigated and prosecuted Plaintiff on his own volition, and no inducement by Nagle is alleged. (Am. Comp. ¶ 70 (alleging "[t]he 'investigation' was directed by the District Attorney of Putnam County himself"); *id.* ¶ 161 (alleging "Levy was in charge of the Galgano case and was personally involved in virtually every decision that was made during the investigation . . . . [and] obsessed and consumed by his personal desire to exact vengeance against Mr. Galgano because Mr. Galgano had publicly criticized him, and Assistant District Attorney Pascale and Defendant Nagle. . . Levy referred to Mr. Galgano as his "trophy" and advised all of his subordinates that Mr. Galgano needed to be punished and prosecuted using any and all means necessary).) Accordingly, the First Amended retaliation claim is dismissed as to Nagle.

### 8. Tenth Cause of Action – Abuse of Process Under New York

Although Carmel Defendants do not argue as much, the Court nonetheless dismisses the abuse of process claim as to Carmel Defendants on timeliness grounds. *See supra* Section II.C.5.

### 9. Eleventh Cause of Action – Failure to Intercede

Carmel Defendants argue the failure to intercede claim must be dismissed as Plaintiff cannot establish that Carmel Defendants had a realistic opportunity to intervene and prevent the alleged harm and that Plaintiff has not alleged Carmel Defendants knew the evidence against Plaintiff was insufficient. (Carmel Mem. 38–39.)

Regarding the failure to intercede claims, "[l]iability may attach only when (1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean–Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008). Because a "failure to intervene claim is contingent upon the disposition of the primary claims underlying the failure to intervene claim," *Matthews v. City of New York*, 889 F. Supp. 2d 418, 443–44 (E.D.N.Y. 2012), Plaintiff's failure to intervene claims are assessed only as they relate to the surviving claims. Officers that "may be held liable under a theory of direct participation . . . [may not] be held liable for failure to intervene." *Hicks v. City of New York*, 232 F. Supp. 3d 480, 496 (S.D.N.Y. 2017) (citation omitted), *aff'd in part, vacated in part* 719 F. App'x 61 (2d Cir. 2018). Therefore, Plaintiff may not assert a failure to intervene claim against a defendant who they have plausibly alleged was personally involved in the underlying violation. Because the Court has not dismissed any of the claims under which a failure to intervene claim could be brought against Carmel Defendants, the motion is granted as to the failure to intervene claims.

10.  Twelfth Cause of Action – Supervisory Liability

Carmel argues Plaintiff's claim of supervisory liability must be dismissed, because Plaintiff has failed to plausibly plead that a municipal policy, custom, or practice that caused the alleged constitutional violations.  (Carmel Mem. 40.)  Here, Plaintiff's allegations against Carmel are that a "final law enforcement officer" made a decision to dedicate manpower to the investigation against Galgano, (Am Compl. ¶¶ 70–71), and that Police Chief Cazzari previously endorsed unlawful investigative techniques, as evidenced by a prior lawsuit, (Am. Compl. ¶¶ 50–51, 239).  These allegations are insufficient to plausibly state a claim that the "challenged action [was] directed by an official with final policymaking authority."  *Mandell v. County of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003); *see also Pembaur*, 475 U.S. at 481 ("Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.").  Plaintiff's allegations regarding an unnamed final law enforcement officer and Police Chief Cazzari are insufficient to allow the Court to plausibly infer that either was a final policymaker.  *See Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 303 (S.D.N.Y. 2015) (dismissing a *Monell* claim where the plaintiff merely alleged that the police sergeant supervised the search but failed to allege facts that the defendant had final policy making authority); *Powell v. Corr. Med. Care, Inc.*, No. 13-CV-6842, 2014 WL 4229980, at *6 (S.D.N.Y. Aug. 15, 2014) (dismissing a *Monell* claim where the plaintiff "allege[d] no facts suggesting any individual defendant was acting as a policymaker"); *Dilworth v. Goldberg*, 914 F. Supp. 2d 433, 454 (S.D.N.Y. 2012) (dismissing a *Monell* claim because "none of the facts indicate[d] that any of the persons employed by [the defendant] who committed allegedly unconstitutional acts [were] final policymakers," and because "[n]othing in the[ ] allegations suggest[ed] that the[ ] doctors were final policymakers of [the defendant] or that their actions

constituted official [municipal] policy"); *Lyubeznik v. N.Y.C. Health & Hosps. Corp.*, No. 97-CV-4716, 1998 WL 813407, at *2 (E.D.N.Y. July 29, 1998) (dismissing a *Monell* claim because the plaintiff did not "allege facts which would support a finding that the injury was caused by an existing, unconstitutional municipal policy that [could] be attributed to a municipal policymaker"); *see also Santiago v. Warminster Township*, 629 F.3d 121, 135 n.11 (3d Cir. 2010) (holding that while whether a police chief "is a final policymaker is ultimately a legal rather than a factual question, that does not relieve [the plaintiff] of the obligation to plead in some fashion that [the police chief] had final policy making authority, as that is a key element of a *Monell* claim" (citation omitted)). There is simply no basis, on the facts alleged by Plaintiff, to conclude that Plaintiff has plausibly alleged that Cazzari, a police chief, and his unnamed colleague, had final policymaking authority with respect to how Carmel police officers were to carry out searches. *Cf. Weber v. Dell*, 804 F.2d 796, 803 (2d Cir. 1986) (holding that the "highest ranking law enforcement official" was the "policy maker" as it relates to "strip searches" (internal quotation marks omitted)).[30] Thus, for the same reasons the Court already determined Plaintiff failed to allege Putnam County was liable under *Monell* for allegations regarding a formal policy, widespread custom, and failure to train claim, the Claim against Carmel is also dismissed. *See supra* Section II.B.2,

### 11. Thirteenth Cause of Action – Conspiracy

Carmel Defendants argue that Plaintiff has failed to allege a conspiracy between Nagle and the Putnam County Individual Defendants. For the same reasons explained in denying Putnam County Individual Defendants' Motion, *see supra* Section II.C.6, the Court finds

---

[30] As a matter of New York law, the town board and police board "are the only entities which may be considered responsible for establishing rules and regulations pertaining to police conduct." *Green*, 96 F. Supp. 3d at 304 n.13.

Plaintiff has sufficiently alleged that following Galgano's public criticism of Defendants, including Nagle's handling of the Zaimi trial, Nagle entered into a conspiracy with the other Defendants to discredit Plaintiff, and engaged in numerous overt acts, including submission of false affidavits, in support of said conspiracy.  (Am. Compl. ¶¶ 54, 105.)  Thus, the Motion is denied as to the conspiracy claim.

### III.  Conclusion

For the foregoing reasons, Putnam County Defendants' Motion To Dismiss the Complaint is granted in its entirety, and all claims against Putnam County Defendants are dismissed without prejudice.

Putnam County Individual Defendants' Motion To Dismiss granted in part and denied in part.  The Motion is granted as to all claims against Abissi.  The Motion is also granted to the tenth cause of action for abuse of process.  The Motion is denied as to the ninth cause of action for defamation and the thirteenth cause of action for § 1983 conspiracy.

Carmel Defendants' Motion To Dismiss is granted in part and denied in part.  The Motion is granted as to the eighth case of action for retaliation; the tenth cause of action for abuse of process; the eleventh cause of action for failure to intercede; and the twelfth cause of action for supervisory liability.  The Motion is denied as to the first cause of action for unlawful seizure of Plaintiff's communications; second cause of action for malicious prosecution under § 1983; the third cause of action for denial of due process; the fourth cause of action for malicious prosecution under New York state law; the fifth cause of action for unlawful search of Plaintiff's home, offices, and motor vehicle, and the seizure of his computers and electronic storage devises; the sixth cause of action for unlawful search and seizure of plaintiff and his cell phone; and the thirteenth cause of action for § 1983 conspiracy.

However, because this is the first adjudication of Plaintiff's claims on the merits, the dismissals are without prejudice. Should Plaintiff choose to file a Second Amended Complaint, he must do so within 30 days of this Opinion, addressing the deficiencies identified herein. Plaintiff is cautioned to realistically consider his ability to cure the specific defects outlined in this Opinion before submitting a Second Amended Complaint merely repackaging all of the claims alleged in the Amended Complaint. The Amended Complaint will replace, not supplement, the complaint currently before the Court

The Clerk of the Court is respectfully requested to terminate the pending Motions. (Dkt. Nos. 139, 143, 147.)

SO ORDERED.

DATED:     September 28 2018
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE