UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GEORGE GALGANO,

                       Plaintiff,

     -v-

COUNTY OF PUTNAM, *et al.*,

                   Defendants.

Case No. 16-CV-3572 (KMK)

OPINION & ORDER

Appearances:

Nicholas A. Gravante, Jr., Esq.
Mark A. Singer, Esq.
Richard Weill, Esq.
Boies, Schiller & Flexner LLP
New York, NY; Albany, NY; Armonk, NY
*Counsel for Plaintiff*

Joshua M. Goldstein, Esq.
Caroline B. Lineen, Esq.
Karen C. Rudnicki, Esq.
Lewis R. Silverman, Esq.
Silverman and Associates
White Plains, NY
*Counsel for Defendant County of Putnam*

Michael I. Goldman, Esq.
Alex J. Ru, Esq.
Robert J. Pariser, Esq.
Lee M. Patten, Esq.
Lydecker Diaz
Jersey City, NJ; New York, NY; Melville, NY; Miami, FL
*Counsel for Defendants Town of Carmel and Michael Nagle*

Richard B. Epstein, Esq.
Michael A. Miranda, Esq.
Maurizio Savoiardo, Esq.
Miranda Slone Sklarin Vervenioits, LLP
Mineola, NY
*Counsel for Individual Defendants Adam Levy, Andres Gil, Lourdes Gonzalez, and Henry Lopez*

KENNETH M. KARAS, District Judge:

Plaintiff George Galgano ("Galgano" or "Plaintiff") brings this Action against the County of Putnam ("Putnam County"), the Town of Carmel ("Carmel"), former Putnam County District Attorney Adam Levy ("Levy"), Assistant Putnam County District Attorney Andres Gil ("Gil"), Putnam County District Attorney's Office Investigator Lourdes Gonzalez ("Gonzalez"), Putnam County District Attorney's Office Senior Investigator Henry Lopez ("Lopez"), and Carmel Police Department Detective Sergeant Michael T. Nagle ("Nagle") (collectively "Defendants") alleging violations of the First, Fourth, and Fourteenth Amendments, and New York state law. (*See generally* Sec. Am. Compl. ("SAC") (Dkt. No. 318).)[1]

Before the Court are three Motions To Dismiss. The first is filed on behalf of Levy, Gil, Gonzalez and Lopez ("Putnam Individual Defendants" or "PID") (the "PID Motion"). (PID Not. of Mot. (Dkt. No. 338); PID Mem. of Law in Supp. of Mot. ("PID Mem.") (Dkt. No. 341); Decl. of Maurizio Savoiardo, Esq. in Support of Mot. ("Savoiardo Decl.") (Dkt. No. 340).) The second is filed on behalf of Putnam County (the "Putnam County Motion"). (Cty. Not. of Mot. (Dkt. No. 339); Cty. Mem. of Law in Supp. of Mot. ("Cty. Mem.") (Dkt. No. 343); Decl. of Lewis R. Silverman, Esq. in Support of Mot. ("Silverman Decl.") (Dkt. No. 342).) The third is filed on behalf of Carmel and Nagle ("Carmel Defendants") (the "Carmel Defendants' Motion") (Carmel Defs.' Not. of Mot. (Dkt. No. 349); Carmel Defs.' Mem. of Law in Supp. of Mot. ("Carmel Defs.' Mem.") (Dkt. No. 351); Decl. of Michael I. Goldman, Esq. in Support of Mot.

---

[1] Plaintiff initially included claims against Assistant Putnam County District Attorney Heather Abissi ("Abissi") as well. (*See* Dkt. No. 72.) However, all claims against Abissi were dismissed in a prior Opinion, (*see* Dkt. No. 288), and Plaintiff has not elected to replead such claims here.

("Goldman Decl.") (Dkt. No. 350).)  For the following reasons, the PID and Putnam County

Motions are denied, and the Carmel Defendants' Motion is granted in part and denied in part.

## I.  Background

### A. Factual Background

The Court has detailed this case's factual background at length in a prior opinion.  (*See*

2018 Opinion (Dkt. No. 288).)[2]  Accordingly, the Court recounts only those alleged facts, drawn

from the SAC, that serve as necessary background to the instant Motion.

Plaintiff alleges that this Action resulted from a lengthy personal and political feud

between Levy and Putnam County Sheriff Donald Smith ("Smith").  (SAC ¶¶ 29–39.)  On

October 30, 2013, the Putnam County Legislature sided with Levy over Smith by doubling

Levy's staff of criminal investigators, effectively sidelining Smith from much of Putnam County

law enforcement.  (*Id. ¶¶* 35–37.)  In furtherance of the feud, Levy charged Lani Zaimi

("Zaimi")—a local restaurant owner and vocal Smith political supporter—with sexually

assaulting an unnamed waitress ("M.A").  (*Id.* ¶¶ 32, 40.)

Plaintiff is a criminal defense attorney based in Westchester County, New York.  (*Id.*

¶ 26.)  Plaintiff's law firm, Galgano & Associates, employed an assistant and office manager,

Stefanie Capolongo ("Capolongo"), as well as three full-time attorneys, including senior

associate Eric Sharp ("Sharp").  (*Id.* ¶ 28.)  Plaintiff and Sharp represented Zaimi throughout his

prosecution, and as a result, Plaintiff found himself in the middle of the feud between Levy and

Smith.  (*Id.* ¶¶ 33, 41.)

---

[2] The 2018 Opinion may also be found at *Galgano v. County of Putnam*, No. 16-CV-3572, 2018 WL 4757968 (S.D.N.Y. Sept. 28, 2018), *vacated in part on reconsideration*, 2019 WL 2235891 (S.D.N.Y. May 16, 2019).

Plaintiff "vigorously defend[ed] his client" in court and to the public, accusing Levy of misconduct and conducting a robust cross-examination of M.A and Nagle at trial.  (*Id.* ¶¶ 42–48, 58.)  On March 17, 2014, after six days of deliberations, the jury in the Zaimi matter was unable to reach a verdict; the trial thus ended in a partial acquittal and a mistrial as to the remaining counts.  (*Id.* ¶ 59.)  Plaintiff's successful defense of Zaimi and his public criticism of the prosecution during the case "agitated and embarrassed" the Carmel Police Department, Levy, and Nagle, creating a motive for Defendants to seek to discredit Zaimi and Plaintiff.  (*Id.* ¶ 49.)

In February 2014, shortly before Zaimi's trial, Defendants advised Plaintiff that Zaimi had recently been accused of an additional sexual assault (alleged to have occurred in November 2012) by a second waitress, Kimberly LoRusso.  (*Id.* ¶ 50.)  Shortly after informing Plaintiff of the additional allegation, Defendants arrested Zaimi for this alleged assault and "launched a media campaign to disseminate the allegation," actions that Plaintiff believes were taken to "contaminat[e] the jury pool in the imminent trial" regarding the M.A matter.  (*Id.* ¶ 51.)  In an effort to investigate the new allegation, Plaintiff hired defense investigator Andrew Kuchta ("Kuchta") to identify and obtain statements from potential witnesses regarding the new allegation.  (*Id.* ¶ 52.)  Kuchta identified Quincy McQuaid ("McQuaid"), boyfriend of Kimberly LoRusso's sister (Lia LoRusso), as a possible intermediary with Kimberly LoRusso.  (*Id.* ¶ 54.)

Defendants then "fabricat[ed]" and pursued allegations that Plaintiff "conspired with McQuaid to bribe, tamper with, and intimidate Kimberly LoRusso."  (*Id.* ¶ 64.)  Defendants' "unlawful and vindictive 'investigation' . . . last[ed] eighteen months," was directed by Levy, and "involved the second highest-ranking member of the Town of Carmel Police Department (Lieutenant Brian Karst [("Karst")]) and every member of the Town of Carmel Police Department's Detective Division, of which Nagle (the third highest-ranking member of the

Town of Carmel Police Department) is Chief." (*Id.* ¶ 65.) Additionally, the "Carmel Police Department, the Putnam County District Attorney's Office, the New York State Police, and the New Burn (North Carolina) Police Department formed an inter-agency Task Force for the purposes of this investigation." (*Id.*)

On April 30, 2014, Levy, Gonzalez, and Karst met with Donna Cianflone ("Cianflone"), mother of Kimberly and Lia LoRusso. (*Id.* ¶ 66.) Defendants thereby obtained Cianflone's cooperation in fabricating a supposed conspiracy between Plaintiff, Kuchta, and McQuaid to bribe Kimberly LoRusso to prevent her from testifying against Zaimi. (*Id.* ¶ 66–68.) On May 1, 2014, Gil submitted several false statements from himself and Gonzalez as part of a successful application for authorization to collect information from McQuaid's cell phone. (*Id.* ¶¶ 70–75.) These statements included the false attestation that, during a recorded phone call, McQuaid had revealed that he was seeking to pay Kimberly LoRusso not to testify and "indicated that the money was coming from the defendant [Zaimi] and his lawyer was a go between." (*Id.* ¶ 71.) This false application was then "incorporated by reference into all subsequent eavesdropping applications submitted in connection with the Defendants' investigation of [Plaintiff]." (*Id.* ¶ 75.) On May 14, 2014, Gil successfully applied for a court order authorizing the installation and use of a pen register and "trap and trace" device, and the collection of cellular site location information for Plaintiff's cell phone. (*Id.* ¶ 84.) Similarly, on June 6, 2014, Levy and Nagle submitted false statements under oath in a successful application for a warrant authorizing the interception of communications from Plaintiff's cell phone. (*Id.* ¶¶ 98–102.)

Based on knowledge gathered from intercepts on McQuaid's phone, Defendants detained McQuaid and Lia LoRusso for possession of illegal drugs, and coerced them into fabricating allegations of witness tampering by Plaintiff. (*Id.* ¶¶ 102–122.) On July 2, 2014, despite an

"utter lack of evidence," Defendants applied for search warrants to search Plaintiff's home, office, and vehicle, again relying on false and misleading affidavits.  (*Id.* ¶ 125–38.)  For example, Nagle's affidavits "repeated his knowingly false claims that recorded telephone calls established [Plaintiff] as a 'go between' to facilitate Zaimi's bribery of Kimberly LoRusso," and stated that Plaintiff had "directed" McQuaid and Lia LoRusso to bribe Kimberly LoRusso and "promised" to provide a "big payday" if the bribe was "successful."  (*Id.* ¶ 130.)  On July 2, 2014, dozens of law enforcement officers, including Nagle, Gonzalez, and Gil, executed the search warrants at Plaintiff's home and office.  (*Id.* ¶ 139.)  Levy directed Gil before and during the search.  (*Id.*)  Also present were numerous members of the Carmel Police Department, including Karst and the entire Carmel Police Department's Detective Division, a commitment of police manpower which, Plaintiff infers, "would have required approval by a Town of Carmel Police Department policymaker."  (*Id.* ¶ 140.)  Law enforcement officials, including some Defendants, seized computers, hard drives, and files, among other materials, from Plaintiff's office, including numerous communications and documents allegedly "protected by the attorney-client and work product privileges."  (*Id.* ¶ 143.)

During their search of Plaintiff's professional offices, law enforcement officers claimed to have discovered controlled substances in Sharp's and Plaintiff's constructive possession.  (*Id.* ¶ 155.)  As a result, Plaintiff and Sharp were arrested and arraigned in Westchester County.  (*Id.*)  Over a year later, the charges against Plaintiff were dismissed.  (*Id.* ¶ 156.)  The Westchester County District Attorney's Office stated in court filings that it had "conducted an extensive review of the evidence and a painstaking review of the search warrant and supporting application" for Plaintiff's office, and concluded that it could not proceed with a prosecution because the relevant warrants "were supported by affidavits that contained materially false

statements." (*Id.*) Specifically, the Westchester prosecutors cited issues with the "reliability as to the allegations" in Nagle's affidavit, noting that Nagle's transcription and characterization of certain recorded communications were inconsistent with those recordings as "preserved on tape recordings." (*Id.* ¶ 157.)

On August 20, 2014, Defendants sought and obtained Plaintiff's indictment before a Putnam County grand jury on charges of bribing and tampering with a witness. (*Id.* ¶ 166.) On January 28, 2015, a Putnam County court issued a decision and order dismissing the indictment, criticizing the grand jury process as "defective," and condemning "the cumulative effect of numerous evidentiary and other errors." (*Id.* ¶¶ 171, 173.) However, the county court granted the Defendants leave to investigate the case against Plaintiff properly and present the case to another grand jury. (*Id.* ¶ 175.)

Putnam County First Assistant District Attorney Lisa Ortolano ("Ortolano") led a reinvestigation of Plaintiff's case, discovering that sworn statements submitted in support of the search of Plaintiff's home, office and vehicle were "misleading and inaccurate," and "not supported by evidence." (*Id.* ¶¶ 179–84, 194.) She further concluded that it would be impossible to obtain "lawful indictment" of Plaintiff. (*Id.* ¶ 184.) However, Levy then subjected Ortolano to discipline and verbal abuse, and she eventually resigned after refusing orders to amend reports recommending that the case against Plaintiff be dropped. (*Id.* ¶¶ 185, 194–202.)

On May 15, 2015, Ortolano disclosed to Plaintiff's attorneys that, in an interview, McQuaid and Lia LoRusso had contradicted or recanted their previous statements implicating Plaintiff. (*Id.* ¶¶ 188–90.) Lia LoRusso and McQuaid then confirmed to Plaintiff that Defendants had coerced them into falsely implicating him. (*Id.* ¶¶ 191–93.) McQuaid also

described "dates" arranged by Defendants in exchange for McQuaid's cooperation, during which he and Lia LoRusso were brought to Levy's office from jail for sexual liaisons.  (*Id.* ¶ 193.)

Following Ortolano's termination, Levy, Gil, and others again presented the case against Plaintiff to a second grand jury.  (*Id.* ¶ 208.)  On July 10, 2015, Plaintiff was again charged with bribing a witness, tampering with a witness, conspiracy, and related charges.  (*Id.* ¶ 209.) Defendants also indicted Capolongo, Plaintiff's assistant, hopeful that they might secure her cooperation against Plaintiff.  (*Id.* ¶ 211.)  Plaintiff and Capolongo both moved to dismiss the indictments against them, and after a "detailed review" of the grand jury proceeding, the Putnam County court again found "an absence of proof that [Plaintiff] was a co-conspirator or in any way involved in any wrongdoing," concluding, "[i]n sum, there is no evidence whatsoever that [Plaintiff] intended to confer, intended to offer to confer, or intended to agree to confer a benefit upon Kim[berly] LoRusso for her failure to testify."  (*Id.* ¶¶ 214–15.)  The court further noted that intercepted text messages "say nothing at all about whether [Plaintiff] intended to bribe or tamper with Kim[berly] LoRusso."  (*Id.* ¶ 217.)  In fact, the court found to the contrary, concluding that the messages "suggest not only that [Plaintiff] was not the genesis of the conspiracy to tamper with and/or bribe Kim[berly LoRusso], but that, once provided with taped evidence that someone seemed to have committed those acts, he not only did not support them[,] but affirmatively directed that any misunderstanding of those acts be corrected immediately." (*Id.* ¶ 217.)  The county court also noted that the prosecution had engaged in the same misconduct that caused the first indictment to be dismissed.  (*Id.* ¶ 218.)  Levy filed a notice of appeal from the county court's order of dismissal, but his office withdrew the notice of appeal immediately following Levy's defeat in the November 3, 2015 election.  (*Id.* ¶ 224.)

Plaintiff alleges that as a result of Defendants' actions, he suffered loss of liberty and significant economic, physical, and emotional injuries.  (*Id.* ¶ 226.)  His ability to secure gainful employment and income has been severely impaired by Defendants' destruction of his professional reputation and disruption of his law practice and related businesses.  (*Id.* ¶ 227.)  Plaintiff avers that "[n]othing can undo the reputational damage he has sustained."  (*Id.* ¶ 228.)  Additionally, Plaintiff incurred substantial legal fees defending against the allegedly "malicious and meritless investigations and criminal charges that Defendants pursued against him."  (*Id.* ¶ 229.)  Plaintiff was held in custody for over eight hours before his first Putnam County arraignment as a result of the investigations and criminal charges, and was required to make a number of appearances in Putnam County Court in connection with the prosecution.  (*Id.* ¶ 230.)  He alleges that he suffered severe emotional and mental anguish, pain, and humiliation as a result of being "investigated for, and charged with, crimes he did not commit and subjected to gross and illegal invasions of his home, office, and personal effects."  (*Id.* ¶ 231.)  Plaintiff also alleges that he continues to "suffer mental anguish, suffering from sleeplessness and preoccupation about Defendants' violations of his privacy, the integrity of his home, and the well-being of his daughters and wife."  (*Id.*)

### B.  Procedural History

Plaintiff filed his initial Complaint on May 13, 2016, and his First Amended Complaint ("FAC") on October 14, 2016.  (*See* Dkt. Nos. 1, 72).)  On November 17, 2017, Putnam County, Putnam Individual Defendants, and Carmel Defendants each filed their First Motions To Dismiss (the "First Motions").  (Dkt. Nos. 139–49.).  On December 17, 2017, Plaintiff filed his Opposition.  (Dkt. Nos. 155–56.)  On January 17, 2018, Putnam County, Putnam Individual Defendants, and Carmel Defendants filed their respective Replies.  (Dkt. Nos. 163–69.)

On September 28, 2018, the Court issued an Opinion and Order granting Putnam County's First Motion its entirety, granting in part and denying in part Putnam Individual Defendants' First Motion, and granting in part and denying in part Carmel Defendants' First Motion. (2018 Op. at 91.)  In particular, the Court dismissed all claims against Putnam County for failure to adequately plead *Monell* liability, (*see id.* at 41–56); all claims against Assistant Putnam County District Attorney Heather Abissi due to prosecutorial immunity, (*see id.* at 66–67); all abuse of process claims due to statutes of limitations, (*see id.* at 78–79, 88); the First Amendment retaliation claim against Nagle because Levy was not "induced" by Nagle to prosecute Plaintiff, (*see id.* at 86–87); all failure to intervene claims against Carmel Defendants because these claims are inconsistent with Plaintiff's "direct participation" claims, (*see id.* at 88); and all supervisory liability claims against Carmel due to a failure to adequately plead *Monell* liability, (*see id.* at 89–90).  However, the Court granted Plaintiff 30 days to file a second amended complaint addressing the identified deficiencies.  (*See id.* at 92).

On October 11, 2018, Plaintiff moved for reconsideration of the Court's decision, specifically with respect to the dismissal of claims against Putnam County.  (Dkt. No. 294).  Putnam County filed its Opposition on October 25, 2018, (Dkt. No. 298), and Plaintiff filed a Reply on October 31, 2018, (Dkt. No. 300).  On April 4, 2019, the Court directed supplementary briefing in light of the Second Circuit's decision in *Bellamy v. City of New York*, 914 F.3d 727 (2d Cir. 2019).  (Dkt. No. 308.)  The Parties filed responsive memoranda on April 19, 2019. (Dkt. Nos. 309–10).  On May 16, 2019, the Court issued an Opinion and Order granting the

Reconsideration Motion, thus reinstating the claims against Putnam County.  (2019 Order (Dkt. No. 317).)[3]

On June 14, 2019, Plaintiff filed a Second Amended Complaint.  (Dkt. No. 318.) Pursuant to a briefing schedule adopted on October 17, 2019, (Dkt. No. 336), Putnam County, Putnam Individual Defendants, and Carmel Defendants filed their second Motions To Dismiss (the instant Motions) and accompanying papers on December 13, 2019, (Dkt. Nos. 338–51).[4]  On February 7, 2020, Plaintiff filed his Opposition.  (Dkt. Nos. 353–54.)  On February 28, 2020, Defendants filed their Replies.  (Dkt. Nos. 357–60.)

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his [or her] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.* (alteration and quotation marks omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated

---

[3] The 2019 Order may also be found at *Galgano v. County. of Putnam*, No. 16-CV-3572, 2019 WL 2235891, at *3 (S.D.N.Y. May 16, 2019).

[4] Although Carmel Defendants filed their Motion and papers on December 13, 2019, due to a filing error, they refiled on December 19, 2019.  (Dkt. Nos. 344–351.)

adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  *Leonard F. v. Isr. Disc. Bank of New York*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

B.  Analysis

The Court addresses each of the three Motions separately.  However, where the arguments of the several Defendants overlap, the Court considers each argument only once.

1.  Putnam Individual Defendants

Putnam Individual Defendants argue that that Plaintiff's search and seizure claims are barred because the searches were approved by court orders and supported by probable cause; that Plaintiff's due process claims are duplicative of his malicious prosecution clams; and that all claims against them are barred by prosecutorial or qualified immunity.  (*See generally* PID Mem.)  The Court rejects each of these arguments.

a.  Arguable Probable Cause

When officials act pursuant to a judicial warrant, qualified immunity applies so long as the defendants "had reasonable grounds to believe probable cause supported the warrant." *Martinez v. City of Schenectady*, 115 F.3d 111, 116 (2d Cir. 1997).  This standard applies even where the defendants made material misstatements of fact in warrant applications.  *See McColley v. County of Rensselaer*, 740 F.3d 817, 825–26 (2d Cir. 2014) (discussing the doctrine of "arguable probable cause").  Thus, "[w]here a magistrate has determined that an affidavit . . . provides probable cause for the issuance of a warrant, the person challenging the warrant must make a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard to the truth, made a false statement in his affidavit and that the allegedly false statement was necessary to the finding of probable cause." *Merriweather v. City of New York*, No. 12-CV-5258, 2015 WL 57399, at *7 (S.D.N.Y. Jan. 5, 2015) (alterations and quotation marks omitted).  "To determine whether a false statement was necessary to a finding of probable cause, [a court must] consider a hypothetical corrected affidavit, produced by deleting any

alleged misstatements from the original warrant affidavit and adding to it any relevant omitted information." *Ganek v. Leibowitz*, 874 F.3d 73, 82 (2d Cir. 2017).  If such a "corrected affidavit" still establishes probable cause, no Fourth Amendment violation has occurred.  *See id.* If it does not, then the Court must consider whether officials acted reasonably based on an "objectively reasonable—even if mistaken—belief that the corrected affidavit demonstrated the necessary probable cause."  *Id.*  Insofar as such a belief is reasonable, the official is shielded by qualified immunity; if not, he is not.  *Id.*

At this stage of the proceedings, such "corrected affidavit" analysis does not support probable cause, nor even a reasonable belief in probable cause, for any of the relevant warrant applications.  First, as alleged, false and misleading representations served as the key basis for each search and seizure targeting Plaintiff.  For example, both Gil's May 14, 2014 application to install a pen register, and Levy's June 6, 2014 application for authorization to eavesdrop, on Plaintiff's cell phone relied on false assertions (made by Gonzalez, Gil and Levy) about the substance of prior phone recordings.  (*See* SAC ¶¶ 84–86, 98–99.)  Similarly, prior to Nagle's obtaining search warrants for Plaintiff's home and office, Gonzalez, Lopez, and Nagle allegedly coerced McQuaid and Lia LoRusso to produce statements implicating Plaintiff for witness tampering.  (*Id.* ¶¶ 112–23.)  Nagle then falsely asserted in warrant applications that his investigation had proven that Plaintiff acted as a "go between" to facilitate a bribe of Kimberly LoRusso, thereby repeating identical false statements originally submitted by Gonzalez, Gil and Levy in prior applications.  (*See id.* ¶¶ 72, 127, 130.)

Once these damning (and allegedly false) representations are omitted from the hypothetical, "corrected" versions of such warrants, all that remains is a record of extensive communication between Plaintiff and McQuaid, and indications that Plaintiff had offered to

financially assist McQuaid (but not Kimberly LoRusso).  (*See* PID Mem. 16.)  Plaintiff, of

course, acknowledges that he engaged McQuaid, but asserts that he did so for a lawful purpose,

namely to help him interview Kimberly LoRusso.  (SAC ¶ 54.)  Moreover, as the Second Circuit

has explained, "corrected affidavit" analysis requires that the Court construct and consider a

hypothetical affidavit that not only omits misstatements, but that also *includes* "any relevant

omitted information."  *Ganek*, 874 F.3d at 82.  As alleged here, relevant omitted information

includes the fact that despite having monitored communications between McQuaid and Plaintiff,

Defendants' investigation "revealed no evidence that [Plaintiff] was involved, directly or

indirectly, in seeking to bribe, tamper with, or intimidate Kimberly LoRusso," (SAC ¶ 95), and

that McQuaid was recorded telling Kimberly LoRusso that "they don't care if you come up and

testify or not" and that "there would be no compensation for you not to come," (*Id.* ¶ 135.)

Additionally, Defendants omitted the fact that Plaintiff had repeatedly insisted that McQuaid and

Lia LoRusso record all of their conversations with Kimberly LoRusso, indicating that Plaintiff

was communicating with McQuaid and Lia LoRusso to "secure consent recording to prove Mr.

Zaimi's innocence and uncover prosecutorial misconduct by the Defendants."  (*Id.* ¶¶ 57, 96.)

Accordingly, when all falsified information is omitted and all known relevant information is

included, a "corrected" affidavit simply does not support an assertion of probable cause.[5]  Nor

---

[5] Defendants seek to bolster their "corrected affidavit" argument by attaching various documents (including a transcript of Cianflone's August 12, 2014 grand jury testimony and Levy's June 6, 2014 application for authorization to eavesdrop on Plaintiff's cell phone) to their Motion papers, and by urging the Court to accept as true these documents' factual assertions regarding Plaintiff's conduct.  (*See* PID Mem. 2–3, 11–18.)  However, while the Court may take judicial notice of such records, it may do so "only to establish their existence and legal effect, or to determine what statements they contained . . . not for the truth of the matters asserted."  *Liang v. City of New York*, No. 10-CV-3089, 2013 WL 5366394, at *5 (E.D.N.Y. Sept. 24, 2013) (citations and quotation marks omitted); *see also Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("If the court takes judicial notice, it does so in order to determine what statements [the official records] contained—but again not for the truth of the matters asserted." (citation and

could Defendants argue that they acted reasonably based on their beliefs at the time.  The

fabrication of evidence and the deliberate concealment of exculpatory information are

"objectively unreasonable as a matter of law."  *Haughey v. County of Putnam*, No. 18-CV-2861,

2020 WL 1503513, at *8 (S.D.N.Y. Mar. 29, 2020); *see also Coggins v. Buonora*, 776 F.3d 108,

114 (2d Cir. 2015) ("[T]he alleged falsification of evidence and the related conspiracy, if true,

constitute a violation of clearly established law, and no objectively reasonable public official

could have thought otherwise."); *Rogers v. Bisono*, No. 15-CV-6670, 2016 WL 4224072, at *5

(S.D.N.Y. Aug. 9, 2016) ("Defendants cannot be protected by qualified immunity since they

allegedly fabricated evidence.").

　　　　Finally, in a prior opinion, this Court has already addressed this very issue, explaining

that "a plaintiff must make a substantial preliminary showing . . . that the allegedly false

statement was necessary to the finding of probable cause," and concluding that "Levy, Gil, and

Gonzalez . . . misled the judge into issuing the warrant." (*See* 2018 Op. 72 (quoting, in part,

*Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 466 (S.D.N.Y. 2008)).)

Similarly, the Court explained that "[f]abrication of evidence is not objectively reasonable or a

subject over which reasonable law enforcement officials could disagree, and Levy, Gil, and

Gonzalez are therefore not entitled to qualified immunity as to these claims."  (*Id.*)  Accordingly,

"the law of the case doctrine counsels against reconsideration" of the Court's prior decision with

respect to whether Defendants can claim arguable probable cause.  *See Perkins v. Perez*, No. 17-

---

quotation marks omitted)).  Accordingly, for the purposes of the instant Motion, the Court does
not assume the factual assertions included in these documents to be true.  Indeed, in light of
Plaintiff's allegations contesting many of Defendants' assertions, the Court must assume that
such assertions are false.  Of course, Defendants may challenge Plaintiff's factual allegations,
and hold him to his burden of proof, at later stages of the proceedings.

CV-1341, 2020 WL 248686, at *4 (S.D.N.Y. Jan. 16, 2020) (explaining that "[where] the [a]mended [c]omplaint . . . is in large part identical to [a plaintiff's] first [c]omplaint, the law of the case doctrine counsels against reconsideration"); *Weslowski v. Zugibe*, 96 F. Supp. 3d 308, 316 (S.D.N.Y. 2015) (same).  The Court therefore declines to dismiss any claims on this basis.[6]

### b.  Absolute Immunity

It is well established that "prosecutors are entitled to absolute immunity for that conduct 'intimately associated with the judicial phase of the criminal process.'"  *Hill v. City of New York*, 45 F.3d 653, 660–61 (2d Cir. 1995) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). However, prosecutors are not entitled to absolute immunity for their conduct in "the investigative phase of a criminal case," such as "assisting in a search and seizure or arrest."  *Id.* at 661. Applying these principles, the Court explained in its 2018 Opinion that "Levy and Gil are not entitled to prosecutorial immunity for Plaintiff's allegations that they submitted false affidavits and applications in support of the warrants" or for the "allegedly defamatory statements made by Levy to the media."  (2018 Op. 62 (footnotes omitted).)  At the same time, the Court

_____

[6] Defendants also seek to draw a distinction between the seizure of Plaintiff's effects (which were made pursuant to the warrants discussed above), and the search of their contents (which followed a separate court order).  (PID Mem. 23.)  The distinction fails for two reasons. First, the court order permitting the search of Plaintiff's cell phone and computer was based in part on the same allegedly fraudulent statements that supported their initial seizure.  The state court would not have permitted the search if it had not already permitted the seizure. Accordingly, the false statements in the earlier warrants were indeed "necessary to the finding of probable cause" with respect to the later warrants as well.  *McColley*, 740 F.3d at 826.  Second, "[a]n officer's reliance on a judge's probable-cause determination [must] be 'objectively reasonable,'" *Conroy v. Caron*, 275 F. Supp. 3d 328, 351 (D. Conn. 2017) (quoting *United States v. Leon*, 468 U.S. 897, 922–23 (1984).)  Here, Gil, Gonzalez, and Levy "ha[d] no reasonable grounds for believing that the court order was properly issued," *id.* (quoting *Leon*, 468 U.S. at 922–23), because they allegedly were involved in fabricating the evidence that served as the basis for those warrants.  Thus, because "the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable, . . . the shield of immunity will be lost.'"  *Id.* (alteration omitted) (quoting *Malley v. Briggs*, 475 U.S. 335, 344–45 (1986)).

acknowledged that "Levy is absolutely immune from liability for the conduct alleged by Plaintiff as to the decision to indict Plaintiff and any conduct before the Grand Jury." (*Id.* at 65.)  The Court therefore directed Plaintiff to "clarify in an Amended Complaint the extent to which investigative conduct forms the basis" for his claims of malicious prosecution, due process violations, First Amendment retaliation, and § 1983 conspiracy.  (*Id.* at 65–66.)

Plaintiff has now clarified that all such claims are based exclusively on the "fraudulent[t] obtaining of court orders" authorizing invasive searches, (SAC ¶ 242), and the fabrication and manipulation of evidence, (*see id.* ¶¶ 248–52, 303).  This clarification resolves the issue.  It is well-established that where a prosecutor acts as a complaining witness in support of a warrant, that conduct is "investigative," and thus than not protected by prosecutorial immunity.  *See Van de Kamp v. Goldstein*, 555 U.S. 335, 343 (2009) (noting "that absolute immunity does not apply . . . when a prosecutor acts as a complaining witness in support of a warrant application" (citations omitted)); *Buckley v. Fitzsimmons*, 509 U.S. 259, 274 n.5 (1993) (denying absolute immunity for fabrication of evidence because "there is no common-law tradition of immunity for it").

Nevertheless, Defendants persist in arguing that, because Levy and Gil eventually charged Plaintiff in criminal proceedings, their fraudulent warrant applications and fabricated evidence should be characterized as part of that "commencing a criminal proceeding," and thus that Levy and Gil are shielded by absolute prosecutorial immunity.  (PID Mem. 19–21.)

The argument is without merit.  It is clear that the same prosecutor may enjoy absolute immunity for later, prosecutorial activity, while lacking such immunity with respect to earlier, non-prosecutorial activity in the same case.  *See Kalina v. Fletcher*, 522 U.S. 118, 129–31 (1997) (explaining that a prosecutor's "activities in connection with the preparation and filing of two of the three charging documents—the information and the motion for an arrest warrant—are

18

protected by absolute immunity," but concluding that her execution of a certification of determination of probable cause "under penalty of perjury" was not so protected).  Indeed, courts have regularly held prosecutors liable for fabricating evidence in advance of criminal proceedings—even where the same prosecutors subsequently prosecuted the plaintiff.  *See, e.g.*, *Hill*, 45 F.3d at 662 (explaining that prosecutors' manufacture of evidence "in order to get probable cause" was not protected by absolute immunity, despite later prosecutorial conduct before a grand jury); *Liffiton v. Keuker*, 850 F.2d 73, 77–78 (2d Cir. 1988) (denying absolute immunity to defendant prosecutors who submitted allegedly false affidavits in support of an application for a wiretap, while acknowledging that they would be entitled to immunity for later misuse of the grand jury process).  In other words, the simple fact that Levy and Gil eventually capitalized on their investigative misconduct to engage in further prosecutorial misconduct does not entitle them to rely on the latter to immunize the former.  *See Buckley*, 509 U.S. at 275–76 ("That the prosecutors later called a grand jury to consider the evidence this work produced does not retroactively transform that work from the administrative into the prosecutorial."); *Zahrey v. Coffey*, 221 F.3d 342, 353 (2d Cir. 2000) (explaining that "a subsequent immunized act of a single official does not break the chain of causation traceable to his initial misconduct occurring in another capacity" and that the fact that an official's absolutely immune conduct "may have been the means by which he initiated the prosecution does not permit him to transpose the immunity available for defamation as a defense to malicious prosecution" (citation and quotation marks omitted)); *Watson v. Grady*, No. 09-CV-3055, 2010 WL 3835047, at *17 (S.D.N.Y. Sept. 30, 2010) ("[A] plaintiff may state a claim against a prosecutor where a deprivation of liberty *results* from the initial act of obtaining evidence known to be false, at least where the same person who fabricated the evidence forseeably used it." (citation, quotation marks and alteration

omitted)).  Thus, while the SAC also contains allegations concerning Levy's and Gil's

prosecutorial misconduct, (*e.g.*, SAC ¶¶ 163, 166, 187, 199, 304), such allegations do not

undermine claims based on Levy's and Gil's prior investigative misconduct.  These allegations

simply provide additional context, as well as support for claims against other Defendants that do

not enjoy absolute immunity (e.g., Putnam County).  Accordingly, the Court adheres to its prior

ruling that Levy and Gil are not shielded by absolute immunity for their investigative conduct,

including their alleged fabrication of evidence.  (*See* 2018 Op. 66.)[7]

### c.  Due Process Claims

Defendants argue that Plaintiff's due process claims are duplicative of his malicious

prosecution and unreasonable search and seizure claims.  The Court acknowledges, of course,

---

[7] Defendants seek to bolster their absolute immunity argument in the particular context of Plaintiff's Fourth Amendment malicious prosecution claims by noting that "the initiation or continuation of a criminal proceeding," is an element of such claims.  (*See* PID Mem. 18–19 (quoting *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010).)  Accordingly, argue Defendants, a prosecutor can never be liable for malicious prosecution, because "prosecutorial" conduct is essential to the completion of the claim.

This is incorrect.  While a malicious prosecution claim requires that a criminal proceeding be instituted against the plaintiff, neither *Manganiello* nor any other case requires that defendant himself make the formal prosecutorial decision.  Rather, all that is required is that the defendant *cause* a criminal proceeding to occur by taking "an active role in the prosecution such as giving advice and encouragement or importuning the authorities to act."  *Manganiello*, 612 F.3d at 163; *see also Rohman v. New York City Transit Auth. (NYCTA)*, 215 F.3d 208, 217 (2d Cir. 2000) (explaining that, in the context of malicious prosecution claims, initiation "is a term of art"); *Bailey v. City of New York*, 79 F. Supp. 3d 424, 447 (E.D.N.Y. 2015) (explaining that the "majority" of § 1983 malicious prosecution cases involving evidence fabrication "arise from allegations that a police officer fabricated evidence and forwarded it to prosecutors").  Thus, courts have held, malicious prosecution claims against prosecutors may proceed when based on the prosecutors' non-prosecutorial conduct.  *See Harvey v. Town of Greenwich*, No. 3:17-CV-1417, 2019 WL 1440385, at *5 (D. Conn. Mar. 31, 2019) (explaining that a prosecutor may be liable for § 1983 malicious prosecution claims for conduct taken in his capacity as a complaining witness); *Cipolla v. County of Rensselaer*, 129 F. Supp. 2d 436, 452 (N.D.N.Y. 2001) (permitting § 1983 malicious prosecution claims against a prosecutor based on his investigative role prior to prosecution); *see also Kalina*, 522 U.S. at 131 (explaining that a prosecutor who acts a complaining witness is not shielded by absolute immunity from Fourth Amendment liability for resulting deprivations of liberty); *Zahrey,* 221 F.3d at 353–54

that these claims rely on similar facts; for example, both sets of claims rely in part on allegations

that Defendants fabricated evidence.  However, as the Court explained in its 2018 Opinion,

"[c]ourts in the Second Circuit have long treated malicious prosecution and fair trial claims as

separate causes of action."  (2018 Op. 75 (citing *Garnett v. Undercover Officer C0039*, 838 F.3d

265, 278 (2d Cir. 2016) (noting that "fair trial claims cover kinds of police misconduct not

addressed by false arrest or malicious prosecution claims"); *McCaffrey v. City of New York*, No.

11-CV-1636, 2013 WL 494025, at *12 (S.D.N.Y. Feb. 7, 2013) (treating plaintiff's malicious

prosecution and fair trial claims as separate constitutional torts); and *Brandon v. City of New

York*, 705 F. Supp. 2d 261, 276 (S.D.N.Y. 2010) (noting that the Second Circuit has permitted

"claims for both malicious prosecution and a denial of his right to trial based on the same alleged

fabrication of evidence" (citation omitted))).  Moreover, there are several important distinctions

between fair trial and malicious prosecution claims.  For example, "[t]he existence of probable

---

(explaining that a prosecutor who fabricates evidence is not shielded by absolute immunity, even
when he uses evidence to initiate a prosecution).  Here, while Gil and Levy later made formal
prosecutorial decisions, Plaintiff does not seek to hold Gil and Levy personally liable for making
those decisions; rather he seeks to hold them liable for their *prior*, investigative conduct
(evidence fabrication) that caused and enabled the prosecutorial decisions.

    Although Defendants do not rely on it, one (reversed) Second Circuit case appears to
support their argument.  *See McDonough v. Smith*, 898 F.3d 259, 269 (2d Cir. 2018) (agreeing
with a district court determination that "the distinction between a prosecutor's investigative and
prosecutorial functions is immaterial to a malicious prosecution claim, since prosecutors are
generally immune from such claims"), *rev'd and remanded*, 139 S. Ct. 2149 (2019).  The Court
does not apply *McDonough* for three reasons: *first,* the Second Circuit's *McDonough* decision
was reversed by the Supreme Court and so does not bind this Court, *see Sajous v. Decker*, No.
18-CV-2447, 2018 WL 2357266, at *6 (S.D.N.Y. May 23, 2018) (discussing the effect of
vacatur on Second Circuit decisions); *second,* the plaintiff in *McDonough* brought separate
"evidence fabrication" and "malicious prosecution" claims; accordingly, it made sense for the
Second Circuit to treat the latter as focused exclusively on prosecutorial (rather than
investigative) conduct; *third,* applying *McDonough's* apparent rejection of the
investigative/prosecutorial distinction would be inconsistent with longstanding precedent which
explicitly permits suit against prosecutors for the fabrication of evidence that results in a Fourth
Amendment seizure, *see Kalina*, 522 U.S. at 131; *Buckley*, 509 U.S. at 276; *Zahrey,* 221 F.3d at
354; *Watson*, 2010 WL 3835047, at *17.

cause is a defense to a claim of malicious prosecution" but not to a fair trial claim. *Bailey*, 79 F. Supp. 3d at 449–50 (citing *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003). Similarly, a malicious prosecution claim generally requires a "seizure" cognizable under the Fourth Amendment. *See Lanning v. City of Glens Falls*, 908 F.3d 19, 28 (2d Cir. 2018) ("A § 1983 claim for malicious prosecution essentially alleges a violation of the plaintiff's right under the Fourth Amendment to be free from unreasonable seizure."); *Washington v. County of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004) (explaining that a malicious prosecution claim requires "a seizure or other perversion of proper legal procedures implicating [his] personal liberty and privacy interests under the Fourth Amendment" (quotation marks omitted)). By contrast, a violation of the right to fair trial claim requires a "a deprivation of life, liberty, or property" under the Fourteenth Amendment. *Ganek*, 874 F.3d at 90. The claims are composed of distinct elements and therefore reflect distinct constitutional claims. *Bailey*, 79 F. Supp. 3d at 447 (explaining that even where "malicious prosecution and fair trial claims would rise or fall together," they "remain distinct constitutional claims" (citation omitted)).

Finally, the fact that legally distinct constitutional claims may overlap is no reason to dismiss one as duplicative. As the Supreme Court has explained, "[c]ertain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands." *Soldal v. Cook County., Ill.*, 506 U.S. 56, 70 (1992) (permitting simultaneous

claims under the Fourth and Fourteenth Amendments).  Accordingly, the Court adheres to its

prior ruling and declines to dismiss Plaintiff's due process claims on this basis.[8]

### 2.  Claims Against Putnam County

Putnam County argues that: (1) the SAC fails to adequately allege underlying

constitutional violations to which *Monell* liability might attach; (2) the SAC fails to allege a

municipal policy, custom, or practice that caused the alleged constitutional violations; (3) the

Court should not exercise supplemental jurisdiction over Plaintiff's state law claim for replevin,

and, (4) the replevin cause of action should be dismissed as untimely pursuant to N.Y. County

Law § 52.  (*See generally* Cty. Mem.)

### a.  The Underlying Constitutional Claims

"It is well established that a *Monell* claim cannot lie in the absence of an underlying

constitutional violation."  *DeRaffele v. City of New Rochelle*, No. 15-CV-282, 2017 WL

2560008, at *6 (S.D.N.Y. 2017); *see also Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir.

2006) ("*Monell* does not provide a separate cause of action . . .; it *extends* liability to a municipal

organization where that organization's failure to train, or the policies or customs that it has

sanctioned, led to an independent constitutional violation.").  Here, Putnam County offers two

principle arguments for why the SAC fails to plausibly alleged such underlying violations.

First, Putnam County argues that Plaintiff's Fourth Amendment claims fail because

Plaintiff lacks "standing" to challenge the warrant applications related to McQuaid.  (Cty. Mem.

7–8.)  This argument misrepresents Plaintiff's claims.  Plaintiff does not seek recovery for

---

[8] As in its 2018 Opinion, the Court construes Plaintiff's "due process" claims as
procedural, "fair trial" claims.  (*See* 2018 Op. 75.)  Accordingly, Defendants' invocation of
*Bryant v. City of New York*, 404 F.3d 128 (2d Cir. 2005) (rejecting the simultaneous application
of Fourth Amendment and substantive due process analysis) and similar cases is misplaced.

constitutional injuries inflicted on McQuaid, but for constitutional injuries Plaintiff himself has suffered.  For example, Plaintiff alleges that false statements originally included in applications to collect McQuaid's communications were subsequently "incorporated" into false applications directed at Plaintiff's own communications.  (SAC ¶ 75.)  Plaintiff alleges that Defendants then relied on such false statements and manufactured evidence to obtain search warrants of his home, office and vehicle.  (*Id.* ¶¶ 125, 139.)  Defendants do not—indeed cannot— contest that Plaintiff has standing to challenge these searches.  As Plaintiff alleges that Defendants unlawfully searched *his own* communications and *his own* home and effects, he has not "vicariously assert[ed]" the rights of others.  *Alderman v. United States*, 394 U.S. 165, 174 (1969).  On the contrary, he has asserted his own Fourth Amendment rights.  *See Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018) (explaining that a plaintiff must have "a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search"); *Fla. v. Jardines*, 569 U.S. 1, 6, (2013) ("[W]hen it comes to the Fourth Amendment, the home is first among equals.  At the Amendment's very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." (citation and quotation marks omitted)).

Next, Defendants argue that, under New York law, the procurement of a search warrant does not constitute "the commencement of a criminal proceeding," and thus cannot support a claim for malicious prosecution.  (Cty. Mem. 11.)  This argument fails for two reasons.  First, Defendants misunderstand the elements of a Fourth Amendment malicious prosecution claim.  To be sure, a plaintiff pursuing a claim for malicious prosecution under § 1983, must establish, inter alia, "the initiation or continuation of a criminal proceeding against plaintiff."  *Manganiello*, 612 F.3d at 161.  There is, however, no requirement that a defendant's conduct

*constitute* "the initiation or continuation" of such proceedings.  On the contrary, a defendant's conduct need only *play an active role* in such "initiation or continuation."  *See Rohman v. New York City Transit Auth.*, 215 F.3d 208, 217 (2d Cir. 2000) (explaining that a defendant in a malicious prosecution action must "play[ ] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act"); *Bailey*, 79 F. Supp. 3d at 447 (explaining that the "majority" of § 1983 malicious prosecution cases involving evidence fabrication "arise from allegations that a police officer fabricated evidence and forwarded it to prosecutors" (emphasis omitted)).  For example, in *Manganiello*, the Second Circuit explained that a police detective could be held liable for malicious prosecution where he "failed to make a complete and full statement of facts" to the prosecutor and "misrepresented or falsified evidence."  *Id.* at 160.  The same is true here.

Relatedly, Plaintiff's malicious prosecution claim does not rest solely on Defendants' allegedly unlawful procurement of search warrants.  On the contrary, Plaintiff alleges that substantial criminal proceedings resulted from Defendants' fabrication and misrepresentation of evidence as well.  (*See* SAC ¶¶ 155–66, 208–09.)  When prosecutions result from officials' fabrication of evidence, that fabrication represents a quintessential basis for malicious prosecution claims.  *See Manganiello*, 612 F.3d at 161 (explaining that an officer could be liable for malicious prosecution where he misrepresented evidence, forwarded such evidence to a prosecutor, and signed a felony complaint); *Bailey*, 79 F. Supp. 3d at 447 (explaining that a police officer who fabricates evidence and forwards it to prosecutors in order to provide probable

cause may be liable for malicious prosecution).  Accordingly, the Court finds that Plaintiff has adequately alleged the underlying constitutional violations.[9]

### b. *Monell* Claim

In its 2019 Order, the Court thoroughly addressed whether Putnam County could be liable for Levy's actions under *Monell* on a policymaker theory.  (*See generally* 2019 Op.) Citing recent Second Circuit precedent in *Bellamy*, the Court concluded that all prosecutorial misconduct except for the narrow decision whether (and with what charges) to charge a defendant was "properly attributable to the municipality, rather than to the state."  (2019 Op. 6.) Accordingly, the Court concluded that "Plaintiff plausibly alleges that Levy, in conducting and directing the investigation that allegedly violated Plaintiffs rights, represented Putnam County, not the state, and, accordingly, that Putnam County plausibly is liable for Levy's conduct under *Monell* on a policymaker theory."  (*Id.* at 7.)

Putnam County now urges this Court to revisit that holding, arguing that while *Bellamy* established that "New York City, and by extension, New York State counties, are the proper policymaking body for any *Monell* claims deriving from alleged misconduct by prosecutors in New York State," such liability only attaches to the municipality for conduct "involv[ing] the administration of the district attorney's office."  (Cty. Mem. 16–18.)  In support, Putnam County cites a recent case from the Northern District of New York, which appears to confine *Monell* liability for a district attorney's misconduct to cases where a "plaintiff's claims center . . . on the

---

[9] Putnam County also reprises PID's arguments that a "corrected affidavit" analysis would establish probable cause, and that Plaintiff's Due Process claims are duplicative of his Fourth Amendment malicious prosecution claims.  The Court has already discussed and rejected these arguments.  *See supra* Section II.B.1.

administration of the district attorney's office." *Hillary v. St. Lawrence County*, No. 17-CV-659, 2019 WL 977876, at *8 (N.D.N.Y. Feb. 28, 2019).

Putnam County's argument fails for several reasons. First, *Bellamy* is not so limited. As the Second Circuit emphasized, the actions of county prosecutors are "generally controlled by municipal policymakers for purposes of *Monell*," and only "a narrow exception" defines "the decision of whether, and on what charges, to prosecute" as a state, rather than municipal, function. *Bellamy*, 914 F.3d at 759. Here, the SAC alleges several acts by Levy beyond simply the decision whether to prosecute Plaintiff. For example, Plaintiff alleges that Levy executed falsified eavesdropping applications against Plaintiff, (SAC ¶¶ 88–94, 98–102), and that he permitted the use of his office for the sexual liaisons between McQuaid and Lia LoRusso to incentivize their fabricated allegations against Plaintiff, (*id.* ¶¶ 193, 304.) Such conduct is similar to activity which courts subsequent to *Bellamy* have held may serve as the basis for municipal liability. *See, e.g., Newson v. City of New York*, No. 16-CV-6773, 2019 WL 3997466, at *3 n.6 (E.D.N.Y. Aug. 23, 2019) (explaining that a municipality may be held liable "for its prosecutors' decisions concerning the disclosure of exculpatory or impeachment evidence"); *O'Hara v. City of New York*, No. 17-CV-4766, 2019 WL 2326040, at *9 (E.D.N.Y. May 31, 2019) (declining to dismiss *Monell* claims where the plaintiff alleged that the district attorney fabricated evidence, and harassed, intimidated and bribed witnesses to provide false testimony).

Second, Putnam County's reliance on *Hillary* is misplaced. As an initial matter, *Hillary* was decided only one month after (and does not cite or discuss) *Bellamy*. Accordingly, insofar as *Hillary* did not consider *Bellamy*, its reasoning is not persuasive. However, even if *Hillary* were persuasive, Plaintiff has amply alleged that Levy violated Plaintiff's constitutional rights through his administration of the district attorney's office. For example, Plaintiff alleges that

Levy endorsed his subordinates' practice of submitting false and misleading statements in applications for warrants of Plaintiff's home, office, and vehicle, (SAC ¶¶ 74, 127–28), maliciously directed subordinates to subject Plaintiff to an unnecessary "perp walk" in front of the media, (*id.* ¶ 167), and sought to compel a subordinate to manufacture or misrepresent evidence against Plaintiff, (*id.* ¶ 199–200).  Accordingly, even under *Hillary's* reasoning, Putnam County may be liable because Levy's unconstitutional conduct extended to his role as "manager of the district attorney's office."  *Hillary*, 2019 WL 977876, at *8; *see also Pinaud v. County of Suffolk*, 52 F.3d 1139, 1154 n.14 (2d Cir. 1995) (explaining that "as long as a plaintiff's claims center not on decisions whether or not, and on what charges, to prosecute but rather on the administration of the district attorney's office, there can be liability against a New York county for an alleged malicious prosecution" (citation, quotation marks and alterations omitted)).

Third, insofar as Putnam County maintains that *Bellamy* does not support *Monell* liability based on a theory of district attorney-as-policymaker, the argument is both illogical and foreclosed by precedent.  It is well-established that *Monell* liability attaches "where a single act is taken by a municipal employee who, as a matter of [s]tate law, has final policymaking authority in the area in which the action was taken."  *Newton v. City of New York*, 566 F. Supp. 2d 256, 271 (S.D.N.Y. 2008); *see also Walton v. Safir*, 122 F. Supp. 2d 466, 477 (S.D.N.Y. 2001) ("[T]he act of an official with final decision-making authority, if it wrongfully causes the plaintiff's constitutional injury, may be treated as the official act of the municipality . . . .") (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988)) (citations omitted).  Defendants offer no reason why these principles, which apply to the conduct of policymakers generally, should not apply to a district attorney.  Moreover, the Second Circuit has already concluded that

28

a municipality may be liable for the individual acts of a district attorney.  In *Walker v. City of New York*, the Second Circuit held that "[w]here a district attorney acts as the manager of the district attorney's office, the district attorney acts as a county policymaker," and accordingly, that New York City could be held liable for the Kings County District Attorney's deliberate indifference.  974 F.2d 293, 301 (2d Cir. 1992).  Clear precedent thus establishes that a municipality may be liable for the individual unconstitutional actions of a policymaker, even where that policymaker is a district attorney. *See Anilao v. Spota*, 774 F. Supp. 2d 457, 496 n.27 (E.D.N.Y. 2011) ("[G]iven the many allegations in the [a]mended [c]omplaint regarding the personal involvement of the District Attorney, municipal liability in this case against the County can also be based upon [his] alleged role as the final policymaker."); *Conte v. County of Nassau*, No. 06-CV-4746, 2010 WL 3924677, at *27 (E.D.N.Y. Sept. 30, 2010) ("A district attorney implementing policies regarding police investigative procedures is deemed to be acting as manager of the district attorney's office and, thus, as a county policymaker.").

Accordingly, the Court adheres to its prior conclusion that "Putnam County plausibly is liable for Levy's conduct under *Monell* on a policymaker theory."  (2019 Op. at 7.)[10]

---

[10] Putnam County also argues that the SAC fails to allege so widespread and consistent a practice as to constitute a "custom" for *Monell* purposes.  Because the Court has already concluded that the SAC has plausibly alleged a *Monell* claim based on a policymaker theory, it need not, and does not, address this argument.

Similarly, because Putnam County may be liable for Levy's actions under a policymaker theory, it is liable for Levy's "deliberate indifference" in failing to supervise his subordinates. *See Walker*, 974 F.2d at 300 (explaining that a where a district attorney was a municipal policymaker, his "deliberate indifference" in training his subordinates could give rise to *Monell* liability).  Accordingly, the Court need not address Putnam County's arguments regarding whether it might otherwise be liable for deliberate indifference.  (Cty. Mem. 24.)

### c.  Replevin

Defendants argue that Plaintiff's replevin claim is time-barred because the claim accrued when Plaintiff's property was taken on July 2, 2014 and is governed by a one year and ninety-day limitations period.  (PID Mem. 24–25.)  Accordingly, argue Defendants, the replevin claim expired on September 30, 2015, several months before Plaintiff filed his initial complaint on May 13, 2016.  (*Id.* at 25)

The Court declines to dismiss Plaintiff's claim on this basis.  Putnam County is correct that "[s]tate claims brought under state law in federal court are subject to state procedural rules." *Russell v. Westchester Cmty. Coll.*, No. 16-CV-1712, 2017 WL 4326545, at *5 (S.D.N.Y. Sept. 27, 2017) (ultimately citing *Felder v. Casey*, 487 U.S. 131, 141 (1988)).  Putnam County also appears to be correct that the relevant statute of limitations derives from New York County Law § 52 and New York General Municipal Law § 50–i.  The former provides that

> [a]ny claim or notice of claim against a county . . . for damages arising at law or in equity, alleged to have been caused in whole or in part by or because of any misfeasance, omission of duty, negligence, or wrongful act on the part of the county, its officers, agents, servants or employees, must be made and served in compliance with section fifty-e of the general municipal law.  Every action upon such claim shall be commenced pursuant to the provisions of section fifty-i of the general municipal law.

N.Y. Cnty. Law § 52.  New York County Law § 52 thereby incorporates the requirements contained in New York General Municipal Law §§ 50–e and 50–i.  *Id.*  Pursuant to New York General Municipal Law § 50–i, "[n]o action or special proceeding shall be prosecuted or maintained against a city, county . . .[unless] the action or special proceeding shall be commenced within one year and ninety days after the happening of the event upon which the claim is based."  N.Y. Gen. Mun. Law § 50.

However, the Court is not persuaded that, for the purposes of limitations analysis, the "event upon which the claim is based" is the date on which Plaintiff's property was first seized. Indeed, New York courts have held that replevin claims do not accrue while such claims may "interfere[] with a pending or potential criminal prosecution." *B. T. Prods., Inc. v. Barr*, 376 N.E.2d 171, 177 n.2 (1978); *see also Phelan v. Sullivan*, No. 10-CV-724, 2010 WL 2948217, at *7 (N.D.N.Y. July 7, 2010) ("*When no criminal prosecution is pending*, a property owner can file an action for replevin [for return of property seized pursuant to a search warrant]." (emphasis added)), *report and recommendation adopted,* 2010 WL 2948188 (N.D.N.Y. July 22, 2010); *Alvarez v. Abreau*, No. 94-CV-6419, 1997 WL 769563, at *4 n.6 (S.D.N.Y. Dec. 11, 1997) (explaining that a claim for replevin "did not accrue until a motion to suppress had been granted because the property in question had been seized pursuant to a warrant that was later declared invalid"); *Dwyer v. Nassau County*, 322 N.Y.S.2d 811, 812–13 (Sup. Ct. 1971) (explaining that a replevin action was timely because the sought property had been "seized under a warrant" and so "the police were authorized to hold it until determination of the criminal proceeding in connection with which it had been seized, or until a suppression order made continued retention improper").  Moreover, under New York law, "a cause of action for conversion or replevin accrues against a person who lawfully comes by a chattel . . . , not upon the stealing or the taking, but upon the defendant's refusal to convey the chattel upon demand." *Grosz v. Museum of Modern Art*, 772 F. Supp. 2d 473, 482 (S.D.N.Y. 2010) (citations omitted).

Here, Plaintiff has alleged that his property was seized pursuant to a warrant—a facially lawful act.  Plaintiff also alleges that he made "persistent, explicit, and timely demands to the County of Putnam and the Putnam County District Attorney's Office for the return of his property" shortly following the dismissal of the criminal charges against him in October and

November of 2015—just months before he filed his initial complaint.  (SAC ¶¶ 307–08.)[11]

Plaintiff's replevin claim would thus be timely.  Accordingly, in the absence of briefing

adequately addressing the date of accrual of Plaintiff's replevin claim, the Court declines at this

time to dismiss the claim as time-barred.

### 3.  Claims Against the Carmel Defendants

Carmel Defendants argue that Plaintiff fails to properly plead *Monell* liability against

Carmel, and that Plaintiff's conspiracy claims are barred by the intracorporate conspiracy

doctrine.  (*See generally* Carmel Defs.' Mem.)[12]

### a.  *Monell* Claims

As discussed at length in the Court's 2018 Opinion and 2019 Order, a municipality may

only be held liable under § 1983 where the "official policy of the municipality caused the

constitutional injury."  *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008).  A plaintiff may

satisfy this requirement by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by
> government officials responsible for establishing the municipal policies that caused

---

[11] Although Plaintiff's replevin claim was not included until the filing of the SAC (on September 19, 2018), the claim likely "relates back" to his prior pleadings.  *See United States ex rel. Kolchinsky v. Moody's Corp.*, 162 F. Supp. 3d 186, 199 (S.D.N.Y. 2016) (explaining that "a new legal theory applied to the same facts set out in the earlier pleading will relate back" (citation and quotation marks omitted); *United States ex rel. Kirk v. Schindler Elevator Corp.*, 926 F. Supp. 2d 510, 518–19 (S.D.N.Y. 2013) (same); *see also Cady v. Springbrook NY, Inc.*, 44 N.Y.S.3d 107, 109 (App. Div. 2016) (explaining that under "relation-back doctrine . . ., a new theory of recovery may be asserted, so long as it arises from the same transactions alleged in the original complaint"); *Pendleton v. City of New York*, 843 N.Y.S.2d 648, 651–52 (App. Div. 2007) ("A claim asserted in an amended pleading is deemed to have been interposed at the time the claims in the original pleading were interposed, unless the original pleading does not give notice of the transactions, occurrences, or series of transactions or occurrences, to be proved pursuant to the amended pleading." (quoting N.Y. C.P.L.R. 203)).

[12] The Carmel Defendants also argue that Plaintiff's due process claims are duplicative of his malicious prosecution claim.  The Court has already addressed and rejected this argument. *See supra* Section B.1.c.

the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted); *see also Patterson v. County of Oneida*, 375 F.3d 206, 226–27 (2d Cir. 2004) (describing methods of establishing *Monell* liability). Moreover, a plaintiff also must establish a causal link between the municipality's policy, custom, or practice and the alleged constitutional injury. *See City of Okla. City v. Tuttle*, 471 U.S. 808, 824 n.8 (1985) ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a *constitutional* violation. There must at least be an affirmative link between[,] [for example,] the training inadequacies alleged, and the particular constitutional violation at issue." (plurality opinion)); *see also Roe*, 542 F.3d at 37 (holding that "a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the moving force behind the alleged injury" (quotation marks omitted)); *Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at *12 (S.D.N.Y. Mar. 26, 2015) ("[T]here must be a direct causal link between a municipal policy or custom and the alleged constitutional deprivation" (citation and quotation marks omitted)); *Johnson v. City of New York*, No. 06-CV-9426, 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (noting that "a plaintiff must establish a causal connection—an affirmative link—between the [municipal] policy and the deprivation of his constitutional rights" (citation and quotation marks omitted)).

As relevant here, Plaintiff alleges that Carmel, "through its Town Board, had a duty pursuant to Sections 39 and 150 of New York State's Town Law to regulate the conduct of the Town of Carmel Police Department." (SAC ¶ 296.) However, "[i]nstead of supervising the

Carmel Police Department, the Town Board followed a policy, practice, and custom of deferring ultimate control over the conduct of the Carmel Police Department in the Galgano investigation to the District Attorney of Putnam County.  In doing so, the Town Board grossly neglected, and condoned its senior police officers grossly neglecting, their supervisory responsibilities."  (*Id.*) Additionally, Plaintiff alleges that Carmel Police Department's investment in the case was substantial, involving multiple high-ranking officials, the entire Detective Division, and out-of-state travel for witness interviews.  (*See id.* ¶¶ 65, 140.)  Such a commitment, infers Plaintiff, "would have required approval by a Town of Carmel Police Department policymaker."  (*Id.* ¶ 140.)  Accordingly, Plaintiff appears to argue that Carmel is liable for the violation of his constitutional rights based on four distinct *Monell* theories: (1) a consistent and widespread practice of deferring control of the Galgano investigation to Levy, (2) gross neglect by the Town Board (a policymaker) of its supervisory responsibilities, (3) misconduct of unknown policymakers whose involvement can be inferred from the resources devoted to his case, and (4) Levy's misconduct as a de facto policymaker for Carmel.

The Court addresses each argument in turn.

### i.  The "Policy" of Deference to Levy

While Plaintiff labels Carmel's deference to Levy regarding in the Galgano matter a "policy, practice and custom," the label is conclusory and fails to support a *Monell* claim for at least two reasons.  First, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the municipality."  *Tieman*, 2015 WL 1379652, at \*12 (alteration and quotation marks omitted); *see also Tuttle*, 471 U.S. at 823–24 ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional

municipal policy, which policy can be attributed to a municipal policymaker." (plurality opinion)); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation."). Here, Plaintiff alleges such a "policy" of deference only with respect to his own case. (*See* SAC ¶ 296.) Moreover, Plaintiff fails to explain why mere "defer[ence]" of investigative control to a local district attorney, (*see* SAC ¶ 296), suffices to establish a constitutional violation. While deference by a town board to a district attorney might be expected to lead to unconstitutional conduct where the district attorney is known to be inept or malicious, Plaintiff has not alleged that Carmel knew— or even had reason to know—that Levy was either. In the absence of such allegations, Plaintiff has alleged no more than that Carmel's custom of deference "might lead to police misconduct," an allegation which is insufficient to satisfy *Monell*'s requirement that the particular policy be the "moving force" behind a constitutional violation. *Hicks v. City of Syracuse*, No. 17-CV-0475, 2018 WL 6308653, at *3 (N.D.N.Y. Dec. 3, 2018) (quoting *Tuttle*, 471 U.S. at 824 n.8) (quotation marks omitted).

### ii.  The Town Board's "Gross Neglect"

Plaintiff's theory of "gross neglect" by the Town Board over the Police Department fails for similar reasons. "[A] failure to act, train, or supervise can constitute a municipal custom 'only where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need.'" *Tieman*, 2015 WL 1379652, at *18 (quoting *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007). Thus, "'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his

action." *Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 410 (1997). "[D]emonstration of deliberate indifference requires a showing that the official made a conscious choice, and was not merely negligent." *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012); *see also Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992) (discussing deliberate indifference claims). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quotation marks omitted). This is because "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* Thus, a municipality can be found to be deliberately indifferent based on a single constitutional violation only where "the unconstitutional consequences of failing to train [are] so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* at 64. In other words, that violation must be a "highly predictable consequence" of the failure to train or supervise. *Id.* (quotation marks omitted). "Thus, deliberate indifference may be inferred where the need for more or better supervision to protect against constitutional violations was obvious, but the policymaker failed to make meaningful efforts to address the risk of harm to plaintiffs." *Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) (alteration, citations, and quotation marks omitted).

Here, the SAC is completely devoid of allegations suggesting the Town Board "made a conscious choice" to endanger Plaintiff's constitutional rights. *Jones*, 691 F.3d at 81. Indeed, Plaintiff has alleged no "pattern of similar constitutional violations" in other cases which might have put the Town Board on notice that its lax oversight of the police was likely to lead to evidence fabrication. *See Connick*, 563 U.S. at 62. Similarly, Plaintiff has alleged no facts

36

suggesting that evidence fabrication was "obvious" or the "highly predictable" result of the

Town Board's deference to Levy.  *See id.* at 64; *Cash*, 654 F.3d at 334.

### iii.  The Involvement of Unknown Policymakers

While Plaintiff requests that the Court infer "approval" of the Galgano investigation by

an unknown Carmel policymaker from the substantial commitment of Carmel police, (*see* SAC ¶

140), the Court need not address the plausibility of such an inference.  Even assuming such

approval, Plaintiff has not plausibly alleged that the unknown policymaker possessed the

requisite intent to be a legal participant in the underlying constitutional violations.  *See Grullon*

*v. City of New Haven*, 720 F.3d 133, 138–39 (2d Cir. 2013) (explaining that any theory of

liability under § 1983 requires at least gross negligence).  On the contrary, at best, all that

Plaintiff can infer about such a hypothetical policymaker is that he approved the commitment of

significant resources to the investigation.  (SAC ¶ 140.)  Plaintiff can infer nothing, however,

about this unknown policymaker's motives or intentions, or even whether he had knowledge of

Levy's and Nagle's alleged misconduct.  In the absence of any factual allegations or plausible

inferences regarding such knowledge, the purported policymaker cannot be said to have

participated in the constitutional violation.  *See Gronowski v. Spencer*, 424 F.3d 285, 293 (2d

Cir. 2005) (requiring knowledge "of the facts rendering [one's conduct] illegal" as a prerequisite

of personal involvement); *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001)

(explaining that direct participation of the defendant in the constitutional violation is "not alone a

sufficient basis for holding the defendant liable if the defendant had no awareness or notice of

the facts that rendered the action illegal.").  Absent a constitutional violation by this

policymaker, Carmel cannot be liable for his actions.

iv.  Levy as a Carmel Policymaker

Plaintiff also argues that "it is reasonable to infer" that Levy—despite being an elected official of Putnam County rather than Carmel—was also a policymaker for Carmel, and that Carmel can therefore be liable for his actions.  (Pl.'s Mem. 28.)  In support of this argument, Plaintiff cites a single case from the Western District of New York.  *See Peters v. City of Buffalo*, 848 F. Supp. 2d 378 (W.D.N.Y. 2012).  The Court rejects both the inference and the applicability of the precedent.

First, it is well-established that where a theory of municipal liability rests on the suggestion that "the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law."  *Jeffes v. Barnes*, 208 F.3d 49, 57–58 (2d Cir. 2000); *see also Baity v. Kralik*, 51 F. Supp. 3d 414, 437 (S.D.N.Y. 2014) (same).  This "inquiry is dependent on an analysis of state law."  *McMillian v. Monroe County, Ala.*, 520 U.S. 781, 786 (1997); *see also Myers v. County of Orange*, 157 F.3d 66, 76 (2d Cir. 1998) ("We first ask whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue, an inquiry that will necessarily be dependent on the definition of the official's functions under relevant state law." (quotation marks omitted)).  Here, Plaintiff readily admits that Levy is an employee the County of Putnam, *not* the Town of Carmel. (*See* SAC ¶ 19.)  Moreover, to the extent that Plaintiff nonetheless argues that Levy is a de facto Carmel policymaker (even though "state and local positive law" do not say so), Plaintiff must establish that Levy holds such a position by "custom or usage having the force of law."  *Jeffes*, 208 F.3d at 57.  Plaintiff cannot meet this standard.  Rather, he simply urges the Court to "infer" that Levy was a Carmel policymaker from the fact that Levy worked closely with Carmel police

38

officials in a single case.  (*See* Pl.'s Mem. 28.)  This is an imaginative leap, not a plausible

inference.  *See Tieman*, 2015 WL 1379652, at *12 ("a custom or policy cannot be shown by

pointing to a single instance" (alteration and quotation marks omitted)).

Plaintiff's reliance on *Peters* is similarly misplaced.  Unlike Plaintiff here, the *Peters*

plaintiff did not attempt to characterize a county district attorney as a town policymaker solely

on the basis of a single investigation.  On the contrary, she alleged that there was a *general*

"policy, practice or custom" for the Erie County District Attorney to control the homicide

investigations of the City of Buffalo Police Department.  *Peters*, 848 F. Supp. 2d at 389–90.

Plaintiff has not alleged such a general policy here, nor has he alleged facts from which such a

policy might be plausibly inferred.  On the contrary, Plaintiff's allegations of Levy's

involvement in Carmel investigations are limited only to his own case.  (*See* SAC ¶ 296.)

Accordingly, Plaintiff has failed to adequately allege that Levy was a policymaker for Carmel.

Because each of Plaintiff's proposed theories for establishing Carmel's *Monell* liability

fails, all claims against Carmel are dismissed.  *McTerrell v. N.Y.C. Health & Hosps. Corp.*, No.

19-CV-4469P, 2020 WL 1503194, at *4 (S.D.N.Y. Mar. 30, 2020) (dismissing claims against the

municipality for failure to state "a proper claim under *Monell*").

### b.  Conspiracy Claims

Carmel Defendants argue that the "intracorporate conspiracy doctrine" precludes

Plaintiff's conspiracy claim against Nagle.  (Carmel Defs.' Mem. 15–18).  Under this doctrine,

"officers, agents and employees of a single corporate entity are legally incapable of conspiring

together."  *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 388 (S.D.N.Y. 2013)

(quoting *Hartline v. Gallo*, 546 F.3d 95, 99 n.3 (2d Cir.2008).  While the Second Circuit

recognizes the doctrine in the context of conspiracy claims under 42 U.S.C. § 1985, *see*

*Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978), it has not yet decided whether the

doctrine applies to conspiracy claims under § 1983.  *See Chamberlain*, 986 F. Supp. 2d at 388

(discussing intracorporate conspiracy doctrine and § 1983 claims).  Nevertheless, district courts

generally assume its applicability to § 1983 suits as well.  *See, e.g.*, *Dowd v. DeMarco*, 314 F.

Supp. 3d 576, 587 (S.D.N.Y. 2018) ("[T]his court will continue to apply the intracorporate

conspiracy doctrine to Section 1983 claims because the doctrine's logic is sound.") (citation and

quotation marks omitted); *Chamberlain*, 986 F. Supp. 2d at 388 (same) (collecting cases).

Regardless of the doctrine's general viability in the §1983 context, it is inapplicable here

for two reasons.  First, while Nagle is an employee of the Carmel Police Department, (SAC

¶ 23), he is alleged to have acted in concert with several employees of a separate corporate

entity: Putnam County (e.g., Levy and Gil).  Conspiracies between distinct corporate entities

present no "intracorporate" difficulties.  *See Cent. UTA of Monsey v. Vill. of Airmont, New York*,

No. 18-CV-11103, 2020 WL 377706, at *21 n.10 (S.D.N.Y. Jan. 23, 2020) (recognizing that an

alleged "conspiracy between the Village Defendants and the District," in contrast to allegations

that "the Village Defendants conspired among themselves," presented no intracorporate

conspiracy problem).  Second, "the intracorporate conspiracy doctrine contains an important

caveat: namely, that the actors involved be engaged in activities *within the scope* of their

employment."  *Randle v. Alexander*, 960 F. Supp. 2d 457, 475 (S.D.N.Y. 2013) (emphasis in

original).  Accordingly, "an exception to the intracorporate conspiracy doctrine applies to

individuals within a single entity when they are pursuing personal interests wholly separate and

apart from the entity."  *Nassau Cty. Employee "L" v. County of Nassau*, 345 F. Supp. 2d 293,

304 (E.D.N.Y. 2004) (quotation marks, citation and alteration omitted).  Here, Plaintiff has

alleged that multiple members of the conspiracy acted outside of the scope of their employment

and in pursuit of personal motives.  For example, Plaintiff alleges that Defendants arranged

sexual liaisons for McQuaid and Lia LoRusso to incentivize their fabrication of allegations

against Plaintiff.  (SAC ¶¶ 193, 304.)  Such conduct is not within a police officer's official

responsibilities.  *See Zilioli v. City of New York*, No. 17-CV-9495, 2020 WL 1548763, at *5

(S.D.N.Y. Apr. 1, 2020) (explaining that sexual assault is conduct taken "outside of the scope of

[a police officer's] employment"); *Edwards v. Annucci*, No. 17-CV-5018, 2019 WL 1284295, at

*9 (S.D.N.Y. Mar. 20, 2019) ("Employing excessive force and falsifying documents are not core

functions performed in the normal course of a correction officer's duties.").  Similarly, Plaintiff

alleges that Nagle and Levy acted to "exact vengeance against [Plaintiff]" who had "publicly

embarrassed" them, and to thwart Plaintiff's investigation into their misconduct.  (SAC ¶¶ 49,

58, 60, 134.)  Defendants' pursuit of such private (rather than institutional) interests precludes

the applicability of the intracorporate conspiracy doctrine in this case.  *See Alvarez v. City of*

*New York*, No. 11-CV-5464, 2012 WL 6212612, at *3 (S.D.N.Y. Dec. 12, 2012) (explaining that

where officers acted to "shield themselves from liability, embarrassment, and charges of

misconduct" they acted out of personal motives and thus the intracorporate conspiracy doctrine

did not apply); *see also Sanders v. Long Island Newsday*, No. 09-CV-2393, 2015 WL 5475694,

at *16 (E.D.N.Y. July 14, 2015) (explaining that the intracorporate conspiracy doctrine did not

apply where the plaintiff alleged that officer defendants assaulted him "when he refused to

confess to various open, unsolved crimes committed prior to the day of his arrest and took his

suit to cover up their actions"); *Randle*, 960 F. Supp. 2d at 475) (holding that the intracorporate

conspiracy doctrine did not apply to prison guards who forced inmates to fight each other

because the guards were not acting "within the scope of their responsibilities").  Accordingly, the

Court declines to dismiss Plaintiff's conspiracy claims on this basis.

### III.  Conclusion

For the foregoing reasons, both Putnam County's and Putnam Individual Defendants' Motions are denied in full.

Carmel Defendants' Motion is granted with respect to all claims against Carmel, but denied as to Nagle.  As this is the second adjudication of Plaintiff's claims, dismissal is with prejudice.

The Court will hold a status conference on July 14, 2020 at 2 p.m.

The Clerk of the Court is respectfully requested to terminate the pending Motions.  (Dkt. Nos. 338, 339, 349, and 352.)

SO ORDERED.
DATED:      July 2, 2020
            White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE