UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GEORGE GALGANO,

                              Plaintiff,

       v.

COUNTY OF PUTNAM, NEW YORK;
ADAM LEVY; ANDRES GIL; LOURDES
GONZALEZ; HENRY LOPEZ; and DET.
MICHAEL T. NAGLE,

                              Defendants.

---

No. 16-CV-3572 (KMK)

OPINION & ORDER

Appearances:

Marc V. Ayala, Esq.
Boies Schiller Flexner LLP
Armonk, NY
*Counsel for Plaintiff*

Caroline B. Lineen, Esq.
Karen C. Rudnicki, Esq.
Lewis R. Silverman, Esq.
Joshua M. Goldstein, Esq.
Silverman & Associates
White Plains, NY
*Counsel for Defendant County of Putnam*

Shannon S. Brady, Esq.
Putnam County Law Department
Carmel, NY
*Counsel for Defendant County of Putnam, Adam Levy, Andres Gil, Henry Lopez, and Lourdes Gonzalez*

Michael A. Miranda, Esq.
Maurizio Savoiardo, III, Esq.
Richard B. Epstein, Esq.
Miranda Slone Sklarin Verveniotis, LLP
Mineola, NY
*Counsel for Defendants Adam Levy, Andres Gil, Henry Lopez, and Lourdes Gonzalez*

Michael H. Sussman, Esq.
Sussman & Watkins
Goshen, NY
*Counsel for Defendants Adam Levy*

Alex J. Ru, Esq.
Wilson Elser Moskowitz Edelman & Dicker LLP
New York, NY
*Counsel for Defendant Det. Michael T. Nagle*

Michael I. Goldman, Esq.
Robert J. Pariser, Esq.
Lydecker Diaz
Miami, FL
*Counsel for Defendant Det. Michael T. Nagle*

KENNETH M. KARAS, United States District Judge:

George Galgano ("Plaintiff" or "Galgano") brings this Action against Defendants County of Putnam (the "County"), Carmel Police Department Detective Michael T. Nagle ("Nagle"), former Putnam County District Attorney Adam Levy ("Levy"), former Putnam County Assistant District Attorney Andres Gil ("Gil"), former Putnam County Investigator Lourdes Gonzalez ("Gonzalez"), and former Putnam County Investigator Henry Lopez ("Lopez" and with Levy, Gil, and Gonzalez, the "Individual County Defendants" or "ICDs"; collectively, "Defendants"). Plaintiff raises claims pursuant to 42 U.S.C. § 1983 and state law. (*See* Second Am. Compl. ("SAC") (Dkt. No. 318).) Before the Court are the Defendants' Motions for Summary Judgment on Plaintiff's claims. (ICDs' Not. of Mot. (Dkt. No. 713); County's Not. of Mot. (Dkt. No. 729); Nagle's Not. of Mot. (Dkt. No. 731).) Also pending is Plaintiff's Motion for Partial Summary Judgment on his unlawful search and replevin claims and his Motion for Summary Judgment on Defendant Levy's Counterclaims. (Pl's Not. of Mot. (Dkt. No. 711).) For the reasons that follow, Defendants' Motions are granted.

I.  Background

A.  Factual Background

1.  Materials Considered

The following facts are taken from the Parties' statements pursuant to Local Civil Rule 56.1, specifically:

- Defendants' 56.1 Statement, (Defs' Rule 56.1 Statement ("Defs' 56.1") (Dkt. No. 715));

- Plaintiff's Response to Defendants' 56.1 Statement, (Pl's Resp. to Def's Rule 56.1 Statement ("Pl's Resp. 56.1") (Dkt. No. 717));

- Plaintiff's 56.1 Statement (Pl's Rule 56.1 Statement ("Pl's 56.1") (Dkt. No. 712));

- Defendants' Response to Plaintiff's 56.1 Statement (Def's Resp. Rule 56.1 Statement ("Defs' Resp. 56.1") (Dkt. No. 724));

- Defendant Levy's Counter-Statement to Plaintiff's 56.1 Statement (Levy's Rule 56.1 Counter-Statement ("Levy's 56.1") (Dkt. No. 726));

- Plaintiff's Response to Levy's 56.1 Statement (Pl's Resp. to Levy's Rule 56.1 Statement ("Pl's Levy Resp. 56.1") (Dkt. No. 736)).[1]

---

[1] The Court cites to the ECF-stamped page number at the upper right-hand corner of all documents, unless otherwise noted.

Additionally, where necessary, the Court cites directly to the admissible evidence submitted by

the Parties.[2]  The facts as described below are in dispute to the extent indicated.[3]

---

[2] The Parties have submitted a joint list of over five hundred exhibits (the "Joint Exhibit List"), which the Court will refer to as necessary to resolve factual disputes alleged by the Parties in their 56.1 Statements.  (*See* Joint Decl. Ex. A ("Joint Exhibit List") (Dkt. No. 740-1).) According to the Parties' Joint Declaration, the Parties "reserve all rights to challenge any exhibit on the joint exhibit list, including reserving rights regarding authenticity and relevance." (Joint Decl. ¶ 1 (Dkt. No. 740).)  Given the size of the record, the Court has adjudicated any bona fide evidentiary objections a Party has raised, but has presumed, in the absence of any objections, that all exhibits are admissible evidence and cited to them for any relevant facts they contain.
Throughout, the Court refers to exhibits using the shorthand "JEX" followed by the number the Parties have assigned in the Joint Exhibit List.

[3] The ICDs and Nagle have lodged objections to Plaintiff's Response 56.1 Statement, asserting that "Plaintiff has improperly attempted to dispute or refused to admit numerous factual statements in Defendants'. . . 56.1 Statement (i) without citing evidence; (ii) citing evidence that does not actually controvert the fact asserted; (iii) . . . purporting to dispute the asserted fact by making assertions that are not responsive to the asserted fact; ([i]v) relying on semantics to dispute an asserted statement of fact[;] and/or (v[]) denying an asserted fact because it is hearsay."  (Reply Decl. of Maurizio Savoiardo ("Savoiardo Decl.") ¶ 3 (Dkt. No. 721); *see also* Reply Decl. of Michael Goldman ("Goldman Reply Decl.") ¶ 3 (Dkt. No. 738).)  The ICDs and Nagle request that where Plaintiff has entered denials on such impermissible grounds, the Court deem the fact admitted.  (*See* Savoiardo Decl. ¶ 5; Goldman Reply Decl. ¶ 5.)
Courts in the Second Circuit regularly deem facts admitted where a party fails to specifically controvert a statement in its denial.  *See, e.g.*, *Scarpinato v. 1770 Inn, LLC*, No. 13-CV-955, 2015 WL 4751656, at *2 n.3 (E.D.N.Y. Aug. 11, 2015) ("[A]ny of the [d]efendants' Rule 56.1 statements that are not specifically controverted are deemed admitted.").  The Court will thus deem facts admitted where either Party fails to cite to relevant facts in its denial.
It is also common practice to deem a fact admitted where a party's denial is based on semantic carping as to the wording of the statement.  *See Arch Specialty Ins. Co. v. TDL Restoration, Inc.*, No. 18-CV-6712, 2021 WL 1225447, at *1 n.1 (S.D.N.Y. Mar. 31, 2021) ("Where the [p]arties identify disputed facts but with semantic objections only or by asserting irrelevant facts, [the Court will not consider] these purported disputes, which do not actually challenge the factual substance described in the relevant paragraphs, . . . as creating disputes of fact.") (collecting cases).  The Court will therefore deem a fact admitted where a Party's denial is based on a challenge to the wording of the statement.
It is black-letter law in the Second Circuit that 56.1 Statements and Responses "*are not [legal] argument*.  They should contain factual assertions with citation to the record.  They should not contain conclusions."  *U.S. Info. Sys., Inc. v. Int'l Brotherhood of Elec. Workers Loc. Union No. 3*, No. 00-CV-4763, 2006 WL 2136249, at *3 (S.D.N.Y. Aug. 1, 2006) (emphasis in original) (quoting *Rodriguez v. Schneider*, No. 95-CV-4083, 1999 WL 459813, at *1 n.3 (S.D.N.Y. June 29, 1999)).  The Court will thus also deem a fact admitted where a Party's denial relies upon legal argument or conclusions.

### 2. Parties and Other Relevant Actors

Plaintiff is a criminal defense attorney who practices in state and federal courts. (Pl's 56.1 ¶ 1; Defs' Resp. 56.1 ¶ 1.) At all times relevant to this Action, Plaintiff's office was located at 399 Knollwood Road in White Plains, New York. (Defs' 56.1 ¶ 337; Pl's Resp. 56.1 ¶ 337.)

At all times relevant to this Action, Andrew Kuchta ("Kuchta"), who is not a Party to this Action, operated a private investigation firm and worked with Plaintiff. (Defs' 56.1 ¶ 70; Pl's Resp. 56.1 ¶ 70.)

Laini Zaimi ("Zaimi"), who is not a Party to this Action, was a restauranteur in Putnam County at all relevant times. (Pl's 56.1 ¶ 14; Defs' Resp. 56.1 ¶ 14.) Zaimi owned two restaurants that operated under the name Ariano's and was commonly called "Ariano." (Defs' 56.1 ¶ 262; Pl's Resp. 56.1 ¶ 262.)

M.A., who is not a Party to this Action, worked as a waitress for Zaimi. (Defs' 56.1 ¶ 78; Pl's Resp. 56.1 ¶ 78; *see also* Pl's 56.1 ¶ 19; Defs' Resp. 56.1 ¶ 19.)[4] On July 31, 2013, M.A. informed her mother that she had been sexually assaulted by Zaimi. (Defs' 56.1 ¶ 78; Pl's Resp. 56.1 ¶ 78.) She later went to the Carmel Police Department ("CPD") and pressed charges against Zaimi. (Defs' 56.1 ¶ 80; Pl's Resp. 56.1 ¶ 80.)

K.L., who is not a Party to this Action, worked as a waitress for Zaimi. (Pl's 56.1 ¶ 35; Defs' Resp. 56.1 ¶ 35.) On January 29, 2014, K.L. reported to the Putnam County Sheriff's

---

A denial founded on the fact that the party's statement of fact paraphrases the underlying evidence does not create a dispute of fact where the denial fails to "suggest [the party] erroneously, inaccurately or . . . misleadingly characterized" the evidence. *Droplets, Inc. v. E*TRADE Fin. Corp.*, No. 12-CV-2326, 2015 WL 1062670, at *4 (S.D.N.Y. Mar. 9, 2015). Thus, where a Party has objected to the paraphrasing of underlying evidence or testimony but fails to cite facts that indicate that characterization is misleading, the Court will deem the fact admitted.

[4] Plaintiff denies this fact, but the denial is based entirely on semantic carping, so the Court deems the fact admitted. *See Arch Specialty Ins. Co.*, 2021 WL 1225447, at *1 n.1.

Office ("PCSO") that Zaimi had inappropriately touched her.  (Defs' 56.1 ¶ 154; Pl's Resp. 56.1 ¶ 154.)

Lia LoRusso ("Lia"), who is not a Party to this Action, is K.L.'s sister.  (Defs' 56.1 ¶ 75; Pl's Resp. 56.1 ¶ 75.)

Donna Cianflone ("Donna" or "Cianflone"), who is not a Party to this Action, is K.L. and Lia's mother.  (Defs' 56.1 ¶ 76; Pl's Resp. 56.1 ¶ 76.)

Quincy McQuaid ("McQuaid"), who is not a Party to this Action, is Lia's boyfriend. (Defs' 56.1 ¶ 77; Pl's Resp. 56.1 ¶ 77.)

Danielle Pascale ("Pascale"), who is not a Party to this Action, was an Assistant District Attorney ("ADA") at the Putnam County District Attorney's Office ("PCDAO") from 2012 to 2016 and specialized in the prosecution of sex crimes.  (Aff. of Danielle Pascale, Esq. ¶ 3 (Dkt. No. 714-1).)  Pascale prosecuted Zaimi for the sexual assault of M.A.  (Defs' 56.1 ¶ 87; Pl's Resp. 56.1 ¶ 87.)  Pascale also prosecuted Zaimi for the forcible touching of K.L.  (Defs' 56.1 ¶ 159; Pl's Resp. 56.1 ¶ 159.)

Gil worked as an ADA in the PCDAO from February 18, 2014 through December 31, 2015.  (Pl's 56.1 ¶ 3; Defs' Resp. 56.1 ¶ 3.)

Gonzalez worked as an investigator for the PCDAO from February 18, 2014 through December 31, 2015.  (Defs' 56.1 ¶ 19; Pl's Resp. 56.1 ¶ 19.)

Lopez worked as an investigator for the PCDAO from 2008 through 2015.  (Defs' 56.1 ¶ 32; Pl's Resp. 56.1 ¶ 32.)

Chana Krauss ("Krauss"), who is not a Party in this Action, was hired by the PCDAO as an ADA in 2008.  (Defs' 56.1 ¶ 33; Pl's Resp. 56.1 ¶ 33.)  From 2013 through 2015, Krauss

served as the Chief ADA.  (Defs' 56.1 ¶ 34; Pl's Resp. 56.1 ¶ 34.)  Krauss was one of Gil's supervisors.  (Defs' 56.1 ¶ 40; Pl's Resp. 56.1 ¶ 40.)[5]

Lisa Ortolano ("Ortolano"), who is not a Party in this Action, worked for the PCDAO from March 2009 until May 2015.  (Defs' 56.1 ¶ 35; Pl's Resp. 56.1 ¶ 35.)  In 2014, Ortolano was promoted to First ADA when Krauss was promoted to Chief ADA.  (Defs' 56.1 ¶ 38; Pl's Resp. 56.1 ¶ 38.)  Ortolano was one of Gil's supervisors.  (Defs' 56.1 ¶ 40; Pl's Resp. 56.1 ¶ 40.)[6]

Levy was the Putnam County District Attorney ("Putnam County DA") from January 1, 2008 to December 31, 2015.  (Pl's 56.1 ¶ 2; Defs' Resp. 56.1 ¶ 2.)[7]

Nagle is a Detective Sergeant employed by the Town of Carmel, New York.  (Defs' 56.1 ¶ 41; Pl's Resp. 56.1 ¶ 41.)  At the time of the events at issue, Nagle was the Detective Division Commander of the CPD.  (Pl's 56.1 ¶ 158; Defs' Resp. 56.1 ¶ 158.)  As relevant here, he supervised several detectives who worked on the M.A. and K.L. prosecutions.  (Pl's 56.1 ¶ 159; Defs' Resp. 56.1 ¶ 159.)

---

[5] Plaintiff denies this fact, but the denial is based on a dispute as to whether Krauss had actual supervisory authority in practice, not the stated fact, which is that Krauss, as Chief ADA, was one of Gil's supervisors.  (*See* Pl's Resp. 56.1 ¶ 40.)  Because Plaintiff's denial does not actually address the statement of fact, the Court deems this statement admitted.  *See Scarpinato*, 2015 WL 4751656, at *2 n.3 ("[A]ny of the [d]efendants' Rule 56.1 statements that are not specifically controverted are deemed admitted.").

[6] Plaintiff denies this fact for the same reasons as discussed in note 5 *supra*.  As such, the Court deems this fact admitted.

[7] Somewhat confusingly, Defendants have indicated that Levy served as Putnam County DA from January 1, *2009* to December 31, 2015, and Plaintiff has not disputed this fact.  (Defs' 56.1 ¶ 1; Pl's Resp. 56.1 ¶ 1.)

### 3.  Plaintiff's Investigation of M.A.

#### a.  Zaimi's Assault of M.A.

Shortly before 3:30 AM on July 31, 2013, M.A. arrived at Putnam Hospital Center in

Carmel, New York.  (JEX 43 ("M.A. Hospital Records") at 2 (Dkt. No. 757-2).)[8]  Around twenty

minutes later, M.A. reported to hospital staff that "unwanted sexual contact [had] occurred

between [her] and a person known to her."  (*Id.*)  A few hours later, M.A. provided a fuller

account to hospital staff, which a staff member memorialized as follows:

> 18 y/o female presents stating that at work closing the restaurant for the night, her
> boss had her drink wine, then pulled down her pants, pulled down his own pants,
> and had unprotected sexual intercourse despite [her] saying no.  [Patient] ran home
> afterward, spoke with her mother & sister, coming to the ED for eval.

(*Id.* 4–5.)  A rape kit was collected, and a "sl[ight] bruise post[erior] vagina" was noted during

M.A.'s physical examination.  (*Id.* at 3–4, 6.)  At around 7:30 AM, CPD officers arrived and

took a report from M.A.  (*Id.* at 3.)  M.A. was released at around 8 AM.  (*Id.* at 6.)

Later that day, a police report was completed based on what M.A. had told the officers at

the hospital.  (*See* JEX 364 at 2 (Dkt. No. 747-16).)  The report included the following statement:

> [M.A.] states that she works at Ar[]iano's Restaurant in Carmel. . . . Last night at
> approx. 2300 hours[,] she was alone in the restaurant with the suspect- [Zaimi]. . . .

---

[8] The Parties' 56.1 Statements and Responses are replete with disputes concerning how
the other Party characterizes or paraphrases statements in underlying documents.  For example,
Defendants' 56.1 states that "On July 31, 2013, M.A., a teenager, told her mother and sister that
her boss . . . raped and sodomized her.  Ex. 43 (MA Hospital Records) at ICD132304-05."
(Defs' 56.1 ¶ 78.)

In his Response, Plaintiff states "Disputed.  The hospital records provide the following:
'18y/o female presents stating that at work closing the restaurant for the night, her boss had her
drink wine, then pulled down her pants, pulled down his own pants, and had unprotected sexual
intercourse despite the pt saying no.  Pt ran home afterward, spoke with her mother & sister,
coming to the ED for eval.  (JEX 43 [M.A. Hospital Records] at ICD132303-05).'"  (Pl's Resp.
56.1 ¶ 78.)

In all such cases, because there is no dispute as to the authenticity or admissibility of the
underlying document, the Court will cite directly to the underlying document as relevant, rather
than relying on the Parties' 56.1 Statements and Responses and adjudicating irrelevant and
pedantic semantic disputes.

Zaimi asked [M.A.] to have a drink with him at the bar, [M.A.] felt compelled to do it so she . . . shared a beer with him.  After the beer[,] [M.A.] had a glass of wine. . . . [Zaimi] was acting inappropriately by touching her and saying things that were making her uncomfortable.  [Zaimi] asked [M.A.] if she would take a ride with him to [another] restaurant.  [M.A.] couldn't drive because she had been drinking[,] and she felt compelled to go with him because he is her boss so she went.  Upon arriving at the [other restaurant,] . . . [Zaimi] took her purse off her shoulder and threw it to the floor.  [Zaimi] . . . began kissing [M.A.].  [M.A.] pulled away and told [Zaimi] that she didn't want to do that and stated that he was married. . . . Zaimi then walked over to [M.A.] and pulled her shirt up and her pants down, . . . [M.A.] pulled her shirt down and her pants up and again said something about [Zaimi] being married and having kids.  [Zaimi] at that time pulled [M.A.'s] pants own and turned her around.  [Zaimi] penetrated [M.A.] and had vaginal intercourse with her.  [M.A.] states that it was only for approx. 2 min. but that [Zaimi] ejaculated in her.

(*Id.* at 2–3.)

On August 1, 2013, M.A. went to the CPD to press charges against Zaimi.  (Defs' 56.1 ¶ 81; Pl's Resp. 56.1 ¶ 81; *see* JEX 44 ("M.A. Interview Video") (Dkt. No. 757-4).)  M.A. participated in an interview with Nagle and a CPD lieutenant.  (Defs' 56.1 ¶ 81; Pl's Resp. 56.1 ¶ 81.)  During the interview, M.A. reported that Zaimi had given her beer and wine, even though she was underage.  (Defs' 56.1 ¶ 81; Pl's Resp. 56.1 ¶ 81.)  M.A. told the officers that as she was drinking with Zaimi, he pressured her to drink, saying "Drink. . . . Don't be a pussy.  Drink." (M.A. Interview Video 12:32:27–29.)[9]  Zaimi then drove M.A. to another restaurant he owned after she told him she was too intoxicated to drive home.  (Defs' 56.1 ¶ 83; Pl's Resp. 56.1 ¶ 83.)

---

[9] The Court notes that the Parties dispute what M.A. said during the interview.  (*See* Defs' 56.1 ¶¶ 82, 84–85; Pl's Resp. 56. 1 ¶¶ 82, 84–85.)  Defendants also contend that Plaintiff doctored a transcript of the interview and distributed it to the press in advance of Zaimi's trial. (*See* Defs' 56.1 ¶¶ 133–147.)  Plaintiff disputes that the alterations he made to the transcript are in any way inaccurate.  (Pl's Resp. 56.1 ¶¶ 133–147.)  After comparing the video to the transcript and also to Defendants' redline of Plaintiff's alterations to the transcript, (*see* JEX 45 ("M.A. Interview Transcript") (Dkt. No. 757-5); JEX 46 ("M.A. Interview Transcript Redline") (Dkt. No. 757-6)), the Court finds that Plaintiff made changes that comport with what can be heard in the interview.  However, the Court also finds that the transcript, even with Plaintiff's changes, still fails to capture many of M.A.'s statements in the interview, and so cites directly to the video.

In citing to the video, the Court refers to the time depicted in the top center of the video.

Zaimi and M.A. walked into the restaurant, and Zaimi then began kissing and holding M.A.; M.A. stopped him and then the two separated.  (M.A. Interview Video 12:39:16–25.)  A few minutes later, Zaimi again began kissing M.A., pressed her up against a sink, and began pulling her shirt up and her pants down.  (*Id.* at 12:39:46–56.)  M.A. briefly kissed Zaimi back and then pulled up her pants and told Zaimi "you have a wife and you're my boss" before walking away from him.  (*Id.* at 12:20:21–25, 12:21:29–31, 12:39:52–12:40:09.)  Zaimi's pants were partly down, and he was touching his penis.  (*Id.* at 12:40:11–14.)  Zaimi told M.A. that she would have a job no matter what happened.  (*Id.* at 12:20:27–33, 12:21:33–36.)  Zaimi pulled M.A. back to the sink, turned her so she was facing the sink, and pulled down her pants again. (*Id.* at 12:40:16–33.)  Zaimi then sexually assaulted M.A. and ejaculated in her anus.  (*Id.* at 12:22:13–44, 13:17:35–13:18:57.)  M.A. stated that during the assault she was "whimpering a little bit, [and] closing [her] eyes" and "the whole time [she] . . . just . . . wanted to cry."  (*Id.* at 13:18:39–42, 12:22:34–43.)  After the interview had concluded, CPD called Pascale and informed her about M.A.'s statement.  (JEX 187 (Dkt. No. 760-7).)[10]

### b.  Plaintiff's Investigation of M.A. and the Prosecution

On August 9, 2013, Zaimi was indicted and arrested for Rape in the Third Degree, Criminal Sexual Act in the Third Degree, and Unlawfully Dealing with a Child in the First Degree.  (JEX 448 (Dkt. No. 751-11); Pl's 56.1 ¶ 20; Defs' Resp. 56.1 ¶ 20.)  Zaimi hired Plaintiff to represent him on or around August 14, 2013.  (JEX 158 ("Galgano-Kuchta Text Msgs") at 118984, 119098 (Dkt. No. 767-8–9)); *see also* Defs' 56.1 ¶ 90; Pl's Resp. 56.1 ¶ 90.)[11]

---

[10] Levy is a recipient of this email from Krauss.  (*See* JEX 187.)  On August 2, 2013, Krauss also separately emailed Levy with her assessment of M.A.'s interview and also noted that Zaimi had "a history of sexually assaulting female employees[.]"  (JEX 188 (Dkt. No. 760-8).)

[11] When citing to text messages from the backup spreadsheet of Plaintiff's text messages recovered from his laptop, the Court cites to the unique identifier in the left-most column of the

Following his retention, Plaintiff began investigating M.A.  (Pl's 56.1 ¶ 22; Defs' Resp.

56.1 ¶ 22.)[12]  In late August, Plaintiff reached out to Charles J. Gainey ("Gainey"), M.A.'s ex-

boyfriend, via email.  (*See* JEX 39 ("Gainey Complaint") at 2–3 (Dkt. No. 742-24).)  Gainey

called Plaintiff on August 30, 2013 and spoke to him about his contact with M.A. after Zaimi's

---

message spreadsheet.  The Court also notes that no Defendant had knowledge of the content of
any text messages between Plaintiff and Kuchta until after May 1, 2015, when the PCDAO was
authorized, by court order, to search Plaintiff's phone.  (JEX 461 at 11 (Dkt. No. 753-7).)

As relevant here, Plaintiff had not represented Zaimi in 2010 when he was arrested and
pled guilty to sexually harassing a waitress.  (Defs' 56.1 ¶ 89; Pl's Resp. 56.1 ¶ 89.)
Specifically, Zaimi pled guilty to "grab[bing] the victim[']s hand and plac[ing] it on his genitals,
on the outside of his clothing. . . [and] lick[ing] the victim[']s lips.  This was all done without the
victim[']s consent."  (JEX 490 at 33 (Dkt. No. 753-31).)

On August 10, 2013, the day after Zaimi's arrest, the PCDAO received a report from
another woman who "stat[ed] she had a similar incident with [Zaimi]."  (JEX 190 at 3 (Dkt. No.
760-10).)

Additionally, Krauss stated in her deposition that at some point prior to M.A. coming
forward, "Levy [was] at . . . a moot court. . . . and a young girl came up and disclosed
inappropriate touching by Zaimi to him . . . .  [He]  [t]asked me with meeting with the young girl.
I did, but I don't believe in that situation that she wanted to go forward."  (JEX 21 at 114:10–17
(Dkt. No. 742-1).)

Although the PCDAO was not aware of this communication at any time relevant to this
Action, after K.L. came forward to report Zaimi's forcible touching, Kuchta informed Plaintiff
that a waitress who had worked with K.L. had reported that "[w]hen [the waitress] started [at
Zaimi's restaurant], . . . [Zaimi] . . . made her feel uncomfortable, comments and the way he
looked at her.  [The waitress] told her boyfriend . . . who sent an email to [Zaimi] advising him to
cut the shit.  All was fine after that."  (Galgano-Kuchta Text Msgs at 138890, 138907.)

[12] On August 19, 2013, Plaintiff determined that M.A. was attempting to sell a car and
asked Kuchta to inquire about it.  (*See* Galgano-Kuchta Text Msgs at 119598–99, 119601.)  On
August 20, 2013, Plaintiff told Kuchta that he should inform M.A. that Kuchta was seeking to
buy the car for his son and then stated that "[w]e need a good looking 20 year old kid."  (*Id.* at
119631–32, 119650.)  The next day, Plaintiff texted an acquaintance, Alberto Spagnuolo
("Spagnuolo"), a link of M.A.'s Instagram page and wrote "[g]oing to be a match made in
heaven" and, later that afternoon, "[a]re you banging [M.A.] today[?]"  (JEX 159 at 119723,
119733, 119770 (Dkt. No. 767-10).)  On August 28, 2013, Plaintiff texted Kuchta and Spagnuolo
together, writing "[Y]ou can tell [M.A.] that your oldest son, [Spagnuolo] would like to look at
the car . . . [m]aybe we can get [Spagnuolo] a recording device or some shit[.]"  (Defs' 56.1 ¶ 96;
Pl's Resp. 56.1 ¶ 96.)  However, the plan did not proceed further because on August 29, 2013,
M.A. informed Kuchta that the car had been sold.  (Galgano-Kuchta Text Msgs at 120351.)

assault. (*Id.* at 3.) Based on that conversation, Plaintiff drafted an affidavit for Gainey to sign.

(Galgano-Kuchta Text Msgs at 120898.) The affidavit included the following statements:

> I believe that I was the first person [M.A.] called after the sexual encounter she described to me as a rape. . . . Based on my prior dealings with [M.A.], her tone and demeanor during the phone call and her reluctance to call the police and report the incident, I did not believe she was actually raped by anyone. . . . It seemed that she was using the "rape" to make me feel sorry for her in an effort to reconnect . . . .
>
> During the [time] I dated [M.A.], I had occasion to observe her in possession of a prescription pill bottle. She told me that she was prescribed anxiety medication. I broke up with [M.A.], in part because it was difficult to deal with her violent mood swings.

(*Id.* at 2–3.)

On September 5, 2013, Holly Finley ("Finley"), a private investigator who worked with

Plaintiff, approached Gainey at his place of employment, and Gainey signed the affidavit after

making handwritten alterations. (Gainey Complaint at 2–4; JEX 463 (Dkt. No. 753-9); JEX 160

("Galgano-Finley Text Msgs") at 120598, 120619 (Dkt. No. 759-10).)[13] On September 21,

2013, Gainey filed a voluntary statement with the CPD, stating the following:

> I am [M.A.'s] ex-boyfriend . . . . I was harassed by a private investigator [to sign the affidavit] . . . . She would wait outside my house for over an hour on multiple days[.] She would call me many times throughout the day[.] She sent me numerous texts[.]
>
> I don't know what happened that night, also [M.A.] is not a liar . . . . I don't know if [M.A.] did get raped but she wouldn't lie about this to me[.]
>
> [T]he phone conversation that [Plaintiff and I] had was turned into a statement that I was unaware of[.] [Finley] . . . told me at my [j]ob "I have no choice" [but] to give my statement. When I looked at the statement it was amplified to the next level trying to get me to say [M.A.] was "abusive" which I never said. I was tricked by [Finley] into giving my statement. These investigators are twisting my words. The [s]tatement that they had me sign was originally filled with lies and twisted my

---

[13] The Court notes that no Defendant had knowledge of the content of any text messages between Plaintiff and Finley until after May 1, 2015, when the PCDAO was authorized, by court order, to search Plaintiff's phone. (JEX 461 at 11.)

words to make them prove [their] case.  I never said those things.  I scratched out a
lot of the stat[e]ments that [were] really bad.

(Gainey Complaint 5–6.)  Gainey's statement complaining about Plaintiff and Finley's conduct

was shared with the PCDAO, including Krauss and Pascale.  (*See* JEX 48 (Dkt. No. 757-8); JEX

192 (Dkt. No. 760-12).)

On September 16, 2013, Plaintiff directed Finley to stake out M.A.'s home and attempt to

contact her to ask her a number of questions concerning Zaimi's assault.  (Galgano-Kuchta Text

Msgs at 122436; Galgano-Finley Text Msgs at 122429–30.)[14]  The next day, Finley approached

M.A. as she was leaving a tanning salon, but M.A. refused to speak with her.  (Galgano-Kuchta

Text Msgs at 122500, 122567.)  That evening, Kuchta was surveilling M.A.'s home and reported

to Plaintiff that a person he believed to be M.A. had noticed his presence and then refused to

answer when he knocked on the door of M.A.'s house.  (*Id.* at 122555.)

Also on September 17, 2013, Plaintiff told Kuchta, "I think we should just start digging

. . . .  Contact people [and] [t]ell them we are involved in a criminal investigation.  What can you

tell me about [M.A.][?]  If nothing else it will give her anxiety."  (*Id.* at 122586–87.)  On

September 19, 2019, Plaintiff used Kuchta's Facebook account to send a message to individuals

who were "connected to [M.A.] or to her family members" that informed recipients that Kuchta

was "conducting an investigation involving [M.A.]" and that it was "important that [he] speak to

friends, family and individuals who are familiar with and know [M.A.] on a person[al] basis."

(JEX 41 at 2 (Dkt. No. 757-1).)[15]

---

[14] Plaintiff also advised Finley that "[i]f you try to schedule [an] appointment and allow
[M.A.] to shake you, there will be no second appointment because the DA will end that."
(Galgano-Finley Text Msgs at 122433.)

[15] The Parties dispute whether Kuchta was aware of or consented to Plaintiff's use of his
Facebook account.  (Defs' 56.1 ¶ 109; Pl's Resp. 56.1 ¶ 109.)  However, the Court concludes

On September 19, 2013, Plaintiff directed Kuchta to "[g]o to neighbor['s] houses . . . talk about rape, dig and ask about [M.A.'s mother] and her daughters" and to also "[s]tand outside [M.A.'s house].  Take pictures of [the] house, cars, [and] people coming in and out."  (Galgano-Kuchta Text Msgs at 122884, 122885.)  The next day, Kuchta did as Plaintiff directed and reported back that "[i]f anything we made this entire block aware of the investigation . . . I hit every house[.] . . . I [also] walked up to [M.A.'s] house earlier . . . I got to the door and heard

---

that Plaintiff had Kuchta's consent to use his Facebook account because, on September 24, 2013, Kuchta texted Plaintiff his username and password and told Plaintiff how to access the account. (Galgano-Kuchta Text Msgs at 123503.)

After one of M.A.'s contacts responded on September 23, Plaintiff drafted responses that were sent through Kuchta's Facebook account on September 24 and included the following statements:

> [M.A.] has claimed that my client had vaginal and anal intercourse with her and . . . told the client that she did not want to have sex.  Shortly after the incident, she contacted her ex-boyfriend, CJ and claimed to have been raped.  He told her to report the rape to the police but she said she just wanted to forget about it. . . .  I have learned that she is on prescription medications for something but I am trying to better understand who she is and why she would fabricate such a horrible story.  My belief is that she may have lied to her ex to garner sympathy from him and her story escalated out of control when he did not believe her and her mother forced her to go to the police. . . .
>
> I forgot to mention, [M.A.] is claiming that she was "raped" by her boss, [Zaimi], who is the owner of several restaurants.  In a Twitter post, [M.A.] says "Money is the motive."  I'm not certain whether she or her mother feels that they will profit economically from this.  So you understand, the rape charge is not a typical "rape" case where someone is fighting off their attacker who is forcibly having sex with the person.  The charge here does NOT involve any allegation of violence or force, just that [M.A.] said "no" and [Zaimi] should have known that she was not consenting to the vaginal and anal sex.  I don't know about you, but it is difficult for me to accept that someone would endure unwarranted anal sex and not resist or try to get away.

(JEX 41 at 2–3.)

14

from inside, there is no one home and to please go away." (*Id.* at 123079.)[16] Kuchta added that "I am sure some o[f] the neighbors will contact [M.A.'s family] and advise that we were up there asking around[.]" (*Id.* at 123080.)

At around the same time, M.A. notified Pascale about her encounter at the tanning salon and about Plaintiff's Facebook message. (JEX 55 at 2 (Dkt. No. 757-15).) On the evening of September 20, 2013, Pascale sent an email to prosecutors in a number of other counties that described these efforts to reach M.A. and also explained that "the defense attorney [had] texted [M.A.] and asked to speak to her." (*Id.*) Pascale commented that "[M.A.] [was] beside herself and feeling harassed" because of Plaintiff's intrusions into her life. (*Id.* at 3.)[17]

Plaintiff filed a motion to dismiss the indictment in February 2014. (*See* JEX 490.) In support of this motion, Plaintiff emphasized what he argued were inconsistencies in M.A.'s account of the events of July 30–31, 2013, claiming that her account had changed to implicate Zaimi because of pressure from Nagle and Pascale and that the testimony Pascale elicited from her in the grand jury was perjurious. (*See id.* at 12–18.)

On February 13, 2014, a week before Zaimi's trial was to begin on February 20, Plaintiff emailed a complete and unredacted transcript of M.A.'s August 1, 2013 interview with the CPD to two reporters. (*See* JEX 53 (Dkt. No. 757-13); JEX 54 (Dkt. No. 757-14).) In one of the emails, Plaintiff stated that the "alleged victim has admitted to the [CPD] that the sex with [Zaimi] was consensual." (JEX 54 at 2.) On February 19, 2014, Krauss described Plaintiff's

---

[16] Kuchta also informed Plaintiff that "Today [was] [M.A.'s] birthday." (Galgano-Kuchta Text Msgs at 123074.)

[17] In a response to Pascale's email, an ADA from Richmond County commented that the behavior Pascale described was "tampering with a witness and harassment and attorney misconduct." (JEX 194 at 1 (Dkt. No. 760-14).)

disclosure of the transcript as "a method to taint the jury pool [. . .] [and] intimidate the victim." (JEX 200 at 2 (Dkt. 760-20).)  The next day, which was also the first day of the M.A. trial, a multi-page article was published in a local newspaper that quoted extensively from the transcript of M.A.'s interview.  (*See* JEX 402 at 2–4 (Dkt. No. 749-1).)  After reading the article, Krauss commented that "[a]lthough the [newspaper] did not print [M.A.'s] name[,] they printed any portions of her statement that made her seem less credible."  (JEX 201 at 3 (Dkt. No. 761-1).)[18]

At trial, M.A. took the stand as the prosecution's first witness.  (JEX 403 at 3 (Dkt. No. 749-2).)  Plaintiff cross-examined M.A. at length, which at times resulted in her being visibly upset and having to leave the witness stand.  (Pl's 56.1 ¶ 31; Defs' Resp. 56.1 ¶ 31.)[19]  A few weeks into trial, on March 6, 2014, Plaintiff filed a letter with the court requesting that Levy be required to testify so that Plaintiff could probe "the motivation of the [PCDAO] in pursuing [Zaimi's] prosecution."  (JEX 399 at 3 (Dkt. No. 748-16).)[20]  The trial judge denied this request the next day.  (*See* JEX 441 (Dkt. No. 751-4).)  On March 17, 2014, the trial judge declared a mistrial; on the day the mistrial was declared, the jury was reportedly deadlocked eleven to one

---

[18] At the time the article was published, Zaimi was the landlord of the newspaper's parent company.  (JEX 402 at 2.)

[19] The Parties have included a transcript of a portion of Plaintiff's cross-examination of M.A., which fills two hundred trial transcript pages.  (*See* JEX 401 (Dkt. No. 748-18).)
Plaintiff also cross-examined Nagle; during the cross-examination, Plaintiff accused Nagle of engaging in misconduct.  (Pl's 56. 1 ¶ 157; Defs' Resp. 56.1 ¶ 157.)

[20] On or around February 11, 2014, after K.L. came forward with her allegations against Zaimi, Plaintiff had filed a motion to appoint a special prosecutor.  (*See generally* JEX 490.)  In support of his motion, Plaintiff argued that the PCDAO had engaged in a number of alleged improprieties during the M.A. prosecution, including arresting Zaimi based on K.L.'s accusations, that were motivated by Levy's animus toward Zaimi as a supporter of Putnam County Sheriff Don Smith.  (*See id*.)

16

in favor of Zaimi's conviction on the two felony counts related to his sexual assault of M.A and

had unanimously determined that Zaimi be acquitted for the misdemeanor.  (JEX 403 at 2–3.)

### 4.  K.L.'s Report and Plaintiff's Investigation

#### a.  K.L.'s Report of Zaimi's Forcible Touching

On January 29, 2014, K.L. reported to the PCSO that Zaimi had inappropriately touched

her.  (Defs' 56.1 ¶ 154; Pl's Resp. 56.1 ¶ 154.)  K.L. completed a written statement:

> [Today,] the owner of Arian[]o's . . . began training me on the computer.  [He]
> wouldn't stand more than 6 inches away from me.  After putting his hand on my
> back and rubbing it[,] I said stop [and] walked away.  We were alone.  When I came
> back to the register[,] he asked me [i]f I was married, I asked why [and] didn't
> answer. . . .  As he was explain[in]g or talking[,] he [r]epeatedly poked/brushed up
> against my breasts.  I kept backing away and brought up that he knew my Aunt – he
> then tried to hug me [and] I didn't let him.  [A]bout 10 minutes later he grabbed me
> and hugged me [and] I pulled away.

(JEX 59 at 7 (Dkt. No. 757-19).)[21]

K.L. did not press charges because she was told by the officer who took her complaint

that her "complaint was not strong enough to file charges."  (*Id.* at 15.)  On January 31, 2014, the

CPD, at Pascale's direction, reached out to the PCSO about K.L.'s complaint to confirm that

Zaimi was involved, and the PCSO confirmed Zaimi's involvement.  (*Id.* at 2.)[22]  Independently,

Pascale contacted K.L., who informed Pascale that she had not pressed charges because "she was

unhappy with the treatment she received" from the officer who took her complaint.  (*Id.* at 3.)

Because K.L. preferred not to have the PCSO investigate further, on or around February 2, 2014,

---

[21] The PCSO completed an internal investigation and found that the officer who had taken K.L.'s report had "failed to recognize [the] incident[] [K.L. reported] [was] a crime of serious nature" and that his conduct "was in violation of [PCSO] rules and regulations."  (JEX 59 at 5.)

[22] Krauss informed Pascale of K.L.'s report and directed Pascale to reach out to the PCSO.  (JEX 203 at 2 (Dkt. No. 761-3).)  Late on January 31, Krauss also informed Levy about K.L's allegations and the treatment she received while making her report at the PCSO.  (JEX 204 at 2 (Dkt. No. 761-4).)

her complaint was transferred to the CPD.  (*Id.*)  On February 1, 2014, K.L. gave another

statement to the CPD where she reported that Zaimi had actually harassed her twice, first in

November 2012 and then on January 29, 2014.  (JEX 404 at 2–6 (Dkt. No. 749-3).)[23]

Plaintiff became aware of K.L.'s allegations on or around February 1, 2014, when the

CPD sought out Zaimi for further questioning.  (JEX 206 at 2 (Dkt. No. 761-6).)  On February 7,

2014, Plaintiff brought Zaimi and his wife to the CPD to voluntarily answer questions

concerning K.L.'s allegations and also proffered surveillance video.  (JEX 62 at 2 (Dkt. No. 757-

22); JEX 405 at 3–4 (Dkt. No. 749-4); JEX 330.)  The CPD arrested and charged Zaimi on

February 11, 2014, before releasing him on bail.  (JEX 359 at 2 (Dkt. No. 747-11); JEX 405 at

5–6.)[24]  Pascale prosecuted Zaimi for forcibly touching K.L., (Defs' 56.1 ¶ 159; Pl's Resp. 56.1

---

[23] In her statement, K.L. mistakenly wrote January 28, 2014.  (JEX 404 at 3.)  As relevant
here, K.L. provided the following description of the 2012 incident:

> I responded to [Zaimi's] ad . . . [and] met him at the Mahopac rest[aurant] [the]
> same day at 5 pm to interview.  After a few minutes, he told me to move my car to
> a parking lot across the street.  He met me over there and told me he wanted to talk
> in his office.  We walked into the medical building and it looked abandoned.  He
> walked into a small room with a gyn[e]cologist table [and] told me to go in.  I said
> "No" and headed for the door – I was very nervous.  I couldn't find the door[,] and
> we ended up in what looked like a waiting room – he then locked the door [and]
> stood in front of it.  I repeatedly tried to get around him telling him to get out of my
> way.  He kept moving closer and grabbed me.  Both of his arms were around my
> waist [and] his hands were on my butt and my arms were in front of my chest [and]
> I was trying to push him off. . . . He proceeded to tightly hold me [and] tried to kiss
> me/licked my mouth and said "oh come on, don't you need money." . . . He was
> holding me so tight I felt his erect penis against my vagina – I pushed hard – he let
> go.  I ran to [the] door . . . .

(*Id.* at 2.)

[24] Contemporaneous text messages between Krauss and Levy indicate that the CPD
engaged in consistent efforts to arrest Zaimi from the time that the PCDAO became aware of
K.L.'s report.  On January 31, 2014, Krauss reported to Levy that "earlier today . . .a young lady
went to [PCSO] to file report on [Zaimi] . . . .  We had [CPD] call [PCSO] to get information
. . . .  We will be arresting [Zaimi] by Monday[.]"  (JEX 204 at 2.)  On February 1, 2014, Krauss

¶ 159), and Plaintiff continued to serve as Zaimi's defense attorney, (Defs' 56.1 ¶ 158; Pl's Resp. 56.1 ¶ 158).

### b. Plaintiff's Investigation of K.L.

After Plaintiff became aware of K.L.'s statement, he directed Kuchta to begin investigating her on February 7, 2014.  (Galgano-Kuchta Text Msgs at 137612.)  On February 11, 2014, Plaintiff informed Zaimi that "[w]e dug through her garbage last night and got her bank accounts."  (Galgano-Zaimi Text Msgs at 138208.)  On February 11, 2014, K.L. contacted CPD and reported that "a male [had been] banging on her door for the past 10 minutes, she [was] worried and [was] not familiar with this male."  (JEX 40 at 2 (Dkt. No. 742-25).)  CPD contacted K.L.'s local police department, which dispatched officers to her home.  (*Id.*)  When the officers arrived, they identified Kuchta as the man who had been banging on K.L.'s door.  (*Id.*)

---

informed Levy, "[CPD] completed [the] interview [with K.L.] and will be making [the] arrest shortly" but the arrest ultimately did not occur because "[Zaimi] [was] not at either [of his] restaurant[s]."  (JEX 205 at 2 (Dkt. No. 761-5).)  On February 10, 2014, after Plaintiff had brought Zaimi in to voluntarily answer questions, Krauss informed Levy that "[Plaintiff] call[ed] [CPD] and said [Zaimi] [was] out of state . . . [even though] [Zaimi] [k]new since Friday he was to surrender[.]"  (JEX 208 at 2 (Dkt. No. 761-8).)

Text messages between Plaintiff and Zaimi indicate that Plaintiff was in communication with Plaintiff on February 10, 2014.  (JEX 156 Pt. 4 ("Galgano-Zaimi Text Msgs") at 14 (Dkt. No. 759-9).)  Zaimi returned with Plaintiff to be arrested the next day.  (*Id.* at 20–22.)

The Court notes that Defendants had no knowledge of the content of any text messages between Plaintiff and Zaimi until the PCDAO and CPD began wiretapping Plaintiff's phone on June 7, 2014; contemporaneous interception of Plaintiff's text messages continued until June 30, 2014.  (*See* JEX 265; JEX 267.)  Defendants became aware of Plaintiff's messages exchanged with Zaimi prior to June 7, 2014, when the PCDAO was authorized by court order to search Plaintiff's electronic devices on May 1, 2015.  (JEX 461 at 11.)

5.  PCDAO's Investigation of Plaintiff and McQuaid[25]

a.  Plaintiff's February and March 2014 Contact with McQuaid

On February 14, 2014, Kuchta sent Plaintiff a news article about K.L.'s sister, Lia, which also discussed Lia's boyfriend, McQuaid.  (Galgano-Kuchta Text Msgs at 139202, 139204; JEX 408 at 2 (Dkt. No. 749-6).)  Plaintiff told Kuchta that "McQuaid is a friend of mine" and that "[McQuaid] is the answer to all of our questions."  (*Id.* at 139204, 139274.)  Plaintiff did not have McQuaid's phone number but was able to procure it from an acquaintance.  (JEX A at 2 (Dkt. No. 771-1).)[26]  Plaintiff texted McQuaid for the first time on February 24, 2014, and made a plan to meet with him the next day.  (JEX 155 ("Galgano-McQuaid Text Msgs") at 140946, 141001, 141006 (Dkt. Nos. 759-4–5).)[27]  McQuaid met Plaintiff at his home, and McQuaid later provided the following description of the meeting:

---

[25] Levy supervised and was regularly updated on the investigation into McQuaid and Plaintiff.  (Pl's 56.1 ¶ 152; Defs' Resp. 56.1 ¶ 152.)

[26] In his June 29, 2014, video interview, McQuaid provided largely the same narrative of how Plaintiff located him.  (*See* JEX 341 ("McQuaid Interview Video") at 9:00–14:14.)  McQuaid also stated that he and Plaintiff had met before, but had never had more than a brief conversation.  (*Id.* at 11:29–35, 12:43–12:52.)

[27] The Parties have provided the Court with a number of different versions of the text messages between Plaintiff and McQuaid.  The Court will briefly describe them in chronological order based on when Defendants came into possession of them.
From May 16, 2014 to June 30, 2014, Defendants were intercepting all text messages McQuaid sent or received pursuant to an eavesdropping warrant, *see* § I.A.5.i *infra*.  The Parties have included two versions of a report that includes all of these messages.  (*See* JEX 264 ("McQuaid Text Intercepts"); JEX 380 (Dkt. No. 748-2).)
On August 8, 2014, McQuaid executed a consent form allowing the PCDAO to search his phone.  (*See* JEX 291.)  Joint Exhibit 291 has not been docketed and has been provided to the Court in electronic format.  A PDF containing the consent form, file name "Consent Forms," is included in the "Scans" subfolder of the Joint Exhibit 291 folder.
The Parties have provided an extraction report for McQuaid's iPhone, dated August 13, 2014, that includes all text messages McQuaid sent or received that could be recovered, including deleted messages.  (*See* JEX 378 (Dkt. No. 764-19).)  The extraction report includes text messages sent and received between March 27, 2014 and June 30, 2014.  (*See generally id.*)
Gil excerpted some of Plaintiff's messages to McQuaid that pre-date May 16, 2014 and

20

> [Plaintiff] showed me articles on the computer about [M.A. and K.L.'s accusations against Zaimi]. He asked me if I knew anything about it or heard anything. Then he asked if I could reach out to [K.L.] and find anything out about it. I said I would try.

(JEX 122 at 2 (Dkt. No. 758-2).)  After the meeting, Plaintiff texted McQuaid around a dozen questions about K.L. that he wanted answered.  (Galgano-McQuaid Text Msgs at 3–4.)

On or about February 24, 2014, Pascale instructed Gonzalez to reach out to Cianflone, K.L.'s mother; when Gonzalez contacted Cianflone, Cianflone informed Gonzalez that her daughter, Lia, had told her that Plaintiff had contacted McQuaid.  (Defs' 56.1 ¶¶ 149, 177; Pl's Resp. 56.1 ¶¶ 149, 177.)[28]  Gonzalez then called McQuaid and left messages in an attempt to find out more, but McQuaid never returned her calls.  (JEX 16 at 64:16–22 (Dkt. No. 756-16).)[29]

---

presented them as evidence during the first grand jury proceeding on August 19, 2014.  (*See* JEX 292 (Dkt. No. 745-9); JEX 293 (Dkt. No. 745-10).)

On July 7, 2015, Levy introduced a more complete version of McQuaid's text messages with Plaintiff to the second grand jury, which included all messages sent and received between February 24, 2014 and June 21, 2014.  (*See* JEX 347 (Dkt. No. 747-3); JEX 414 (Dkt. No. 749-15).)  The record is unclear as to the source of these text messages, but the Court notes that the timestamps of the first and last text messages in this document are the same as the first and last timestamps in Plaintiff's backup spreadsheet discussed immediately below.  (*Compare* JEX 347, *with* JEX 155.)

Finally, the Parties have included all text messages exchanged between McQuaid and Plaintiff from February 24, 2014 to June 21, 2014, extracted from a backup spreadsheet of all text messages sent or received from Plaintiff' iPhone which was stored on one of Plaintiff's laptop computers.  The Defendants gained access to this spreadsheet at some point after May 1, 2015 when they were authorized by court order to search Plaintiff's seized electronic devices. (JEX 155.)  *See also* § I.A.7 *infra*.

For ease of reference, the Court cites to the Plaintiff-McQuaid text messages as extracted from the backup spreadsheet recovered from Plaintiff's MacBook.  (JEX 155.)  The time stamp on the extracted messages is 4 hours ahead of Eastern Standard Time, and the Court has silently corrected the time where relevant.

[28] Except for this report and the April 12 report from K.L.'s aunt discussed below, Defendants did not have confirmation of any phone contact between Plaintiff and McQuaid until on or around April 29, 2014.  *See* § I.A.5.b *infra*.

[29] The Court notes that Plaintiff objects to Cianflone's statement as hearsay.  (Pl's Resp. 56.1 ¶ 176.)  The Court agrees but includes this statement for the limited purpose of assessing

On March 1, 2014, McQuaid told Plaintiff, "I got some answers to some questions," and then met with Plaintiff in person on March 3, 2014.  (Galgano-McQuaid Text Msgs at 209055, 209101.)  On March 10, Plaintiff texted McQuaid that "there could be an opportunity to earn some decent money[] [g]etting [K.L.'s] statement."  (*Id.* at 209645–46.)  Specifically, Plaintiff told McQuaid:

> I'd like [Lia] to get on the phone with [K.L.] and her mother after the verdict [in the M.A. trial] and record the call. . . .  I'd like [Lia] to engage [K.L.] and [Cianflone] in conversation and see what she says after the verdict.  But the calls must be recorded.  Depending upon the content, it could be a lucrative endeavor for all.  The cops are completely corrupt[,] and I know they made [K.L.] say she was working or was interviewed 18 months ago when in fact she had never met [Zaimi]. . . .  If I can get that on tape, it will blow their case wide open.
>
> The other area of discussion should be my cross examination of [M.A.]  The fact that I had her on the stand for 3 days, her jumping off the stand crying when I asked her about drug use and mental health, etc.  I'd like [Lia] to find out what [K.L.] says when she knows the same thing is going to happen to her.
>
> If she can get a couple calls recorded, it would be worth the trouble if you know what I mean.

(*Id.* at 209661, 209664, 209666.)[30]

---

whether the Defendants had probable cause for the warrants and for initiating the prosecution of Plaintiff.  *See, e.g., Martinez v. City of New York*, 564 F. Supp. 3d 88, 99 (E.D.N.Y. 2021) ("To establish probable cause, officers may rely on hearsay, and a court may properly consider such hearsay at summary judgment." (citing *United States v. Premises & Real Prop. At 4492 S. Livonia Rd.*, 889 F.2d 1258, 1267 (2d Cir. 1989)).

[30] From March to June 2014, Plaintiff paid McQuaid various amounts of cash on multiple occasions.  On March 14, 2014, Plaintiff paid McQuaid $500.  (Galgano-Zaimi Text Msgs at 210089.)  On March 19, Plaintiff gave McQuaid $200 to "get some recorded statements of [K.L.] and [Cianflone]."  (*Id.* at 210742–43.)  On April 7, 2014, Plaintiff paid McQuaid "[$]200 or 300."  (*Id.* at 213626.)  On or around April 19, 2014, Plaintiff paid McQuaid $50.  (Galgano-McQuaid Text Msgs at 215484.)  On May 27, 2014, Plaintiff paid McQuaid "[$]210."  (Galgano-Zaimi Text Msgs at 220890.)  On June 12, 2014, Plaintiff paid McQuaid $300.  (*Id.* at 224010.)

After the M.A. trial ended on March 17, 2014, Plaintiff met with McQuaid and Lia at his office on March 19 at around 5:30 PM.  (Galgano-McQuaid Text Msgs at 210730, 210735.)  Lia later stated that at this meeting:

> George [i.e., Plaintiff,] wanted to show us the tape of my sister working at [Zaimi's] restaurant, the night she went back to work the second time.  I watched the tape and George asked me if I knew anything about what I just saw or the case.  George asked if [there] was anything [I] wanted [him] to know to let [him] know.

(JEX 124 at 3 (Dkt. No. 758-4).)

After that meeting, Plaintiff texted McQuaid:

> Let's get some recordings.  I need to get [K.L.] talking. . . .  [F]or the most part . . . , I want [Lia] to just ask open ended questions like "What exactly happened back in 2012?"  And "What happened when you went to work in January?"  I'm also really really interested in whether the police are trying to influence her to lie. . . .  She can even say that the Pascale chick got hammered because [M.A.] admitted she didn't think she got raped until Pascale told her she was raped.

(*Id.* at 210803, 210805, 210807.)  Later, McQuaid thanked Plaintiff for paying him, and Plaintiff replied:

> Listen no problem with the $$ help man. . . .  If I can help you wi[th] a few bucks here and there it's no big deal. . . .  As far as the conversations, go slow with it.  We don't need a 3 hour conversation.  The more small talks the better.  Just make sure the recording is clear on the phone.  And when you get one or two, stop over we will take care of business and I can guide you guys as to what I need.

(*Id.* at 210831, 210836).

On March 25, 2014, McQuaid texted Plaintiff, "I have a recording for you."  (Galgano-McQuaid Text Msgs at 211361; JEX 244 ("3/25/2014 Lia-Fake K.L. Call") (Dkt. No. 764-15).)[31] McQuaid gave the recording to Plaintiff that same day.  (Defs' 56.1 ¶ 179; Pl's Resp. 56.1 ¶ 179.)  The recording purported to be a recorded call between Lia and K.L.  (Defs' 56.1 ¶ 180;

---

[31] According to the subpoenaed call records and the intercepts from McQuaid's phone, McQuaid did not have any phone contact with K.L. until June 5, 2014.  *See infra* note 73 and accompanying text.

Pl's Resp. 56.1 ¶ 180.)  However, McQuaid and Lia both later admitted that the call was between

Lia and a friend, not K.L.  (Defs' 56.1 ¶ 183; Pl's Resp. 56.1 ¶ 183.)[32]  The call included the

following relevant exchanges:

> [Lia:] Why didn't you tell me he assaulted you? . . .
>
> [K.L.:] He did.  He grabbed my ass.  I wasn't letting some prick put his hands on me, but he needs to be taught a lesson. . . .
>
> [Lia:] And what the fuck? . . .  You told me he fucking grabbed your ass.  And from what I heard, I didn't necessarily see it, but from what I'm getting, according to the police report, and mom -- you know how mom [i.e., Cianflone] likes to talk.  And mom's talking to Danielle . . . the DA. . . .  But you know, [she] made it sound like . . . he had his -- rubbing his cock on you and forced you and pushed you down, and the way it sounded I . . . was upset.  I'm like how the fuck could I not know about that?  Why wouldn't you tell me that?
>
> [K.L.:] Because it didn't happen like that.  It's a long story.  Basically, I don't know.  It depends on my money situation.   He needs to be taught some lesson somehow. . . .  I need money, you know . . . this could be settled very easily. . . .
>
> [Lia:] [D]o you plan on coming up here [to testify]? . . .
>
> [K.L.:] I don't know what I'm going to do yet. . . .  I just want this fucking prick to pay.  That's all.

(3/25/2014 Lia-Fake K.L. Call at 3:23–7:36.)[33]  After listening to the call, Plaintiff texted Zaimi:

---

[32] The record is unclear as to when Defendants gained access to this recording.  However, on January 9, 2015, Gil and Lopez, along with other law enforcement officers, interviewed Lia about the recording and "determined that the [recorded] conversation [was] in fact not a telephone conversation but . . . a scripted conversation between [Lia] and another person, not the victim[,] and both parties were near each other and not on phones."  (JEX 131 at 17 (Dkt. No. 758-11).)

As relevant here, Ortolano provided a *Brady* disclosure to Plaintiff's attorneys on May 15, 2015, that, initially, Lia had told PCDAO that "a taped phone conversation dated March 25, 2014 (provided by Defense) contained the voices of herself and her sister."  (JEX 179 at 2 (Dkt. No. 759-22).)  Later, Lia had told PCDAO "that her previous statement was not true and that the voice on the recording which purported to be that of [K.L.] was NOT [K.L.'s] but instead belonged to a female friend and that the recording was a 'fake' telephone conversation."  (*Id.*)

[33] Plaintiff and Defendant have both provided transcripts of this call.  (*See* JEX 435 (Dkt. No. 750-17); JEX 120 (Dkt. 754-35).)

> Got this [K.L.] bitch on recording saying you grabbed her ass. Good recording.
> We have to come up with some loot . . . . Got to send [Lia] down to North Carolina.
> . . . [K.L.] wants to shake you down for money. Says she needs money and this
> can be settled really easily. . . . I think the cops and DA are in on it with her.

(Galgano-Zaimi Text Msgs at 211382–83, 211394–95, 211397.) The next day, Plaintiff

continued:

> I may be able to get the Feds involved with this one. But we are gonna spend the
> next 4 months capturing her on tape. Gonna set this bitch up. And then we are
> going to use her to get them. . . . I'm gonna get [D.A] Pascale on tape telling [K.L.]
> to change her story.

(*Id.* at 211467, 211469.)

### b. McQuaid's Early April Calls to Cianflone

On April 11, 2014, K.L. testified before the grand jury convened to determine whether

Zaimi would be charged with forcible touching. (*See* Defs' 56.1 ¶ 189; Pl's Resp. 56.1 ¶ 189.)

That morning, Plaintiff and McQuaid exchanged the following texts:

> [Plaintiff:] Rumor is that [K.L.] is in NY.

> [McQuaid:] I don't think so . . . I will call [you] when I get out of work.

> [Plaintiff:] What time? This is kind of important. I can loose [sic] client if I'm not
> in the loop with something like this and I'm taking his money for info. Please give
> me a hand here Quince. I don't want to look like a jerkoff. . . . [G]ive me an idea
> when you think you'll be free to chat. . . .

> [McQuaid:] I can be free like 130 is that good for you.

> [Plaintiff:] Yeah 1:3[0.]

> [McQuaid:] I'm here do you want me to come back at another time. . . .

> [Plaintiff:] . . . .Here[,] [w]here you at[?]

> [McQuaid:] Lobby n u.

(Galgano-McQuaid Text Msgs at 214043–45, 214047, 214068–69, 214076, 214080–82.)[34]

Approximately a minute and thirty seconds after he sent the final text, McQuaid called

Cianflone.  (JEX 263 ("McQuaid Call Records") at 186–87.)[35]

On April 12, 2014, Pascale received a call from K.L.'s aunt, who reported that

"[McQuaid] [had] called [Cianflone] and stated that '[K.L.] may be in [New York] to testify and

she is not safe[.]'"  (JEX 409 at 2 (Dkt. No. 749-7).)[36]  At the time of the report, Pascale stated

---

[34] On April 10, 2014, Plaintiff had texted Zaimi: "[PCDAO is] supposedly presenting this new case ([K.L.]) to the Grand Jury on Friday.  I have to meet up with [McQuaid] again. . . . [McQuaid's] getting us more than [Kuchta] . . . got us and they grabbed thousands and thousands.  We should have used crack heads for [the] other case."  (Galgano-Zaimi Text Msgs at 213851, 213861.)

[35] Because the version of McQuaid's call records included as Joint Exhibit 263 has not been uploaded to the docket, the Court cites to the page number located in the top right corner of each sheet.

[36] In her affidavit in support of the May 1, 2014 pen register and trap and trace warrant application, Gonzalez reported that McQuaid told Cianflone "in substance [that] if [K.L.] is in New York[,] [K.L.] is not safe 'these guys will bring their cousins from Albania and for $500.00 they will kill anyone.'"  (JEX 72 at 10 (Dkt. No. 752-2).)  However, the record does not contain any contemporaneous notes by Gonzalez or Pascale that substantiate that this statement was reported to them on April 12.
During his June 29, 2014 interview, McQuaid described the following exchange, which does not occur on any recorded call:

[Cianflone] told me [Zaimi]'s in a fucking Albanian Mafia. . . .  [A]ll I said to her was I know a couple [Albanians] lives in the Bronx.  You know who I'm talking about, . . . the Crew and all them guys.  All of them motherfuckers get off the plane from JFK and $500 they'll go put a knife in somebody or beat the shit out of somebody to get a pizzeria job . . . an apartment, and you know that's true. . . .  And so I was just speaking facts.

And I say well if that's the case I don't know who the guy [i.e. Zaimi] is.  I don't know nothing about him. . . .  I said you're sure, he's a mobster?  And she's like, yeah . . . .

I had asked her, well then . . . you better tell [K.L.] if she was truly violated go all the way with it.  Do what she's got to do to feel good.  If it was something that the guy just insulted her and offered her some fucking sex or tapped on her on the ass,

---

her belief that McQuaid had gotten this information from Plaintiff or Kuchta because she was aware that Plaintiff had previously reached out to McQuaid "and offered [him] money for dirt on [K.L.]" (*Id.*)[37]  In response to an email from Pascale describing the conversation, Levy stated that "[i]f what [McQuaid] said is true, someone is trying to intimidate [K.L.].  I want [McQuaid] picked up and questioned.  [W]e first need a full work up on him.  Phone records, known associates, financial stressors, etc[.]"  (*Id.*)[38]  On April 16, 2014, Lopez directed a subpoena to Sprint, McQuaid's phone carrier, for call records between January 29, 2014 and April 16, 2014.  (JEX 485 (Dkt. No. 753-27); Def's 56.1 ¶ 194; Pl's Resp. 56.1 ¶ 194.)[39]

---

it ain't right.  But at the end of the day, is it worth it going through hell and back, and then putting herself out there? . . .

It's all I meant by it.  I wasn't trying to put something in somebody's head[.]

(McQuaid Interview Video 22:38–23:33; *see also id.* at 48:20–49:53.)

[37] The Court notes that Plaintiff objects to Pascale's recounting of K.L.'s aunt's recounting of McQuaid's statement to Cianflone as hearsay.  (Pl's Resp. 56.1 ¶ 190).)  The Court agrees but includes this statement for the limited purpose of assessing whether the Defendants had probable cause for the warrants and for initiating the prosecution of Plaintiff.  *See, e.g.*, *Martinez*, 564 F. Supp. 3d at 99 ("To establish probable cause, officers may rely on hearsay, and a court may properly consider such hearsay at summary judgment." (citing *4492 S. Livonia Rd.*, 889 F.2d at 1267)).

[38] Nagle first became aware of the investigation of alleged tampering or bribery of K.L. at around this time.  (Defs' 56.1 ¶ 191; Pl's Resp. 56.1 ¶ 191.)

[39] After McQuaid's call records were received, Lopez asked the New York State Police ("NYSP") to analyze the call data and create call frequency tables with the top 20 numbers for each day include in the data.  (JEX 71 at 3 (Dkt. No. 752-1).)  The NYSP provided the call frequency tables to Lopez the same day.  (*Id.* at 2.)  As relevant here, the call frequency report indicated that Plaintiff and McQuaid exchanged at least one call or message a day from February 24, 2014, when the call records showed the first contact between Plaintiff's phone and McQuaid's phone, through April 16, 2014.  (*Id.* at 11–26.)

The record indicates that PCDAO subpoenaed McQuaid's call records a second time in preparation for the grand jury convened to hear the charges against Plaintiff and, in response, received McQuaid's call records from January 29, 2014 to April 30, 2014.  (*See* McQuaid Call Records.)

27

On April 17, 2014, McQuaid called Cianflone and recorded the conversation. (JEX 100 (Dkt. No. 754-15).)[40] Their conversation included the following relevant exchanges:

[McQuaid:] A friend reached out to me and said that they're still trying to say that she's testifying, or she did testify . . . .

[Cianflone:] No.

[McQuaid:] . . . I'll tell you so there's no mistrust or any misunderstandings. . . . [T]he only reason I'm getting phone calls is 'cause somebody is looking out for me, for her. . . . I guess he's close with . . . the lawyer that represents the other guy . . . ?

[Cianflone:] Galgano, that douchebag?

[McQuaid:] Yeah. I don't know anything about him.

[Cianflone:] Quincy, Quincy . . . that lawyer is out of his mind.

[McQuaid:] Well, I guess he gets paid. . . .

[Cianflone:] No, no, no, . . . he sent an investigator to [K.L]'s house when she was in Carmel. The guy stalked her. The police came and told the investigator, the private detective stalking [K.L], "I catch you on this street within a 100 yards of this house you're going to jail and so is your boss." . . . He called Galgano and warned him . . . .

[McQuaid:] . . . Just so you know, the only reason that I'm finding out I'm not even just asking. It's just a friend is looking out for me, and I guess he's really close with [Galgano], and I also think he uses [Galgano]. And I think he -- you know, I guess he's . . . into [Galgano] for some money or something. So, he's just been calling me to give me a heads up as a friend.

[Cianflone:] Well, . . . I know the last time I talked to the DA that she's refusing to testify. . . . And you know what, I don't blame her . . . .

[McQuaid:] No, I don't blame her either. . . . [Y]ou can't trust nobody that somebody's going to leak something out . . . and like you said, you seen what the other girl went through . . . .

[Cianflone:] Exactly . . . . [K.L.] told her friend. She said, "Listen, I know what he did. He didn't do it to me. He did enough to me." He . . . did sexually assault

---

[40] Defendants were not aware of this call until after the NYSP processed McQuaid's recorder in August 2014, as discussed at note 93 *infra*. This call was played during the first grand jury proceeding on August 19, 2014. (JEX 259j at 35:4–7 (Dkt. No. 744-16).)

[K.L.] . . . .  But not . . . in the way he did the girl. . . .  And he did pin her against the wall.  She did a freak out.  She's probably still having nightmares because he's an animal, he's lower than snail shit.

[McQuaid:] I don't condone any guy that acts like that, whether it's making a girl uncomfortable or not.

[Cianflone:] . . . This is an old story, Quincy.  This isn't something [Zaimi] just did. There's a line of seven women, and he's threatened every one of that he was in the Albanian Mafia.

(JEX 100 at 00:37–3:51.)[41]

On or around April 18, 2014, McQuaid provided his recording of the April 17 call to Plaintiff.  (Galgano-Zaimi Text Msgs at 215075.)  After listening to the recording, Plaintiff texted Zaimi that K.L. had not and would not testify before the grand jury.  (Galgano-Zaimi Text Msgs at 215098.)[42]

### c.  April 30, 2014 Controlled Call from Cianflone to McQuaid

On April 29, 2014, Cianflone called Gonzalez and told her that McQuaid had called her that day and had stated that K.L. could be paid money not to testify.  (JEX 259f at 67:25–68:1 (Dkt. No. 744-12).)[43]  The next day, Cianflone came to the PCDAO offices for an interview. (Def's 56.1 ¶ 203; Pl's Resp. 56.1 ¶ 203.)  As relevant here, Levy and Gonzalez were present for the interview.  (JEX 132 at 4 (Dkt. No. 758-12).)[44]  According to Gonzalez's notes, Cianflone

---

[41] Plaintiff and Defendants have included transcripts of this call.  (JEX 413 at 4–7 (Dkt. No. 749-13); *see also* JEX 121 (Dkt. No. 758-1).)

[42] On April 24, 2014, Plaintiff told Pascale that Zaimi was declining to testify before the grand jury in the K.L. case and that the grand jury could "vote the case."  (JEX D at ORT00471.) On April 26, 2014, Plaintiff again told Zaimi that PCDAO had again been unsuccessful in getting K.L. to testify before the grand jury.  (Galgano-Zaimi Text Msgs at 216570, 216576.)

[43] McQuaid communicated with Plaintiff before and after calling Cianflone on April 29. (Def's 56.1 ¶¶ 348–50; Pl's Resp. 56.1 ¶¶ 348–50.)

[44] Plaintiff has asserted in his Response 56.1 that Gil was also present at Cianflone's interview, citing to a timeline prepared by Ortolano in 2015.  (Pl's Resp. 56.1 ¶ 203.)  Ortolano

told those present that the previous day McQuaid had "[told] her [a] friend is willing to pay for [K.L.] not to testify [and McQuaid could] bring the money directly to" her.  (JEX 68 at 2 (Dkt. No. 757-28).)[45]

After the interview concluded, Cianflone made a controlled call to McQuaid.  (Defs' 56.1 ¶ 205; Pl's Resp. 56.1 ¶ 205; *see also* JEX 88 (Dkt. No. 754-3); JEX 101 (Dkt. No. 754-16).)[46]

During the controlled call, Cianflone and McQuaid had the following relevant exchanges:

[Cianflone:] I was just . . . getting back to what we were talking about yesterday.  I was like a little confused, but I don't know.  You perked -- you perked my interest.

[McQuaid:] Yeah . . . it was brought to my attention.  You know what it is, I think it's more -- it's more the friend I know that uses the lawyer . . . I guess . . . he owes him, I guess he's . . . trying to get out of . . . whoever it is can do something for him . . . and I guess it was brought to his attention that . . . if she . . . doesn't come . . . there might be some compensation from the guy himself . . . .

---

does not cite any contemporaneous records that support her assertion and was not herself present at the meeting.  (JEX 66 at 20 (Dkt. No. 757-26).)  Gil testified in this Action that he did not attend the meeting because he was not at the PCDAO offices on April 30, 2014.  (JEX 14 at 85:18–23 (Dkt. No. 756-14).)  Additionally, a CPD officer's contemporaneous report of the meeting also does not state that Gil was present.  (JEX 132 at 4.)  Thus, the Court concludes there is no dispute of fact here, as the only contemporaneous report of the meeting indicates that Gil was not present, which is consistent with Gil's own testimony.

[45] The report of a CPD detective who was present at the meeting indicates that Cianflone stated during the interview that "on previous dates . . . [McQuaid] had stated that he had been approached by one of his friends who indicated that [Cianflone] could be paid if [K.L.] refused to testify in ongoing criminal case."  (JEX 132 at 4.)
As relevant here, McQuaid and Cianflone had extended phone calls on April 22, April 23, April 25, and April 28, 2014.  (McQuaid Call Records at 208, 209, 215, 225.)
The Court notes that Plaintiff objects to Cianflone's statements during the interview as hearsay.  (Pl's Resp. 56.1 ¶ 204.)  The Court agrees but includes this statement for the limited purpose of assessing whether the Defendants had probable cause for the warrants and for initiating the prosecution of Plaintiff.  *See, e.g.*, *Martinez*, 564 F. Supp. 3d at 99 ("To establish probable cause, officers may rely on hearsay, and a court may properly consider such hearsay at summary judgment." (citing *4492 S. Livonia Rd.*, 889 F.2d at 1267)).

[46] As relevant here, Gonzalez was present for the controlled call.  (JEX 16 at 98:22–24.)  Gonzalez was able to hear both McQuaid and Cianflone speaking during the call.  (Defs' 56.1 ¶ 212; Pl's Resp. 56.1 ¶ 212.)

[Cianflone:] Compensation?

[McQuaid:] Yeah, well I guess for putting her through this bullshit anyway.  I guess guilt.  I don't know.

[Cianflone:] You mean the guy guy? . . .

[McQuaid:] . . . You know. . . there might. . . be able to get some money for her. . . .

[Cianflone:] But like from who I think?  Am I reading between the lines right?

[McQuaid:] Yeah . . . .

[Cianflone:] We're talking about like the restaurant owner?

[McQuaid:] I guess so, yeah.  Yeah . . . .

[Cianflone:] Do you think I should be worried?  I mean 'cause like remember you said to me --

[McQuaid:] I don't think so.  I mean worried about what?  Like what?

[Cianflone:] Remember I said you know . . .  how would they be guaranteed . . . that she's not going to say anything.  And you said . . . it's on your word, right?

[McQuaid:] Yeah . . . .   I don't want to be stuck in the middle of shit.  I mean I'll do it for her . . . .

[Cianflone:] . . . It's interesting . . . .  It's probably good timing, but like what kind of numbers are we talking about?  Is it worth it?

[McQuaid:] . . . I didn't want to engage in a conversation until I talked to you first . . . .

[Cianflone:] Right, you don't know yet . . . .  Well, why don't you find out? . . . Is this . . . a guarantee or are we going to get jerked around?

[McQuaid:] It would probably be -- it would be a guarantee as long as it's guaranteed on the other end, I guess.

[Cianflone:] Right.  And how do we guarantee that, that's what I'm saying? . . .

[McQuaid:] Do you have [any kind of numbers] in mind to where you'd want me to like kind of relay the message? . . .

[Cianflone:] No. . . .  I mean someone ran this by you, so they must have an idea or a number in their head, right?

[McQuaid:] Right.  I can find out for you . . . and see what it's worth.

[Cianflone:] How . . . did they even know that . . . you knew [K.L.] . . . ?

[McQuaid:] Somebody Googled [K.L.'s] name . . . .  Lia came up as [K.L.'s] sister on the computer.  And then the [armed robbery] with us was . . . on the computer . . . .

[Cianflone:] And then they approached you with this.

[McQuaid:] Well, my friend did . . . .  You know, . . . not his lawyer or the guy.  I haven't talked to any of them . . . .

[Cianflone:] I just want to make sure my daughter's safe . . . .

[McQuaid:] That's right.  Please, don't say nothing to any of them DAs and stuff 'cause I don't need to get involved in that shit . . . .

[Cianflone:] What the hell; why would I do that? . . . I ain't that stupid, Quincy.

[McQuaid:] . . . No, I know you're not . . . .  If that comes down the pipeline, then I'm stuck in the middle.  You know what I mean? . . . [K.L.] didn't come up yet, right? . . .

[Cianflone:] Not that I know of . . . .  She hasn't talked to me since she left [in] February.

(JEX 88 at 1:13–7:10.)[47]

### d.  May 1, 2014 Pen Register Application for McQuaid's Phone

On May 1, 2014, Gil applied for a pen register and trap and trace warrant for McQuaid's

phone from Judge Raymond Molea ("Judge Molea").  (Defs' 56.1 ¶¶ 242, 244; Pl's Resp. 56.1

---

[47] Plaintiff and Defendants have both provided transcripts of this controlled call.  (JEX 416 (Dkt. No. 749-17); JEX 108 (Dkt. No. 754-23).)  McQuaid also recorded a portion of the April 30 call, (JEX 101), and Plaintiff has provided a transcript, (JEX 416 at 4–11 (Dkt. No. 749-17)).

Plaintiff and Defendants agree that, during the call, McQuaid was referring to his and Lia's arrest for armed robbery when explaining how his friend found out he knew K.L.  (Defs' 56.1 ¶ 232; Pl's Resp. 56.1 ¶ 232.)

¶¶ 242, 244.)[48]  The application included an affidavit from Gonzalez, which Gonzalez had

reviewed and approved.  (Defs' 56.1 ¶ 243; Pl's  Resp. 56.1 ¶ 243.)  Gil also provided Judge

Molea with a copy of the controlled call.  (Defs' 56.1 ¶ 1211; Pl's Resp. 56.1 ¶ 1211.)  In her

affidavit, Gonzalez stated that she was engaged in "an investigation into allegations that

[McQuaid], [Plaintiff], and [Zaimi] are about to commit the offense of Bribing a Witness."  (JEX

72 at 8 (Dkt. No. 752-2).)  Gonzalez recounted McQuaid's calls to Cianflone in February and

April.  (*Id.* at 10–11.)  Gonzalez also stated that between January 29 and April 16, 2014, Plaintiff

and McQuaid had "telephone call exchanges 339 times."  (*Id.* at 10.)  Finally, Gonzalez stated

that on the April 30 controlled call, "[McQuaid] indicated that the money was coming from

[Zaimi] and his lawyer [i.e., Plaintiff] was a go between."  (*Id.* at 11.)  Judge Molea issued the

warrant on May 1, 2014.  (Defs' 56.1 ¶ 245; Pl's Resp. 56.1 ¶ 245.)[49]

e.  May 5, 2014 Controlled Call from Cianflone to McQuaid

On May 5, 2014, Cianflone made another controlled call to McQuaid.  (Defs' 56.1 ¶ 247;

Pl's Resp. 56.1 ¶ 247.)[50]  The recording device was improperly plugged into Cianflone's phone,

---

[48] Levy directed Gil to draft the application.  (Pl's 56.1 ¶ 74; Defs' Resp. 56.1 ¶ 74.)
Prior to this application, the PCDAO had not applied for a pen register during Levy's tenure as
Putnam County DA.  (Pl's 56.1 ¶ 80; Defs' Resp. 56.1 ¶ 80.)
   Gil listened to the April 30, 2014 controlled call before drafting the May 1, 2014
application.  (JEX 14 at 86:5–15.)
   Gil drafted all warrant applications, affidavits, and progress reports submitted in May
through July 2014.  (Defs' 56.1 ¶ 1027; Pl's 56.1 ¶ 1027.)

[49] Judge Molea also granted applications for orders for cell tower and phone detail
records for Plaintiff's and Zaimi's phone numbers.  (Defs' 56.1 ¶ 246; Pl's Resp. 56.1 ¶ 246.)

[50] Cianflone made multiple controlled calls to McQuaid on May 5.  (JEX 89 (Dkt. No.
754-4); JEX 90 (Dkt. No. 754-5); JEX 91 (Dkt. No. 754-6).)  However, the Court will discuss
only the call relevant to deciding the instant Motions.  (*See* JEX 91.)  Gil was present for this
call.  (Defs' 56.1 ¶ 247; Pl's Resp. 56.1 ¶ 247.)

so McQuaid is very difficult to hear and, in several portions of the call, inaudible.  (Defs' 56.1
¶ 248; Pl's Resp. 56.1 ¶ 248.)[51]  The call includes the following exchanges:

[Cianflone:] So, the money is for that specific reason.  So she doesn't testify.

[McQuaid:] Right, I guess, yeah, I guess it's like compensation, I guess, you know.

[Cianflone:] Compensation.

[McQuaid:] Right . . . .

[Cianflone:] . . . Obviously, this [money] came from you-know-who.  I know you
don't let me say his name.

[McQuaid:] No . . . .  I guess everyone is trying to feel right about it themselves, so
if [K.L.] can make out, why not?

[Cianflone:] Yeah, because this guy is gonna take a cut in that too.  That doesn't
sound like a lot of money, 2500.

[McQuaid:]  No, no, no. He doesn't get any money.  I meant he was trying to look
good in front of his lawyer, maybe his lawyer will deduct something [inaudible.]

[Cianflone:]  Right.  And is his lawyer the same lawyer as the restaurant owner?
. . . This guy's got a lot of money, the, the "A" guy, "A", the "A," right?  That's
who we're talking about?

[McQuaid:] Yeah.  Well, I think he's hurting.

[Cianflone:] He's hurting?  Yeah, well, I think he's got a lot of money . . . .  He's
got two restaurants.

[McQuaid:] . . . From what I heard he can't get anybody in there no more.

[Cianflone:] Really?

[McQuaid:] Yeah . . . And you know what, serves him right.

[Cianflone:] Yeah, it does serve him right . . . .

[McQuaid:] . . . If he insults me with $500, I'm gonna tell him to go fuck himself
. . . or $1000, all right.  Well, have a nice day, you know . . . .

---

[51] Gil and Cianflone could hear the conversation as it occurred.  (Defs' 56.1 ¶ 249; Pl's
Resp. 56.1 ¶ 249.)

[Cianflone:] Right.  Right . . . .

[Cianflone:] So, you know what, . . . this attorney guy, I think I know who you're talking about.  His name starts with a "G," right? . . . You told me his name.  I remember.  Okay. . . . I think he's . . . probably talking to your friend.  It might not be your friend.  It's probably him that initiated all this.

[McQuaid:] Nah.  No, he's very professional.  I mean, listen, he's a rottweiler when it comes down to it if he can expose somebody on the stand he's gonna do it.  It's just -- I know of him but I don't know him . . . .  But I know he's very good and he's very expensive.

[Cianflone:] Oh.

[McQuaid:] He's very good.  Now, he -- I don't think he ever in his right mind would risk any kind of -- getting disbarred or any of that shit over this bullshit.  So . . .  I'm sure he probably had a conversation with his client and one of my clients knows that shit's going down, mother-in-law, sister-in-law, you know whatever the fuck . . . maybe the guy said something to him.

[Cianflone:] Right . . . .

[Cianflone:] [K.L.'s] going to . . . say to you, well, . . . what kind of numbers are we talking? . . .

[McQuaid:] She's got to give me a number and [inaudible].

[Cianflone:] She's got to give you a number.

(JEX 91 at 4:21–10:35.)[52]

### f.  May 6, 2014 Controlled Call from Cianflone to McQuaid

On May 6, 2014, Cianflone made another controlled call to McQuaid.  (JEX 92 (Dkt. No. 754-7).)[53]  The call includes the following relevant exchanges:

---

[52] Plaintiff and Defendant have both provided transcripts of this call.  (*See* JEX 419 (Dkt. No. 749-20); *see also* JEX 111 (Dkt. No. 754-26).)

At the time of the May 5 call, Plaintiff was the only attorney of record for Zaimi whose name started with a "G."  (Defs' 56.1 ¶ 266; Pl's Resp. 56.1 ¶ 266.)

[53] Nagle and Pascale were present for this call.  (Defs' 56.1 ¶ 275; Pl's Resp. 56.1 ¶ 275.)

[Cianflone:] After we talked yesterday, I shot [K.L.] a text.  I really didn't think I'd hear from her, but she called me back. . . .  [S]he's interested, but what do you think the first question she asked me was?

[McQuaid:] How much?

[Cianflone:] Yup.

[McQuaid:] Okay.

[Cianflone:] And you know what, based on all the things that you told me about these Albanians, and . . . what they'll do for $500, like kill someone. . . .  I'm skittish about them.  I just really want this over with and out of my life and out of my daughter's life 'cause my concern is [K.L.].

[McQuaid:] Right, right. . . .

[Cianflone:] . . . [D]id you come up with a number?

[McQuaid:] . . . No, I was just waiting to hear back from her or you, one or the other . . . .

[Cianflone:] . . . She's hesitant to talk to you or anyone now. . . .  You know [K.L] is on shaky grounds, and she trusts me, even though she's mad at me . . . she does trust me. . . .  I . . . would like to do this for her.  She's been a wreck since all of this happened. . . .

[McQuaid:] So, she didn't come up and testify or anything, so she's good, right? . . . [S]he didn't put herself in harm's way, did she? . . .

[Cianflone:] No, I told you she wasn't -- had no plans of, but -- . . . I don't know. Is there a trial coming up?  Is something coming up?

[McQuaid:] I have no clue.  I don't have any clue about that. . . .  I was just asking you because -- then she should be good.  She shouldn't be -- . . . she didn't put herself in harm's way.  That was a smart move, you know.

[Cianflone:] By not testifying.  That's what I'm talking about.  Now they're making an offer to make sure she doesn't, right?  But they're not coming up with what it's worth to them. . . .  And that's what's confusing me.

[McQuaid:] Right.  So, like I said . . . I wasn't going to put a number on it, you know.  I was just waiting to hear from you guys.

[Cianflone:] Well, you can't put a number on it.  I'm talking about . . . those douche bags. . . .  What kind of number are they talking?  You still don't know.

36

[McQuaid:] I was waiting to hear from you guys first.

[Cianflone:] All right.  Well, you know what, you said something about 2,500 yesterday.

[McQuaid:] Yeah, yeah.

[Cianflone:] I ran that past her.  She wasn't too excited.

[McQuaid:] Okay. . . .  Tell me what you want me to ask for.

[Cianflone:] I don't know.  I'm thinking five might . . . make that happen. . . . Five thousand.

[McQuaid:] Five thousand?  Okay. . . .  I just said I wouldn't even -- you know, I would be insulted if somebody offering her five hundred bucks, so . . . like you said five, I'll try --

[Cianflone:] Yes, that would be an insult, right?

[McQuaid:] Right, right.  That's all I meant by numbers. . . .  [N]obody told me exact number[s].  Nobody told me a number to ask for, so I figured I would talk to you guys first and let you guys figure it out, you know.

[Cianflone:] All right.  Okay.

[McQuaid:] Five thousand is the number? . . .

[Cianflone:] I think five thousand, yeah.

[McQuaid:] Sounds fair. . . .

[Cianflone:] I don't trust any of it, do you?

[McQuaid:] No, no.  But I know my friend wouldn't . . . do anything stupid . . . 'cause he knows what'll happen to him. . . .

[Cianflone:] So, how does this work?  Like what, . . . you just bring me the money and then that's their guarantee, your word, and my word? . . .

[McQuaid:] Yeah, 'cause my word is good enough with these people, but she's going -- you know, she can't do no games, you know. . . .

[Cianflone:] [K.L.] would never do that. . . .  Because you know why, because from what you told me she'd end up dead.  She does not want to end up dead.

[McQuaid:] . . . All right, no, that's fair enough.  So, why don't I try to reach out?
. . .

[Cianflone:] You sure this is good, right, Quin, and I'm trusting you .

[McQuaid:] Yeah. No, no, and I'm trusting you guys . . . , so it goes both ways.

[Cianflone:] Yeah.

[McQuaid:] So, I'm trusting you too. . . .  All right?

[Cianflone:] All right, Quin.

(JEX 420 at 6–13, 15 (Dkt. No. 749-21); *see also* JEX 112 (Dkt. No. 754-27).)[54]

After the call ended, Pascale texted Levy that the call "[w]ent well.  [McQuaid]

answered.  Nothing earth shattering [but] buggy enough for a wire.  I spoke to the state police[,]

and immediately after the call[,] [McQuaid] call[ed] [Plaintiff.]"  (JEX 412 at 2 (Dkt. No. 749-

12).)  After Levy texted that he would like to hear the May 5 and 6 calls, Pascale commented,

"[w]e really need . . . the substance of the texts [between Galgano and McQuaid]."  (*Id.*)

### g.  May 8, 2014 Controlled Call from Cianflone to McQuaid

On May 8, 2014, Cianflone conducted another controlled call with McQuaid.  (JEX 93

(Dkt. No. 754-8).)  The call included the following relevant exchanges:

[Cianflone:] . . . I thought we could talk because based on our last conversation . . .
I actually have [K.L.] texting me . . . because I texted her back after we talked and
I said . . . this is going to be over soon.  And I never heard back from you, so.

[McQuaid:] Yeah, . . . I've been working with this company . . . late, and I didn't
want to bother you. . . .

[Cianflone:] I guess my question to you is like what'd I tell [K.L.]?  Is this gonna
be over with soon?

---

[54] McQuaid also recorded the May 6 phone call.  (JEX 102 (Dkt. No. 754-17).)  After the
call ended, McQuaid communicated with Plaintiff.  (Def's 56.1 ¶¶ 360–63; Pl's Resp. 56.1
¶¶ 360–63.)

[McQuaid:] Yeah. . . .  I'll find out more details.  I'll either text it to you later, or I'll call you tomorrow. . . .

[Cianflone:] Did they agree to that number, to the 5,000?

[McQuaid:] . . . No, I didn't – I'm still supposed to talk to my friend today. . . .  He actually texted me earlier too, but I . . . couldn't talk.

(JEX 421 at 3–6 (Dkt. No. 749-22); *see also* JEX 113 (Dkt. No. 754-28).)  Plaintiff had texted

McQuaid prior to his call with Cianflone.  (JEX 250 ("QM Pen Register Line Sheet") 6203,

6265.)[55]

h.  Early May 2014 Communications Between Plaintiff and McQuaid

On May 8, 2014, Plaintiff texted McQuaid concerning statements he made on his calls

with Cianflone:

> Really need to meet up with you and [Lia].  This is fucking important.  I don't want these people to think that they are being physically threatened or that anyone is giving them money not to testify.  You need to clear that up.  I know you were trying to get info from them and that it was [K.L.] that suggested to [Lia] that money would make this all go away but you have to clean up what was said to the mom. Nobody is in the Albanian mafia, nobody is getting killed or hurt and nobody is getting money in exchange for not testifying.  We need to make that shit clear with the mom.  I don't need you, me and everyone involved arrested and charged with [m]aking threats etc.  Please, you need to come here so I can explain how to clean that up.  And we need to clean it up today.  I'm really concerned you are gonna get jammed up. . . . I'll pay you for missing work and come pick you up myself.  I just don't want you or me getting jammed up.  And the recorded conversations that you had with the mom make it sound like we are threatening them or paying them off.

---

[55] When referring to the results from the pen register and trap and trace on McQuaid's or Plaintiff's phones, the Court refers to the line number that precedes each entry as these documents have not been uploaded to the docket.

McQuaid also exchanged text messages with Plaintiff after his call with Cianflone. (Defs' 56.1 ¶ 368; Pl's Resp. 56.1 ¶ 368.)

39

(Galgano-McQuaid Text Msgs at 217875–80, 217887–89.)[56]   After McQuaid failed to make a

meeting, Plaintiff sent the following messages:

> Quincy, trust me you don't want these people thinking that they are being
> threatened or are being paid to ignore subpoenas.  You need to appreciate that I
> can't have them thinking that you are threatening them or paying them off through
> your "friend" who knows me.  Stop by my house . . . later so I can explain why.
> I'm only looking out for you.  I don't want you to [get] jammed up man. . . .

> I just don't want you getting arrested if these fucking people say that you were
> threatening them.  It's that simple so we have to make it clear to them that that is
> not the case.  I know how to do it where you may be able to help us get to the truth
> of all of this.

(Id. at 217941, 217958.)  After McQuaid missed further meetings over the course of the next two

days, Plaintiff reiterated on May 10:

> I don't think that you understand but when you listen to those tapes of her mother
> and you, you make it seem like [K.L.] is dealing with a dangerous guy and if she
> cooperates and testifies that she could get hurt.  You make it seem like you spoke
> to a client of mine who is offering her money not to testify.  This is a huge fucking
> problem that needs to be cleared up.  I have a way that you can do that.  But if you
> won't meet with me to clear it up, I have to go to [the] DA and explain this whole
> situation in order to make sure that we don't get jammed up.  That will fuck
> everything up Quincy.  I will have to give them the fucking recordings now, they
> will be of no value to me, [K.L] and her mother will know what we were doing.
> We don't need that.  But I can['t] run the risk that someone is going to come to my
> house with handcuffs.  This needs to be cleaned up.  I know how to do it without
> anyone getting jammed up.  But you and [Lia] have to meet with me.  Please
> Quincy, you've been good to me.  I've tried to help you out, don't just disappear
> on me.

(Id. at 218147.)

A few minutes later, McQuaid replied "What I didn[']t say anything like that[,] she said

[Zaimi] was mafia[.]"  (Id. at 218152.)  Plaintiff then wrote:

> Quincy, trust me your comments "good she didn't expose herself" etc. [w]ill be
> construed as implied threats.  Trust me trust me trust me.  If you listen to your

---

[56] It is unclear from the record when McQuaid transferred the recording to Plaintiff, but
the content of Plaintiff's text messages clearly refers to statements that McQuaid and Cianflone
made on the May 6 call.

conversation, it seems like you're saying that the [Albanians] are crazy and she shouldn't put herself out there and testify. I know that's not what you meant but when we all get locked up for conspiracy to obstruct justice, I'll hit you with the "I told you so." Bottom line, you have to clean this up with the mom. I know how. But I need you and [Lia] to come sit with me for 5 measly minutes.

(*Id.* at 218173.) On May 12, 2014, Lia was released from rehab. (JEX 124 at 3.)[57]

### i. May 14, 2014 Pen Register Application for Plaintiff's Phone and Eavesdropping Application for McQuaid's Phone

On May 14, 2014, Gil submitted applications to Judge Molea for a pen register and trap and trace warrant for Plaintiff's phone, (Pl's 56.1 ¶ 107; Defs' Resp. 56.1 ¶ 107), and for an eavesdropping warrant on McQuaid's phone, (Defs' 56.1 ¶ 374; Pl's Resp. 56.1 ¶ 374).[58] The eavesdropping application was signed by Levy and included an affidavit from Gonzalez. (Defs' 56.1 ¶ 375; Pl's Resp. 56.1 ¶ 375.)[59] The pen register application was signed by Gil, (Defs' 56.1 ¶ 382; Pl's Resp. 56.1 ¶ 382), and also included an affidavit from Gonzalez, (Pl's 56.1 ¶ 110;

---

[57] By May 14, PCDAO and the CPD had McQuaid's cell phone records for the period from January 29, 2014 through May 11, 2014. (Defs' 56.1 ¶ 378; Pl's Resp. 56.1 ¶ 378.)
    The source for the records for January 29, 2014 to April 30, 2014 is described in note 39 *supra.* The call records for May 1, 2014 to May 11, 2014 were recorded pursuant to Judge Molea's May 1, 2014 order authorizing the pen register and trap and trace on McQuaid's phone, *see* § 1.A.5.d *supra.*

[58] Gil drafted both applications. (Pl's 56.1 ¶ 112; Defs' Resp. 56.1 ¶ 112.)

[59] Levy had never applied for an eavesdropping warrant before, and no one in the PCDAO had applied for an eavesdropping warrant during Levy's tenure as Putnam County DA. (Pl's 56.1 ¶¶ 117–18; Defs' Resp. 56.1 ¶¶ 117–18.)
    Prior to signing the eavesdropping warrant, Levy read and reviewed it and also listened to four of the five controlled calls. (Pl's 56. 1 ¶ 122; Defs' Resp. 56.1 ¶ 122.)
    Gil has testified that he did not recall that Levy made any changes in the application before signing it. (JEX 14 at 168:12–14.)
    Prior to joining the PCDAO, Gil had assisted on one eavesdropping warrant while working for the Bronx County District Attorney's Office. (Pl's 56. 1 ¶ 121; Defs' Resp. 56.1 ¶ 121.)
    Nagle has testified that the CPD did not have the capacity to undertake or monitor a wiretap and that this was the only time in his career that he was involved in monitoring an eavesdropping warrant. (Pl's 56.1 ¶ 119; Defs' Resp. 56.1 ¶ 119.)

Defs' Resp. 56.1 ¶ 110).[60]  Gil also provided Judge Molea with copies of the controlled calls.
(Defs' 56.1 ¶ 1211; Pl's Resp. 56.1 ¶ 1211.)

    In her affidavit in support of the pen register warrant for Plaintiff's phone, Gonzalez
summarized K.L.'s report of Zaimi's sexual assault and McQuaid's subsequent contact with
Cianflone in February, on April 11, and on April 29.  (JEX 74 at 11–13 (Dkt. No. 752-6).)
Gonzalez stated that on the unrecorded April 29, 2014 call, McQuaid told Cianflone "in
substance: did [K.L.] testify in the Grand Jury, if she doesn't the defendant is willing to make it
worth her while and pay her money to not testify."  (*Id.* at 13.)

    Gonzalez also stated that on the five controlled calls between April 30 and May 8, 2014,
McQuaid made "incriminating statements as to the existence of a conspiracy with intent to, and
taking steps to, offer and/or confer a bribe onto [K.L.] in exchange for her to refrain from
testifying, or meant to influence her testimony[.]"  (*Id.*)  Gonzalez reported that between March 5
and May 11, Plaintiff and McQuaid had exchanged "430 incoming and outgoing SMS text and
voice transmissions[,] . . .[including] communications . . . prior to, and subsequent to, each of the
controlled calls [with Cianflone.]"  (*Id.* at 14.)  Gonzalez concluded that "the information at hand
verifies Mc[Q]uaid's assertion that Galgano is involved, however, [PCDAO is] seeking this . . .
[o]rder as the means to determine whether Galgano is conspiring with Zaimi . . . prior to each of
the controlled calls[.]"  (*Id.*)

    As relevant here, the application for the McQuaid eavesdropping warrant stated that
"[t]hough probable cause exists to arrest and prosecute Mc[Q]uaid, we do not have sufficient
evidence to arrest and prosecute his co-conspirators."  (JEX 73 at 7 (Dkt. No. 752-4).)

───────────────

[60] The Court summarizes the contents of the applications and accompanying affidavits
only insofar as relevant to deciding the instant Motions.

In her affidavit in support of the McQuaid eavesdropping warrant, Gonzalez represented

that the "substance of the [April 30, 2014] conversation is as follows":

[Cianflone:] I was like a little confused, but you perked my interest.

[McQuaid:] It was brought to my attention, a friend I know uses the lawyer, he was trying to get him to do something for him . . . compensation from the guy himself . . . there might be able to get some money for her . . . .

[Cianflone:] from who I think, am I reading between the lines right, you talking about the restaurant owner?

[McQuaid:] I guess so, yea, yea . . . .

[Cianflone:] You know what, I want to do what's best for [K.L.] . . . .

[McQuaid:] If something did go down, that's why I brought it to your attention first.

[Cianflone:] How would they be guaranteed that she would not say anything, you said it was on your word . . . .

[McQuaid:] I don't want to be stuck in the middle of this shit, I'll do it for her, as far as I know I don't have a problem with her.

[Cianflone:] What kind of numbers are we talking about, is it worth it?

[McQuaid:] I didn't want to engage in conversation till I talked to you first.

[Cianflone:] Why don't you find out.

[McQuaid:] Okay.  Like I said I wanted to talk to you first.

[Cianflone:] Is this like a guarantee or are we going to get jerked around.

[McQuaid:] No it's probably a guarantee . . . .  Do you have anything in mind, do you want me to relay a message, do you have any numbers in mind?

[Cianflone:] No, I figure they have a number in mind, let me know . . .  They approached you with this? . . .

[McQuaid:] My friend did, not the lawyer or the guy, I haven't talked to any of them . . . .  Please don't say anything to any of them Das and shit, I don't need to get involved in any of this . . . .  She didn't come up yet?

[Cianflone:] Who [K.L.]?

[McQuaid:] Yeah.

[Cianflone:] I don't know I haven't talked to her I want to do what's right by her, find out what it's worth and let me know.

[McQuaid:] Okay . . . and we never had this conversation, if it ever gets out to law enforcement . . . .

(*Id.* at 18–19.)[61]

Gonzalez similarly represented that the "substance of the [May 5, 2014] conversation

[was] as follows":

[McQuaid:] I got some good news.

[Cianflone:] For [K.L.] . . . You sounded a little vague on the phone.

[McQuaid:] I need to hear from her.

[Cianflone:] Oh really she has to call you, I can try . . . I could shoot her a text . . . text her and say call Quincy?

[McQuaid:] Just say I might have good news about something, it's in her best interest to call me.

[McQuaid:] It's not going to be 500, I would be upset . . . .  Maybe thousands, like 2,500.00, I could really talk to them . . . I just want you to trust me . . . I'm not going to get a piece of the pie.

[Cianflone:] Isn't this kinda illegal?

[McQuaid:] Not really, not really, it's illegal if someone was threatening her not to testify, consider it as compensation for her inconvenience.

---

[61] With the exception of marked alterations masking K.L.'s identity, the Court has not otherwise corrected any spelling or other errors in the warrant.

Gonzalez also stated in her affidavit that "All dates and times referred to herein are approximate.  Furthermore, unless otherwise noted, where statements of other individuals are described, those descriptions are intended to convey the sum and substance of such statements and are not exact quotes. . . . [N]ot every detail of this investigation has been noted."  (JEX 73 at 12.)

Referring to the controlled calls, Gonzalez stated that "Given my training and experience, I believe that Mc[Q]uaid was coached on several of the . . . calls, and that other people were present during the May 6, 2014, recorded call[.]"  (*Id.* at 15.)

[Cianflone:] It's not coming direct, but from a middle man?

[McQuaid:] She just can't testify.

[Cianflone:] The money is for that specific reason so she doesn't testify?

[McQuaid:] Right, consider it as compensation.

[Cianflone:] Compensation that makes sense . . . I don't understand why there would be a middle man involved?

[McQuaid:] It's a friend of mine who is using him for legal advice that's the middle man.

[Cianflone:] Obviously this came from you know who.

[McQuaid:] I just thought that if [K.L.] can make out why not.

[Cianflone:] This guy has to take a cut of it too, that doesn't sound like a lot of money 2,500.00.

[McQuaid:] No, no, no he's not taking any money . . . . Maybe his lawyer will deduct some money from what he owes him? . . . I'll make sure that I'm there when that goes down so that no one is taking her piece of the pie.

[Cianflone:] But this guy has a lot of money, the A guy, that's who were talking about?

[McQuaid:] Yea well I think he's hurting.

[Cianflone:] Well I don't know I think he has a lot of money . . . He's got two restaurants.

[McQuaid:] Yea but I heard that he couldn't get anyone in there with all of this going on . . . . It insults me if its only 500, like go fuck yourself, but a thousand dollars or so why not.

[Cianflone:] This attorney guy, I think his name starts with a G, you told me so.

[McQuaid:] He's very professional, I know of him, but I know him, he is very good, but he is very expensive . . . . He's not looking to get disbarred for some kind of bullshit . . . . She's got to give me a number and I'll bring it to him.

(*Id.* at 20–22.)[62]

Judge Molea granted both applications.  (Defs' 56.1 ¶¶ 380, 385; Pl's Resp. 56. 1 ¶¶ 380,

385.)[63]  The wiretap on McQuaid's phone was activated on May 16, 2014.  (Defs' 56.1 ¶ 386;

Pl's Resp. 56. 1 ¶ 386.)[64]

### j.  May 19, 2014 Controlled Call from Cianflone to McQuaid

On May 19, 2014, Cianflone made another controlled call to McQuaid.  (JEX 94 (Dkt.

No. 754-9).)[65]  The call included the following relevant exchanges:

> [Cianflone:] I lay in bed at night worrying about [K.L.], if she's safe.  I don't need
> this.
>
> [McQuaid:] If she's safe, what?  Nobody, nobody threatened anybody or anything.
>
> [Cianflone:] I know that, but I also remember our conversations, and I'm worried
> about [K.L.] because nothing happened. . . .  None of what you talked to me about
> happened so it scared the shit out of me. . . .  Because . . . you gotta remember
> something, Quincy, while Lia was away, and you and I had those discussions about

---

[62] Gil testified in this action that he drafted this "summary" of the call with Cianflone's assistance at some point after May 5, 2014 but before the eavesdropping application was submitted.  (JEX 14 at 145:25–146:6, 146:13–22.)

During the first grand jury presentation, Gil entered into evidence a document that included this "summary" of the May 5 controlled call.  (JEX 279 (Dkt. 745-4).)  The document included the following title: "TRANSCRIPT OF RECORDED TELEPHONE CALL OF MAY 5, 2014, BETWEEN DONNA CIANFLONE AND QUINCY MCQUAID AS REVIWED [sic] BY DONNA CIANFLONE[.]"  (*Id.* at 2.)  Gil could not recall if this document was created when he was drafting the eavesdropping application prior to May 14 or when he was preparing for the first grand jury presentation.  (JEX 14 at 147:11–14.)

[63] PCDAO initially requested to intercept McQuaid's phone calls between 8:30 AM and 6:30 PM and his text messages 24 hours a day.  (JEX 73 at 34.)  However, intercepted calls revealed the McQuaid was engaging in the sale of a controlled substance, (JEX 76 at 5 (Dkt. No. 752-9), so an amended application, signed by Levy, was submitted on June 5, 2014, requesting that PCDAO be allowed to intercept McQuaid's calls 24 hours a day, (*id.* at 3, 12).

[64] As relevant here, the eavesdropping took place at a NYSP "plant" in Dutchess County.  (Defs' 56.1 ¶ 387; Pl's Resp. 56. 1 ¶ 387.)  Lopez, Gonzalez, Nagle, and several other CPD Officers took part in intercepting McQuaid's calls and text messages at the plant.  (Defs' 56.1 ¶¶ 388–89; Pl's Resp. 56. 1 ¶¶ 388–89.)

[65] Nagle was present for this controlled call.  (Pl's 56.1 ¶ 144; Defs' Resp. 56.1 ¶ 144.)

[K.L.] they're still weighing on my mind.  She's still texting me like "What am I supposed to do, mom?  What's going on?"  I don't know.  I don't know.  That's what I text her back "I don't know."

[McQuaid:] Right.  Well, I'll try to find out what's going on with that, but not for nothing, I mean if I'm going to throw my neck out there I'd like to hear from [K.L.] her story of what happened . . . because . . . I don't want to put my neck out there for -- you know, she can call . . . .

[Cianflone:] She's afraid, Quincy. . . . She's afraid.

[McQuaid:] She's afraid of me?

[Cianflone:] No, she's not afraid of you.  She's afraid of those people.

[McQuaid:] She doesn't have anything to do with those people.

[Cianflone:] Well, she will once she accepts the $5,000.

[McQuaid:] Well, I'd like to hear from her what happened . . . .

[Cianflone:] Is that why you kept asking me when I lived in Carmel a few months ago what happened that night with [Zaimi]?

[McQuaid:] No, no.  I just asked you because I didn't know.  I never heard anything of it.

[Cianflone:] No, remember, you asked me right before I moved to the apartment . . . .

[McQuaid:] Yeah, I asked because I never knew the story, like the full story.  I never knew the story . . . .  Just heard there was something briefly.  That was from Lia probably a week or so before she -- actually, when [K.L.] moved that's the only time I heard of it, but I heard a brief thing.  I didn't hear, you know, exactly what happened.

[Cianflone:] Okay, but I told you.  I told you what happened.  Wait . . . how would that make a difference?  This is what I'm not getting, Quincy.  I don't know what's going on.  How would that make a difference what happened -- what he did to [K.L.] that night?

[McQuaid:] Because I . . . just wanna . . . know . . . what the situation is . . . I'm not getting involved with these people or DAs or law – you know what I mean?  I was told something.  I relayed the message to you.

[Cianflone:] Well, the DA . . . wants to bring her up here.

[McQuaid:] That's her choice.  If she wants to come up, she comes up.

[Cianflone:] No.  No, obviously, that's not her choice, Quincy, right?  Isn't that what we've been talking about?  Why do you think I'm scared shitless?

[McQuaid:] Yeah, I know.

[Cianflone:] I gotta worry about her, so I gotta worry about her safety 'cause you told . . . we already talked about this.  Someone doesn't want her to testify.

[McQuaid:] Who?

[Cianflone:] Someone.  You told me that, Quincy.

[McQuaid:] Well, I didn't no, nobody said nothing about I mean I just said it could be like some . . . compensation for her.  I don't know.

[Cianflone:] Right, compensation for her if she doesn't testify.

[McQuaid:] I guess.  I don't -- I guess that's how it works. . . . I'm assuming that['s] how it works, right?  I don't know.

[Cianflone:] . . . You told me that.  I don't know about this bullshit.  I never had this in my life, in my life.

[McQuaid:] Neither have I, so I . . . don't, you know.

[Cianflone:] Listen . . . . You said to me -- I was sitting in my apartment, and you said to me, you know, is she gonna come up to testify?  I said -- what'd I say to you?  I said, well, she doesn't seem to . . . be interested in that.

[McQuaid:] That was me just asking you, so that -- I wasn't asking for anybody, that was just me asking you . . . .

[Cianflone:] Wait a minute . . . You say your friend -- your friend who knows whoever, those people -- said that if she was willing not to testify that there's something in it for her because she owed -- remember?  And you were going to go through me because she owes me money.  We had a whole conversation about it. Are you trying to make me think I'm crazy?

[McQuaid:] I'm not trying to do anything.  I'm just --

[Cianflone:] You wanna tell me what's going on? . . . Level with me.  Be honest with me.  You wanna tell me what's going on?

[McQuaid:] Nothing's going on . . . .

[Cianflone:] . . . What I'm thinking is all of that kind of like fear factor with [K.L.] testifying and coming up, and if she doesn't she'll be compensated. Now, you're acting vague, so I'm getting a little freaked out . . . .

[McQuaid:] I have to find out a little more what's going on. Like I said I've been tied up . . . .

[Cianflone:] . . . All right. I understand. I understand that, and I appreciate what you're doing for Lia, but can you understand that because of this, this testimony issue and that [K.L.] -- they want [K.L.] to come up here and she doesn't know what to do because she thought maybe she was going to be exempt from that now based on what you and I talked about. Why won't she talk to you? I don't know. I've asked her. She said I don't want to talk to anyone. What am I supposed to do about that?

[McQuaid:] I don't know. I mean I'd like to hear it . . . from her myself. And you know I mean it makes me comfortable, and . . . nothing to do with you. I would just like to know what the hell's going on, what the exact story was, and what happened. That's all. . . And what she really wants to do . . . .

[Cianflone:] You don't believe me?

[McQuaid:] No, I believe you. I believe you. I . . . don't doubt a word you say . . . . I'll be straight up honest with you. I didn't even engage in it because [you told Lia's probation officer you didn't want me around her] . . . I'm not going to go on a limb for [K.L.] too . . . if nobody wants me around . . . . You would do the same thing. You would always hesitate if I said . . . that about you. . . .

[Cianflone:] I just want [K.L.] to be safe. . . . You want me to try to get my daughter to call you. . . .

[McQuaid:] I need to hear from her. I want to just hear from her what, what the hell's going on and what she wants to do. That's all. . . . it doesn't matter to me what she wants to do. If she comes up, if she flies up, . . . it doesn't threaten me or threaten anything. . . .

[Cianflone:] No, I'm afraid if she flies up and testifies like something's going to happen to her, so.

[McQuaid:] Well, the reason I just said is that I don't see any sign at the end of the rainbow why it would be worthwhile to go through that, to fly up here, you're not getting paid for it. I mean what'd you gonna do? Give you a couple spending bucks . . . . I don't see . . . why it would be worthwhile . . . to go up there unless . . . [K.L.] was totally violated. I mean that's why I asked you what happened. That's the

49

only thing I said like . . . why would it be worthwhile coming up to testify, to go through all that crazy shit like that other girl just went through.

[Cianflone:] Quincy?

[McQuaid:] Yeah. . . .

[McQuaid:] Yeah.  No, . . . I'm not stupid to the thing.  I'm just saying. . . .

[Cianflone:] If you did something wrong.  Somebody knows you did something wrong and you're willing to give them money, you obviously know . . . you did something wrong.

[McQuaid:] Right.

[Cianflone:] It's a no-brainer, Quincy.  Why would you even -- I mean I'm sure she'll tell you if she does talk to you. . . .  I'll try to get her to call you.

(JEX 94 at 9:39–9:59, 13:06–18:47, 27:21–29:07.)[66]

On May 19, 2014, Plaintiff texted McQuaid, "Let's go.  Grab your girl and let's go.  Let's make some money."  (Galgano-McQuaid Text Msgs at 219456–57.)  However, as discussed below, Plaintiff did not meet with McQuaid until several weeks later on May 27, 2014.  (*See id.* at 220891.)

On May 21, 2014, Zaimi was arraigned on a misdemeanor indictment for forcibly touching K.L. on January 29, 2014.  (JEX 131 at 2–3.)[67]  During the arraignment, Krauss moved to consolidate K.L.'s case with the retrial of M.A.'s case.  (JEX 405 at 6.)  After the indictment came in, Plaintiff texted McQuaid at 4:55 PM that "[K.L.] testified at grand jury on April 11.

---

[66] Plaintiff and Defendant have both provided transcripts of this call.  (*See* JEX 423 (Dkt. Nos. 750-2–4); JEX 114 (Dkt. No. 754-29).)

[67] On April 25, 2014, the grand jury had declined to indict Zaimi on the felony counts charged for the November 2012 incident that K.L. had reported.  (*See* JEX 405 at 6.)
Zaimi was convicted of forcible touching and sentenced on September 6, 2016; the Appellate Division affirmed his conviction.  *See People v. Zaimi*, 90 N.Y.S.3d 104, 105 (App. Div. 2018).  The Court of Appeals denied Zaimi leave to appeal.  *See People v. Zaimi*, 122 N.E.3d 1141 (Table) (N.Y. 2019).

[Zaimi] was indicted. . . . I need [Lia] to call [K.L.] in front of me. . . . Don't do anything until

we talk.  Please don't call mother or [K.L.]."  (Galgano-McQuaid Text Msgs at 219951–52,

219957.)[68]  At 5:12 PM, CPD officers saw Plaintiff's van enter his office building's parking lot,

and Plaintiff and Zaimi exited the van after it parked.  (JEX 69 at 4 (Dkt. No. 757-29).)

On May 26, 2014, Plaintiff texted McQuaid:  "You and [Lia] feel like making a call[?]"

(Galgano-McQuaid Text Msgs at 220755.)  Plaintiff and McQuaid agreed to meet at 5:00 PM at

Plaintiff's house.  (*Id.* at 220762–63.)  Lia and McQuaid arrived at Plaintiff's home at 4:55 PM.

(*Id.* at 220805.)  At 5:30 PM, Lia texted K.L.:  "Hey gotta talk asap."  (JEX 284 at 2 (Dkt.

No. 745-5).)[69]

I feel bad that you're fucking broke.  I just want you to know I appreciate your help.
I know the 50s don't help that much and that your time is worth more than that.  I
just need to be able to go to [Zaimi] with one more decent recording to get you a
few grand.  I know it.

(Galgano-McQuaid Text Msgs at 221169.)  McQuaid replied "I appreciate everything u do . . .

don't worry we are going to get u that recording you need to put a[n] end to this for u."  (*Id.* at

221170–71.)

On May 27, 2014, Gil submitted a biweekly progress report, as required by Judge

Molea's May 14, 2014 order granting the eavesdropping warrant on McQuaid's phone.  (JEX 75

at 3 (Dkt. No. 752-8).)  In his report, Gil represented that on the May 19, 2014 controlled call,

"[McQuaid had] informed . . . Cianflone that he needed to speak to [K.L.] to finalize the deal and

---

[68] Later on May 21, Gil texted Levy that he had "received an update from [the] plant that
[Plaintiff] wants Lia to call [K.L.] in front of him."  (Pl's 56.1 ¶ 151; Defs' Resp. 56.1 ¶ 151
(internal quotation marks omitted).)

[69] Lia texted K.L. again the next day at 3:13 PM:  "Hey, u ever gonna talk to me . . . ."
(JEX 284 at 2.)  K.L. did not respond to either text.  (*See id.*)

assure his people that she would not cooperate with the prosecution of [Zaimi]." (*Id.* at 5.)[70]  Gil

summarized McQuaid and Galgano's phone and in-person contact between May 21 and May 26,

2014. (*Id.* at 5–7.)  Gil also provided Judge Molea with copies of the controlled calls. (Defs'

56.1 ¶ 1211; Pl's Resp. 56.1 ¶ 1211.)

On June 1, 2014, Plaintiff texted McQuaid:  "I'm at the office if you [and Lia] want to

talk and play a game called phone calls for dollars.  Lol.  That's my new game." (Galgano-

McQuaid Text Msgs at 221673.)  McQuaid came to Plaintiff's office, and after they met,

Plaintiff texted McQuaid:  "I'm gonna find you guys a place.  May be temporary or short term

but you can't be homeless and [Lia] should be with her daughter. . . .  And this has nothing to do

with [K.L.] and her case." (*Id.* at 221698, 221704.)

On June 3, 2014, Plaintiff texted McQuaid:

> Quincy, I'm afraid that if I don't get the recorded calls today, I'm never getting
> them.  I'm in court again tomorrow.  Any chance Lia can call [K.L.] today?  If she
> can, I can either make myself available or type out a list of shit I would like
> discussed . . . I really need to know what [K.L.] knows about the other case.  What
> she knows about [M.A.] and/or her family and/or the case with [M.A.].  And then
> I would just love for [K.L.] to tell Lia what happened at the restaurant[.]

(*Id.* at 221962, 221980–81, 221986.)  McQuaid confirmed to Plaintiff that he would attempt to

get the requested information. (*Id.* at 221979, 221983, 221987.)

Later in the day, Plaintiff texted McQuaid:  "Could you ask Lia if I could sign in to her

FaceBook account just to look something up." (*Id.* at 222018.)  McQuaid responded that that

would not be a problem. (*Id.* at 222020.)  Plaintiff then followed up:

> [J]ust ask her and find out her sign in name and password.  Tell her I won't send
> anything to anyone.  I just want to look something up. . . . In a time crunch. . . . I

---

[70] Gil reported to Judge Molea that he had "listened to copies of numerous calls
intercepted during the past 12 days" and spoken to "case officers, . . . Gonzalez . . . and [a CPD
detective] on a regular basis." (JEX 75 at 3.)  Gil did not report that he had spoken to Nagle.
(*See generally id.*)

have an apartment that just became vacant over the weekend.  Place needs some
work.  Was getting 2000 a month for it but if you want to do some work, I'll take
care of you.  Pretty big place but in upper Westchester.  Cortlandt Manor.  Lia and
her daughter can stay there tonight though.  And if you fix some shit up, I can wait
for rent until you get back on your feet so to speak.

(*Id.* at 220222, 222030, 222107–08.)[71]

On the morning of June 4, 2014, McQuaid called Lia and requested she call Plaintiff, and

told her that Plaintiff has "got an apartment for us that we can take rent free for now . . . until we

get on our feet."  (JEX 266 ("McQuaid Call Intercepts") 11787 at 00:23–33.)[72]  He told Lia that

Plaintiff wanted access to her Facebook account; Lia confirmed that Plaintiff could use her

account.  (*Id.* at 01:02–08.)  McQuaid then directed Lia to call Plaintiff and gave her Plaintiff's

phone number.  (*Id.* at 01:09–15, 01:45–50.)  Less than an hour later, McQuaid again called Lia

and asked her to call Plaintiff, because "if you can do it, it will help us out."  (McQuaid Call

Intercepts 11803 at 00:32–34.)  At around 11:00 AM, Lia called McQuaid to confirm Plaintiff's

phone number.  (McQuaid Call Intercepts 11818 at 00:27–42.)

At 4:30 PM, Plaintiff called McQuaid, and the following relevant exchange occurred:

[McQuaid]: What up Buddy, [Lia] was trying to call you today, I'm with her now
if you want that pass code and shit?

[Plaintiff:] Oh okay okay okay.  You want to text?

[McQuaid:] You want it texted, okay alright.  Yeah I'll text it to you. . . .

[Plaintiff:] . . . I'm still up in Carmel . . . .

---

[71] At the time of this message, McQuaid was 37 years old, (JEX 122 at 2), and living with
his parents, (McQuaid Interview Video at 2:44–2:48).  Lia was 41 years old, (JEX 124 at 2), and
living with Cianflone, (McQuaid Interview Video at 53:22–53:32).

[72] In citing to the calls recorded pursuant to the May 14 eavesdropping warrant on
McQuaid's phone, the Court cites the unique reference number provided for each call in the
hyperlinked NYSP report included as Joint Exhibit 266 because this report has not been
uploaded to the docket.

[McQuaid:] Oh you up there for [Zaimi]?

[Plaintiff:] Yeah, man.

[McQuaid:] What's going on with that?

[Plaintiff:] They fucking . . . set a trial date . . . of September now.

[McQuaid:] September?

[Plaintiff:] Yeah, yeah, we just . . . got guns, man.  We just got guns.

[McQuaid:] Guns?

[Plaintiff:] . . . We are gonna go get Pascale, here's what we're gonna do to her. [firearm being dry-fired in background]

[McQuaid:] Yea, doggy!  So what's going on?

[Plaintiff:] You wanna know what we're gonna do to Pascale, I'll show you what. [firearm discharging in background]

[McQuaid:] You're . . . out of your mind!

[Plaintiff:] That's what we're, that's what I'm gonna do to her.  Did you see it, did you see what I just did to her? . . . We went to [Zaimi]'s house and we have these things where we put pictures of her up on these things . . . Um . . . I don't know, and we're . . . shooting her, man.  We just shot Danielle Pascale in the tit.

[McQuaid:] There you go.

[Plaintiff:] We just shot her tit off, man.

[McQuaid:] There you go, you the man, doggy! . . .

[Plaintiff:] You guys going to be around for a little bit?

[McQuaid:] . . . I'm going to text you that so you can do what you got to do, hey that apartment is that open?

[Plaintiff:] You been by that place in Cortlandt?

[McQuaid:] . . . I'm going to go by it . . . on the way home.

(McQuaid Call Intercepts 11891 at 00:10–2:07; *see also* JEX 131 at 5.)  At around 5:30 PM,

McQuaid texted Plaintiff Lia's Facebook login credentials.  (Galgano-McQuaid Text Msgs at

222456.)  At 7:00 PM, Plaintiff texted McQuaid a photo of Plaintiff holding a shotgun and the

message: "I'm going to go knock off a gas station."  (Defs' 56.1 ¶ 740; Pl's Resp. 56.1 ¶ 740;

Galgano-McQuaid Text Msgs at 222474.)  McQuaid responded "Ur out of ur mind n I fucking

love it . . . but the gas station thing plz pass on it cuz you know ill probably get arrested for it

. . ."  (*Id.* at 222478.)

Also on June 4, 2014, CPD detectives travelled to New Bern, NC to locate K.L. and then

met her at her home the next day.  (JEX 132 at 13.)  After speaking to the detectives, K.L. agreed

to cooperate and make controlled calls to McQuaid.  (*Id.*)  That same day, K.L. sent a text

message to McQuaid stating that she was looking for Lia.  (Defs' 56.1 ¶ 458; Pl's Resp. 56.1 ¶

458.)[73]  Later in the day, McQuaid called K.L. and the two agreed that Lia would call K.L. the

next day, June 6, 2014.  (Defs' 56.1 ¶ 459; Pl's Resp. 56.1 ¶ 459.)  After the call with K.L.,

McQuaid called Plaintiff and then texted him "Call me back asap got some goo[d] news call me

asap."  (Defs' 56.1 ¶¶ 460–61; Pl's Resp. 56.1 ¶¶ 460–61.)

---

[73] Joint Exhibit 262 has not been filed to the public docket and includes three separate
documents that were provided to the First Grand Jury: (1) NYSP Call Frequency Report for
McQuaid's Phone, 3/3/2014–5/15/2014 ("JEX 262-1"); (2) NYSP Pen Register Report for
McQuaid's Phone, 3/3/2014–6/30/2014 ("JEX 262-2"); (3) NYSP Line Sheet Report for
McQuaid's Phone, 3/3/2014–5/15/2014 ("JEX 262-3").
    According to McQuaid's phone and text message records, this was the first time
McQuaid received a text from K.L. since Plaintiff had contacted McQuaid on February 24, 2014.
(*See generally* McQuaid Call Records; McQuaid Call Intercepts; JEX 264; JEX 262-2.)
    McQuaid also stated during the June 29, 2014 recorded interview that he was unable to
contact K.L. because he did not have "a number to get in touch with her . . . 'cause she changed
her number."  (JEX 437 at 53:22–25 (Dkt. No. 750-19).)

### k.  June 6, 2014 Eavesdropping Application for Plaintiff's Phone

On June 6, 2014, Gil submitted an application, signed by Levy, for an eavesdropping warrant (the "June 6 Eavesdropping Warrant") on Plaintiff's phone that was supported by an affidavit signed by Nagle to Judge Molea.  (JEX 77 (Dkt. No 752-11).)[74]  Gil also provided Judge Molea with copies of the controlled calls.  (Defs' 56.1 ¶ 1211; Pl's Resp. 56.1 ¶ 1211.)

In addition to Nagle's affidavit, Levy's application "incorporated . . . by reference" the affidavits and applications submitted on May 1 and May 14, among other things.  (JEX 77 at 2–4.)  Relying on Nagle's affidavit and the other documents, Levy provided a summary of the investigation and the allegations against Plaintiff.  (*Id.* at 5–10.)  As relevant here, Levy represented that, based on communications between Plaintiff and McQuaid, Plaintiff was engaging "in conduct meant to influence and persuade [K.L] from testifying . . . , while also attempting to obtain information meant to persuade and influence [M.A.] from testifying[.]"  (*Id.* at 7–8.)[75]  Levy also represented that Plaintiff "ha[d] access to deadly weapons and ha[d] communicated a willingness to use such weapons along with his co-conspirators against [Pascale]."  (*Id.* at 8.)[76]

---

[74] Gil drafted both the application, (Pl's 56.1 ¶¶ 112, 154; Defs' Resp. 56.1 ¶¶ 112, 154), and accompanying affidavit, (Defs' 56.1 ¶ 465; Pl's Resp. 56.1 ¶ 465).

Gil testified that he reviewed the application with Levy, but that he did not believe that Levy made any changes before signing it.  (JEX 14 at 221:6–16.)

Nagle reviewed the affidavit and the documents referenced therein before executing the affidavit.  (Defs' 56.1 ¶ 466; Pl's Resp. 56.1 ¶ 466.)  Gil testified that he did not believe that Nagle made any changes to the affidavit prior to signing it.  (JEX 14 at 224:12–14.)

[75] Nagle made the same representation concerning attempts to influence M.A.'s testimony in his affidavit.  (JEX 77 at 29.)

[76] In his affidavit, Nagle reported the content of the June 4, 2014 call, as quoted in § I.A.5.j, and further stated:

[A]n intercept . . . indicates that Galgano has access to guns and that he is going to get the assigned Assistant District Attorney prosecuting Zaimi [i.e. Pascale] and

As relevant here, Nagle stated in his affidavit that McQuaid had received a call from Cianflone on May 19, 2014, and that during the call, McQuaid had said "that he needed to speak with [K.L.] to finalize the deal and assure his people that she would not cooperate with the prosecution of Zaimi" and that "his guy wanted [McQuaid] to deal with [K.L.] directly[.]"  (*Id.* at 22, 27.)[77]  Nagle represented that McQuaid also said on the May 19 call that "five thousand is a number my people should be good with, I need to speak with [K.L.] though to see what she wants to do, my people are gonna want to talk to her before giving money."  (*Id.* at 28–29.)

Nagle further reported that "intercepted communications [show] that Mc[Q]uaid and Lia will receive consideration in the form of several thousand dollars of United States Currency and an apartment in Courtlandt [sic] Manor as consideration for their role in the conspiracy" and that "[Plaintiff] is baiting Lia to give up control of her Facebook account to [Plaintiff] while he

---

that he is going to shoot her.  Furthermore, the intercept reveals that Galgano was in the presence of Zaimi when he was discharging a [d]eadly [w]eapon and making threats against ADA Pascale.  Galgano does represent Zaimi and was present in Carmel Town Court when Zaimi was ordered to surrender his weapons and instructed that he was not allowed to possess any such weapons while the Orders of Protection were in place and remain in place for the two [pending indictments].

(JEX 77 at 30 (footnote omitted).)

[77] Nagle's affidavit "incorporated . . . by reference" the previous applications and affidavits submitted to Judge Molea.  (JEX 77 at 16–18.)  Nagle also stated that "[a]ll dates and times referred to herein are approximate.  Furthermore, unless otherwise noted, where statements of other individuals are described, those descriptions are intended to convey the sum and substance of such statements and are not exact quotes."  (*Id.* at 18.)

Nagle has testified that his knowledge of the statements in the affidavit came from, among other sources, attending meetings at the plant where he was made privy to "the information . . . that was needed to move the case forward."  (Defs' 56.1 ¶¶ 474, 476; Pl's Resp. 56.1 ¶¶ 474, 476.)  Nagle also spoke directly with Gonzalez, Lopez, Gil, and a CPD detective, reviewed telephone records, and read investigative reports.  (Defs' 56.1 ¶¶ 477, 479; Pl's Resp. 56.1 ¶¶ 477, 479.)

dangles the possibility of a rent free apartment over the heads of Mc[Q]uaid and Lia[.]"  (*Id.* at 29, 35.)

Finally, Nagle reported that "[Plaintiff] and McQuaid met and furthered the conspiracy by attempting to contact [K.L.]" on May 30 and June 1, 2014 based on text messages the two exchanged, several of which the Court has reproduced at § I.A.5.j *supra*.  (*Id.* at 33.)

Judge Molea approved the application on June 6, 2014.  (Defs' 56.1 ¶ 484; Pl's Resp. 56.1 ¶ 484.)[78]  The wiretap on Plaintiff's phone was activated the same day.  (*See* JEX 267.)

<u>l.  June 6, 2014 Controlled Call from K.L. to McQuaid</u>

From June 6 through June 8, 2014, K.L. conducted at least five controlled calls with McQuaid.  (Defs' 56.1 ¶ 487; Pl's Resp. 56.1 ¶ 487.)[79]  On June 6, 2014 at 12:24 PM, McQuaid texted Plaintiff "Call me bub ur going to miss n opportunities wit [K.L.] on the phone tonight at 5:30."  (Defs' 56.1 ¶ 490; Pl's Resp. 56.1 ¶ 490.)  McQuaid then called Lia at 12:30 PM, and the following exchange took place:

[McQuaid:] You want to do that thing at 5:30 or no?

[Lia:] Yeah.  Yeah. . . .

[McQuaid:] . . . Because I don't know what's the deal with this check but they might not be able to get it to me today so I need George to come through.

[Lia:] Okay.

[McQuaid:] And he will too if we can do that thing. . . . he's got to at least give me like three, you know.

[Lia:] Yeah, he has to.

_____

[78] The line sheets for intercepted communications from Plaintiff's phone identify the individual who intercepted each communication; neither Gil nor Levy appear on the line sheets. (Defs' 56.1 ¶¶ 485–86; Pl's Resp. 56.1 ¶¶ 485–86.)

[79] On June 6, 2014, CPD officers were conducting surveillance at Plaintiff's office and observed Plaintiff and McQuaid together outside of Plaintiff's office.  (JEX 362 at 2 (Dkt. No. 747-14).)

[McQuaid:] So, if we get that we'll be golden.

(JEX 371 at 01:13–01:40.)

At around 1:50 PM, Plaintiff replied to McQuaid and the following exchanges took place from approximately 1:50 PM to 6:50 PM:

> [Plaintiff:] [K.L.] wants to talk to me?  Lia needs to get [K.L.] talking about the other girl.  She can say "Quincy told me that they are looking to try your case with the first case with that girl [M.A.]."
>
> [McQuaid:] No shes calling us at 530 I talk to her last nite not u we can record it wit u there.
>
> [Plaintiff:] Okay. I will let you know whether to come office or my house.  Not sure where I will be.
>
> [McQuaid:] Nows the time might be are [sic] only shot . . . im picking lia up now what u wanna do.
>
> [Plaintiff:] I have to run . . . .
>
> [McQuaid:] K so what do u want us to do call wit out u.
>
> [Plaintiff:] Yeah just record it.  And make sure she asks what happened and if she knows the other girl, [M.A.].  I'm 1000% sure Lia's aunt is friends with [M.A.]'s mother.
>
> [McQuaid:] You gave me the wrong recorder the on u []gave me a broken one we might have one shot at this. . . .
>
> [Plaintiff:] Eric [Sharp] has recorder at the office.
>
> [McQuaid:] Tell him I will be right there.

(Galgano-McQuaid Text Msgs at 222726, 222733, 222735–36, 222738–39, 222785, 222790, 222792, 222795–96, 222800, 222815–16.)  CPD officers conducting surveillance observed Plaintiff and McQuaid smoking cigarettes together outside of Plaintiff's office at around 6 PM, immediately before McQuaid texted Plaintiff that Plaintiff had given him the wrong recorder.

(JEX 362 at 2.)  CPD officers later observed Sharp meet McQuaid outside of Plaintiff's office and hand McQuaid something.  (*Id*.)

At 7:57 PM, K.L. called McQuaid.  (JEX 95 (Dkt. No. 754-10).)  On the call, the following relevant exchanges took place:

> [K.L.:] I talked to mom at one . . . point.  I haven't talked to her in a while, but at one point I talked to her and she was saying Quincy called her. . . . Something about money?
>
> [Lia:] I'm trying to remember. . . . I don't know exactly their conversation, but mom was also kinda . . . making it sound like you guys are in contact.  That's how she made it sound to Quincy.  And . . . trying to figure out a way if you could have money coming to you.  And it just sounded kinda like odd because I didn't think you guys were like really talking recently, you and her.  So, I said to him I thought it was kinda just weird and shady. . . . [But] I don't know . . . details . . . I don't even know the situation.  I haven't spoken to you since . . . .
>
> [K.L.:] . . . Wait a minute?  What happened to me?
>
> [Lia:] That's what I'm saying.  I didn't know.  Mom finally told me.  I didn't even know until mom said something.
>
> [K.L.:] Yeah. I mean, you know, it is what it is, but . . . I'm confused about money that was being offered to me.
>
> [Lia:] Well, that you're going to have to ask Quin 'cause I don't know so much about that . . . I don't want to give you the wrong information 'cause I don't know. And like I said, all I knew was that they had like one conversation, but if you want, I could put him on the phone . . . .
>
> [K.L.:] . . . I don't understand why . . . I mean it's like that's a lot of money for me to do what?
>
> [Lia:] . . . I don't know what happened.  All I know is that I guess there's . . . a case involved or something.  I don't know.  Mom was making it sound like . . . the DA was looking for you . . . .  And I was like . . . what happened? . . .
>
> [K.L.:] I went to New York not long ago and I went in front of the grand jury.  I told the truth.  I said what I had to say.  Now, the DA has been calling like crazy.  They're, they're trying to fly me in like the beginning of next week.
>
> [Lia:] Oh shit. . . .  I'm so concerned for you. . . .  Are you okay?

[K.L.:] No, I'm fine.  Lia, you know me.  I'm a tough bitch. . . .  But I just don't wanna talk about it. . . .  I already went the first step.  Now, the DA wants to fly me in.

[Lia:] Right.  What did this . . . motherfucker do 'cause -- I mean what'd he do to you, this fuck?  I mean unless you don't want to talk about it. . . .

[K.L.:] No, I don't want to really talk about it. . . .  So Quincy and mom talked about money and me?  Well, I guess . . . I gotta talk to Quincy.

[Lia:] Well, yeah.  You'd have to ask him.  I know mom . . . made it sound like she was talking to you and calling Quincy like relaying from you.  Like, oh, I just talked to [K.L.] and . . . making it sound like you were giving her messages, and I . . . didn't think that was true because I didn't think you spoke to her. . . . If you want I could put him on the phone and you can ask him. . . .

[K.L.:] All right, yeah. . . .  Hey, what's going on?

[McQuaid:] Nothing, nothing.  Um, what's going on?

[K.L.:] No, I'm asking you what's going on.  I mean . . . I don't understand.

[McQuaid:] Well, no.  See, I'm lost too because I . . . don't even know what's going on with . . . what did this guy do to you?

[K.L.:] Quincy, I really don't want to talk about . . . what he did to me.  You know what I mean?  You know I . . . had to go in front of a grand jury.  That was enough trauma for me.  I really don't want to talk about it . . . .  So I told the truth and that's that.  But . . . the DA's hounding me.  They're trying to fly me in the beginning of next week.

[McQuaid:] Right . . . you had to go to a grand jury?

[K.L.:] Yeah.

[McQuaid:] Oh shit. . . .  When did you have to do that?

[K.L.:] . . . It was a while back. . . .  Honestly, I don't even know. . . .

[McQuaid:] . . . I mean I don't know if Lia told or your mother told you 'cause it's been like in the newspaper . . . -- I guess something happened with another girl.  Is it [M.A.] or something?  I don't know.  Did you . . . work with that girl?

[K.L.:] No . . . , I don't even know who that is.

[McQuaid:] No, I know 'cause I don't . . . think he was convicted or something, right?

[K.L.:] Honestly, I have no idea. . . . Like I said, the DA has been calling me. . . . I gotta call them back this weekend.

[McQuaid:] Right . . . your mother had said something and . . . I don't even know what's going on.  And I said, well, what the hell happened?  But . . . I don't even know the story . . . and then your mother started talking to me about it and about the DA was trying to get in touch with you.  And all I said to your mom was . . . that girl I guess who claims that she got raped, the . . . 18-year-old or whatever, 19-year-old . . . he never got convicted for that, but I know she ran out the courtroom crying and stuff.

So, . . . all I said to your mom was . . . these DAs . . . I know they use people.  They're just looking for convictions and stuff.  So, I said . . . it's up to [K.L.] because . . . she was there. . . .  You know if you were violated or not violated.  If it was just . . . a little bullshit where, . . . he grabbed your ass -- even still, no guy has a right to make any woman uncomfortable.  So, I'm not making like one's better than the other, but I said . . . at the end of the day I mean is it worth her getting . . . her business out in the newspapers, on the Internet if . . . it was something that wasn't that bad?

And then, . . . a friend of mine had called.  You know, he . . . knows . . . not . . . the guy.  He . . . uses . . . his lawyer or something, and they're friends.  So, he had reached out to me . . . because . . . somehow down the pipeline they found out . . . I'm with Lia, I guess because of our shit that was in the newspaper.  And they put two and two together that you guys were sisters.  So. . . he just said, maybe, you know, if the guy -- . . . maybe you could be compensated.  So I said . . . something to that nature to your mom, but never really got into it.

And then she just kept calling me and saying that she was talking to you about money and this and that, and you had a number in your head.  But . . . I don't want to get involved 'cause I really don't even know what's going on. . . .  I said I would have to talk to [K.L.] first.

[K.L.:] Well, my mom said something about a few thousands or something like that, but I mean compensated by who?

[McQuaid:] . . . How much?

[K.L.:] I don't know, a few thousand.

[McQuaid:]  Okay. No . . . , maybe you could . . . [K.L.], like I would have to find out more information.  I . . . haven't -- 'cause you know I haven't -- it's not like I know who -- I don't talk -- I don't know who his lawyer is.  I don't -- I'm not talking

-- I'm just talking to a friend. You know, he could be just shooting for the stars too. . . . But he . . . was looking out for me. He's a good friend of mine, so it's not like . . . this guy I say "Hello" and "Bye" to.

And you know, he feels bad too because he also heard that . . . maybe . . . the guy is pretty brutal. When it comes to women, he's a pig or whatever, . . . but like I said I . . . don't even know what happened, so I just told your mom, . . . before I inquire to anything I would have to . . . know what's going on. Like, you know, did this guy -- 'cause I said I would go down there and throw him through a window myself if he fucking fucked with her. But . . . is it something simple . . . did he just grab your ass or did he . . . really do something like. . . .

[K.L.:] Quincy, it was traumatic, traumatic enough.

[McQuaid:] Right.

[K.L.:] You know I really don't --

[McQuaid:] No, listen, I . . . don't. . . .

[K.L.:] And honestly, the shit's following me and . . . I'm tired of the bullshit. So, that's why I didn't know what the hell my mom was talking about. I . . . want this behind me. And eventually, I'm going to have to fly up to New York because they already found me once here . . . .

[McQuaid:] Right. But let me ask you a question. Why. . . do you have to fly in? How do they have control over you for that? If you . . . don't want to.

[K.L.:] Because if they subpoenaed me, they can make me do anything, or I'll go to jail .

[McQuaid:] Oh really. No, I. . . don't even know.

[K.L.:] Yeah.

[McQuaid:] So, . . . I'm just asking you questions because I'm just . . . trying to find facts out. . . . That's crazy. 'Cause I know . . . up in Putnam County the DA's fighting with the Sheriff's Department, and I was just looking out for you because I said . . . if that's the case you don't know who the hell's leaking what or -- you know what I mean? . . . I was just trying to look out for you. . . .

[K.L.:] I appreciate it. . . . I want to be done with this. . . . If they're talking about compensation . . . when would you know that? . . .

[McQuaid:] Well, I would have to find out for you. You know, that's why I said I needed to talk to you first. . . . Like I said, I don't even know if my -- how legit it

is.  You know, my friend . . . , I could find out for you, but . . . if you were to get - - say somebody was to compensate you, you would still have to -- you wouldn't be able to come up.  I mean, obviously, right?  Wouldn't that be the point of being compensated?

[K.L.:] Exactly.

[McQuaid:] How would you get around that if you just said you couldn't get around it, you know?

[K.L.:] . . . I don't know.  I'd have to figure something out . . . talk to the DA.  I'm not sure. . . .

[McQuaid:] . . . [T]hese fucking DAs and stuff I just don't trust any of them.  You know what I mean?  And who knows?  And I know up there it's crazy right now because . . . Levy is showboating.  And he's fighting with the sheriff of Putnam County . . . that's the head guy of the cops is fighting with the DA.  Like I wouldn't put too much real estate in that shit .  You know what I mean?

[K.L.:] Yeah, I hear you.

[McQuaid:] I mean I'm not saying anybody's coming -- you know, but you know, you just don't wanna -- who wants any problems?  That's why I was curious of how nature -- how serious the thing was.

[K.L.:] No, I hear you. . . .  Could you find out tonight?

[McQuaid:] . . .  I can try. . . .  But like I said . . . I'm only asking these questions 'cause I'm going to be kind in the middle of this and . .  I don't want . . . to get screwed either.  But if that happens . . . how . . . are you gonna figure out you're going to tell them that you're not going to come?

[K.L.:] Right.  Exactly.

[McQuaid:] So . . . you're just going to tell them you're not coming then.

[K.L.:] Yes. . . .

[McQuaid:] Okay, 'cause I don't want you to get in trouble either . . . I could inquire.  If you want me to, I'll inquire.  I'll see what I can do. . . .  And I'll find out how legit it is. . . .  Like I said, this didn't come from any of the people. . . .  It was just a friend. . . .  I mean you want me to give the guy a fucking beating for you?

[K.L.:] No, no. . . .

[McQuaid:] Because I know that other girl . . . was . . . pretty much abused on the stand and . . . was torn up. And she kinda threw her own case. She was crying and ran out the courtroom six times. I just don't want to see none of that shit go on with you 'cause once you're there you're there. You're theirs. You have to deal with cross-examinations. They're going to bring up anything that happened in your past, you know?

[K.L.:] Well, yeah. I mean I don't really have much to worry about there.

[McQuaid:] Right, I know. . . . It doesn't mean they always tell the truth either. You know what I mean? . . . You know how they try to make people look bad. Not the DA to you, but I'm saying you're going to have to deal with his lawyers or whatever. . . .

[K.L.:] I'm done. . . . It's following me everywhere. . . . I would need to know tonight. . . .

[McQuaid:] I could make phone calls for you. I could try by tonight or tomorrow definitely. . . . I'll see . . . if it still stands. . . .

[K.L.:] I'm telling you right now, seriously though, it's going to be as early as possible if it's going to be tomorrow because they're . . . calling me I don't know how many times. . . .

[McQuaid:] Yeah, but you got to understand something, [K.L] If I'm in the middle of this, I gotta have your word and I gotta know that . . . there ain't gonna be you coming through the backdoor and something. You know what I mean? . . . . Like you can't say, all right, I agree to something and . . . , I gotta . . . see how serious of the nature it is. So . . . , let's play it by ear. . . . But if that was to go down it'd be . . . like me trying to vouch for you. And . . . I can't be stuck in the middle of that 'cause I'm not answering questions to people . . . you know?

[K.L.:] . . . I understand that. . . .

[McQuaid:] But let me ask you a question. Like I said, say . . . you call them up and say you're not going to go. I mean what do you do then? . . .

[K.L.:] I'm not sure, honestly. But . . . I'm the victim, so I'd have to call the DA and talk to them.

[McQuaid:] . . . All right. Well, . . . I'll see what I can do for you. . . . I'd love to help you out, but . . . if something can be done, . . . it's got to be quiet. You can't say nothing to nobody. You know what I mean? It would have to just . . . I don't want to be involved. It's got nothing to do with me. I'm not getting anything out of it. . . . I was just told by a friend he might -- maybe he could get some compensation for you, and I figured I'd just throw it your way. And I didn't have

your number and . . . I couldn't get in touch with you, so, unfortunately, I had to say to your mom can you tell [K.L.] to call me. And . . . she's asking me why, . . . so I just kinda mentioned it briefly.

[K.L.:] . . . I don't want to get in trouble either, Quin. . . . So, it has to be Western Union'd to me or something. . . .

[McQuaid:] . . . I know. And that's why I mean . . . if it does happen and you're rightfully deserved of it, I guess . . . you just gotta ignore these people or tell them . . . no harm, no foul and you're not pressing charges. . . . I don't know how it works. . . .

[K.L.:] Yeah. . . . I can text my lawyer and see what he says but . . . I can figure that out on my end. I can take care of me . . . so, don't worry about me.

[McQuaid:] All right . . .'cause . . . you can't be saying nothing to nobody either . . . . Even up here, don't say nothing to nobody up here that's even a possibility 'cause then it's going to fuck your whole . . . fuck the whole shit up, you know?

[K.L.:] . . . Yeah. Okay.

[McQuaid:] . . . Let me see how real it is. . . . People talk shit too. . . . But let me just see. . . . I'll have an answer. . . . If it's real, I'll find out by tonight or tomorrow morning.

(JEX 95 3:25–20:42.)[80]

### m.  June 7 Controlled Calls from K.L. to McQuaid

The next day, K.L. called McQuaid at 1:51 PM. (JEX 96 (Dkt. No. 754-11); JEX 268

("K.L. Call Intercepts") 23.)[81]  During the call, the following relevant exchanges occurred:

[McQuaid:] I'm just waiting for him to call me back, so . . . soon as he calls me back. He'll call me back within the hour.

---

[80] McQuaid also recorded a portion of this call. (JEX 104 (Dkt. No. 754-19).) On McQuaid's recording, McQuaid and Lia can occasionally be heard whispering suggestions to one another about how to respond to K.L.'s questions. (*See generally id.*)
   The Parties have provided transcripts of K.L.'s recording of the call. (JEX 426 (Dkt. No. 750-7); JEX 115 (Dkt. No. 754-30).) Plaintiff has also provided a transcript of McQuaid's recording of the call. (JEX 410 (Dkt. Nos. 749-8–10).)

[81] For June 7 and June 8, 2014, the hyperlinked NYSP report of K.L.'s controlled calls is 2 hours ahead of Eastern Standard Time. Where the time of the call is noted, the Court has silently corrected the time.

[K.L.:] . . . There's freaking cops at my house last night, Quin. . . .  My neighbor told me that the freaking mobile cops were knocking on my door last night when I was out.  So, they're trying to get to me . . . .

[McQuaid:] You know what, that's fucking harassment. . . .  If you don't feel comfortable doing something . . . , you have every right in the world to say I'm not doing it.  I don't care if you're subpoenaing me or not.  I'm not doing it. . . .  They can't harass you like that.  It's fucking ridiculous.

[K.L.:] Right.  But I never said I wasn't doing it.

[McQuaid:] . . . No, I never -- I'm not telling you to do it or not do it.  I'm just . . . saying if you didn't want to . . . like if you were in a position that you just said it's not worth it.  What the fuck am I going all the way up there to be abused and fucking tormented on the fucking stand for. . . .  At the end of the day what're you getting out of it?  You know what I mean?  I'm just saying if you didn't wanna do it . . . they can't harass you like that.  It's your . . . right to say yes or no.

[K.L.:] Right. . . .  I understand. . . .  I don't know Quin.  Look, I guess I'm just trying to get to the bottom line here.  I don't know what's going on.  All I know is that like I get -- when you called my mom . . . and talked about money with her.  I don't know somewhere around like $5,000 or some shit.

[McQuaid:] Right.

[K.L.:] I personally don't want to go to New York, to be very honest with you.

[McQuaid:] Right.

[K.L.:] I talked to my lawyer this morning.  I can walk away if I wanted to.

[McQuaid:] Right.  Right.

[K.L.:] But this guy also -- you know he did damage . . . .

[McQuaid:]  No, I understand. . . .  I mean . . . you can make that decision.  Like I said, a friend of mine, he . . . did say . . . maybe she could be compensated . . . and I . . . just relayed the message.  That's all. . . .  So I'm working on it too, but . . . I'm stuck . . . in a bad place too if it doesn't go right.  You know what I mean? . . .  Let me make a phone call now.  I'm going to call you back in 10 minutes.  Let me find out the details.

(JEX 96 at 00:27–02:51.)[82]

K.L. again called McQuaid at 2:34 PM.  (JEX 97 (Dkt. No. 754-12); McQuaid Call

Intercepts 12620.)  The following relevant exchanges took place during the call:

[McQuaid:] Really [K.L.]? . . .  All I did was try to make arrange . . .

[K.L.:] Quincy, listen to me a minute, please. . . .  Listen, this all came on my lap
. . . .  You contacted my mother . . . .  I'm dealing with all this bullshit.  This has
been going on for months. . . .

[McQuaid:] Well, first of all . . . I didn't say nothing.  All I said to your mom was
I told you to call -- this was a month ago, a month ago literally.  I said . . . tell [K.L.]
to call me . . . to see what's up.  She said all right . . . 'cause I didn't want to mention
it 'cause it's your business. . . .  But here's the thing, I understand that.  And
somebody said something to me, so I . . . just gave you the message because I don't
feel any guy should do this to any girl or whatever, so I figured maybe . . . I might
help you out.  That's all I was doing was trying to actually be -- doing a nice thing.
There's no smoking mirrors [sic].  There's no agendas.  There's nothing.  But . . .
you got to understand something.

[K.L.:] That's all right, Quincy, but you got to understanding where I'm sitting . . .
I'm getting this from my mom and you're telling me it's a friend. . . .  You're telling
me a friend of yours is offering me this compensation.

[McQuaid:]  No, I said he said maybe he could talk to somebody and get some
compensation.  I don't know who he's going to be talking to. . . .  I don't tell him
nothing.  He . . . came to me.  He texted me and said, yo, did you see the thing . . .
and he said that supposedly the DA was putting . . . that you testified out on the
street.  And . . .  I said how he thought it was fucked up because first of all that
shouldn't be on the street or to people.  I don't know how the fuck he even found
out, so I was looking out for you.  That's all because you know at the end of the
day you don't know who the fuck you're dealing with and if you're going to be
testifying against somebody I don't think people should -- in the public should
know.  That's all.  And I . . . just seen what that girl went through and I was just
looking out for you.  That's all it was about. . . .  But the thing is you got to
understand something.  I'm in a position now that I'm in the middle.  I'm trying to
help you out and you're getting like hostile with me like I'm doing something
wrong . . . .

---

[82] The Parties have both provided transcripts of this call.  (JEX 428 (Dkt. No. 750-9);
JEX 116 (Dkt. No. 754-31).)
    At 2:10 PM, K.L. called McQuaid, and McQuaid told her he was "waiting on something"
and would call her back.  (JEX 438 at 3 (Dkt. No. 751-1).)

[K.L.:] No.

[McQuaid:] I don't need to be involved with something, say -- I don't know even know what happened.  And you don't want to tell me, but you know what, I kind of need to know from you where you're at and where your mind is and what happened because the fact of the matter is if . . . I try to do something for you to help you out and you decide a week later that, you know what, this guy he deserves to be behind bars or . . . deserves to pay and change your mind, I got to deal with people, all right, or Albanians or whatever.  And I got to deal with that and I got to deal with . . . DA trying to fucking say I tampered with a witness or something.  I . . . don't need any of that, [K.L.]. . . .  And . . . you don't want to talk about it.  That's fine, but . . . I'm a guy for details and . . . I'm not trying to put you on the spot, but I kind of need to know what's going on because you just didn't seem yourself last night and I don't need to be wrapped up in any kind of bullshit.  I don't trust cops.  I don't trust DAs.  And . . . I don't know what they're squeezing you on the other side.  I'm not saying that you would do anything bad to me at all.  I'm not saying that, . . . I thought maybe as friend I could help you out.  That's all.  It was brought to my attention.

[K.L.:] I understand that, Quincy. . . .  But . . . I have got to call Danielle, who has been calling me.  I'm not just going to turn around and not do this. . . .  Look, I want this over more than you can possibly imagine, okay. . . .

[McQuaid:] Right. . . .

[K.L.:] So, I talked to my lawyer.  I can turn around and say I'm done. . . .  That's my decision.

[McQuaid:] That's absolutely your decision.

[K.L.:] And I'm not going to go and make this decision today when I'm going to wait three months and then . . . find out . . . this is bullshit?

[McQuaid:] . . . You have to understand something. . . .  If I'm going to get down to it, I'll get down to it, but you got to understand it's not going to happen in a half hour, you know what I mean?  And it's not going to happen three weeks from now either.  I'm not saying that either, but I need to know where you're at.  Like I don't even know what the fuck happened.  And honestly, I'll be the first one to go down there for you and throw somebody through a window, and you know that, okay, 'cause . . . I don't care if the guy just tapped an ass and said something rude to you.  I don't care if he just said something rude to you.  A guy has no right, especially an owner of a business, to say that -- to do -- to make any girl feel uncomfortable, all right.  So, you have to do what you got to do.  I'm not telling you . . .

[K.L.:] Quincy here's my point.  I don't want to talk about it.  I've had to tell this fucking story a hundred fucking times.  I don't want to talk about it.  It was very traumatic. . . .

[McQuaid:] . . . I got you . . . , but you understand this . . . if you do testify, you're going to have to do two weeks of trial and fucking . . . say your story. . . .  I'm just saying because you're saying you want it out of your life and you don't want to talk about it.  That's fine and all dandy.  I understand that.  And I understand if you need to come up here and do this -- hey, if he needs to be behind bars 'cause he violated . . . you that bad, then so be it.  I'm not condoning any of this shit.  I think it's wrong to begin with.  I don't think you should make any co-worker -- any worker, especially a female and you're a man feel uncomfortable.  I really do.

[K.L.:] Quincy, I don't want to talk about that fucking asshole right now, okay.  That's not why I'm talking to you. . . .  So, what you're telling me is that this friend that supposedly thinks he can get me some sort of compensation this could happen in like three months from now?

[McQuaid:] No, I didn't say three months from now.  Who said anything about three months from now?

[K.L.:] You said it's not going to be a half hour and it's probably not going to be three weeks.

[McQuaid:] Well, I mean I'm getting the impression that you think like I'm going to have some kind of money for you within a half hour. . . .

[K.L.:] Quincy, they're trying to fly me like Monday or Tuesday to New York.  I don't have an option.

[McQuaid:] I understand that, but what I'm trying to -- what did you say about Monday and Tuesday?

[K.L.:] They're trying to fly me to freaking New York to go meet with the DA.

[McQuaid:] [K.L.], only you can decide what you want to do, sweetie, you know what I mean? . . .  I mean, listen, and, and if you think it's just going to be come fly up for an hour or two, I'm just letting you know . . . you better know what you're getting into because it's going be a trial.  You're going to have to answer all kinds of tough questions and . . . you've seen it up on TV. . . .  And if you need to do that that's what you need to do.  Believe me, I support . . . you whatever you do, but I'm just saying . . . I can't put my neck out on the line and be in the middle.  And if it's so traumatic you decide a week later, two weeks later that you still want to crucify this guy 'cause then I got your sister to worry about.  I got my family . . .  You know, my address is all over the fucking computer now 'cause of this bullshit.  And

. . . I'm a man of my word and I don't -- my reputation's always been good. I don't need bullshit coming back to me. You understand?

And I don't know what happened, and you don't want to tell me, that's fine, but you, you know I, I'm just in a --

[K.L.:] Quincy, it's not something I want to tell you. It's not something that I'm going to fucking tell you.

[McQuaid:] I don't want you to repeat or relive anything either. I'm just saying understand where I'm coming from. I don't know what happened. . . . Listen, I don't care if the guy just said something rude to you. . . .

[K.L.:] But Quincy? . . . That has got nothing to do with anything, okay see, because here's the deal. . . . You want me to tell you right now that I'm not going to testify and then sit here and twiddle my fucking thumbs. Is that what you want me to do?

[McQuaid:] No, . . . I'm not telling you to do anything, [K.L.].

[K.L.:] . . . I mean I have got two calls by the DA. They want to fly me to New York this week. So, that's a decision I'm making. Either I'm going or I'm not, but I need to know if I'm not going I need to know that you know there's something backing me up on that like a reason why I'm not going.

[McQuaid:] Right. And I understand that and I feel . . . if you can get a little compensation, regardless, you should if it's available . . . , but . . . you got to understand where I'm at . . . .

[K.L.:] All right, well, have your friend call me. . . .

[McQuaid:] I'll talk to him about that, . . . I'm just trying to explain where I'm coming from. I'm not trying to dance. It seemed like last night it was like a big dance and . . . before I even put my neck on the line . . . I'm making sure that it's either going to go smooth or it's not going to go smooth 'cause I don't know . . . the magnitude --

[K.L.:] It can go really smooth. It can go really smooth; Quincy, but you know me. If I get dicked around, I'm not very pretty to deal with. You know that. . . . So, I can make it go very pretty and very smooth, and it could be done and fucking over with and I can disappear for three weeks and I'll be a happy fucking girl.

[McQuaid:] Okay.

[K.L.:] Or I can get dicked around for the next three weeks and then get really pissed off.

[McQuaid:] Right. . . . but [K.L.], first of all . . . I'm not going to waste your fucking time, number one . . . . So, either it's going to be a legit thing or it's not, but I need to know . . . if it happens I'm not going to get snowballed. And I'm not saying . . . you would do that to me. I'm just saying that I don't know because I don't know what the fuck went on and, and I'm not trying to keep talking about it, but I don't know your state of mind . . . but let me see. I'll call him . . . .

[K.L.:] Do you want to know my state of mind? I'm done with this crap. I've been dealing with it for months. I was fucking traumatized, humiliated, and I felt fucking dirty. And it's done and over with . . . .

[McQuaid:] Okay . . . that's all I need to know . . . .

[K.L.:] And I'm disgusted by what happened to me.

[McQuaid:] . . . That's all I need to know. That's all -- I don't need details . . . . All right, so let me call the guy and then I'll see if he'll talk to you direct.

(JEX 97 at 00:19–10:24.)[83]

McQuaid then travelled to Plaintiff's house and arrived at 5:14 PM. (Defs' 56.1 ¶¶ 552–53; Pl's Resp. 56.1 ¶¶ 552–53.)[84] At 5:39 PM, McQuaid texted K.L.: "Found out what's up call me back so I can tell u." (Defs' 56.1 ¶ 557; Pl's Resp. 56.1 ¶ 557.) McQuaid attempted to call K.L. both before and after this text message, but both calls went to voicemail. (Defs' 56.1 ¶¶ 555, 558; Pl's Resp. 56.1 ¶¶ 555, 558.)

At 5:51 PM, Plaintiff texted McQuaid: "Thanks. Just stay on top of her and record everything." (Defs' 56.1 ¶ 560; Pl's Resp. 56.1 ¶ 560.)[85] At 5:59 PM, McQuaid responded: "U

---

[83] Both Parties have commissioned transcripts of this call. (JEX 436 (Dkt. No. 750-18); JEX 117 (Dkt. No. 754-32).) McQuaid also recorded a portion of this call. (JEX 105 (Dkt. No. 754-20).) Plaintiff commissioned a transcript of McQuaid's recording. (JEX 439 (Dkt. No. 751-2).)

[84] CPD officers were conducting surveillance on Plaintiff's home on June 7 and observed McQuaid's car parked in the driveway of Plaintiff's house. (JEX 363 at 2 (Dkt. No. 747-15).)

[85] At 7:14 PM, Plaintiff texted Zaimi that he had "[s]pent the day with [McQuaid] talking to [K.L.] on the phone." (Galgano-Zaimi Text Msgs at 222929.)

got it buddy.  I want [sic] trying to b[]other u on ur day off just wanted u to know what's up n to

continue or not that angl[e] u come up[ ]wit[h] is good thank you."  (Defs' 56.1 ¶ 562; Pl's Resp.

56.1 ¶ 562.)

K.L. called McQuaid again, and he told her he would call her back "in one second"

because a police officer was "behind" him.  (JEX 429 at 3 (Dkt. No. 750-10).)  At 6:21 PM, K.L.

called McQuaid again.  (Defs' 56.1 ¶ 563; Pl's Resp. 56.1 ¶ 563; JEX 98 (Dkt. No. 754-13).)

The following exchanges took place during the call:

> [McQuaid:] . . . I found out what's going on a little bit. . . .  They don't care if you
> come up and testify or not or nothing.  That's not why they're . . . interested. . . .
> There'd be no compensation for you not to come. . . .  They just want to know
> because they think . . . the DA's up to . . . a lot of bullshit, and they would be willing
> to pay for that information because it's . . . a lot deeper than just your thing. . . .  I
> guess the DA's playing games, a lot of politics, a lot of showboating, and . . . they
> . . . think they're putting . . . words in your mouth.  They figure that when you come
> up they're going to make you say stuff that's not true anyway.
>
> [K.L.:] Right.
>
> [McQuaid:] . . . So, I mean they would be willing to pay . . . 'cause I guess . . . they
> think they know what's going on.  They know what's happening.  I guess they're
> trying to consolidate your case with [M.A.]'s for some reason. . . .  I guess that's
> the girl --
>
> [K.L.:] I don't know. Honestly, I don't know, hon.
>
> [McQuaid:] . . . So, they just feel that the DA's up to no good and . . . what's it,
> Danielle Pascale . . . is trying . . . , I guess between that, Levy, . . . they just feel that
> they're up to no good and they're putting words in people's mouths and changing
> stories because I guess with the [M.A.] thing they have her on videotape saying a
> whole []other story compared to what the DA actually said happened, so . . . .  I
> guess they're playing games up there.  And . . . they'd be willing to work with you
> . . . if that's the case in your story. . . .  They say the guy threw you down and . . .
> all this other stuff.  I don't know if that's true or not. . . .  That's . . . what the police
> statement says.
>
> [K.L.:] Yeah, I don't . . . know.
>
> [McQuaid:] . . . What did you tell them? . . .

[K.L.:] I told them what happened. . . .  Quincy, listen to me.  Honestly, honestly, Quincy, my mother asked me.  I didn't even tell her.

[McQuaid:] Right.  All right. . . .  I'm trying to tell you what they said what's on the police report.  That he threw you down, rubbed up against you or whatever, something . . . to that nature. . . .

[K.L.:] I don't even know which police report. . . .  They want info from me.

[McQuaid:] No, they just think the DA is . . . try and showboat and make a mission out of it.  This is . . . the gist of the story. . . .  But . . . they're willing to pay for that. . . .  They're not trying to pay you not to come.  I mean, if you come, you come.  If you testify, you testify. . . .  They feel strongly about it because . . . you went in front of the grand jury and . . . he wasn't indicted. . . .

[K.L.:] . . . Are they willing to pay me first, then get the info 'cause that's the only way I'll do it.

[McQuaid:] . . . It's kinda gotta be a mutual thing.  It could be . . . a 50/50 . . . .  You could do it at the same time.  It's like any other transition . . . .  They're not trying to tell you not to come testify or anything.  They're not worried about that.  I guess it goes a lot deeper than you . . . ?  There's a lot more, the . . . evilness of it, . . . and they just know there's a lot of fucking funny, foul play going on. . . .

[K.L.:] . . . Maybe I could.  I mean how much . . . would they be willing to pay me? . . . You're saying 50/50, so how much would they be willing to pay me now . . . up front?

[McQuaid:] No, I meant . . . you can do a mutual exchange like any trans, transitive.  If you got info for them, . . . and they hand you it right there. . . .  I guess that's how it works . . . .  I don't think they're going to pay somebody and not have the information, . . . I'd say they pay you and then you tell them right there on the spot or tell me to tell them or whatever . . . .

[K.L.:] . . . I would have to talk to them first.  I wouldn't be able to tell you to tell them. . . .

[McQuaid:] . . . Like I said, maybe you . . . don't have anything.  Maybe you do.  So, that's what they were inquiring about.  That's what they meant by being compensated.

[K.L.:] All right.

[McQuaid:] . . . Think about it. . . .  If there's anything you can help them out with, and listen . . . my friend is not gonna play games . . . and like he's a true friend . . .

he's been reaching out for me.  And . . . he just told me I haven't been looking into it . . . .  It came to my lap just like it came to your lap.

(JEX 98 at 00:11–6:28.)[86]  McQuaid texted Plaintiff around five minutes after the call ended:

"She called me back I got it recorded I did what u said she said maybe there[']s a couple things

that she kn[o]ws that the [DA] did."  (Defs' 56.1 ¶ 573; Pl's Resp. 56.1 ¶ 573.)  Plaintiff

responded:  "Good stuff.  It's DA and cops.  Remember they arrested this guy on [K.L.'s] case

10 days before [M.A.'s] trial."  (Defs' 56.1 ¶ 574; Pl's Resp. 56.1 ¶ 574.)

### n.  June 8, 2014 Controlled Call from K.L. to McQuaid

On June 8 at 2:24 PM, K.L. called McQuaid a final time.  (JEX 476; K.L. Call Intercepts

49.)  The call included the following relevant exchanges:

> [K.L.:] I'm confused . . . because when I talked to my mom, she told me, basically . . . that I'll get compensated if I don't testify.  Now, you're telling me that I'm going to be compensated if I get dirt on the DA.  I'm just not gonna do that. . . .  I mean, as far as I know, . . . the DA's been on my side helping me really good. . . . The original plan, and the original offer was that you told my mom I would be compensated if I didn't testify.
>
> [McQuaid:] First of all, I never said that.  I just said you could get compensated. . . .  This goes way deeper than you, [K.L.]. . . .  They're trying to consolidate your case with [M.A.].  For what reason, nobody knows.
>
> [K.L.:] . . . If they're trying to consolidate me and [M.A.]'s case, what does that do to me?  Does that hurt me?
>
> [McQuaid:] I didn't say anything like that. . . .  You testified in front of the grand jury.  The guy didn't get indicted.  That's unheard of.  So, obviously the case is weak.  So, they're trying to put you with [M.A.], obviously. . . .  His lawyer didn't even put him on the grand jury to fend for himself, and . . . they had a witness testifying at the grand jury and he still wasn't indicted.  That's pretty unheard of, [K.L.].  I mean I'm not a lawyer, but . . . I asked a couple people.  That shows a sign of weak case.  So, obviously, they're consolidating you with . . . her, I don't know why. . . .  They got a hard on, but this goes deeper than you, sweetheart.

---

[86] Defendants have commissioned a transcript of this call.  (JEX 118 (Dkt. No. 754-33).) McQuaid also recorded this call.  (JEX 106 (Dkt. No. 754-21).)  Plaintiff commissioned a transcript of McQuaid's recording.  (JEX 430 (Dkt. No. 750-11).)

[K.L.:] Alright, I understand what you're saying. . . .  Well, let me ask you this, then why would I want to testify anyway?  Then why wouldn't I want an offer to not testify? . . .  That's what I'm asking. . . .  Wasn't that the original offer?

[McQuaid:] Regardless what you think, I'm just looking out for you. . . .  I mind my own business, so it doesn't matter to me.  You do what you want.  I . . . was trying to look out for you because I don't know if you know, if you read the articles or what, or they didn't tell you. . . .  Levy . . . he's trying to make a name for himself, and he got embarrassed because he let that other guy go that raped a little girl that was his personal trainer and shit.  So, he got demoted down from that case, the first case . . . against the guy that owns the pizzeria.  So, it's like a whole big, fucking politic mess, and I just didn't want to see you get caught up in it. . . .  They're not saying for you to go against the DA, and they're not trying to bribe you because that would be against the law . . . .  They're not worried because being that the guy didn't get indicted I guess . . . they're pretty confident they can beat it anyway.

So, . . . instead of you coming up here, getting used, and running around like a rag doll, okay, I was just trying to see if maybe -- I mean it was brought to my attention. I didn't look into it for you.  I'm not getting anything out of it. . . .  I said, all right, let me see because I know what these fucking people do, and . . . you know too. You see enough TV or news articles.  They don't care about . . . the person after they testify.  They don't care . . . if somebody's going to look for them, or somebody's going to harass them.  They don't give a shit.  Once you're done, you're done.  And they already put out on the street that you already . . . came up and testified.  That shouldn't've been out public like that. . . .  And then you're going to be in the newspaper.  You're going to be on the Internet.  I'm . . . just saying at the end of the rainbow is there a pot of gold? . . .  I don't see what you would be getting out of doing it.

[K.L.:] . . . bottom line, Quincy, . . . I'm a victim here, and nobody's telling me what to say.  I said what happened to me.  And what happened to me . . . that's between me, the DA, and the grand jury.  I know what happened to me.  Nobody else was there but me and him. . . .

[McQuaid:] That's what I've always said from the get-go.  I even told your mother nobody can tell you what to do.  Only you can do what you feel is right.

[K.L.:] Exactly.  Nobody is telling me what to say.

[McQuaid:] I'm just saying be prepared. . . .  I read a couple of articles on what . . . happened with that girl, and she was 18.  There's a whole different ballgame when a girl's in her late thirties, forties, you know what I mean? . . .  The jury looks at it different.  And being that he wasn't indicted, me, personally, that would have me worried.

[K.L.:] Quincy, it doesn't matter how old you are.  I could be 65 years old and if I
got molested, groped, raped, it doesn't matter if I'm 18 or if I'm 65.

[McQuaid:] . . . [K.L.], you're totally right, . . . .  It shouldn't go this far, but what
I was trying to say to you is . . . in the jury's eye if they didn't convict him for . . .
the 18 year old . . . and they didn't indict him when you actually took the stand in
the grand jury . . . there's something shady or somebody's not doing their job, and
. . . that's all I'm saying.  You just gotta be prepared.  That's all I'm telling you.
I'm not telling you what to do.

[K.L.:] . . . If . . . he didn't get convicted for what he did to her, from what you're
saying.  I don't know nothing about this girl.  I don't even know her name 'cause I
don't read the paper, and you know that.  I don't look for shit to look for. . . .  And
you're saying he didn't get indicted for me. . . , then I guess . . . what?  I mean what
is everybody worried about?  So, what I'm trying to say is, . . . I don't know nothing
about the DA, okay.  I'm dealing with Danielle, who's the ADA. . . .  If I don't have
to testify, if I can walk away from this, [scot] free.  I'm not . . . asking for shit.  This
was brought to my lap. . . .  So, you gotta understand this.  You're the middle man.
So, if you're telling me I can walk away.  I don't have to testify, and they will
compensate me for that, then let me know by tonight.  As far as dirt on the DA, . . .
I don't play that game, Quincy. . . .  I don't know nothing about, I mean I met him
a few times and he was nice -- I'm dealing with Danielle, and I wouldn't do nothing
to hurt Danielle. . . .  She's a beautiful person, that's all I know.

[McQuaid:] Nobody's saying you gotta go against her or go to court and testify
against Danielle . . . they thought maybe if the cops or the detectives are . . . pushing
you to do something that, you know -- and nobody knows but you . . . I'm not going
to get into that because we already covered that and you didn't want to say nothing,
so that's fine . . . but I'm just saying maybe they were doing something . . . that's
. . . not legit. . . .  You would never have to take the court or the stand.  They just
wanted to know for their own personal reason . . .

[K.L.:] . . . I'm not a kid, Quin.  The detectives aren't gonna screw with me and
they're not going to try to make me say something . . . that didn't happen. . . .  Every
time I've talked to them, it's been in the precinct. . . .  I can't talk for nobody else.
No, I'm a grown-ass woman.  If they even tried to come at me and say, oh, say this.
No, that didn't happen.  You know me.

[McQuaid:] . . . [K.L.] you gotta do what makes you happy.  I'm just saying . . .
have your eyes wide open because you're going to go into a lot of scrutiny when
you come up here.  I'm saying if it goes to trial or whatever.

[K.L.:] I know. . . .  I'm looking out for me, man, you know.  And . . . I care about
me right now.  I got a life I have to live and this shit is following me and I'm tired
of it. . . .  But . . . if there's money . . . in it for me to not testify, let me know.

[McQuaid:] . . . I understand that and that's, that's why I'd rather you see you get something.

[K.L.:] Then don't say my testimony's weak, Quincy. You don't know what happened to me, so whoever your friend is that's telling you this, they don't know because they weren't there.

[McQuaid:] Nobody knows, [K.L.]. Nobody said they know.

[K.L.:] . . . Exactly my point. So, you can't say my testimony's weak.

[McQuaid:] . . . I didn't mean . . . your story is weak or what happened to you is weak or . . . what you did on the stand is weak. I'm saying somebody's not doing their job because if he didn't fend for himself on the grand jury, which you would've known 'cause you would've been right there. You would've seen it. And you took a grand jury and they still couldn't indict him for a felony? . . . . Something's not right. And I've asked a lot of people, and I've asked a lot of people that've been on the wrong side of the law, . . . and they say that is unheard of. So, I don't know who is not doing their job . . . . I've even asked my lawyer for you just to see what was going -- like just for curiosity so . . . so I knew what I was talking about 'cause I don't know the law that well. . . . So, just be careful.

[K.L.:] . . . He was indicted. It might've been a misdemeanor, but he was indicted.

[McQuaid:] Yeah, a misdemeanor, not a felony.

[K.L.:] It doesn't matter. He was still fucking indicted . . . .

[McQuaid:] Well, I'm just telling you what I was told . . . .

[K.L.:] I don't understand. Who is your friend? How do you know all the details about me, Quincy? . . .

[McQuaid:] . . . You go online, just check online. Half the shit you get online.

[K.L.:] You can go online and see that he wasn't indicted?

[McQuaid:] . . . It . . . said he wasn't indicted for a felony. He was indicted for a misdemeanor, which is pretty much unheard of, and it even says that Levy was grandstanding.

[K.L.:] . . . I don't want to talk about it. Okay. . . . I don't want to talk about it anymore, the indictment, nothing. Alright, I got enough to talk about that shit with Danielle. So, listen, either there's money in it for me not to testify or there's not. . . . I can't live this shit anymore. It's making me sick . . . to my stomach. So, I need to know by tonight, babe.

[McQuaid:] But you're saying one thing, . . . but . . . you know how much you're going to live through in . . . two weeks of trial and stuff? . . . But that's not my business. That's on you. But . . . all right. I'll find out.

[K.L.:] He was indicted for what he did to me, so whatever I have to say in front of a jury they're going to believe me. I'm not scared. I have nothing in my past. There is no dirt on me that I can't beat, but there is no dirt on me. . . . But what I'm saying is I don't want to do it. . . . If there's an out for me, I'll take it. . . .

[McQuaid:] Alright. Let me find out. All right?

[K.L.:] . . . Yeah, so let me know by tonight. I mean I will testify . . . , if it's weak or whatever. I know it's not weak. I know my testimony is not weak. . . . It was on camera what he did to me, so I know it was not weak.

[McQuaid:] Okay. Alright. So, let me find out. All right?

(JEX 476 at 00:37–15:46.)[87]

Just after midnight on June 10, 2014, Plaintiff texted McQuaid: "Let's get together tomorrow. I have some ideas on how to make some serious money." (Galgano-McQuaid Text Msgs at 223276.) After McQuaid responded "K let me know when," Plaintiff texted: "Today if possible. Requires a plan. But there is huge huge huge upside." (Defs' 56.1 ¶ 598; Pl's Resp. 56.1 ¶ 598.) However, Plaintiff was in a car accident on June 10 and was unable to meet McQuaid. (Defs' 56.1 ¶ 601; Pl's Resp. 56.1 ¶ 601.) On June 11, Plaintiff texted McQuaid: "Just got home . . . can we meet first thing in the am? I would like to book a flight for me and you to go down south one morning and come back later that night. I can give you details when I see you. Could end up being huge, huge, huge." (Defs' 56.1 ¶ 602; Pl's Resp. 56.1 ¶ 602.) On

---

[87] Defendants have provided a transcript of this call. (JEX 119 (Dkt. No. 754-34).) McQuaid also recorded the call. (JEX 107 (Dkt. No. 754-22).) On McQuaid's recording, Lia can be heard speaking to McQuaid. (*Id.* at 3:46–47.) Plaintiff has provided a transcript of McQuaid's recording. (JEX 433 (Dkt. No. 750-14).)
   On June 8, Zaimi also texted Plaintiff: "What you did now, you are gonna put in jail me and you both, you got that bitch? . . . On tape." (Defs' 56.1 ¶ 596; Pl's Resp. 56.1 ¶ 596.) Plaintiff responded "Yeah stop by." (Defs' 56.1 ¶ 596; Pl's Resp. 56.1 ¶ 596.)

June 12, Plaintiff and McQuaid agreed to meet at Plaintiff's office.  (Defs' 56.1 ¶ 603; Pl's Resp.

56.1 ¶ 603.)  On June 13, Plaintiff texted McQuaid "What's the name of the city in NC we have

to fly into?" and McQuaid responded "New Bern."  (Defs' 56.1 ¶ 604; Pl's Resp. 56.1 ¶ 604.)

On June 18, 2014, Gil filed a two-week progress report as required by the eavesdropping

warrant on Plaintiff's phone.  (*See* JEX 80 at 2–3 (Dkt. No. 752-16).)  Gil summarized McQuaid

and Plaintiff's plans to go to New Bern, NC to locate K.L. (*Id.* at 6.)  Gil also provided Judge

Molea with "[l]ine sheets with hyperlinks to audio intercepts."  (*Id.*)  Gil provided Judge Molea

with copies of the controlled calls.  (Defs' 56.1 ¶ 1211; Pl's Resp. 56.1 ¶ 1211.)

<u>o.  McQuaid and Lia's Arrests and Subsequent Statements</u>

On June 25, 2014, the CPD learned that McQuaid and Lia were planning to purchase

narcotics in Hawthorne, NY.  (Defs' 56.1 ¶ 667; Pl's Resp. 56.1 ¶ 667.)[88]  The CPD stopped

McQuaid and Lia for a traffic violation and searched the car.  (Defs' 56.1 ¶¶ 668–69; Pl's Resp.

56.1 ¶¶ 668–69.)  After officers found a substance believed to be heroin, McQuaid and Lia were

taken into custody.  (Defs' 56.1 ¶ 669; Pl's Resp. 56.1 ¶ 669.)  Around the time of the stop, Lia

"was shooting heroin into her arm" and McQuaid "had fresh needle puncture marks on his

arm[.]"  (JEX 82 at 6 (Dkt. No. 752-19).)[89]

After being interviewed, both Lia and McQuaid gave written statements.  (JEX 122; JEX

124.)[90]  McQuaid's statement is partly a narrative written by McQuaid and partly a series of

---

[88] Several times during June 2014, NYSP had observed McQuaid attempting to purchase narcotics.  (*See* JEX 131 at 5–7.)

[89] An NYSP investigator reported that "[Lia] was found to be in possession of 6 dosage units of suspected Heroin, 1 used hypodermic needle[,] and 3 unused hypodermic needles." (JEX 131 at 7.)

[90] Officers did not record the interviews because the NYSP Barracks in Hawthorne, NY where the interviews were conducted did not have video recording equipment.  (*See* JEX 132 at 14.)

questions and answers written by the CPD detective who interviewed him. (*See generally* JEX 122.) As relevant here, McQuaid stated that Plaintiff had contacted him through a friend and that, in late February 2014, McQuaid had met Plaintiff at his home. (*Id.* at 2.) At the meeting, McQuaid agreed to attempt to get information from K.L. (*Id.*) McQuaid then called K.L. but received no response, so he called Cianflone and got information from her. (*Id.*) Plaintiff and McQuaid met several times, and Plaintiff told McQuaid at these meetings that "[K.L.] could be compensated for her time if she would talk to him. [Plaintiff] wanted to find out [be]cause he felt the D.A. and Detectives were being crooked and putting words in her mouth." (*Id.* at 2, 4.) McQuaid indicated that Plaintiff had directed him to call K.L., had told him to record the conversations with her, and had told him, at least in part, what to say on the calls. (*Id.* at 4–5.)

McQuaid stated that during his calls with K.L. he had told her that "they were interested in finding out . . . if the cops and D.A. were pushing her to say anything" and that K.L. "told [him] no but if there was money for not testifying she would be interested." (*Id.* at 4.) McQuaid stated that during his last phone call with K.L. he told her that being paid not to testify "is against the law and that[']s not what they were interested in." (*Id.*) McQuaid further stated that Plaintiff "was looking into flying down [to North Carolina] me[,] him[,] and Lia to visit and talk to [K.L.]. He wanted us just to introduce him to her so he could talk to her." (*Id.*)

---

At some point after McQuaid's arrest, Gil spoke to him. There is a dispute in the record as to what was said during this conversation. Gil testified in his deposition that he told McQuaid that the PCDAO was considering bringing a bribery charge, based on the conversations with Cianflone and K.L., or potentially an assault charge, based on the call where Plaintiff suggested shooting ADA Pascale. (JEX 14 at 266:11–267:22.) Ortolano testified during her deposition that Gil told her that he had threatened McQuaid with an attempted murder charge. (JEX 22 100:14–101:15 (Dkt. No. 742-2).)

Lia's statement was typewritten by Lopez, who was taking notes while a CPD lieutenant interviewed Lia.  (JEX 17 103:4–7, 108:19–23, 117:5–7 (Dkt. No. 756-17); *see also* JEX 124.)[91] In addition to statements noted above about Plaintiff's contact with McQuaid, Lia also stated the following concerning what happened after she left rehab on May 12:

> George [i.e., Plaintiff] made the comment that [Zaimi] is willing to pay anything in the world to get what he needs done. . . .
>
> Quincy and I went to the home office because George wanted to show us something.  George showed us court[-]related paperwork about the indictment involving my sister [K.L.].  George asked if we knew anything about it.  George asked if I could get my sister on the phone.  I said probably not; I haven't spoken to her.  I sent her a private message via Facebook.  George asked if he could have my Facebook account password.  George wanted to make a point to himself.  I did not give [the password] to him.  I believe after we left, George tried to break into my Facebook account due [to] the text messages that Quincy received throughout the early morning hours.
>
> George was very careful about bringing up money.  George believed that my sister would walk away from the case if she got the right pay day.  George wanted us to ask her if it's something she would consider.  George was under the impression that my sister would take money, walk away[,] and disappear. . . .
>
> George knew that we were struggling and that he had an empty apartment in Cortlandt Manor if we were interested until we got on our feet.  George said he'd like to help [us] out financially but [Zaimi] ha[d]n't paid [him]; that's when George offered the apartment.
>
> George wanted to know if [K.L.] was coming up for trial to testify.  George just wanted to know where her head was at.  George said to us if she was willing to take money not to testify it could be a big pay day for all of us.  That conversation took place on the speaker phone while we were in the car.

(JEX 124 at 3–4.)[92]  McQuaid and Lia also agreed to cooperate against Plaintiff, and McQuaid agreed to wear a recording device while meeting with Plaintiff.  (JEX 82 at 7.)  Over the next

---

[91] Lopez took notes during the interview.  (*See* Letter from Richard B. Epstein, Esq. to Magistrate Judge Paul E. Davison (July 16, 2021) Ex. F at 4–5 (Dkt. No. 592-4).)

[92] As relevant here, on May 15, 2015 the PCDAO provided a *Brady* notice to Plaintiff's attorney that Lia had recanted the following two statements in her written statement:

several days, McQuaid attempted to set up a meeting with Plaintiff through phone calls and texts, but no meeting was scheduled.  (JEX 132 at 14.)

On June 26, 2014, Gil filed another two-week progress report as required by the May 14, 2014 eavesdropping warrant on McQuaid's phone.  (JEX 82 at 2–3.)  Gil noted that McQuaid and Lia had been arrested and that "[a]n audio voice recorder was . . . recovered from [McQuaid's] vehicle . . . [that] [McQuaid] stated . . . he [had] obtained . . . from Galgano[.]"  (*Id.* at 6.)[93]

On June 29, 2014, Nagle requested that McQuaid and Lia come to the CPD.  (JEX 18 219:22–220:6 (Dkt. No. 756-18).)  At CPD, McQuaid and Lia were both interviewed on video.

---

(1) "George wanted us to ask [K.L.] . . . if . . . [walking away from case in exchange for money was] something [K.L] would consider"; and (2) "George said to us if [K.L.] was willing to take money to not testify that it could be a big pay day for all of us.  That conversation took place on the speaker phone while we were in the car."  (JEX 179 at 3.)

[93] Gil also stated that McQuaid "[had] signed a consent form for [the PCDAO] to search the . . . device[,] [which McQuaid] stated . . . had recordings on it of the conversations . . . with [K.L.]"  (JEX 82 at 6.)  For reasons that are unclear, this consent form is not included in the record before the Court.
   On August 8, 2014, McQuaid executed another consent waiver authorizing the PCDAO to access the recordings on the device.  (JEX 131 at 10; *see also* JEX 291.)  Joint Exhibit 291 has not been docketed and has been provided to the Court in electronic format.  A PDF containing the consent form, file name "Consent Forms.pdf," is included in the "Scans" subfolder of the Joint Exhibit 291 folder.
   On August 14, 2014, the recorder was turned over to the NYSP Computer Crime Unit.  (JEX 131 at 10.)  A forensic analysis prepared by the NYSP indicates that the recorder contained copies of McQuaid's recordings of calls with Cianflone on April 17 and April 30, 2014 quoted at length at §§ I.A.5.b–c *supra*, along with recordings of the calls that occurred at 7:57 PM on June 6, 2014; 2:34 PM and 6:21 PM on June 7, 2014; and 2:24 PM on June 8, 2014.  The Court notes that the device included several other very short recordings that do not include any relevant communications.  (*See* JEX 291.)
   On August 19, 2014, Gil introduced into evidence a CD containing the recordings during the first grand jury proceeding against Plaintiff.  (Defs' 56.1 ¶ 742; Pl's Resp. 56.1 ¶ 742.)

(Defs' 56.1 ¶ 681; Pl's Resp. 56.1 ¶ 681.)[94]  Gonzalez interviewed McQuaid.  (Defs' 56.1 ¶ 683;

Pl's Resp. 56.1 ¶ 683.)[95]  The interview began at around 11:50 PM and lasted approximately four

hours.  (*See generally* McQuaid Interview Video.)[96]

Over the course of the interview, McQuaid repeatedly denied that he had ever intended to

or attempted to bribe K.L or dissuade her from testifying when talking to either Cianflone or

K.L.  (*Id.* at 1:25–30; 18:15–40; 19:40–54; 23:28–41; 28:26–32; 35:35–40; 1:49:08–13.)[97]

McQuaid also initially stated that Plaintiff had never told him that K.L. could be paid for not

testifying.  (*Id.* at 15:56–16:02; 30:01–09.)  When confronted with Lia's written statement that

Plaintiff told her that Zaimi was "willing to pay anything in the world to get what he needs

done," McQuaid again denied ever hearing Plaintiff make that statement but admitted that the

statement could have been made when he was not present.  (*Id.* at 1:53:22–1:54:55.)  After being

told that Plaintiff may have given Lia heroin, McQuaid continued denying that Plaintiff had ever

stated that K.L. could be paid not to testify.  (*Id.* at 1:56:25–39, 1:57:02–12.)

---

[94] The Parties have included two versions of the video recordings of McQuaid's interview, (*see* JEX 123 (Dkt. No. 758-3); McQuaid Interview Video), and two versions of the recording Lia's interview, (*see* JEX 125 (Dkt. No. 758-5); JEX 343; JEX 344).

[95] Gil watched McQuaid's interview via video feed in another room.  (JEX 15 at 173:3–7 (Dkt. No. 756-15).)  Nagle watched portions of the interview with Gil, but was not present for the entire interview.  (*Id.* at 173:8–25; JEX 18 at 221:7–18.)
Krauss, at Levy's direction, requested Gonzalez come to the PCDAO office and complete a videotaped interview with McQuaid.  (JEX 16 at 235:13–20, 247:17–248:18.)

[96] In citing to the video of McQuaid's interview, the Court uses the timestamp of the recording, not the date and time displayed across the top of the video.

[97] Before Gonzalez informed him that Cianflone had recorded some of her calls with him, McQuaid indicated that he was aware that law enforcement might have recordings of some or all of the calls that contradicted his statements in the interview.  (McQuaid Interview Video at 18:36–40, 39:18–19.)

However, throughout the interview, McQuaid affirmed that he would not have approached Cianflone or K.L. without Plaintiff requesting he contact them.  (*Id.* at 38:46–39:10, 1:43:35–1:44:07, 2:06:37–42, 3:26:58–3:27:07, 3:28:15–21.)  Additionally, McQuaid said the following about his calls with K.L. on June 6 to 8:

> [McQuaid:]  [During the June 6, 2014 call,] I'm under the impression the whole time [K.L.]'s not coming up to testify.  So, I said . . . I have to make a phone call and find out what the exact terms are.  I can't tell you it's not to come testify.  I can't tell you it's to talk . . . I can't tell you nothing 'cause I don't exactly know. . . .  Of course, I text George, you know, won't answer, sporadic. . . .  If he did answer, he answered like at fucking 12:30 at night, right?  That's like how he is. . . .

> [K.L.] starts calling by Saturday morning [June 7, 2014] at like 9:30 in the morning. . . . And I'm like what the fuck . . . I think I told her I did not talk to him yet. . . . So, I don't talk to [K.L.] maybe in the whole day. . . .

> Finally, I talk to George.  He says make sure you specify that it's not paying her not to testify, like the whole thing is bigger than her.  He felt that his client's being targeted and he was curious if people were persuading her on what to say on the street, you know, or something like that . . . .

> [Gonzalez:] . . . So, that . . . call was basically like your directions . . . ?

> [McQuaid:] Right, on what to do. . . .  And I was kind of relieved 'cause it kinda cleared it up. . . .  'Cause I was kinda on a -- like I really don't want to be the one that offers and says, well, you can get paid for not testifying, regardless whether you're coming or not.

(*Id.* at 36:09–38:15; *see also id.* at 39:18–50.)  At various points during the interview, McQuaid reiterated that up until Plaintiff told him on June 7. 2014 what to tell K.L, it was unclear to McQuaid what Plaintiff's objectives were in asking him to approach K.L.  (*Id.* at 2:16:02–31, 2:18:45–2:20:08, 2:32:29–2:33:31.)[98]  However, early in the interview, McQuaid also stated that

---

[98] McQuaid twice stated that Plaintiff's explanations of why he distrusted K.L.'s testimony were not coherent because Plaintiff was "all over the place."  (McQuaid Interview Video at 41:11–41:56; 2:19:19–2:20:08.)

he initially thought that Plaintiff's offer of compensation was for K.L. not to testify, even though Plaintiff never said this to him directly.  (*Id.* at 15:54–16:13.)

During the last 45 minutes of the interview, after Gonzalez had read McQuaid excerpts from the controlled calls, had informed McQuaid that Plaintiff may have provided Lia with heroin, and immediately after a 35-minute break, McQuaid stated and then repeatedly affirmed that when he and Plaintiff initially met, Plaintiff had told McQuaid to offer K.L. money not to testify.  (*Id.* at 3:20:04–58, 3:27:30–59, 3:28:50–59, 3:32:25–3:33:07; 3:36:06–54.)[99]

Lopez conducted Lia's interview, which was videotaped.  (Defs' 56.1 ¶ 682; Pl's Resp. 56.1 ¶ 682.)[100]  For a portion of the interview, Lopez reviewed Lia's statement with her and made extensive use of leading questions to prompt Lia's recollection.  (Pl's 56.1 ¶ 209; Defs' Resp. 56.1 ¶ 209.)

While Lia and McQuaid were being interviewed, CPD obtained "information . . . that [they] may have been compromised as confidential informants" and arrested them after the interviews were completed.  (JEX 447 at 22 (Dkt. No. 751-10).)[101]

---

[99] On May 15, 2015, Ortolano sent a *Brady* disclosure to Plaintiff's attorneys, informing them that during a recent interview, "McQuaid indicated that the subject of paying [K.L.] money not to testify against [Zaimi] originated with [K.L.]'s mother Donna Cianflone."  (JEX 179 at 3.)

[100] Levy has testified in this Action that after reviewing the interview recording, he believed Lia was visibly under the influence of drugs, and a PCDAO ADA came to the same conclusion after reviewing the video in 2015.  (Pl's 56.1 ¶ 207; Defs' Resp. 56.1 ¶ 207.)

[101] According to Gil, CPD determined, while Lia and McQuaid were at CPD, that a call had been placed from McQuaid's mother's phone number to Plaintiff's phone number.  (JEX 14 273:5–25.)  A review of Plaintiff's intercepted communications confirms that Plaintiff received two calls from a number listed in McQuaid's iPhone contacts as belonging to McQuaid's mother. (JEX 267 at 46418, 46420.)  In citing to the calls recorded pursuant to the June 6 Eavesdropping Warrant on Plaintiff's phone, the Court cites the unique reference number provided for each call in the hyperlinked NYSP report included as Joint Exhibit 267 because this report has not been uploaded to the docket.

p.  July 2, 2014 Search Warrants

On July 2, 2014, Gil submitted search warrant applications for Plaintiff's home, office, and van (the "July 2 Search Warrants") to Judge Molea.  (JEX 83–85 (Dkt. Nos. 752-20–22).)  The applications included affidavits signed by Nagle.  (Defs' 56.1 ¶ 705; Pl's Resp. 56.1 ¶ 705.)[102]  Gil also provided Judge Molea with recordings of the controlled calls.  (Defs' 56.1 ¶ 1211; Pl's Resp. 56.1 ¶ 1211.)

The warrants, in relevant part, stated:

You are hereby directed to search and seize (1) cell phone with the number (914)325-1500; (2) [recordings from the surveillance system]; (3) electronic audio recording and storage devices (including, but not limited to a MP3 player [sic]); (4) electronic storage devices (including but not limited to Compact Discs (CDs and DVDs), thumb drives, scan disk memory devices, and computer hard drives); (5) office computer of George Galgano, and Eric Sharp, and laptop computers; (6) transcripts of recorded communications between [McQuaid] and [Cianflone] and [K.L.]; and (7) paper notes relating outlining and describing a conspiracy to bribe, intimidate, and tamper with a witness.

(JEX 83 at 2.)[103]

Nagle's affidavits summarized much of the investigation discussed above.  *See* §§ I.A.5.a–n.  Judge Molea granted the applications on July 2, 2014.  (Defs' 56.1 ¶ 709; Pl's Resp. 56.1 ¶ 709.)

---

[102] When questioned concerning the July 2 Search Warrant for Plaintiff's office, Gil testified that Nagle reviewed the affidavit and that the only change he recalled Nagle making was to the suite number of Plaintiff's office.  (JEX 14 at 289:16–290:7.)

[103] The other two warrants contain different language when describing the computers to be seized but are otherwise materially identical for the purposes of this Opinion.  The warrant for the search of Plaintiff's home states that officers may seize an "office computer and laptop computers[,]"  (JEX 84 at 2), while the warrant for Plaintiff's van authorized seizure of "computers[,]" (JEX 85 at 2).

The warrants for Plaintiff's house and office were executed on July 2, 2014. (JEX 447 at 24–28, 54–58, 61; JEX 457 at 3–8 (Dkt. No. 753-3).)[104]  A CPD officer who had been involved with the investigation since its inception led the search of Plaintiff's home with a team of NYSP officers. (JEX 447 at 54.)[105]  Similarly, a CPD officer who was intimately familiar with the details of the K.L. investigation led the search of Galgano's office with a team of NYSP officers. (*Id.* at 24.)[106]  Plaintiff was at his office at the time of his search, and an officer searched Plaintiff and seized his cell phone. (*Id.* at 26.)[107]  As relevant here, officers searching Plaintiff's home

---

[104] In his deposition, Gil testified that prior to the search warrants being executed, he met with the NYSP and CPD officers who would be executing the search warrants and "briefed them on the scope and breath of the warrant[s] and what the warrant[s] authorized them and allowed them to seize . . .." (JEX 14 at 303:16–304:14.)

Plaintiff's van was seized on July 2, 2014, and the search was executed on July 9, 2014 by the same officer who led the search of Plaintiff's office. (JEX 447 at 25.)  No items were taken from the van during the search, and the van was later returned to Plaintiff. (*Id.*)

[105] As relevant here, the officer had, among other activities in support of the investigation, been present for Cianflone's initial report of McQuaid's attempts to bribe her on April 30, 2014; had assisted in conducting the controlled phone calls between Cianflone and McQuaid on April 30 and May 6, 2014; had travelled to North Carolina and conducted the controlled calls between K.L. at McQuaid from June 6 to June 8, 2014; and had also taken Lia's statement on June 25, 2014. (*See* JEX 447 at 14–15, 23; JEX 124 at 2, 4.)

[106] As relevant here, the officer had been present for Cianflone's initial report of McQuaid's attempts to bribe her on April 30, 2014; had assisted in conducting the controlled phone calls between Cianflone and McQuaid on April 30 and May 5, 2014; had travelled to North Carolina and conducted the controlled calls between K.L. and McQuaid from June 6 to June 8, 2014; and had intercepted McQuaid and Plaintiff's phone calls in May and June of 2014. (JEX 447 at 14, 16, 23; McQuaid Call Intercepts at 7613, 15809.)

[107] Plaintiff has testified in this Action that he is unable to identify precisely the officer who searched him. (JEX 9 at 327:7–20 (Dkt. No. 767-1).)

Gil was present at the search of Plaintiff's office. (Defs' 56.1 ¶ 719; Pl's Resp. 56.1 ¶ 719.)  Gil sent pictures of the search to Krauss. (JEX 375 at 2 (Dkt. No. 755-2).)  Levy and Lopez were not present at either search. (Defs' 56.1 ¶¶ 720–21; Pl's Resp. 56.1 ¶¶ 720–21.)  However, Gil provided regular updates to Levy via text messages throughout the day. (*See generally* JEX 376 (Dkt. No. 755-3).)

seized a number of electronic devices, including an Apple MacBook Pro and an Apple MacBook Air.  (Decl. of Michael A. Miranda, Esq. Ex. D ("Abissi Affirm.") at 12–13 (Dkt. No. 289-4).)[108] While searching Plaintiff's home, officers located a shotgun stored under Plaintiff's bed but did not seize it and also located a receipt for the purchase of the shotgun, which was dated June 2, 2014.  (JEX 447 at 54, 58.)

### 6.  First Grand Jury Presentment and First Indictment

Gil commenced his presentation to the first grand jury (the "First Grand Jury") on August 4, 2014, and the First Grand Jury heard testimony from eleven witnesses.  (Defs' 56.1 ¶¶ 727, 745; Pl's Resp. 56.1 ¶¶ 727, 745.)

On August 6, 2014, Gil called a CPD detective as a witness and asked him about Plaintiff and McQuaid's text messages during early June 2014, including the messages where Plaintiff offered a rent-free apartment to McQuaid while also seeking Lia's Facebook account.  (JEX 259c at 59:4–68:21 (Dkt. No. 744-9).)  Later, Gil asked the detective the following questions:

Q. Now, with this login username and password, what could George Galgano do?

A.  He could log in to [Lia]'s Facebook account, obtain possible contact information, also possibly try to communicate with [K.L.].

Q. If he did, who would [K.L.] on the other end think she is communicating with?

A. By the fact it was her sister [Lia]'s page, that she was communicating with Lia.
. . .

---

Nagle was present at Plaintiff's office and has testified that he was not the officer who searched Plaintiff.  (JEX 19 at 79:20–80:11 (Dkt. No. 756-19).)  The record is unclear as to whether Gonzalez was present.  (*See generally* Pl's 56.1; Defs' 56.1.)

[108] The PCDAO represented to Judge Zuckerman on September 14, 2015, that these two laptop computers were the only devices searched by the PCDAO after Judge Zuckerman authorized the search of Plaintiff's seized devices on May 1, 2015.  (Abissi Affirm. at 23.)  According to discovery produced in this Action, the backup spreadsheet of Plaintiff's text messages was recovered from the MacBook Pro.  (ICDs' Mot. To Strike Ex. A at 1, 14 (Dkt. No. 418-1).)

Q. Intercept reference Number 11909?

A. . . . [T]ext message . . . to . . . McQuaid stating "I won't write anything or fuck with it or let anyone know I'm looking[.]" . . .

Q. Based upon your investigation, what conclusion did you draw about what he's talking about, about what George Galgano is talking about in the communication intercepted in 11909? . . .

A. There is obviously a level of deception at this point.  Also, it became clear to the investigation that he was using that Facebook page to obtain information to interfere with an ongoing criminal investigation and court proceedings in regards to the case involving [K.L.].

[Gil:] Now, at this time, I just want to give you a limited instruction.  Again, this testimony is not being introduced for the purpose of proving that the crimes referred to here; bribery, bribing a witness, witness tampering, witness intimidation and other various crimes that I will ask you to consider at the end did, in fact, happen.  It's simply being offered as background information to explain the nature of that investigation that led to this Grand Jury presentation.  It will be for you the Grand Jury to decide whether any crimes have been committed after hearing all of the evidence presented and being instructed on the law.

(*Id.* at 68:22–69:9; 69:22–71:14.)

On August 12, 2014, Gil questioned Cianflone concerning the controlled calls she made to McQuaid.  (*See generally* JEX 259f.). Specifically, Gil introduced a "partial transcript" of the May 5, 2014 controlled call, that included  "the pertinent parts with respect to the conversation about [K.L.]."  (*Id.* at 72:11–73:3.)  The transcript Gil introduced was the same as the summary of the May 5 controlled call included in Gonzalez's May 14, 2014 affidavit in support of the wiretap on McQuaid's phone.  (*Compare* JEX 279 at 2–3, *with* JEX 73 at 18–19.)  The document had the following title, which Cianflone read into the record: "TRANSCRIPT OF RECORDED TELEPHONE CALL OF MAY 5, 2014, BETWEEN DONNA CIANFLONE AND QUINCY MCQUAID AS REVIWED [sic] BY DONNA CIANFLONE[.]"  (JEX 279 at 2; JEX 259f at 76:3–8.)

Cianflone stated she had confirmed the accuracy of the transcript that morning when she had "used earphones plugged into the computer and listened to the entire [conversation] and read [the transcript] to make sure that everything was accurate" and that because it was difficult to hear McQuaid on the recording she had "[officers] close the air-conditioner and close the door. . . . And I raised the volume all the way and pressed . . . the earplugs, really tight into my ears in order for it to be legible to me." (JEX 259f at 73:23–74:1, 74:7–11.)  Cianflone read the transcript of the call to the Grand Jury.  (*Id.* at 76:3–78:25.)  Gil then introduced a recording of the conversation on CD into evidence and informed the Grand Jurors that "if at any time . . . during your deliberations you want to listen to this, I will provide you with a pair of headphones and you can do the same thing that the witness did." (*Id.* at 80:24–81:3.)  During Cianflone's testimony, Gil played the controlled calls that occurred on April 30, May 5, May 8, and May 19, 2014 for the Grand Jury.  (*Id.* at 71:11–19; 82:17–18; 87:1–2; 90:13–14.)

On August 14, 2014, Gil called McQuaid as a witness and had the following relevant exchanges with him:

Q. On April 30th, you spoke to Donna?

A. Yes.

Q. You said something to the effect of the money is coming from the defendant and his lawyer was a go between?

A. Yes.

Q. Now, in the beginning or at this time when you were talking to Donna, you were telling Donna that it wasn't coming from the lawyer, but you were going through a friend; is that right?

A. Yes.

(JEX 259h at 37:15–38:3 (Dkt. No. 744-14.)

Gil and McQuaid also had the following exchange:

91

Q. The next day on May 1st when you went to his office, what did you do with that recorded call?

A. He listened to it.

Q. Where?

A. At his house.

Q. I am sorry, where is that?

A. At the house.

Q. You went to his house and his office or just his office?

A. It's one or the other.  I think a couple times it was at his house.

Q. I don't know if this refreshes your memory or not, but I know through evidence, [the cell tower data for your phone], that you were in the vicinity of his office at Knollwood Road on May 1st?

A. Okay.

Q. Would you have gone to both locations that day or only one?

A. No, it would just be his office.

Q. When you got to his office, what did you do with the recording device?

A. He listened to it, then he downloaded it.

Q. Who downloaded it?

A. Eric.

Q. What did he download it to?

A. His computer.

Q. Was it George's computer[?]  Eric's computer?

A. I believe it was George's.

Q. Was it on his desk, in his chair?

A. His desk.

(*Id.* at 39:18–41:6.)[109]

Gil also asked McQuaid about his contact with Plaintiff during late May and early June; McQuaid testified that he had met Plaintiff several times and that, as early as May 19, 2014, Plaintiff had begun indicating that it was possible that K.L. could be paid for providing information about the PCDAO, rather than for not testifying.  (*Id.* at 55:21–57:13; 61:18–62:14.) However, McQuaid also testified that the two plans had co-existed for a period and that Plaintiff had indicated on May 26 that he wanted to fly down to North Carolina, meet K.L. and talk with her about the prosecution and ultimately pay her not to testify.  (*Id.* at 66:5–8; 68:2–22.) McQuaid also testified that at a meeting later in May, Plaintiff discussed a plan at some length but that McQuaid did not understand what role he would play in the plan or what Plaintiff's plan was.  (*Id.* at 76:3–12.)

On August 19, 2014, Gil introduced into evidence McQuaid's April 17, 2014 call with Cianflone and played it for the First Grand Jury.  (*See* JEX 259j at 29:16–30:13; 35:4–36:21.) Gil also introduced text messages Plaintiff had sent to McQuaid between March 27, 2014 and May 16, 2014, and had McQuaid read several of those text messages into the record.  (*Id.* at 35:8–14; 50:19–69:2; *see also* JEX 292.)[110]  Specifically, Gil had McQuaid read into the record several text messages Plaintiff sent McQuaid on May 8 through May 12, 2014:

> And the recorded conversations that you had with the mom make it sound like we are threatening them or paying them off.  We can't leave off like that man.

---

[109] It is undisputed that on May 1, 2014, McQuaid's cell phone routed three outgoing calls through a cell tower that also served Plaintiff's office and, thus, that McQuaid was located during that period in the vicinity of Plaintiff's office.  (Defs' 56.1 ¶¶ 351–52; Pl's Resp. 56.1 ¶¶ 351–52.)

[110] A forensic analysis of McQuaid's phone, completed August 13, 2014, included, as relevant here, text messages that McQuaid had received from Plaintiff from March 27, 2014 through June 30, 2014.  (*See generally* JEX 378.)

. . . It might make sense to bring [Lia] Quincy.  I just want to make sure we are all protected here.  I will explain better in person.

Quincy, trust me your comments "good she didn't expose herself" etc. [w]ill be construed as implied threats.  Trust me trust me trust me.  If you listen to y [sic] . . . .

Any chance you can stop by my office tomorrow with [Lia] to hear my plan to clean this shit up?

(JEX 292 at 3–4; JEX 259j at 63:16–68:23.)[111]

The First Grand Jury voted to indict Plaintiff and McQuaid on all counts and Lia on some counts.  (Defs' 56.1 ¶ 787; Pl's Resp. 56.1 ¶ 787.)  On August 20, 2014, Gil signed and filed an indictment (the "First Indictment") against Plaintiff in Putnam County Court.  (JEX 450 at 9 (Dkt. No. 751-12).)[112]  Plaintiff was arraigned on August 21, 2014.  (JEX 33 at 7 (Dkt. No. 742-11).)

### 7.  Dismissal of the First Indictment and the PCDAO's Searches of Plaintiff's Electronic Devices

At some point after his devices were seized, Plaintiff moved in the Zaimi prosecution to prevent the PCDAO from reviewing any of the content stored on his seized devices.  (*See* JEX 33 at 6–7.)  The judge presiding over the Zaimi prosecution granted Plaintiff's request on September 5, 2014.  (JEX 34 at 4, 7 (Dkt. No. 742-13).)  Thereafter, Gil submitted an ex parte motion for issuance of a revised search warrant, which was denied with leave given to refile on notice to the defense.  (JEX 470 at 2 (Dkt. No. 753-15); JEX 185 at 2 (Dkt. No. 760-5).)  On November 29, 2014, Plaintiff moved, as relevant here, to dismiss the indictment, to controvert

---

[111] The Court has quoted the complete messages above at § I.A.5.h *supra*.

[112] On August 8, 2014, Plaintiff filed a Complaint in federal court on Zaimi's behalf against, among others, Levy and the PCDAO seeking $130 million in damages for false arrest. (JEX 357 at 16 (Dkt. No. 747-9).)  Plaintiff never served Levy with the Complaint.  (Levy 56.1 ¶ 46; Pl's Levy Resp. 56.1 ¶ 46.)

the search warrants, and to appoint a special master to review the evidence on his seized devices;

the assigned judge, who was retiring, deferred these motions to Judge David Zuckerman ("Judge

Zuckerman").  (JEX 33 at 3–5, 8; JEX 185 at 2.)[113]  The PCDAO cross-moved for the seized

devices to be unsealed and for an "iron wall" ADA to be appointed to review the evidence.  (JEX

33 at 38 (Dkt. No. 742-12).)

On January 28, 2015, Judge Zuckerman dismissed the indictment against Plaintiff with

leave to replead and declined to rule on Plaintiff's motions controverting the search warrants.

(*Id.* at 38, 44–45.)  Judge Zuckerman held that "the evidence presented, viewed in the light most

favorable to the People, does establish every element of the offenses charged" but that  "the

cumulative effect of numerous evidentiary and other errors which occurred during the Grand

Jury presentment . . . compels the court to dismiss the indictment" pursuant to N.Y. Crim. Proc.

Law § 210.35(5).  (JEX 33 at 13 (Dkt. No. 742-11).)[114]  Judge Zuckerman also granted

---

[113] As part of his reply in support of his motion to dismiss the First Indictment filed on
November 26, 2014, Plaintiff included text messages he had exchanged with McQuaid.  (Defs'
56.1 ¶ 788; Pl's Resp. 56.1 ¶ 788; Abissi Affirm. at 49 (Dkt. No. 289-5).)  The Parties dispute
which text messages Plaintiff included.  Defendants assert that Plaintiff included "a series of text
messages he had exchanged with Quincy McQuaid regarding McQuaid's conversations with
Cianflone."  (Defs' 56.1 ¶ 788.)  Plaintiff asserts that he included "all of the text messages that
he had exchanged with Quincy McQuaid between February 24, 2012 and June 22, 2014.  (Pl's
Resp. 56.1 ¶ 788.)

[114] Judge Zuckerman also noted that it is "a rare exception when a court must dismiss an
indictment due to errors which occur during Grand Jury presentment [under N.Y. Crim. Proc.
Law  § 210.35(5)].  This, however, is one such rare case."  (JEX 33 at 10.)
Judge Zuckerman's opinion also dismissed the case "due to a lack of corroboration for
the accomplice testimony [of the crimes charged.]"  (*Id.* at 13.)  However, Judge Zuckerman's
analysis of this issue does not directly reference Plaintiff and appears instead to address the case
against an associate of Plaintiff's—Eric Sharp—who was also charged by the PCDAO with
involvement in the scheme.  (*Id.* at 13–20.)  On only one occasion is Plaintiff named, and in that
instance, he is named in connection with Sharp.  (*Id.* at 15.)  Thus, the Court concludes that the
lack of corroboration evidence was not a basis upon which Judge Zuckerman dismissed the
indictment against Plaintiff but rather a basis for dismissing Plaintiff's associate.

Plaintiff's request to appoint a special master to access and review the content stored on Plaintiff's devices.  (JEX 33 at 45–46 (Dkt. No. 742-12).)

At a hearing concerning the electronic evidence on February 20, 2015, Gil stated on the record that "we seized [Plaintiff's devices], [but] we don't know what's on them yet.  It could be anything from witness bribery to anything alluding to the drugs that Mr. Galgano was found in possession with.  We have no idea."  (JEX 466 at 4–5 (Dkt. No. 753-12).)[115]  Gil also stated:

> [W]e don't want to waive any right that should the Court deem that those warrants should be controverted or that those warrants should be deemed as seizure warrants and not search warrants, however the Court may find we at that time would . . . be able to take the proper remedy whether it's seeking a new warrant or amended warrant that would satisfy the Court at that time. . . .  We do stand by those warrants.  We submitted motion papers on those warrants indicating the evidence that we had in our possession at that time.  Justice Molea signed those warrants based upon the evidence presented and affidavits presented[,] and we believe those warrants do satisfy the constitutional requirements and that the records should reflect that since those warrants were executed on July 2 of 2014, the defendant Mr. Galgano has taken every step from then until now to prevent us from looking into the substance of the items seized.

(*Id.* at 5–6.)  On February 23, 2015, Judge Zuckerman vacated his January 28 order appointing the special master.  (JEX 34 at 6.)

After the PCDAO made a renewed motion to appoint a special master or, in the alternative, to allow PCADO direct access to the seized materials, Judge Zuckerman ordered on May 1, 2015 that "any prior order sealing the recovered materials be and hereby is vacated for the limited purpose of allowing the [PCDAO] access thereto."  (JEX 461 at 11.)  Judge Zuckerman noted that, despite Plaintiff's concerns about the PCDAO gaining access to privileged materials:

> [T]he court is well aware that law enforcement authorities regularly seize, by search warrant or otherwise, materials which may arguably contain privileged or otherwise inadmissible information.  On those occasions, law enforcement authorities may

---

[115] Ortolano was also present at this hearing.  (Defs' 56.1 ¶ 832; Pl's Resp. 56.1 ¶ 832.)

> nevertheless access the materials but are required to abide by rules applicable to
> such review. There is no reason to believe that, nor have [Galgano or Sharp]
> delineated any reason why, the prosecutor in the instant case could not and would
> not abide by such rules . In addition, the court has not been persuaded that the
> instant case is so unique that this court must involve itself in the [PCDAO]'s
> investigation and possible prosecution of alleged criminal conduct. Moreover, in
> the event that law enforcement authorities act improperly, Defendants have
> remedies – at the very least in the nature of suppression . . . . In sum, there is no
> need for this court to prophylactically intervene in the process whereby law
> enforcement authorities acquire and review information in their possession.

(*Id.* at 10–11.) Judge Zuckerman also specifically noted that because there was not an

indictment before the court, "[t]he propriety and constitutionality of the issuance and execution

of the search warrants is not ripe for determination." (*Id.* at 10.)[116]

On May 4, 2015, Gil sent a copy of Judge Zuckerman's order to Levy and Ortolano.

(Defs' 56.1 ¶ 843; Pl's Resp. 56.1 ¶ 843.) In the ensuing email exchange, Ortolano stated, "[b]e

advised[] that the original search warrant did not specifically authorize the testing of the seized

items. . . . Therefore, we might have issues to face if the search of the items yields inculpatory

evidence (in addition to those already noted in my [May 1] memo)[.]" (JEX 470 at 2.) She

stated on May 5 in response to subsequent messages: "[A]s to the issues regarding the search

warrant. At this point the warrant is what it is. I feel that Judge Zuckerman's decision taken

together with [Gil's] order to show cause gives us a legitimate argument that we are permitted to

analyze the evidence." (JEX 184 at 2 (Dkt. No. 760-4).)

Krauss, who had been added to the emails being exchanged, also gave her opinion on

May 5, stating:

> I am concerned that it will be difficult to argue down the line that our warrants were
> sufficient to go into the items when we sought to refile to address that very concern.

---

[116] Plaintiff appealed Judge Zuckerman's order, and the Second Department affirmed in
*Galgano v. Levy*, 15 N.Y.S.3d 895, 896 (App. Div. 2015). In its decision, the Second
Department declined to "express any view regarding the legality of the . . . search warrants." *Id.*
at 896.

When I expressed this concern yesterday to [Ortolano] and [Gil][,] they . . . expressed concerns not only about the probable cause language that would go into a new warrant application but the time delay that a new application on notice to defense would cause.  They are concerned this would prevent us from getting into the items past our time period to re[-]present.  [Gil] feels strongly that the language in the original warrant as to the ability to search the items was sufficient but sought to file additional applications just to be safe.

(JEX 185 at 2.)  In response to Krauss's email, Ortolano reiterated that "I feel we have the authority and the right to search the items."  (*Id.*)

At some time after May 1, Gil and another ADA coordinated with the NYSP to search Plaintiff's phone and laptop computers.  (Pl's 56.1 ¶ 374; Defs' Resp. 56.1 ¶ 374.)[117]  After Gil provided the NYSP with search terms, they provided the PCDAO a CD that included, among other items, an excel spreadsheet with Plaintiff's text messages (the "Galgano Spreadsheet"), which dated back to 2011.  (Pl's 56.1 ¶ 375; Defs' Resp. 56.1 ¶ 375.)[118]

After Levy left office, he took a copy of the Galgano case file, including the Galgano Spreadsheet, with him.  (Pl's 56.1 ¶ 376; Defs' Resp. 56.1 ¶ 376.)  Gil also took a copy of the Galgano case file with him when he resigned from PCDAO.  (Pl's 56.1 ¶ 378; Defs' Resp. 56.1 ¶ 378.)

### 8.  Second Grand Jury Presentment and Second Indictment

Within a few weeks after Judge Zuckerman's dismissal of the First Indictment on January 28, 2015, Levy directed Ortolano to review the available evidence and determine if the PCDAO

---

[117] On May 8, 2015, the NYSP made copies of the data from Plaintiff's seized MacBook Pro and MacBook Air.  (Def's 56.1 ¶ 848; Pl's Resp. 56.1 ¶ 848.)  On August 4, 2015, the NYSP completed their extraction of Plaintiff's iPhone.  (JEX 237 at 2 (Dkt. No. 764-10).)

[118] As noted in note 108 *supra*, the Galgano Spreadsheet was recovered from the MacBook Pro seized from Plaintiff's office on July 2, 2014.

should re-present the case to a second grand jury.  (JEX 22 at 43:10–47:6.)[119]  During the next several months, Ortolano had "check-in" meetings with Levy concerning her review.  (Pl's 56.1 ¶ 321; Defs' Resp. 56.1 ¶ 321.)  On May 6, 2015, Ortolano sent Gil and Levy, among others, a detailed timeline of events that occurred from January 29, 2014 to June 30, 2014 that she had drafted during her review of the evidence.  (Pl's 56.1 ¶¶ 320, 326; Defs' Resp. 56.1 ¶¶ 320, 326; see also JEX 66 at 2.)[120]

At some point after March 17, 2015, the Westchester County District Attorney's Office ("WCDAO") contacted Ortolano and asked that a supervising ADA provide confirmation that the PCDAO stood behind the July 2 Search Warrant for Plaintiff's office.  (Defs' 56.1 ¶ 834; Pl's Resp. 56.1 ¶ 834.)  Ortolano informed Levy of this request, and Levy responded that Ortolano could provide an opinion to the WCDAO.  (Id.)

On May 1, 2015, Ortolano submitted a draft memorandum to Levy, in which she assessed the July 2 Search Warrant for Plaintiff's office and related evidence in response to the WCDAO's request.  (See JEX 487 (Dkt. No. 753-28).)  Ortolano's memorandum outlined what she determined to be misrepresentations in Nagle's affidavit in support of the July 2 Search Warrant based on her independent review of the calls from Cianflone and K.L. to McQuaid and the other available evidence described above.  (See JEX 487 at 3–8.)  On May 4, 2015, Ortolano

---

[119] Levy testified in this Action that he believed Judge Zuckerman's decision was incorrect after reviewing it and that the case should likely be re-presented, but that he "wanted another set of eyes . . . going over all the evidence in our possession so that we could included additional corroboration . . . ."  (JEX 13 at 203:11–204:14 (Dkt. No. 756-13).)

[120] Ortolano also began preparing a memorandum assessing whether there was sufficient evidence to re-present the case, but this memorandum was not sent to any of the Defendants before Ortolano resigned.  (Pl's 56.1 ¶ 329; Defs' Resp. 56.1 ¶ 329.)

sent the final version of the memorandum to Levy, Gil, and Krauss with only minor changes. (JEX 175 at 2 (Dkt. No. 759-18).)[121]

On May 12, 2015, Levy, Gil, and Ortolano had a meeting, which Ortolano secretly recorded.  (Defs' 56.1 ¶¶ 850–51; Pl's Resp. 56.1 ¶¶ 850–51.)[122]  During the meeting, Levy repeatedly stated that he disagreed with Ortolano's conclusion that there were misrepresentations in Nagle's affidavit in support of the July 2 Search Warrant for Plaintiff's office and directed her to review the available evidence again.  (JEX 174 at 3:24–4:3, 4:7–5:7, 6:15–7:14, 34:13–20, 37:10–13, 38:11–24 (Dkt. No. 759-17).)  Levy also said that after he received Ortolano's memorandum, he had personally reviewed the available evidence and that, based on that review, he intended to re-present the case to a second grand jury.  (Defs' 56.1 ¶¶ 854–55; Pl's Resp. 56.1 ¶¶ 854–55.)  Ortolano emphasized that she determined there were misrepresentations in Nagle's affidavit because she listened to the calls referenced in it and did not hear words that were included in the affidavit.  (JEX 174 at 5:8–6:11, 35:5–14.)  Ortolano also stated that she saw significant problems with the available evidence, particularly McQuaid and Lia's changing testimony.  (*Id.* at 8:14–11:1, 25:9–27:24.)  Gil stated that, while he had told Ortolano about doubts he had about the case, he believed Plaintiff was at least involved with tampering with

---

[121] On May 8, 2015, Ortolano sent Levy a follow-up email: "It has come to my attention that you believe that my memo indicates that there was no probable cause for the warrant.  That was NOT the intent of the memo.  My intention was to point out my main objections to the warrant that would prohibit me from 'standing behind' the warrant [to the WCDAO.]  I have many objections to how it was drafted and worded that don't prohibit me from standing behind it but I have always felt that based on what we knew we had probable cause for the warrant.  I just have an objection to what I perceive to be misrepresentations in the affidavit."  (JEX 175 at 2.)

[122] The Parties have provided a copy of the recording.  (*See* JEX 173 (Dkt. No. 759-16).) The Parties have also provided a transcript of the recording, which the Court will cite as there is no dispute as to the transcript's accuracy.  (JEX 174 (Dkt. No. 759-17).)

K.L. and that there was evidence that Plaintiff was involved with attempting to bribe her as well. (*Id*. at 17:18–18:18, 20:17–19, 21:5–22:1, 22:10–23:17, 23:19–24:23.)

After this meeting, Levy asked another ADA to review all of the evidence and provide a memorandum assessing the available evidence against Plaintiff. (JEX 12 at 32:3–12 (Dkt. No. 756-12).) The ADA provided a draft of the memorandum to Levy on May 17, 2015, (JEX 488 at 2 (Dkt. No. 753-29)), and a second draft that incorporated Levy's feedback on May 19, 2015, (JEX 489 at 2 (Dkt. No. 753-30)). The ADA provided a final version of the memorandum on June 2, 2015. (JEX 182 at 2 (Dkt. No. 760-2).) Ultimately, Levy concluded that the case should be re-presented. (JEX 13 at 205:23–206:10.)[123]

On June 29, 2015, Levy, Abissi, and Gil began presenting evidence to another grand jury (the "Second Grand Jury"). (Defs' 56.1 ¶ 874; Pl's Resp. 56.1 ¶ 874.)[124] The Second Grand Jury was provided with fifty-nine exhibits and heard testimony from twelve witnesses. (Defs' 56.1 ¶¶ 875–76; Pl's Resp. 56.1 ¶¶ 875–76.) The Second Grand Jury voted to indict Plaintiff on all counts. (Defs' 56.1 ¶ 907; Pl's Resp. 56.1 ¶ 907.) On August 14, 2015, Gil signed and filed a second indictment against Plaintiff (the "Second Indictment"). (JEX 460 at 7 (Dkt. No. 753-6).) Judge Zuckerman dismissed the Second Indictment on October 26, 2015. (*See generally* JEX 36 (Dkt. No. 742-19).)

B.  Procedural History

The Court has recounted the procedural history of this Action in its previous Opinions. *See Galgano v. County of Putnam ("Galgano I")*, No. 16-CV-3572, 2018 WL 4757968, at *16

---

[123] The Parties do not dispute that Levy made the decision to re-present the case. (Pl's 56.1 ¶ 348; Defs' Resp. 56.1 ¶ 348.)

[124] At some point prior to leaving office, Levy listened to all of the controlled calls at least once. (JEX 12 at 151:2–153:7.)

(S.D.N.Y. Sept. 28, 2018), *opinion vacated in part on other grounds on reconsideration*, 2019 WL 2235891 (S.D.N.Y. May 16, 2019); *Galgano v. County of Putnam ("Galgano II")*, No. 16-CV-3572, 2020 WL 3618512, at *4 (S.D.N.Y. July 2, 2020).  Thus, the Court will recount the subsequent history of this case only as relevant to the instant Motions.

On February 24, 2021, Plaintiff filed his Motion To Dismiss Levy's counterclaims.  (Not. of Mot. (Dkt. No. 503); Pl's Mem. of Law in Supp. of Mot. To Dismiss Levy's Counterclaims (Dkt. No. 504).)  On March 10, 2021, Levy filed his response.  (Levy's Mem. of Law in Opp'n to Pl's Mot. To Dismiss Levy's Counterclaims (Dkt. No. 510).)  On March 17, 2021, Plaintiff filed his Reply.  (Pl's MTD Reply (Dkt. No. 514).)

On November 16, 2021, the Court set a briefing schedule for the Parties' Motions for Summary Judgment.  (*See* Dkt. (minute entry for Nov. 17, 2021); *see also* Order (Dkt. No. 670).)  On December 29, 2021, the Parties requested that the Court allow them to file a Joint Exhibit List and that they be allowed to bundle all memoranda of law and accompanying papers for submission on the reply date.  (*See* Letter from Lewis R. Silverman, Esq. to Court (Dec. 29, 2021) (Dkt. No. 689).)  The Court granted these requests the next day.  (*See* Dkt. No. 690.)  On January 3, 2022, Nagle, the ICDs, and the County agreed to a stipulation withdrawing Nagle's crossclaim against the ICDs and the County.  (*See* Stip. (Dkt. No. 692).)

After the Court granted two extensions (*see* Dkt. Nos. 690, 696), the Court set the filing deadline as June 3, 2022, (*see* Order (Dkt. No. 708)).  On June 2, 2022, Plaintiff filed his Motion for Partial Summary Judgment and accompanying papers.  (Not. of Mot. (Dkt. No. 710); Pl's Mem. of Law in Supp. of Partial Summ. J. ("Pl's Mem") (Dkt. No. 711); Pl's 56.1.)  The Defendants filed their opposition briefs and accompanying papers that day as well.  (Defs' Resp. 56.1; Levy's 56.1; ICDs' Mem. of Law in Opp'n to Pl's Mot. for Partial Summ. J. ("ICDs'

Opp'n") (Dkt. No. 718); County's Mem. of Law in Opp'n to Pl's Mot. for Partial Summ. J.

("County's Opp'n") (Dkt. No. 720); Nagle's Mem. of Law in Opp'n to Pl's Mot. for Partial

Summ. J. ("Nagle's Opp'n") (Dkt. No. 722); Levy's Mem. of Law in Opp'n to Pl's Mot. for

Partial Summ. J. ("Levy's Opp'n") (Dkt. No. 723).)  Plaintiff also filed his Replies.  (Pl's Levy

Resp. 56.1; Pl's Reply (Dkt. No. 733); Pl's Levy Reply (Dkt. No. 734).)

Defendants also filed their Motions for Summary Judgment and accompanying papers on

June 2, 2022.  (ICDs' Not. of Mot.; ICDs' Mem. of Law in Supp. of Summ. J. ("ICDs' Mem")

(Dkt. No. 714); County's Not. of Mot.; County's Mem. of Law in Supp. of Summ. J. ("County's

Mem") (Dkt. No. 730); Nagle's Not. of Mot.; Nagle's Mem. of Law in Supp. of Summ. J.

("Nagle's Mem") (Dkt. No. 732); Defs' 56.1.)  Plaintiff filed his opposition.  (Pl's Resp. 56.1;

Pl's Mem. of Law in Opp'n to Defs' Mots. for Summ. J. ("Pl's Opp'n") (Dkt. No. 716).)

Defendants filed their Replies.  (ICDs' Reply (Dkt. No. 719); County's Reply (Dkt. No. 735);

Nagle's Reply (Dkt. No. 737).)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (same); *Truitt v.

Salisbury Bank & Tr. Co.*, 52 F.4th 80, 85 (2d Cir. 2022) (same); *Cambridge Funding Source

LLC v. Emco Oilfield Servs. LLC*, No. 22-CV-10741, 2023 WL 7405862, at *4 (S.D.N.Y. Nov.

9, 2023) (same).  "In deciding whether to award summary judgment, the court must construe the

record evidence in the light most favorable to the non-moving party and draw all reasonable

inferences in its favor."  *Torcivia v. Suffolk County*, 17 F.4th 342, 354 (2d Cir. 2021); *see also

Horror Inc. v. Miller*, 15 F.4th 232, 240 (2d Cir. 2021) (same).  "The movant 'bears the initial

burden of showing that there is no genuine dispute as to a material fact.'"  *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (quoting *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018)); *see also LaFontant v. Mid-Hudson Forensic Psychiatric Ctr.*, No. 18-CV-23, 2023 WL 6610764, at *7 (S.D.N.Y. Oct. 10, 2023) (same); *Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same).

"However, when the burden of proof at trial would fall on the non[-]moving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim," in which case "the non[-]moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration adopted) (internal quotation marks and citation omitted); *see also U.S. Bank Nat'l Ass'n as Tr. for Reg. Holders of J.P. Morgan Chase Com. Mortg. Sec. Corp., Multifamily Mortg. Pass-Through Certificates, Series 2017-SB42 v. 160 Palisades Realty Partners LLC*, No. 20-CV-8089, 2022 WL 743928, at *3 (S.D.N.Y. Mar. 10, 2022) (same). Further, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a 'metaphysical' possibility that h[er] allegations were correct; [s]he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)); *see also Jennifer Fung-Schwartz, D.P.M, LLC v. Cerner Corp.*, No. 17-CV-233, 2023 WL 6646385, at *3 (S.D.N.Y. Oct. 12, 2023) (same), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (internal quotation marks and citation omitted); *see also Kollias v. Univ. of Rochester*, No. 18-CV-6566, 2023 WL

5608868, at *4 (W.D.N.Y. Aug. 30, 2023) ("When a motion for summary judgment is properly

supported by documents or other evidentiary materials, the party opposing summary judgment

may not merely rest on the allegations or denials of his pleading." (quoting *Wright v. Goord*, 554

F.3d 255, 266 (2d Cir. 2009))).

     "On a motion for summary judgment, a fact is material if it might affect the outcome of

the suit under the governing law." *Seward v. Antonini*, No. 20-CV-9251, 2023 WL 6387180, at

*12 (S.D.N.Y. Sept. 29, 2023) (quoting *Royal Crown Day Care LLC v. Dep't of Health &*

*Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014)).  "At this stage, 'the role of the court is not to

resolve disputed issues of fact but to assess whether there are any factual issues to be tried.'"

*U.S. Sec. & Exch. Comm'n v. Amah*, No. 21-CV-6694, 2023 WL 6386956, at *8 (S.D.N.Y. Sept.

28, 2023) (alteration adopted) (quoting *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011)).

Therefore, "a court's goal should be 'to isolate and dispose of factually unsupported claims.'"

*Sullivan v. Nat'l Express LLC*, No. 21-CV-5789, 2023 WL 6279255, at *8 (S.D.N.Y. Sept. 26,

2023) (quoting *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir.

2004)).

     When ruling on a motion for summary judgment, a district court should "consider only

evidence that would be admissible at trial." *Latimer v. Annucci*, No. 21-CV-1275, 2023 WL

6795495, at *3 (S.D.N.Y. Oct. 13, 2023) (citing *Nora Beverages, Inc. v. Perrier Grp. of Am.,*

*Inc.,* 164 F.3d 736, 746 (2d Cir. 1998)).  "[W]here a party relies on affidavits or deposition

testimony to establish facts, the statements must be made on personal knowledge, set out facts

that would be admissible in evidence, and show that the affiant or declarant is competent to

testify on the matters stated." *Mozzochi v. Town of Glastonbury*, No. 21-CV-1159, 2023 WL

3303947, at *3 (D. Conn. May 8, 2023) (quoting *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir.

2012) (itself quoting Fed. R. Civ. P.56(c)(4))); *see also E. Fishkill Fire Dist. v. Ferrara Fire Apparatus, Inc.*, No. 20-CV-576, 2023 WL 6386821, at *11 (S.D.N.Y. Sept. 28, 2023) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ." (internal citation omitted)); *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (internal citation omitted)).

"Where, as here, cross motions for summary judgment are filed, [courts] 'evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010) (quoting *Hotel Emps. & Rest. Emps. Union v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002)); *see also Dish Network Corp. v. Ace Am. Ins. Co.*, 21 F.4th 207, 212 (2d Cir. 2021) ("When both parties have moved for summary judgment, 'the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" (quoting *Coutard v. Mun. Credit Union*, 848 F.3d 102, 114 (2d Cir. 2017))); *Est. of Smith v. Cash Money Recs., Inc.*, No. 14-CV-2703, 2018 WL 2224993, at *3 (S.D.N.Y. May 15, 2018) ("On dueling motions for summary judgment, the court must evaluate each party's motion on its merits and determine whether either is entitled to judgment as a matter of law." (citing *Coutard*, 848 F.3d at 114)).

B.  Analysis

As noted above, the Parties have entered cross-Motions for Summary Judgment.  Plaintiff argues that he is entitled to summary judgment on his claim that the June 6 Eavesdropping

Warrant and July 2 Search Warrants were defective, that the resulting searches of Plaintiff's electronics and of his person were unconstitutional, and that his electronic devices should be returned to him.  (Pl's Mem 21–40.)  Plaintiff also argues that summary judgment should be granted on his *Monell* claim against the County because Levy was acting as a final policymaker in directing that the warrants be filed and executed.  (*Id.* at 40.)  Finally, Plaintiff argues that he should be granted summary judgment on Levy's counterclaims.  (*Id.* at 40–41.)

Defendants have each moved for Summary Judgment on Plaintiff's claims.  (*See generally* ICDs' Mem; County's Mem; Nagle's Mem.)  In the interests of judicial economy and given the strenuous advocacy engaged in by all Parties, the Court considers all arguments only once, even if raised by multiple Parties in their briefs.

### 1. Absolute Immunity

Although the Court has previously ruled on the extent to which Levy and Gil are entitled to absolute immunity on two prior occasions during the pendency of this litigation, *see Galgano I*, 2018 WL 4757968, at *23–27; *Galgano II*, 2020 WL 3618512, at *7–8, the ICDs now essentially request reconsideration based on the complete record.  The ICDs assert that Levy and Gil are entitled to prosecutorial immunity for drafting and submitting the eavesdropping and search warrant applications because state law required that they sign and submit them and that, as a result, they were not acting as complaining witnesses.  (ICDs' Mem 26–30; ICDs' Opp'n 32–33.)  Plaintiff objects that Levy and Gil cannot be absolutely immune because their activities were clearly investigative in nature.  (Pl's Opp'n 40–46; Pl's Reply 31.)

The Court has previously held that Levy and Gil were protected by absolute immunity for their "evaluation of the evidence and subsequent decision[s] to indict Plaintiff [and for any] misconduct during the grand jury proceedings."  *Galgano I*, 2018 WL 4757968, at *26.  The

107

Court also held that Levy and Gil "are not entitled to prosecutorial immunity for [submitting] . . . affidavits and applications in support of the warrants." *Id.*

It is well-established that "prosecutors are entitled to absolute immunity for that conduct 'intimately associated with the judicial phase of the criminal process.'" *Hill v. City of New York*, 45 F.3d 653, 660–61 (2d Cir. 1995) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). However, not every action performed by a prosecutor is "absolutely immune merely because [it was] performed by a prosecutor." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). Rather, a prosecutor's entitlement to absolute immunity turns on "the capacity in which the prosecutor acts at the time of the alleged misconduct." *Zahrey v. Coffey*, 221 F.3d 342, 346 (2d Cir. 2000). Thus, to determine whether a prosecutor's conduct is entitled to absolute immunity, courts must take "a functional approach, which looks to the nature of the function performed [by the prosecutor]." *Buckley*, 509 U.S. at 269 (citation and internal quotation marks omitted); *see also Van de Kamp v. Goldstein*, 555 U.S. 335, 342 (2009) ("To decide whether absolute immunity attaches to a particular kind of prosecutorial activity, one must take account of [] 'functional' considerations . . . ."). Notably, "the initiation and pursuit of a criminal prosecution are quintessential prosecutorial functions." *Shmueli v. City of New York*, 424 F.3d 231, 237 (2d Cir. 2005) (citing *Imbler*, 424 U.S. at 430).

Generally, whether a prosecutor "may be sheltered by absolute immunity from liability for [his conduct] turns on whether or not [his conduct] occurred in the course of his role as an advocate." *Hill*, 45 F.3d at 662. This protection covers such acts as "initiating a prosecution and presenting the case at trial" or at other court proceedings, *id.* at 661; *see also Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998) ("A prosecutor enjoys absolute immunity for acts taken in initiating a prosecution and in presenting the [s]tate's case, whether at a trial, a preliminary

108

hearing, or a bail hearing." (citations and internal quotation marks omitted)), as well as "the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made[,]" *Buckley*, 509 U.S. at 273; *see also Hill*, 45 F.3d at 661 (noting that prosecutors are "immune for conduct in preparing for [prosecutorial] functions," including "evaluating and organizing evidence for presentation at trial or to a grand jury, or determining which offenses are to be charged" (citations omitted)).  Absolute immunity also protects "the knowing presentation of perjured testimony to a grand jury, without any prosecutorial involvement in its earlier inducement." *Bernard v. County of Suffolk*, 356 F.3d 495, 506 (2d Cir. 2004).  Furthermore, it is well established that a prosecutor's motives for actions that are deemed to be within his or her role as an advocate are irrelevant to the granting of absolute immunity.  *See Shmueli*, 424 F.3d at 237–38 (holding that absolute immunity is "not affected by allegations that improperly motivated prosecutions were commenced or continued pursuant to a conspiracy"); *Bernard*, 356 F.3d at 503 (holding that "once a court determines that challenged conduct involves a function covered by absolute immunity, the actor is shielded from liability for damages regardless of the wrongfulness of his motive or the degree of injury caused"); *Pinaud v. County of Suffolk*, 52 F.3d 1139, 1148 (2d Cir. 1995) ("[W]hen the underlying activity at issue is covered by absolute immunity, the plaintiff derives no benefit from alleging a conspiracy." (internal quotation marks omitted)).

In contrast, "[w]hen a [prosecutor] functions outside his . . . role as an advocate for the People, the shield of [absolute] immunity is absent." *Hill*, 45 F.3d at 661.  Specifically, "[w]hen a prosecutor performs the investigative functions normally performed by a detective or police officer, it is neither appropriate nor justifiable that, for the same act, immunity should protect the

one and not the other." *Buckley*, 509 U.S. at 273 (internal quotation marks omitted); *see also*

*Smith*, 147 F.3d at 94 ("[W]hen a prosecutor . . . performs the investigative functions normally

performed by a detective or police officer, he is eligible only for qualified immunity." (internal

quotation marks omitted)).

Although the line between a prosecutor's acts as an advocate and as an investigator is

often "difficult to draw," *Zahrey*, 221 F.3d at 347, "[t]he key . . . is the degree to which the

specific conduct at issue is 'intimately associated with the judicial phase of the criminal

process,'" *DiBlasio v. Novello*, 344 F.3d 292, 300 (2d Cir. 2003) (quoting *Imbler*, 424 U.S. at

430). In assessing how closely connected a prosecutor's conduct is to the judicial phase of the

criminal process, the timing of the conduct is relevant, but not dispositive. *See id.* at 300–01; *see*

*also Genzler v. Longanbach*, 410 F.3d 630, 639 (9th Cir. 2005) ("The timing of evidence

gathering is a relevant fact in determining how closely connected that conduct is to the official's

core advocacy function in the judicial process . . . ."). For example, the Supreme Court has

observed that absolute immunity is unavailable for investigative conduct that takes place before

probable cause has been established: "[a] prosecutor neither is, nor should consider himself to be,

an advocate before he has probable cause to have anyone arrested." *Buckley*, 509 U.S. at 274;

*see also Zahrey*, 221 F.3d at 347 n.2 (explaining that *Buckley* "suggests that a prosecutor's

conduct prior to the establishment of probable cause should be considered investigative"). The

converse is not necessarily true, however. "[A] determination of probable cause does not

guarantee a prosecutor absolute immunity from liability for all actions taken afterwards."

*Buckley*, 509 U.S. at 274 n.5. The Second Circuit has distinguished between "preparing for the

presentation of an existing case," on the one hand, and attempting to "furnish evidence on which

a prosecution could be based," on the other—making clear that only the former entitles a

110

prosecutor to absolute immunity. *Smith*, 147 F.3d at 94; *see also Giraldo v. Kessler*, 694 F.3d 161, 166 (2d Cir. 2012) ("[I]nvestigative acts that are entitled to only qualified immunity are those undertaken in the phase of law enforcement that involves the gathering and piecing together of evidence for indications of criminal activities and determination of the perpetrators."). Notably, the mere fact that a prosecutor might later convene a grand jury and obtain an indictment does not serve to cloak his or her prior investigatory actions with the protection of absolute immunity. *Buckley*, 509 U.S. at 275–76 ("That the prosecutors later called a grand jury to consider the evidence this work produced does not retroactively transform that work from the administrative into the prosecutorial.").

The Supreme Court has held that a "prosecutor's appearance in court in support of an application for a search warrant and the presentation of evidence at that hearing [are] protected by absolute immunity." *Kalina v. Fletcher*, 522 U.S. 118, 125–26 (1997); *see also Van de Kamp*, 555 U.S. at 343 (reaffirming that prosecutorial immunity applies "when a prosecutor . . . appears in court to present evidence in support of a search warrant application" (citation omitted)). However, where the prosecutor acts as a complaining witness in support of a warrant, that conduct is not protected by prosecutorial immunity. *See Van de Kamp*, 555 U.S. at 343 (noting "that absolute immunity does not apply . . . when a prosecutor acts as a complaining witness in support of a warrant application" (citations omitted)).

The ICDs argue that the Court should grant them absolute immunity because the undisputed record establishes that they were acting as advocates, rather than complaining witnesses, when they sought the search warrants. (ICDs' Mem 26–30.) The Court finds the ICDs' claims meritless.

As an initial matter, the Court agrees with the ICDs that the record is now clear that Levy and Gil were not acting as "complaining witnesses" when they submitted the applications.  As the ICDs correctly point out, New York law requires that trap and trace, pen register, and eavesdropping warrant applications be submitted by an Assistant District Attorney or a District Attorney.  *See* N.Y. Crim. Proc. Law §§ 700.05, 700.10, 705.00, 705.05.  The ICDs rely on a non-precedential Second Circuit decision, *Lawlor v. Connelly*, 471 F. App'x 64 (2d Cir. 2012) (summary order), to claim that since Levy and Gil were legally required to submit the applications, they must have been engaging in advocacy instead of investigating and thus be protected by absolute immunity.  (ICDs' Mem 27–28.)  However, *Lawlor*, besides not being binding upon this Court, does not compel that conclusion because while the case did analyze whether a prosecutor was entitled to absolute immunity for submitting an application for convening an investigatory grand jury as required by a Connecticut statute, the panel found that absolute immunity applied because an investigatory grand jury was a unique creature of Connecticut law that the Second Circuit had previously held was the equivalent of a traditional grand jury for immunity purposes.  *Lawlor*, 461 F. App'x at 65–66.[125]  Thus, *Lawlor* provides no authority to find that Levy and Gil were engaging in advocacy when seeking the eavesdropping and search warrants prior to convening a grand jury.

The record demonstrates that, at the time the warrants were being sought, PCDAO personnel understood that the warrants were needed to determine whether Plaintiff was involved

---

[125] The other cases the ICDs cite are similarly inapposite because they deal with material witness orders, which "may issue only when a prosecution is ready for trial."  *Flagler v. Trainor*, 663 F.3d 543, 548 (2d Cir. 2011); *see also Simon v. City of New York*, No. 09-CV-1302, 2011 WL 317975, at *9 (E.D.N.Y. Jan. 3, 2011) (noting that "a material witness order can only be issued after a criminal proceeding has begun"), *report and recommendation adopted*, 2011 WL 344757 (E.D.N.Y. Feb. 1, 2011).

in McQuaid's offers to bribe K.L.  For example, on May 6, 2014, Pascale texted Levy that the controlled call between McQuaid and Cianflone "[w]ent well.  [McQuaid] answered.  Nothing earth shattering [but] buggy enough for a wire." (JEX 412 at 2.)  After Levy texted that he would like to hear the May 5 and 6 calls, Pascale commented "[w]e really need . . . the substance of the texts [between Galgano and McQuaid]."  (*Id.*)  Similarly, in the May 14, 2014 application for an eavesdropping warrant on McQuaid's phone, Levy specifically represented that "[t]hough probable cause exists to arrest and prosecute Mc[Q]uaid, we do not have sufficient evidence to arrest and prosecute his co-conspirators."  (JEX 73 at 7.)

Based on these statements, the Court holds Levy and Gil are not entitled to absolute immunity for the applications for the June 6 Eavesdropping Warrant or the July 2 Search Warrants because the applications were clearly "undertaken in the phase of law enforcement that involves the gathering and piecing together of evidence for indications of criminal activities and determination of the perpetrators."  *Giraldo*, 694 F.3d at 166; *see also Smith*, 147 F.3d at 94 (explaining that absolute immunity is not available where the prosecutor acted to "furnish evidence on which a prosecution could be based").[126]

---

[126] The ICDs have also cited to several decisions adjudicating motions to dismiss where courts in this District have extended absolute immunity to ADAs for conduct related to search warrants. *See Parker v. Zugibe*, No. 16-CV-4265, 2017 WL 4296795, at *3 (S.D.N.Y. Sept. 26, 2017) (explaining that "[i]t is not entirely clear what role the D.A. [d]efendants played in the process leading up to the issuance of the search warrant, but even if they drafted the warrant, district attorneys are 'entitled to absolute immunity for the . . . function of drafting and obtaining [a] search warrant'") (quoting *E. Coast Novelty Co. v. City of New York*, 809 F. Supp. 285, 291 (S.D.N.Y. 1992)); *Kanciper v. Lato*, 989 F. Supp. 2d 216, 230 (E.D.N.Y. 2013) (finding prosecutor absolutely immune for his role in procuring search warrants where he "helped to draft and prepare the search warrant materials" that were then filed by a law enforcement officer); *E. Coast Novelty Co.*, 809 F. Supp. at 291 (finding ADA entitled to absolute immunity for the function of drafting and obtaining a search warrant).  The Court expresses no opinion as to the validity of these decisions, which were based solely on the allegations in the complaints at issue and—insofar as they are inconsistent—declines to follow them because the factual record before the Court provides ample evidence that Levy and Gil were acting in an investigative capacity.

### 2. Eavesdropping and Search Warrant Claims

Plaintiff levels three claims against the ICDs and Nagle related to the warrants they sought on June 6 and July 2, 2014, and the search of Plaintiff's person that occurred on July 2, 2014. First, Plaintiff asserts that Defendants misrepresented and omitted evidence in their applications for the June 6 Eavesdropping Warrant and July 2 Search Warrants for his home, office, and van. (Pl's Mem 21–36; Pl's Reply 8–25.) In response, Defendants argue that probable cause existed because the affidavits contained no material misrepresentations. (ICDs' Opp'n 12–32; Nagle's Opp'n 6–24; ICDs' Mem 31–32; Nagle's Mem 12–21, 27–33.)[127] Nagle additionally argues that, even if probable cause did not exist based on his affidavits in support of the June 6 Eavesdropping Warrant or July 2 Search Warrants, he is entitled to qualified immunity because the affidavits gave rise to at least arguable probable cause. (Nagle's Mem 24–26.)

Second, Plaintiff argues that the July 2 Search Warrants were defective because they were insufficiently particular and overbroad. (Pl's Mem 36–38; Pl's Reply 26–28.) The ICDs argue that Plaintiff's claims are barred by res judicata and/or collateral estoppel. (ICDs' Opp'n 33; ICDs' Mem 33.) Nagle argues that the July 2 Search Warrants were sufficiently particular and not overbroad. (Nagle's Opp'n 24–28.)

Finally, Plaintiff argues that during the execution of the July 2 Search Warrants, he was unlawfully searched. (Pl's Mem 39.) The ICDs and Nagle assert that summary judgment must be denied because Plaintiff has proffered no admissible evidence that any of the ICDs or Nagle searched Plaintiff. (ICDs' Opp'n 34–35; Nagle's Opp'n 28–29; ICDs' Mem 33.) Nagle further

---

[127] The County has adopted all of the arguments made by Nagle and the ICDs in opposition to Plaintiff's Motion for Summary Judgment on his Fourth Amendment claims. (County's Opp'n 8, 11.)

argues that the search of Plaintiff's person was lawful because the July 2 Search Warrants authorized the seizure of Plaintiff's phone and because there was probable cause to search Plaintiff as officers had reason to believe that he would be in possession of his phone.  (Nagle's Opp'n 29.)

The Court will address each of these arguments in turn.

### a.  Probable Cause To Search

"Probable cause for a search exists 'where the known facts and circumstances are sufficient to warrant a [person] of reasonable prudence in the belief that contraband or evidence of a crime will be found.'"  *United States v. Feng Ling Liu*, No. 12-CR-934, 2014 WL 101672, at *3 (S.D.N.Y. Jan. 10, 2014) (alteration in original) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).  "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see also Ganek v. Leibowitz*, 874 F.3d 73, 86 (2d Cir. 2017) (explaining that "[t]he law has long recognized that probable cause [to search a location] does not demand evidence of every element of a crime").

Probable cause does not require direct evidence, and it may "be based on an accumulation of circumstantial evidence."  *United States v. Harding*, 273 F. Supp. 2d 411, 417–18 (S.D.N.Y. 2003).  "[C]ommon sense" inferences can support a finding of probable cause. *United States v. Bowen*, 689 F. Supp. 2d 675, 679–80 (S.D.N.Y. 2010); *see also United States v. Todisco*, 667 F.2d 255, 258 (2d Cir. 1981) (per curiam) (finding probable cause for wiretap warrant on defendant's phone existed where, during a single period, the pen register on the defendant's phone revealed repeated contacts with phone numbers associated with narcotics

115

dealers, the defendant regularly met with narcotics dealers in person, and the DEA had evidence that defendant was engaging in narcotics sales).

Probable cause may also be supported by the expert opinion of law enforcement officials. *See United States v. Brown*, 676 F. Supp. 2d 220, 228 (S.D.N.Y. 2009) ("[A] [g]overnment agent's expert opinion is an important factor to be considered by the judge when making a probable cause determination." (quotation marks omitted); *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985) (noting that "an agent's expert opinion is an important factor to be considered by the judge reviewing a warrant application.").

"[W]hen [a] warrant is based upon information obtained through the use of a confidential informant, courts assess the information by examining the 'totality of circumstances' bearing upon its reliability." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (citing *Gates*, 462 U.S. at 230–31; and *Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991)).

Law enforcement officers who act pursuant to a warrant are entitled to qualified immunity so long as they "had reasonable grounds to believe probable cause supported the warrant." *Martinez v. City of Schenectady*, 115 F.3d 111, 116 (2d Cir. 1997) (citation omitted). This standard applies even where there are misstatements and/or omissions of fact in warrant applications. *See Escalera v. Lunn*, 361 F.3d 737, 743–44 (2d Cir. 2004) (discussing the doctrine of "arguable probable cause"). Thus, "a plaintiff who argues that a warrant was issued on less than probable cause faces a heavy burden." *Merriweather v. City of New York*, No. 12-CV-5258, 2015 WL 57399, at *7 (S.D.N.Y. Jan. 5, 2015) (citation omitted). To vitiate probable cause, a plaintiff must demonstrate that the person seeking the warrant "(1) 'knowingly and deliberately, or with a reckless disregard of the truth,' procured the warrant, (2) based on 'false

statements or material omissions,' that (3) 'were necessary to the finding of probable cause[.]'"

*Ganek*, 874 F.3d at 81 (quoting *Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir. 1994)).

<u>b.  Corrected Affidavit Analysis</u>

A plaintiff "challenging [a] warrant must make a substantial preliminary showing" of

both a defendant's intent and the materiality of the alleged misrepresentations or omissions.

*Merriweather*, 2015 WL 57399, at *7 (quotation marks omitted).  "To determine whether a false

statement was necessary to a finding of probable cause, [the Court must] consider a hypothetical

corrected affidavit, produced by deleting any alleged misstatements from the original warrant

affidavit and adding to it any relevant omitted information."  *Ganek*, 874 F.3d at 82.  To correct

the affidavit, the Court must "examine all of the information the officers possessed when they

applied for the . . . warrant."  *Escalera*, 361 F.3d at 744.  When determining whether

misrepresentations or omissions were material, the Court considers the misrepresentations or

omissions as a whole, not one-by-one.  *See Washington v. Napolitano*, 29 F.4th 93, 107 (2d Cir.

2022) ("[T]here may be instances when no single omission or misrepresentation is sufficient to

defeat a finding of probable cause, but the combined effect of the omissions and

misrepresentations suffices to call into question the reliability of the affiant and the affiant's

witnesses such that the question of probable cause cannot be resolved on a summary judgment

motion." (quoting *Andrews v. Scuilli*, 853 F.3d 690, 703 n.16 (3d Cir. 2017)), *cert. denied*, 143

S. Ct. 485 (2022).

If the "corrected affidavit" still establishes probable cause, no Fourth Amendment

violation has occurred, and summary judgment for the officials is required under the first prong

of the qualified immunity analysis.  *See Ganek*, 874 F.3d at 82.  If it does not, then the Court

must consider whether the officials acted reasonably based on an "objectively reasonable—even

if mistaken—belief that the corrected affidavit demonstrated the necessary probable cause."  *Id.*

117

Insofar as such a belief is reasonable, the officials are shielded by qualified immunity because there was arguable probable cause; if not, they are not. *Id.*; *see also Escalera*, 361 F.3d at 744 (holding that if a corrected affidavit provides "an objective basis to support arguable probable cause, remaining factual disputes are not material to the issue of qualified immunity[,] and summary judgment should be granted to the defendant on the basis of qualified immunity").

The Court will consider each of the controverted warrants in turn.

### i. June 6, 2014 Eavesdropping Warrant

The Court will first assess whether there was probable cause for the June 6 Eavesdropping Warrant. Plaintiff argues that Levy, Gil, and Nagle made a number of deliberate misstatements and omissions in the warrant affidavit. (Pl's Mem 22–29; Pl's Reply 8–18.) For each alleged misrepresentation or omission, the Court will first quote the statement in the affidavit to which Plaintiff objects and then describe and analyze whether the evidence in the record demonstrates there was a misstatement or omission. Once the Court has reviewed all of Plaintiff's objections, the Court will delete any actionable misrepresentations, add any actionable omissions, and also add any evidence available to Levy, Gil, and Nagle at the time the affidavit was submitted to the Court. Finally, the Court will address whether the resulting "corrected affidavit" still provided a basis for probable cause for the June 6 Eavesdropping Warrant.[128]

Plaintiff first alleges that Nagle and Gil materially misrepresented the content of the April 30 to May 8 controlled calls between Cianflone and McQuaid in the following emphasized statement:

> [B]etween April 30, 2014, and May 8, 2014, there were five recorded telephone calls made between Donna and Mc[Q]uaid at TARGET PHONE 1, in which

---

[128] In addressing this claim, although the Parties have cross-moved for summary judgment, the Court will assume that Defendants bear the burden of demonstrating the absence of a dispute of material fact and draw all reasonable inferences in favor of Plaintiff.

> *Mc[Q]uaid offered money in exchange for [K.L.]'s testimony and explains that the money is coming from Zaimi through his lawyer Galgano as a go between.*

(JEX 77 at 20 (emphasis added); *see also* Pl's Mem 22.)[129]

On the April 30, 2014 controlled call, McQuaid and Cianflone had the following exchange:

> [Cianflone:] I was just . . . getting back to what we were talking about yesterday. I was like a little confused, but I don't know. You perked -- you perked my interest.
>
> [McQuaid:] Yeah . . . it was brought to my attention. You know what it is, I think it's more -- it's more the friend I know that uses the lawyer . . . I guess . . . he owes him, I guess he's . . . trying to get out of . . . whoever it is can do something for him . . . and I guess it was brought to his attention that . . . if she . . . doesn't come . . . there might be some compensation from the guy himself . . . .
>
> [Cianflone:] Compensation?
>
> [McQuaid:] Yeah, well I guess for putting her through this bullshit anyway. I guess guilt. I don't know.
>
> [Cianflone:] You mean the guy guy? . . .
>
> [McQuaid:] . . . You know. . . there might. . . be able to get some money for her. . . .
>
> [Cianflone:] . . . But like from who I think? Am I reading between the lines right?
>
> [McQuaid:] Yeah . . . .
>
> [Cianflone:] We're talking about like the restaurant owner?
>
> [McQuaid:] I guess so, yeah. Yeah . . . .

(JEX 88 at 1:13–2:35.) As relevant here, this entire exchange was represented in Gonzalez's May 14 affidavit, *see* § I.A.5.i *supra*, and Gonzalez also explained there that on the April 30 controlled call, "Mc[Q]uaid [had] indicated that the money was coming from the defendant and his lawyer was a go between with Mc[Q]uaid's friend . . . ." (JEX 73 at 18–19.)

---

[129] Materially similar statements were made in Gonzalez's and Nagle's other affidavits. (JEX 72 at 5, 11; JEX 73 at 14; JEX 83 at 6; JEX 84 at 6; JEX 85 at 6.)

Nagle and Gil were both participants in the investigation and knew that Zaimi was a restaurant owner and that Plaintiff was his lawyer in the K.L. prosecution. (*See* Defs' 56.1 ¶¶ 191–92; Pl's Resp. 56.1 ¶¶ 191–92; Pl's 56.1 ¶ 112; Defs' Resp. 56.1 ¶ 112.) Nagle and Gil were also aware of a report received in February from Cianflone that Plaintiff had contacted McQuaid, (Defs' 56.1 ¶¶ 149, 177; Pl's Resp. 56.1 ¶¶ 149, 177), and a report received in April from K.L.'s aunt that McQuaid had indicated that K.L. could be harmed if she testified before the grand jury, (JEX 409 at 2). By June 6, 2014, Nagle and Gil were also aware, based on McQuaid's phone records and the pen register and eavesdropping warrants active on his phone, that McQuaid had been in consistent contact with Plaintiff since late February. (*See generally* McQuaid Call Records; McQuaid Call Intercepts.)

Plaintiff takes the position that Nagle's statement is misleading because McQuaid never directly stated on a call that Plaintiff was the go-between. (Pl's Mem 22.) However, even drawing all inferences in Plaintiff's favor, the Court concludes that Gil and Nagle's omission of the reference to the "friend" that was included in Gonzalez's May 14 affidavit is not an actionable misrepresentation. As an initial matter, Gil and Nagle refer the reviewing magistrate to Gonzalez's May 14 affidavit, where she represented the content of the relevant call and also stated that McQuaid had indicated on the call that there was an intermediary between Plaintiff and McQuaid. (JEX 77 at 20.) While Plaintiff argues that McQuaid's statement on the call is entirely too garbled to serve to implicate Plaintiff, the Court has reviewed the April 30 call and concludes that McQuaid's statement was an entirely transparent ruse. McQuaid said:

> Yeah . . . it was brought to my attention. You know what it is, I think it's more -- it's more the friend I know that uses the lawyer . . . I guess . . . he owes him, I guess he's . . . trying to get out of . . . whoever it is can do something for him . . . and I guess it was brought to his attention that . . . if she . . . doesn't come . . . there might be some compensation from the guy himself . . . .

(JEX 88 at 1:24–1:54.)[130]  As is evident from the Court's transcription, McQuaid repeatedly rephrased himself as he attempted to explain who the source of the compensation was without implicating Plaintiff, who, as Zaimi's attorney, was the only logical broker for such a transaction.[131]  McQuaid then went on to confirm that the ultimate source of the money was "the restaurant owner," (*Id.* at 2:29–2:35.), who could only be Zaimi because Zaimi was the only person that K.L. had accused of forcible touching.  Moreover, this inference was supported by the available call data, which indicated that Plaintiff had contacted McQuaid for the first time in late February, after K.L. had come forward to accuse Zaimi, and also had contacted McQuaid on April 29, the day that Cianflone reported that McQuaid had offered money to her for K.L. not to testify.  (*See generally* McQuaid Call Records; *see also* Def's 56.1 ¶¶ 348–50; Pl's Resp. 56.1 ¶¶ 348–50.)  Finally, Gil and Nagle were aware, based on Plaintiff's actions during the M.A. litigation the prior fall, that Plaintiff was willing to use intermediaries to reach out to Zaimi's victims and those close to them.  *See* § I.A.3.b *supra*.  Thus, the Court concludes that there was no actionable misrepresentation as to Plaintiff's status as a go-between in McQuaid's efforts to bribe K.L.

In the same vein, Plaintiff argues that Nagle's statement included a misrepresentation because it incorporated by reference Gonzalez' representations as to the content of the May 5,

_____

[130] This statement was included in Gonzalez's May 14 affidavit as follows: "It was brought to my attention, a friend I know uses the lawyer, he was trying to get him to do something for him . . . compensation from the guy himself . . . there might be able to get some money for her [sic]. . . ."  (JEX 73 at 18.)

[131] Although not dispositive, it is certainly relevant that Plaintiff himself understood McQuaid to have indicated that his friend knew Plaintiff on the April 30, 2014 controlled call when he listened to it.  On May 8, 2014, Plaintiff texted McQuaid:  "You need to appreciate that I can't have [K.L. or Cianflone] thinking that you are threatening them or paying them off *through your 'friend' who knows me*."  (Galgano-McQuaid Text Msgs at 217941 (emphasis added).)

121

2014 controlled call in her May 14 affidavit.  (Pl's Mem 22–23.)  In relevant part, Plaintiff

asserts that the following representation by Gonzalez as to the contents of the call was false:

> [Cianflone:] This attorney guy, I think his name starts with a G, you told me so.
>
> [McQuaid:] He's very professional, I know of him, but I know him [sic], he is very good, but he is very expensive . . . .  He's not looking to get disbarred for some kind of bullshit . . . .  She's got to give me a number and I'll bring it to him.

(JEX 73 at 21–22.)  The Court's transcription of the same exchange from the May 5, 2014 is as

follows:

> [Cianflone:] So, you know what, . . . this attorney guy, I think I know who you're talking about.  His name starts with a "G," right? . . . You told me his name.  I remember.  Okay. . . . I think he's . . . probably talking to your friend.  It might not be your friend.  It's probably him that initiated all this.
>
> [McQuaid:] *Nah.  No, he's very professional.  I mean, listen, he's a rottweiler when it comes down to it if he can expose somebody on the stand he's gonna do it.  It's just -- I know of him but I don't know him . . . .  But I know he's very good and he's very expensive.*
>
> [Cianflone:] Oh.
>
> [McQuaid:] *He's very good.  Now, he -- I don't think he ever in his right mind would risk any kind of -- getting disbarred or any of that shit over this bullshit.  So . . .  I'm sure he probably had a conversation with his client and one of my clients knows that shit's going down, mother-in-law, sister-in-law, you know whatever the fuck . . . maybe the guy said something to him.*
>
> [Cianflone:] Right . . . .
>
> [Cianflone:] [K.L.'s] going to . . . say to you, well, . . . what kind of numbers are we talking? . . .
>
> [McQuaid:] *She's got to give me a number and [inaudible].*

(JEX 91 at 7:36–10:35 (emphases added).)  Plaintiff notes three discrepancies in Gonzalez's

representation of the call: (1) the omission of McQuaid's denial of knowing Plaintiff; (2) the

joining of McQuaid's statement "[s]he's got to give me a number" to his earlier statements

concerning Plaintiff; and (3) the addition of "and I'll bring it to him" where McQuaid cannot, in

fact, be heard on the call.  (Pl's Mem 23–24.)  The Court agrees that Gonzalez misrepresented

the content of the May 5, 2014 call and that this statement should be deleted.  However, while

Plaintiff asserts that this misrepresentation was intentional, (Pl's Mem 23), the undisputed record

reveals that Gil provided Judge Molea with the audio recording of the May 5 and other

controlled calls when submitting the application for the June 6 Eavesdropping Warrant, (Defs'

56.1 ¶ 1211; Pl's Resp. 56.1 ¶ 1211).  Additionally, Gil has testified, and Plaintiff apparently

does not dispute, that he reviewed this section of the May 14 affidavit with Cianflone, and she

confirmed his "summary" of the call was accurate.  (JEX 14 at 145:25–146:6, 146:13–22.)  Thus,

even drawing all inferences in Plaintiff's favor, the Court concludes that the misrepresentation

here was, at most, the result of negligence or incompetence on Gil's part.

Plaintiff next argues that Nagle and Gil misrepresented the content of the May 19, 2014

controlled call by stating that "Mc[Q]uaid informed Donna that he needed to speak with [K.L.]

to finalize the deal and assure his people that she would not cooperate with the prosecution of

Zaimi[;]" that "Mc[Q]uaid indicated [on the May 19 call] that his guy wanted him to deal with

[K.L.] directly[;]" and that McQuaid said on the call "five thousand is a number my people

should be good with, I need to speak with [K.L.] though to see what she wants to do, my people

are gonna want to talk to her before giving money."  (JEX 77 at 22, 27, 28–29; Pl's Mem 24–

25.)

The Court agrees with Plaintiff that Nagle and Gil, in large part, misrepresented the

content of the May 19 controlled call in their representations as to the substance of McQuaid's

statements.  The record indicates that McQuaid sought to speak directly to K.L. concerning the

offer of money not to testify, as when McQuaid said:

> Well, I'll try to find out what's going on with [the offer of compensation], but not
> for nothing.  I mean if I'm going to throw my neck out there I'd like to hear from

[K.L.] her story as to what happened there because . . . .  I don't want to throw my
neck out there for -- you know, she can call . . . .

(JEX 94 at 13:24–44.)  However, McQuaid never states he is seeking to speak to K.L. based on

directions from the individuals offering money to K.L. not to testify, nor does McQuaid confirm

that there has been any agreement from those individuals as to the sum to be paid.  (*See*

*generally id*.)  Thus, all of these statements should be deleted, with the exception of the

statement that McQuaid said he wanted to speak directly to K.L. about what she wanted to do.

Plaintiff also claims that Defendants omitted exculpatory statements made by McQuaid

during the May 19, 2014 controlled call that indicated that there was never a threat to K.L.  (Pl's

Mem 25; Pl's Reply 12–13.)  Plaintiff points out that Cianflone told McQuaid "I lay in bed at

night worrying about [K.L.], if she's safe.  I don't need this[,]" and Mc[Q]uaid responded that "If

she's safe, what? Nobody, nobody threatened anybody or anything."  (JEX 94 at 9:39–9:49.)

Cianflone then replied "Well, I know that.  But I also remember our conversation and I'm

worried about [K.L.]"  (*Id.* at 9:49–57.)  Later, when Cianflone said "the DA wants to bring her

up here[,]" McQuaid responded:  "That's her choice.  If she wants to come up, she comes up."

(*Id*. at 15:07–14.)  At another point, McQuaid stated "it doesn't matter to me what she wants to

do.  If she comes up, if she flies up, . . . it doesn't threaten me or threaten anything . . . ."  (*Id*. at

27:39–45.)

However, the Court concludes that a review of the entirety of the call does not support

Plaintiff's argument.  First, Plaintiff's assertion that Cianflone admitted there had never been a

threat against K.L. misreads that statement; it is clear from the context that Cianflone is agreeing

that *McQuaid* had never threatened K.L., not that McQuaid had never communicated that *others*

had threatened K.L.  (*Id*. at 9:39–9:57.)  Second, while at points in the call McQuaid indicated

that he had no interest in K.L.'s decision and that she was not at risk if she came to testify in

124

New York, McQuaid also made statements that can be fairly read to indicate that K.L. would be in danger if she chose to testify.  For example, McQuaid said that "if I'm going to throw my neck out there I'd like to hear from [K.L.][;]" that "I . . . just wanna . . . know . . . what the situation is . . . I'm not getting involved with these people or DAs or law [without hearing from K.L.]. . .[;]" and that "I'm not going to go on a limb for [K.L.] . . . if nobody wants me around[,]"  (*Id.* at 13:27–44, 14:54–15:03, 18:36–41.)  These statements indicate that McQuaid believed he was putting himself at risk of harm—including from the individuals who were promising to pay K.L.—if he acted to secure payment and K.L. then decided to testify.  If McQuaid believed he was under threat if he sought payment, it is unclear to the Court how the same concern would not apply to K.L., as she would be engaging—or refusing to engage—with the same individuals as McQuaid.  While it is possible that McQuaid's statements could be understood to mean only that he would be at risk if he represented that K.L. would not testify and then K.L. chose to, the Court sees no reason to assume that any reprisals would be limited to McQuaid, since the goal of the payment was to prevent K.L. from testifying, not McQuaid.  Finally, Gil also provided the controlled calls with the June 6 Search Warrant Application, so Judge Molea would have had an opportunity to listen to the call in its entirety when determining whether to issue the warrant.  (Defs' 56.1 ¶ 1211; Pl's Resp. 56.1 ¶ 1211.)  Thus, even drawing all inferences in Plaintiff's favor, Nagle and Gil did not misrepresent the content of the call by omitting the statements Plaintiff deems exculpatory because McQuaid made conflicting statements as to the risk of harm from the individuals who had offered K.L. money not to testify and the underlying call was provided to Judge Molea for his review.

    Next, Plaintiff claims that Nagle, Gil, and Levy misrepresented the content of text messages between Plaintiff and McQuaid when they stated that Plaintiff and McQuaid were

"attempting to obtain information meant to persuade and influence [M.A.] from testifying against Zaimi[.]"  (Pl's Mem 25–26 (citation omitted); JEX 77 at 7–8, 29.)  Plaintiff argues that the intercepted communications supporting this statement can be read only to indicate that Plaintiff was seeking out information to connect M.A. and K.L. in order to substantiate his theory that K.L.'s report of Zaimi's forcible touching was false.  (Pl's Mem 26.)  The June 3, 2014 text messages at issue between McQuaid and Plaintiff included the following statements from Plaintiff:

> Quincy, I'm afraid that if I don't get the recorded calls today, I'm never getting them.  I'm in court again tomorrow.  Any chance Lia can call [K.L.] today?  If she can, I can either make myself available or type out a list of shit I would like discussed . . . I really need to know what [K.L.] knows about the other case.  What she knows about [M.A.] and/or her family and/or the case with [M.A.].  And then I would just love for [K.L.] to tell Lia what happened at the restaurant[.]

(Galgano-McQuaid Text Msgs at 221962, 221980–81, 221986.)[132]

Even drawing all inferences in Plaintiff's favor, Plaintiff's statements can be read to imply that he was seeking this information to dissuade M.A. from testifying at Zaimi's second trial for assaulting her, particularly given that the PCDAO had moved to consolidate K.L. and M.A.'s cases two weeks before.  (JEX 405 at 6.)  Moreover, Nagle and Gil were aware that Plaintiff had been in communication with McQuaid prior to and during the period that McQuaid offered bribes to Cianflone and suggested that K.L. could be harmed if she testified.  Nagle and Gil were also aware of Plaintiff's aggressive attempts to contact M.A. virtually and in person

---

[132] The Court notes that Plaintiff in his briefing appears to also refer to a message that Plaintiff sent on June 6, 2014, which is the same day that PCDAO submitted its warrant application.  (*See* Pl's 56.1 ¶ 155.)  This message was sent at around 2:00 PM on June 6, so it is possible that Gil, Levy, and Nagle were aware of this before submitting the warrant application.  (Galgano-McQuaid Text Msgs at 222735.)  However, because the June 6 application and affidavit only include the June 3, 2014 text messages, the Court assumes that these messages were the only potential basis for the statement.  (JEX 77 at 35–37.)

during September 2019, his effort to manufacture evidence that undermined her account by coercing an affidavit from her ex-boyfriend, and his disclosure of M.A.'s taped interview to the public in the leadup to her trial.  *See* § I.A.3.b *supra*.  Because of Plaintiff's previous behavior, his involvement with and direction of McQuaid, and the pending motion to consolidate the trials, Plaintiff's request that McQuaid attempt to find out if K.L. and M.A. were connected in some way could reasonably be construed as an effort to find information that could be used to further dissuade M.A. from testifying at a consolidated second trial.  The Court concludes that Levy, Gil, and Nagle drew a reasonable inference based on the information available to them.

Next, Plaintiff objects that Nagle and Gil misrepresented Plaintiff's promises to get an apartment for McQuaid and Lia when they stated that Plaintiff was "baiting Lia to give up control of her Facebook account to [him] while he dangle[d] the possibility of a rent[-]free apartment[.]"  (Pl's Mem 26–27 (emphases and citation omitted); JEX 77 at 35.)  Plaintiff argues that the text messages he exchanged with McQuaid demonstrate that Plaintiff was trying to help McQuaid and Lia, that he indicated that he would eventually collect rent, and that there was no evidence that Plaintiff explicitly represented to McQuaid that he would use Lia's account to send messages to anyone.  (Pl's Mem 27.)

However, the record is not as clear-cut as Plaintiff asserts.  Plaintiff did initially text McQuaid that he wanted to assist McQuaid and Lia with finding an apartment because "you can't be homeless."  (Galgano-McQuaid Text Msgs at 221698, 221704.)  Two days later, Plaintiff asked for access to Lia's Facebook account and then sent the following messages:

> [J]ust ask her and find out her sign in name and password.  Tell her I won't send anything to anyone.  I just want to look something up. . . .  In a time crunch. . . .  I have an apartment that just became vacant over the weekend.  Place needs some work.  Was getting 2000 a month for it but if you want to do some work, I'll take care of you.  Pretty big place but in upper Westchester.  Cortlandt Manor.  Lia and

her daughter can stay there tonight though.  And if you fix some shit up, I can wait
for rent until you get back on your feet so to speak.

(*Id.* at 220222, 222030, 222107–08.)  Although Plaintiff initially suggested the idea of finding

McQuaid and Lia an apartment was an act of good will, Plaintiff linked the availability of an

apartment to Lia's Facebook credentials, particularly given that Plaintiff represented that *Lia*,

whose credentials he was seeking, could begin staying at the apartment the very same day since

it was empty.  (*Id.*)  Additionally, as relevant here, both McQuaid and Lia were over 35 years old

and living with their parents.  (*See* JEX 122 at 2; JEX 124 at 2; McQuaid Interview Video at

2:44–2:48, 53:22–53:32.)

McQuaid's response to these text messages also indicates that he understood the

availability of the apartment was linked to timely providing Lia's Facebook credentials.  The

next morning, McQuaid called Lia twice, directing her to call Plaintiff and give him the

credentials, (*see* McQuaid Call Intercepts 11787, 11803), and stating on the calls that Plaintiff

had "an apartment . . . we can take rent free for now," and that ""if you can [call Plaintiff and

give him your Facebook credentials], it will help us out[,]"  (McQuaid Call Intercepts 11787 at

00:23–33; McQuaid Call Intercepts 11803 at 00:32–34).  Later that afternoon, McQuaid called

Plaintiff and immediately brought up the credentials.  (McQuaid Call Intercepts 11891 at 00:10–

18.)  Around an hour later, McQuaid provided the credentials as Lia had failed to do so earlier.

(Galgano-McQuaid Text Msgs at 222456.)  With the exception of the phone calls between

McQuaid and Lia, Nagle and Gil included all of the relevant text message exchanges and the

phone conversation between Plaintiff and McQuaid in Nagle's June 6 affidavit, which was filed

two days after the final phone conversation between the two took place.  (JEX 77 at 35–40.)  As

of June 6, it was unclear from McQuaid's phone traffic whether Plaintiff had, in fact, given

McQuaid and Lia access to the apartment.  (*See generally* McQuaid Intercepted Calls; Galgano McQuaid Text Msgs.)

The Court concludes that based on the facts in the record and those included in Nagle's affidavit, Gil and Nagle did not misrepresent that Plaintiff was baiting Lia to provide her Facebook account while dangling an apartment before her and McQuaid.  Plaintiff's own text messages to McQuaid imply an exchange, and McQuaid's behavior immediately afterwards, of which Nagle and Gil were aware, indicates he understood an exchange was taking place.

Plaintiff also argues that Nagle inappropriately relied on his "training and expertise" and provided his personal opinions as to the reasons that Plaintiff took particular actions.  (JEX 77 at 22; Pl's Mem 27.)  However, the Court will not consider these challenges as law enforcement officers may provide opinions based on their training and experience in support of a search warrant.  *See United States v. Ohlson*, No. 11-CR-225, 2011 WL 7555151, at *2 (W.D.N.Y. Nov. 18, 2011) ("Courts recognize that experience and training may allow a law enforcement officer to discern probable cause from facts and circumstances where a layman might not." (quoting *United States v. Gaskin*, 364 F.3d 438, 457 (2d Cir. 2004)), *report and recommendation adopted*, 2012 WL 913037 (W.D.N.Y. Mar. 16, 2012); *see also United States v. Jones*, 738 F. App'x 13, 16 (2d Cir. 2018) (summary order) (finding that a warrant application was supported by probable cause where the warrant affidavit included a statement that a "[DEA officer], based on his training and experience, knew that narcotics traffickers frequently maintain[ed] evidence concerning their narcotics activities in their residences").

Plaintiff argues that Defendants could not have had probable cause when submitting the June 6 Eavesdropping Warrant application because Levy stated in the May 14, 2014 eavesdropping warrant application that although "probable cause exist[ed] to arrest and

prosecute McQuaid, we do not have evidence to arrest and prosecute his co-conspirators."  (Pl's Mem 29 (emphasis and citation omitted); JEX 73 at 7.)  However, it is unclear to the Court how Levy's statement as to probable cause to arrest or prosecute Plaintiff on May 14, 2014 is at all relevant to whether probable cause existed based on the additional factual averments provided in the June 6 Eavesdropping Warrant application and the other information available to Levy, Nagle, and Gil, including, as particularly relevant here, the calls and text messages intercepted through the eavesdropping warrant on McQuaid's phone, which confirmed that Plaintiff and McQuaid were communicating about K.L. and that Plaintiff was providing direction to McQuaid as to how to proceed.  (*See generally* McQuaid-Galgano Text Msgs; McQuaid Intercepted Calls.)

Finally, Plaintiff argues that Levy and Gil misrepresented the content of his June 4, 2014 call with McQuaid when they stated that Plaintiff had "access to deadly weapons and [had] communicated a wiliness to use such weapons" against Pascale.  (JEX 77 at 8.)  However, the Court concludes that Levy, Nagle, and Gil provided a fair summary of the content of the call, which included the following relevant exchanges:

[Plaintiff:] Yeah, yeah, we just . . . got guns, man.  We just got guns.

[McQuaid:] Guns?

[Plaintiff:] . . . We are gonna go get Pascale, here's what we're gonna do to her. [firearm being dry-fired in background]

[McQuaid:] Yea, doggy!  So what's going on?

[Plaintiff:] You wanna know what we're gonna do to Pascale, I'll show you what. [firearm discharging in background]

[McQuaid:] You're . . . out of your mind!

[Plaintiff:] That's what we're, that's what I'm gonna do to her.  Did you see it, did you see what I just did to her? . . . We went to [Zaimi]'s house and we have these things where we put pictures of her up on these things . . . Um . . . I don't know, and we're . . . shooting her, man.  We just shot Danielle Pascale in the tit.

[McQuaid:] There you go.

[Plaintiff:] We just shot her tit off, man.

(McQuaid Call Intercepts 11891 at 00:45–01:51.)  Nagle and Gil included an excerpt from the call in Nagle's affidavit, and also provided Judge Molea with a copy of the call so that he could "hear the demeanor of [Plaintiff] and have an independent assessment of the content and threats found therein."  (JEX 77 at 38 n.9.)  Nagle also informed Judge Molea:

> A search of records on file with the New York State Police and New York State Department of Criminal Justice Services reveals that [Plaintiff] does not have a pistol permit, nor has he applied for one.  Furthermore, ATF was contacted and is running a query to determine if [Plaintiff], Mc[Q]uaid, or Lia have recently been flagged for purchasing long barrel weapons or firearms.  Also, precautionary measures were emplaced to ensure the safety of ADA Pascale.

(*Id.* at 30 n.8.)

Plaintiff argues that he never communicated a willingness to hurt anyone and that "[h]is sole target was a picture."  (Pl's Mem 28.)  However, a review of the call recording does not support Plaintiff's position, as he made a direct threat against Pascale and then discharged a firearm, apparently as a demonstration of that threat.  Moreover, given the precautionary measures that Nagle took and then reported to Judge Molea and the fact that Gil provided the call to Judge Molea for his review, the Court determines that Nagle and Gil did not misrepresent Plaintiff's statements or their tenor in Nagle's affidavit.

On the basis of the foregoing review, the Court concludes that the statements concerning the May 5 and May 19 calls discussed above must be deleted from the corrected affidavit.  At the same time, the additional evidence that the Court has discussed above must also be included.

Having reviewed Plaintiff's objections and deleted the misrepresentations from the May 5 and May 19 calls, the corrected affidavit analysis supports probable cause to suspect that

Plaintiff was engaging in the crimes alleged by Levy, Gil, and Nagle.  On the April 30, 2014 controlled call, McQuaid stated, in relevant part, that there was money for K.L. not to testify that would come from Zaimi through a friend who knew Plaintiff.  *See* § I.A.5.c *supra*.  On the May 5, 2014 call, McQuaid told Cianflone that he did not know Zaimi's lawyer, but McQuaid's phone records and Cianflone's February and April reports together demonstrated that Plaintiff had been in contact with McQuaid for months and that the contact had begun only after K.L. came forward.  *See* §§ I.A.5.b, e *supra*.  Additionally, all of the relevant parties were aware that during the M.A. prosecution the previous fall, Plaintiff had engaged intermediaries to harass M.A. and those close to her.  *See* § I.A.3.b *supra*.  After May 14, 2014, when the wiretap on McQuaid's phone was activated, Levy, Nagle, and Gil confirmed that Plaintiff and McQuaid were communicating about K.L. and were also aware that, after Zaimi was indicted, Plaintiff had directed McQuaid not to contact Cianflone or K.L., indicating that Plaintiff had been directing McQuaid's actions.  *See* § I.A.5.j *supra*.  While it is true that McQuaid attempted to back away from his previous statements to Cianflone on the May 19, 2014 call, this call took place before Zaimi was indicted.  After Zaimi was indicted, Plaintiff began communicating actively with McQuaid, requesting that McQuaid and Lia make and record calls with K.L. and indicating that they could be paid for the recordings.  The evidence available to Levy, Gil, and Nagle did not directly show that Plaintiff had ever discussed bribing K.L., but they did have McQuaid's recorded offer of compensation to Cianflone if K.L. refused to testify and considerable circumstantial and direct evidence of Plaintiff's involvement with and direction of McQuaid for several months prior to and after the offer being made to Cianflone on April 29 and April 30.

As noted above, "[p]robable cause for a search exists 'where the known facts and circumstances are sufficient to warrant a person of reasonable prudence in the belief that

contraband or evidence of a crime will be found.'" *Feng Ling Liu*, 2014 WL 101672, at *3

(alteration adopted) (citation omitted); *see also Zalaski v. City of Hartford*, 723 F.3d 382, 390

(2d Cir. 2013) ("[Probable cause] requires only facts sufficient to establish the sort of fair

probability on which reasonable and prudent people, not legal technicians, act." (alteration

adopted) (quotation marks omitted)).  Moreover, "[t]he law has long recognized that probable

cause [to search a location] does not demand evidence of every element of a crime[.]"  *Ganek*,

874 F.3d at 86.  Here, even though Gil, through negligence or incompetence, misstated the

content of certain calls, Nagle, Gil, and Levy had more than sufficient evidence to establish

probable cause for a warrant to monitor Plaintiff's communications based on the uncontroverted

statements in the affidavit, the previous applications which were incorporated by reference, and

their investigation as a whole.  *See M.C. v. County of Westchester*, No. 16-CV-3013, 2020 WL

7481023, at *7–11 (S.D.N.Y. Dec. 18, 2020) (finding warrant was supported by probable cause

after engaging in extensive analysis of alleged misstatements and omissions); *Siddiqui v.

Rocheleau*, No. 18-CV-839, 2019 WL 12239678, at *10 (D. Conn. May 15, 2019) (finding

corrected affidavit provided probable cause where "uncontested parts of the search warrant

[a]ffidavit show[ed] that [the defendant] conducted an extensive investigation before applying

for a search warrant"); *Sanders v. City of Rochester*, 360 F. Supp. 3d 152, 162 (W.D.N.Y. 2019)

("Errors contained in a search warrant affidavit caused by mere negligence or innocent mistakes

do not establish falsity or reckless disregard." (citing *Calderon v. City of New York*, No. 14-CV-

1082, 2015 WL 2079405, *6 (S.D.N.Y. 2015)); *Patterson v. Labella*, No. 12-CV-1572, 2014

WL 4892895, at *15 (N.D.N.Y. Sept. 30, 2014) (holding that the failure of the defendants "to

include exculpatory information in the application for the search warrant" did not vitiate

probable cause); *cf. Walczyk v. Rio*, 496 F.3d 139, 161 (2d Cir. 2007) (explaining that "the law

does not demand that an officer applying for a warrant volunteer every fact that arguably cuts against the existence of probable cause, as long as he does not omit circumstances that are critical to its evaluation" (quotation marks omitted)); *Martinez*, 115 F.3d at 116 (concluding that officers were entitled to qualified immunity where search warrant was supported by undisputed evidence, including a controlled call).[133]

### ii.  July 2, 2014 Search Warrants

Plaintiff also challenges the July 2 Search Warrants for his home and office.[134]  As with the June 6 Eavesdropping Warrant, the Court will address each of Plaintiff's proffered misrepresentations or omissions before analyzing whether the corrected affidavit was supported by probable cause.

Plaintiff again argues that Nagle's affidavit misrepresented him as a "go-between"; misrepresented him as dangerous based on his June 4 call with McQuaid; and misrepresented his linking Lia's Facebook account to the rent-free apartment in Cortlandt Manor.  (Pl's Mem 30, 32, 34.)  Plaintiff points to no new evidence available to Nagle or Gil that would have controverted these statements, *see* § II.B.2.b.i *supra*, and so the Court again finds that Nagle and Gil's statements were not misrepresentations.

---

[133] Plaintiff has strenuously argued that there are innocent explanations for his statements and conduct referenced in the affidavits, but the availability of alternative explanations for conduct described in a warrant is not relevant to the question of whether the officers, at the time they sought the warrant, had probable cause.  *See Panetta v. Crowley,* 460 F.3d 388, 395 (2d Cir. 2006) ("[T]he fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause." (quotation marks omitted)); *Escalera*, 361 F.3d at 744–45 ("The issue under the corrected affidavit analysis is whether, if [the defendant] had included all she learned from her investigation, the application would have supported a reasonable officer's or magistrate's belief that probable cause existed." (alteration adopted) (quotation marks omitted)).

[134] Because the affidavits in support of these warrants are largely identical, the Court will cite only to the affidavit in support of the warrant to search Plaintiff's home.  (JEX 83.)

134

Plaintiff claims that Nagle misrepresented the content of the June 5 to June 8, 2014 conversations between McQuaid and K.L. by stating that "Mc[Q]uaid exchanged several recorded communications with [K.L.] . . . in which he engaged in conversation meant to offer a bribe to, intimidate and tamper with a witness . . . and persuade her from testifying against . . . Zaimi[.]" (JEX 83 at 6–7; Pl's Mem 30.)  However, the Court concludes that Nagle did not misrepresent the content of these calls because McQuaid did make multiple statements that support Nagle's summary.  For example, on the June 6, 2014 call, McQuaid made the following statements:

> [K.L.:] I appreciate it. . . .  I want to be done with this. . . .  If they're talking about compensation . . . when would you know that? . . .
>
> [McQuaid:] Well, I would have to find out for you.  You know, that's why I said I needed to talk to you first. . . .  Like I said, I don't even know if my -- how legit it is.  You know, my friend . . . , I could find out for you, but . . . if you were to get -- say somebody was to compensate you, you would still have to -- you wouldn't be able to come up.  I mean, obviously, right?  Wouldn't that be the point of being compensated?
>
> [K.L.:] Exactly.
>
> [McQuaid:] How would you get around that if you just said you couldn't get around it, you know?
>
> [K.L.:] . . . I don't know.  I'd have to figure something out . . . talk to the DA.  I'm not sure. . . .
>
> [McQuaid:] . . . [T]hese fucking DAs and stuff I just don't trust any of them.  You know what I mean?  And who knows?  And I know up there it's crazy right now because . . . Levy is showboating.  And he's fighting with the sheriff of Putnam County . . . that's the head guy of the cops is fighting with the DA.  Like I wouldn't put too much real estate in that shit . You know what I mean?
>
> [K.L.:] Yeah, I hear you.
>
> [McQuaid:] I mean I'm not saying anybody's coming -- you know, but you know, you just don't wanna -- who wants any problems?  That's why I was curious of how nature -- how serious the thing was.

[K.L.:] No, I hear you. . . .  Could you find out tonight?

[McQuaid:] . . .  I can try. . . .  But like I said . . . I'm only asking these questions 'cause I'm going to be kind in the middle of this and . . I don't want . . . to get screwed either.  But if that happens . . . how . . . are you gonna figure out you're going to tell them that you're not going to come?

(JEX 95 at 13:24–15:38.)  And on June 8, 2014, McQuaid made the following statements to

K.L.:

[McQuaid:] I didn't say anything like that. . . .  You testified in front of the grand jury.  The guy didn't get indicted.  That's unheard of.  So, obviously the case is weak.  So, they' re trying to put you with [M.A.], obviously. . . .  His lawyer didn't even put him on the grand jury to fend for himself, and . . . they had a witness testifying at the grand jury and he still wasn't indicted.  That's pretty unheard of, [K.L.].  I mean I'm not a lawyer, but . . . I asked a couple people.  That shows a sign of weak case.  So, obviously, they' re consolidating you with . . . her, I don't know why. . . .  They got a hard on, but this goes deeper than you, sweetheart. . . .

So, . . . instead of you coming up here, getting used, and running around like a rag doll, okay, I was just trying to see if maybe -- I mean it was brought to my attention.  I didn't look into it for you.  I'm not getting anything out of it. . . .  I said, all right, let me see because I know what these fucking people do, and . . . you know too.  You see enough TV or news articles.  They don't care about . . . the person after they testify.  They don't care . . . if somebody's going to look for them, or somebody's going to harass them.  They don't give a shit.  Once you're done, you're done.  And they already put out on the street that you already . . . came up and testified.  That shouldn't've been out public like that . . . .  And then you're going to be in the newspaper.  You're going to be on the Internet.  I'm . . . just saying at the end of the rainbow is there a pot of gold? . . .  I don't see what you would be getting out of doing it.

(JEX 476 at 2:19–3:10, 4:39–5:24.)  Additionally, Gil provided Judge Molea with the recorded

calls when submitting the July 2 Search Warrant applications.  (Defs' 56.1 ¶ 1211; Pl's Resp.

56.1 ¶ 1211.)  Thus, the Court concludes that Nagle did not misrepresent the content of the June

5 to 8 communications between McQuaid and K.L.

Plaintiff also claims that Nagle and Gil made a misrepresentation when stating that "[o]n

June 7, 2014, our surveillance team observed Mc[Q]uaid's vehicle at [Plaintiff]'s residence while

a three minute conversation was intercepted between Mc[Q]uaid's and [K.L], during which

Mc[Q]uaid told [K.L.] there would be compensation for her if she did not come to New York and testify." (JEX 83 at 15; Pl's Mem 30.)  Plaintiff further asserts that the only three-minute call between McQuaid and K.L. on June 7 occurred at 1:51 PM, several hours before McQuaid was at Plaintiff's home.  (Pl's Mem 31.)  The Court agrees that this statement is a misrepresentation because the record reflects that this call did not take place while Plaintiff and McQuaid were at Plaintiff's home, and this statement will be deleted.  *See* § I.A.5.m *supra*.

Plaintiff also claims that this statement misrepresents the content of the call because "[a]t no time during the conversation does McQuaid offer compensation to K.L. not to testify." (Pl's Mem 30.)  On the call at issue, K.L. and McQuaid had the following exchange:

> [K.L.:] I don't know Quin.  Look, I guess I'm just trying to get to the bottom line here.  I don't know what's going on.  All I know is that like I get -- when you called my mom . . . and talked about money with her.  I don't know somewhere around like $5,000 or some shit.
>
> [McQuaid:] Right.
>
> [K.L.:] I personally don't want to go to New York, to be very honest with you.
>
> [McQuaid:] Right.
>
> [K.L.:] I talked to my lawyer this morning.  I can walk away if I wanted to.
>
> [McQuaid:] Right.  Right.
>
> [K.L.:] But this guy also -- you know he did damage . . . .
>
> [McQuaid:] Like I said, a friend of mine, he . . . did say . . . maybe she could be compensated . . . and I . . . just relayed the message.  That's all. . . .  So I'm working on it too, but . . . I'm stuck . . . in a bad place too if it doesn't go right.  You know what I mean? . . .  Let me make a phone call now.  I'm going to call you back in 10 minutes.  Let me find out the details.

(JEX 96 at 1:50–2:51.)  The Court agrees with Plaintiff that at no point on this call does McQuaid offer compensation to K.L., but the affidavit did not make that representation.  Instead,

Nagle stated that on the call McQuaid said "there would be compensation for her if she did not

come to New York and testify." (JEX 83 at 15.)

The Court therefore determines that Nagle's statement does not misrepresent the content

of the call, as McQuaid indicated that a friend had told him that "maybe [K.L.] could be

compensated" and that "I'm stuck . . . in a bad place . . . if it doesn't go right." (JEX 96 at 2:34–

2:46.) Thus, while McQuaid at first equivocates by saying "maybe" K.L. could be compensated,

he then states that he would be "stuck . . . in a bad place" if "it"—which could only refer to

providing K.L. compensation not to testify—"doesn't go right." Nagle and Gil did not provide

excerpts from any of the calls between K.L. from June 6 to June 8, 2014 in Nagle's affidavit, but,

as noted above, Gil did provide the recorded calls to Judge Molea when submitting the

application. (Defs' 56.1 ¶ 1211; Pl's Resp. 56.1 ¶ 1211.) Thus, Judge Molea would have been

able to listen to the June 7 call along with the previous June 6 call, where McQuaid had

expressed his concern about being "in the middle of this" if K.L. decided to accept compensation

and then testified anyway. (*See*, *e.g.*, JEX 95 at 14:13–21, 15:18–42, 17:32–50.)

Plaintiff argues that Gil and Nagle omitted exculpatory information from Nagle's

affidavit because they did not quote McQuaid's disavowal of a bribery scheme in the June 7,

2014 controlled call with K.L. (Pl's Mem 31.) However, this information was not omitted from

Gil's application because, as noted before, Gil provided recordings of the relevant calls to Judge

Molea with the applications. (Defs' 56.1 ¶ 1211; Pl's Resp. 56.1 ¶ 1211.)

In addition, Plaintiff asserts that Nagle and Gil omitted exculpatory evidence by failing to

state in Nagle's affidavit that Nagle was unaware of any communication between Plaintiff and

McQuaid where Plaintiff directed McQuaid to bribe or tamper with K.L. (Pl's Mem 32.)

However, Nagle's failure to state that there was no such recording or text message is not an

actionable omission because the obvious inference from Nagle's failure to include any such recording or text message was that none existed.

Plaintiff next argues that the following statement was a misrepresentation:

On June 29, 2014, prior to his arrest, Quincy Mc[Q]uaid showed [Nagle] a photograph sent from Galgano's telephone (914)325-1500 in which Galgano is holding a shotgun, while stating in the caption of the message that he is going to hold up a gas station.  An intercept of Mc[Q]uaid's telephone shows that he replied in substance: "don't do that thing with the gas station I don't want to go to jail."

(JEX 83 at 11; Pl's Mem 32.)  Plaintiff claims that this is a misrepresentation because the actual exchange was "an attempt at humor and nothing more."  (Pl's Mem 32.)  According to the intercept reports for McQuaid and Plaintiff's phones, Nagle and Gil did not have any record of Plaintiff sending the picture or the accompanying text message.  (*See generally* JEX 264, JEX 265.)  Thus, it is undisputed that Nagle's statement that he first saw the picture and text message on June 29 is not a misrepresentation.  Nagle did have McQuaid's response in the intercept report for McQuaid's phone, which read in its entirety:  "Ur out of ur mind n I fucking love it . . . but the gas station thing plz pass on it cuz you know ill probably get arrested [for it] . . . ."  (JEX 265 at 11921.)[135]  Nagle did not quote the entirety of this message in his affidavit, but he did indicate he was providing the "substance" of McQuaid's text, not its verbatim content.  (JEX 83 at 11.)  The Court thus concludes that Nagle's paraphrase was not a misrepresentation of McQuaid's message, as it accurately provides the substance of the message.  Plaintiff appears to argue that by failing to include McQuaid's entire text message, Nagle misrepresented the tenor of the conversation, making it appear serious rather than humorous.  The Court disagrees.  Even

---

[135] Joint Exhibit 265 is a NYSP intercept report that includes all of the text message intercepted during the wiretap of Plaintiff's phone.  When citing to text messages included in Joint Exhibit 265, the Court refers to the unique reference number assigned to each text message because it has not been posted on the public docket.

read in its entirety, McQuaid's statement suggests he was confused by the picture Plaintiff sent

and the accompanying caption; McQuaid states that Plaintiff is "out of [his] mind," suggesting

that he found Plaintiff's statement extreme and possibly out of character.  Additionally, Nagle

and Gil learned of this image three days before filing the warrant, but, based on Nagle's

description, understood that it had been sent on June 4, 2014—the same day as the call where

Plaintiff said he would shoot Pascale.  Thus, this image and Plaintiff's accompanying statement

that he was going to commit a different crime using a firearm were relevant evidence of

Plaintiff's state of mind on that day and relevant to his intent to attack Pascale or engage in other

violent activity.  In short, Nagle and Gil did not misrepresent the tenor of Plaintiff's exchange

with McQuaid in the affidavit.

      Plaintiff also contends that Nagle and Gil selectively edited a text message exchange he

had with McQuaid on June 7, 2014 to misrepresent its content.  (Pl's Mem 32–33.)  Nagle's

affidavit stated:  "At or around 6:33 on June 7, 2014, Mc[Q]uaid sent a SMS text message to

Galgano stating:  'She called me back I got it recorded I did what u·said . . . [.]'"  (JEX 83 at 16.)

The complete text message exchange, as included in McQuaid and Plaintiff's intercept reports

was as follows:

> [McQuaid:] She called me back I got it recorded I did what u said she said maybe
> there[']s a couple things that she kn[o]ws that the d.a[.] did[.]

> [Plaintiff:]  Good stuff.  It's DA and cops.  Remember they arrested this guy on
> [K.L.]'s case 10 days before [M.A.]'s trial.

(JEX 265 at 12691–92.)  Plaintiff argues that by failing to include the final portion of McQuaid's

message and Plaintiff's response, Nagle and Gil obscured that Plaintiff was merely attempting to

obtain information from K.L.  (Pl's Mem 33.)  However, the Court concludes that Nagle and Gil

did not misrepresent the content of this exchange because Nagle's affidavit contained multiple

other quotations from Plaintiff and McQuaid's text messages that indicated that Plaintiff was directing McQuaid to record his conversations with K.L. and provide them to Plaintiff.  (JEX 83 at 15–16.)  An obvious inference from these quotations was that Plaintiff was listening to these recordings to discover what K.L. had said.  (*See id.* at 14–16.)  Thus, even drawing all inferences in Plaintiff's favor, the omitted statements are duplicative of those already included in the affidavit.  To the extent that Plaintiff argues that these statements would have demonstrated his specific interest in "information as to any wrongdoing on the part of Defendants," (Pl's Mem 32), this goal does not conflict with the larger goal of discovering information about K.L.'s understanding of her case, which was apparent from the included messages.  Thus, Nagle and Gil's failure to include the statements Plaintiff highlights does not make the statement included in the affidavit misleading.

In addition to the foregoing, Plaintiff argues that Nagle and Gil should have disclosed that Lia was high on heroin when she provided her June 25 statement.  (*Id.* at 34.)  Gil had reported to Judge Molea in his June 26 bi-weekly progress report on the June 6 Eavesdropping Warrant that Lia "was shooting heroin into her arm" and that McQuaid "had fresh needle puncture marks on his arm[]" prior to being interviewed on June 25.  (JEX 82 at 6.)  Additionally, Nagle reported in his affidavits in support of the July 2 Search Warrants that "several glassines of a substance believed to be heroin and hypodermic needles were recovered [from McQuaid's car]."  (JEX 83 at 7.)  Thus, there was no actionable omission here, given the very short period between the submission of the progress report and the affidavit to the same judge for review and the fact that Nagle included a reference to the heroin found in McQuaid's car in his affidavits in support of the July 2 Search Warrants.

Plaintiff further argues that Gil and Nagle omitted that, during Lia's June 29 interview, Lopez strongly led her—including by reading back her June 25 statement to refresh her recollection and then asking her if the statement was true.  (Pl's Mem 33–34.)  The record does reflect that Levy and another PCDAO ADA acknowledged this pattern after independently reviewing the video of Lia's interview.  (Pl's 56.1 ¶ 209; Defs' Resp. 56.1 ¶ 209.)  Thus, drawing all inferences in Plaintiff's favor, this information should have been disclosed in the affidavit and will be added to the Court's analysis of the affidavit.

Plaintiff additionally argues that Nagle "added opinion disguised as facts" when he stated:

> Following the indictment of Zaimi [on May 21, 2014], [Plaintiff] changed strategies and wanted Mc[Q]uaid and Lia . . . to influence, and create an environment demonstrating that [K.L.] would be harmed and physically and emotionally confronted if she testified and that it was in her best interest to take the money to provide information about the prosecution and police agency handling the matter.

(JEX 83 at 9; Pl's Mem 35.)  Plaintiff claims that "no evidence shows" that Plaintiff changed strategies.  (Pl's Mem 35.)  However, the Court notes that up until late in the day on June 7, 2014, McQuaid had continued to represent, with varying degrees of detail, that K.L. could receive compensation for refusing to testify.  *See* §§ I.A.5.c–m *supra*.  After speaking to Plaintiff at his home on June 7, McQuaid texted him ". . . I wa[s]n[']t trying to b[]other u on ur day off just wanted u to know what's up n to continue or not[.]  [T]hat angl[e] u come up[ ]wit[h] is good thank you."  (Defs' 56.1 ¶ 562; Pl's Resp. 56.1 ¶¶ 562.)  Then, McQuaid called K.L. and stated for the first time that there was no compensation for her not to testify.  (JEX 98 at 00:10–00:19.)  The next day, after K.L. called him back to discuss whether she was interested in accepting money to provide information about the PCDAO, McQuaid attacked the strength of K.L.'s testimony, the PCDAO's potential mistreatment of her, the difficulty of cross-

examination, and the lack of any monetary reward for K.L. testifying.  (JEX 476 at 2:19–3:10, 4:39–5:24.)  The Court finds that a reasonable inference from this evidence was that Plaintiff had shifted strategies and directed McQuaid to change his focus from bribing K.L. to dissuading her from testifying.  As such, Nagle's statement was not a misrepresentation of the evidence available to him.

Plaintiff also asserts that Nagle had no evidence to support his statement that Plaintiff "promised a 'big payday' for everyone if [K.L.] took money in exchange for not testifying against Zaimi."  (JEX 83 at 9; Pl's Mem 35.)  However, this statement was taken almost verbatim from Lia's June 25 statement:  "[Plaintiff] said to us if [K.L.] was willing to take money to not testify that it could be a big pay day for all of us."  (JEX 124 at 4.)  Thus, Nagle's statement was not a misrepresentation of the available evidence.

Additionally, Plaintiff objects that Nagle had no evidence to support Nagle's statement that "[o]n June 13, 2014, further intercepts and surveillance prove[d] that Mc[Q]uaid and Lia . . . met with Galgano at his office . . . to plan and discuss traveling to North Carolina to engage [K.L.] in continuance of the conspiracy to bribe, intimidate, and tamper with [K.L.]."  (JEX 83 at 16–17; Pl's Mem 35.)  Specifically, Plaintiff appears to argue that there was no evidence to show "that the trip was to bribe K.L.," given that McQuaid specifically stated in his June 25 statement that Plaintiff "was looking into flying down [to North Carolina] me[,] him[,] and Lia to visit and talk to [K.L.].  He wanted us just to introduce him to her so he could talk to her."  (Pl's Mem 35; JEX 122 at 4.)

The Court disagrees with Plaintiff.  While it is true that McQuaid said on June 25 that the purpose of the trip was only to "talk to" K.L., the final recorded call between McQuaid and K.L. on June 8, 2014 ended with McQuaid agreeing to "find out" for K.L. whether there was still

compensation available for her not to testify.  (JEX 476 at 15:21–15:46.)  Moreover, after the

June 25, 2014 statement, McQuaid informed Gonzalez on June 29, 2014 that Plaintiff had

previously directed him to bribe K.L. before indicating in late May and early June that he wanted

only to pay her for information.  (McQuaid Interview Video at 3:20:04–58, 3:27:30–59, 3:28:50–

59, 3:32:25–3:33:07, 3:36:07–55.)  Thus, there was evidence to support Nagle's statement that a

purpose of Plaintiff's proposed trip was to bribe K.L.  The Court therefore concludes that this

statement was not a misrepresentation.

Having reviewed all of Plaintiff's claimed misrepresentations and omissions, the Court

notes that the statement that the June 7 call at 1:51 PM occurred when Plaintiff and McQuaid

were together must be deleted and the fact that Lopez led Lia during her June 29, 2014 interview

to confirm her previous statement must be added.  The Court also adds to the affidavit the

additional evidence quoted above in addressing the alleged misrepresentations and omissions

that Plaintiff raised that supported Nagle's statements.

The Court concludes that the corrected affidavit still supports a finding of probable cause.

As an initial matter, the Court incorporates its analysis of the corrected affidavit in support of the

June 6 Eavesdropping Warrant here.  *See* § II.B.2.b.i *supra*.  Nagle and Gil were aware of the

following additional facts.  Prior to the June 6, 2014 call, McQuaid met with Plaintiff and also

requested and received an electronic recording device from him by way of his associate, Sharp.

*See* § I.A.5.l *supra*.  On the call with K.L. on June 6, McQuaid represented that K.L. could be

paid for not testifying.  *See id.*  On June 7, 2014, McQuaid repeatedly put off speaking to K.L.

until he had spoken to Plaintiff and, after that conversation, for the first time stated that no one

was willing to pay K.L. not to testify but instead only for information.  *See* § I.A.5.m *supra*.  On

June 8, 2014, McQuaid and K.L. had another call, which ended with K.L. stating she would not

provide information but that McQuaid should confirm that no one was willing to provide her money not to testify. *See* § I.A.5.n *supra*. McQuaid agreed to inquire on K.L.'s behalf. *See id.* Over the next week, McQuaid and Plaintiff engaged in further communications via text message and in person, and Plaintiff referenced a plan that "[c]ould end up being huge, huge, huge" and involved going to meet K.L. in person in North Carolina. *Id.* On June 25, 2014, CPD and the NYSP arrested McQuaid and Lia; both Lia and McQuaid were high at the time. *See* § I.A.5.o. While McQuaid denied that Plaintiff had directed him to attempt to bribe K.L, Lia confirmed that this was the case. *See id.* Lia and McQuaid also agreed to cooperate with the investigation. *Id.* On June 29, 2014, McQuaid and Lia participated in further interviews, during which McQuaid admitted that Plaintiff had directed him to bribe K.L. and Lia affirmed her previous statements. *Id.*

Again, as noted above, "[p]robable cause for a search exists 'where the known facts and circumstances are sufficient to warrant a person of reasonable prudence in the belief that contraband or evidence of a crime will be found.'" *Feng Ling Liu*, 2014 WL 101672, at *3 (alteration adopted) (citation omitted); *see also Zalaski*, 723 F.3d at 390 ("[Probable cause] requires only facts sufficient to establish the sort of fair probability on which reasonable and prudent people, not legal technicians, act." (alteration adopted) (quotation marks omitted)). Moreover, "[t]he law has long recognized that probable cause [to search a location] does not demand evidence of every element of a crime[.]" *Ganek*, 874 F.3d at 86. The Court concludes that, based on the undisputed sequence of events, many of which were included in the affidavits, Gil and Nagle had probable cause to search Plaintiff's home and office for evidence of his involvement in a conspiracy to bribe and tamper with K.L. Perhaps most importantly, Gil and Nagle had statements from McQuaid and Lia that corroborated the call pattern and other

145

circumstantial evidence available to them.  While Plaintiff objects that McQuaid and Lia were

both high during one and likely both interviews, their drug use does not presumptively render

their testimony unreliable, particularly when that testimony was corroborated by call pattern

evidence and surveillance that confirmed that McQuaid and Lia were meeting with Plaintiff and

using equipment he provided when communicating with K.L.  Moreover, it is undisputed that Gil

disclosed McQuaid and Lia's drug use on June 25, 2014 in his progress report, which was

submitted a little more than a week before the July 2 Warrant Application.  Accordingly, Gil and

Nagle's failure to again disclose that information about the June 25 or June 29 interviews is

insufficient to undermine the existence of probable cause.  *See M.C.*, 2020 WL 7481023, at *7–

11 (finding warrant was supported by probable cause after engaging in extensive analysis of

alleged misstatements and omissions); *Patterson*, 2014 WL 4892895, at *15 (holding that the

failure of the defendants "to include exculpatory information in the application for the search

warrant" did not vitiate probable cause); *Rodriguez v. City of Bridgeport*, No. 03-CV-1597, 2005

WL 3307274, *4 (D. Conn. Dec. 2, 2005) (holding that the defendants were not required to

include information that may have discredited the testimony of witnesses relied upon in a search

warrant application); *cf. Walczyk*, 496 F.3d at 161 (explaining that "the law does not demand that

an officer applying for a warrant volunteer every fact that arguably cuts against the existence of

probable cause, as long as he does not omit circumstances that are critical to its evaluation"

(quotation marks omitted)); *Martinez*, 115 F.3d at 116 (concluding that officers were entitled to

qualified immunity where search warrant was supported by undisputed evidence, including a

controlled call).

c.  Particularity and Overbreadth[136]

Having determined that the June 6 Eavesdropping Warrant and July 2 Search Warrants

were supported by probable cause, the Court will now consider Plaintiff's arguments that the

July 2 Search Warrants were facially deficient and thus officers could not rely on them to

conduct either the July 2, 2014 searches of his home and office or the May 2015 searches of his

seized electronic devices.  (Pl's Mem 36–38.)[137]  As to the July 2, 2014 searches, Plaintiff alleges

that the Warrants failed to specify with particularity the offenses being investigated and claims

the Warrants were overbroad because they did not place restrictions on which devices officers

could seize.  (*Id.* at 36–37.)  With respect to the May 2015 searches, Plaintiff argues that the

Warrants were insufficiently particular because they failed to limit the files on the devices that

---

[136] Nagle has argued that, under the fellow-officer rule, he was entitled to rely upon Gil, who drafted the affidavit Nagle executed and, as such, cannot be liable for any insufficiencies in the affidavits in support of the July 2 Search Warrants.  (Nagle's Mem 27–30; Nagle's Opp'n 27–28.)  Plaintiff argues in response, citing to an out-of-circuit case, that the fellow-officer rule is inapplicable when assessing the particularity or breadth of a warrant.  (Pl's Reply 25–26.) Because the Court finds that Nagle's personal knowledge is not at issue in the analysis below, the Court declines to opine as to whether the fellow-officer rule applies in the context of challenges to the particularity or breadth of a warrant.

[137] The ICDs have argued that res judicata bars Plaintiff's claims here, relying on Judge Zuckerman's May 1, 2015 order in *People v. Galgano*, (*see generally* JEX 34), and the Second Department's subsequent affirmance of Judge Zuckerman's order in *Galgano v. Levy*, 15 N.Y.S.3d 895, 896 (App. Div. 2015), (ICDs' Opp'n 33).  However, as Plaintiff has pointed out, (Pl's Reply 27–28), Judge Zuckerman's order specifically noted that the "propriety and constitutionality of the issuance and execution of the search warrants is not ripe for determination[,]" (JEX 34 at 9).  The Second Department similarly declined to "express any view regarding the legality of the . . . search warrants."  *Galgano*, 15 N.Y.S.3d at 896.  Because there has been no adjudication of these issues on the merits, res judicata does not bar Plaintiff's claims.  *See Tounkara v. Republic of Senegal*, No. 21-CV-8027, 2022 WL 17826422, at *10 (S.D.N.Y. Dec. 20, 2022) (finding res judicata did not bar the plaintiff's claim against two defendants because "there was no adjudication on the merits as to th[o]se defendants in the [p]rior [a]ction"), *report and recommendation adopted*, 2023 WL 2692434 (S.D.N.Y. Mar. 29, 2023).

officers could search or set a temporal limit for those searches. (*Id.* at 37–38.) The Court will address the objections to each search in turn.

The Warrants Clause of the Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "To achieve its goal, the Warrants Clause requires particularity and forbids overbreadth." *United States v. Jacobson*, 4 F. Supp. 3d 515, 521 (E.D.N.Y. 2014) (quoting *United States v. Cioffi*, 668 F. Supp. 2d 385, 390 (E.D.N.Y. 2009)).

"[T]he particularity requirement 'makes general searches . . . impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.'" *United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013) (quoting *Marron v. United States*, 275 U.S. 192, 196 (1927)); *see also United States v. Wey*, 256 F. Supp. 3d 355, 380 (S.D.N.Y. 2017) ("Courts implement the particularity requirement by insisting that warrants not 'leave to the unguided discretion of the officers executing the warrant the decision as to what items may be seized.'" (quoting *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 453 (S.D.N.Y. 2013))). The Second Circuit has explained that to satisfy the particularity requirement, a warrant must have "three components": (1) "[the] warrant must identify the specific offense for which the police have established probable cause[,]" (2) it must "describe the place to be searched[,]" and (3) it must "specify the items to be seized by their relation to designated crimes." *Galpin*, 720 F.3d at 445–46 (citations and quotation marks omitted). "In general, a warrant is sufficiently particular if it 'enable[s] the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize.'" *United States v. Patel*, No. 16-CR-798, 2017 WL

148

3394607, at *2 (S.D.N.Y. Aug. 8, 2017) (quoting *United States v. George*, 975 F.2d 72, 75 (2d Cir. 1992)).

A warrant sufficiently describes the specific offenses at issue where it "identif[ies] the alleged crime for which evidence is sought." *In re 650 Fifth Ave. & Related Props.*, 830 F.3d 66, 99 (2d Cir. 2016); *see also Galpin*, 720 F.3d at 447 (agreeing that a warrant violated the Fourth Amendment's particularity requirement, "insofar as the warrant generally authorized officers to search [the defendant's] physical property and electronic equipment for evidence of violations of 'NYS Penal Law and or Federal Statutes'"); *George*, 975 F.2d at 76 (concluding that a warrant lacked particularity where "[n]othing on the face of the warrant [told] the searching officers for what crime the search [was] being undertaken").

When specifying the items to be seized, a warrant may list particular categories of items. *See United States v. Robinson*, No. 16-CR-545, 2018 WL 5928120, at *17 (E.D.N.Y. Nov. 13, 2018) (rejecting a particularity challenge to a warrant that set out "the particular categories of property to be seized which 'constitute[d] evidence, instrumentalities, contraband or fruits of the [s]ubject [c]rimes,'" and where the warrant only authorized the seizure of property to the extent that it related to the crimes described in the supporting affidavit). As a rule, generic terms "may be used so long as the warrant identifies a specific illegal activity to which the item sought related." *United States v. Nejad*, 436 F. Supp. 3d 707, 729 (S.D.N.Y. 2020) (alterations adopted) (citation omitted).

"A warrant that comports with the particularity requirements may, however, be defective due to overbreadth." *United States v. Purcell*, 967 F.3d 159, 179 (2d Cir. 2020). A warrant is overbroad if its "description of the objects to be seized . . . is broader than can be justified by the probable cause upon which the warrant is based." *Galpin*, 720 F.3d at 446 (citation omitted).

149

"The level of specificity required [by the Fourth Amendment] depends on the nature of the crime and its level of complexity." *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 304 (S.D.N.Y. 2018). However, "the Fourth Amendment does not require a perfect description of the data to be searched and seized." *Fonville v. Yu*, No. 17-CV-7440, 2021 WL 3145930, at *7 (E.D.N.Y. July 26, 2021) (alteration adopted) (citation omitted). Nor does the Fourth Amendment "require that every item or document to be seized be specifically identified in the warrant; generic terms may be used to describe the materials to be seized." *United States v. Levy*, No. 11-CR-62, 2013 WL 664712, at *5 (S.D.N.Y. Feb. 25, 2013), *aff'd*, 803 F.3d 120 (2d Cir. 2015).

"[Law enforcement officers] cannot cure a defective warrant by pointing to a warrant application or affidavit that has not been attached to or incorporated by the warrant." *United States v. Conley*, 342 F. Supp. 3d 247, 270 (D. Conn. 2018) (citing *Groh v. Ramirez*, 540 U.S. 551, 557 (2004)). A court may review an affidavit in support of a warrant only if "the warrant uses appropriate words of incorporation and if the supporting document accompanies the warrant." *In re 650 Fifth Ave.*, 830 F.3d at 100.

### d. Good Faith Exception

Even if a warrant does not comport with the requirements of the Fourth Amendment, "[t]he fact that a Fourth Amendment violation occurred—i.e., that a search . . . was unreasonable—does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 40 (2009) (italics omitted). As a general matter, the good faith exception applies where law enforcement officers "act[ed] 'in objectively reasonable reliance' on a search warrant, even when the warrant is subsequently invalidated." *United States v. Ganias*, 824 F.3d 199, 221 (2d Cir. 2016) (en banc) (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)).[138]

---

[138] Although *Leon* arose in the suppression context, its principles also "appl[y] in civil cases . . . brought pursuant to § 1983, in which a plaintiff seeks to challenge a warranted search

There are four circumstances in which the good-faith exception will not apply:

"(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." *Purcell*, 967 F.3d at 179–80 (quoting *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992)).   The "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well[-]trained officer would have known that the search was illegal in light of all of the circumstances . . . [,] includ[ing] a particular officer's knowledge and experience . . . but not his subjective intent."  *Herring*, 555 U.S. at 145–46 (quotation marks and citations omitted).   The Court must "consider the objective reasonableness, not only of the officers who . . . executed [the] warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination."  *Leon*, 468 U.S. at 923 n.24.

As relevant here, a finding that a warrant was facially deficient does not end the Court's inquiry.  *See United States v. Rosa*, 626 F.3d 56, 66 (2d Cir. 2010) (explaining that "[n]ot every facially deficient warrant . . . will be so defective that an officer will lack a reasonable basis for relying upon it").   Even where the Court has determined that law enforcement officers relied on a facially invalid warrant, "the Court must [also] determine whether the officers nonetheless fall into the narrow gap . . . between violations of clearly established law and circumstances where an officer's conduct nonetheless constitute[s] isolated negligence."  *Zemlyansky*, 945 F. Supp. 2d

---

as unlawful."  *Calderon*, 2015 WL 2079405, at *5; *accord Kaplan v. County of Orange*, 528 F. Supp. 3d 141, 168 (S.D.N.Y. 2021) ("[I]t is well-established that a police officer who relies in good faith on a warrant issued by a neutral and detached magistrate upon a finding of probable cause is presumptively shielded by qualified immunity." (quotation marks omitted)).

at 472; *see also id.* at 471 (noting that the "gap between the objectively unreasonable execution of a warrant and the presence of good faith is a narrow one grounded in the particular circumstances [of the case]").

In undertaking this inquiry, the Court is guided by factors identified by the Second Circuit, including: (1) the presence of exigent circumstances or time pressure during the application for and issuance and execution of the warrant; (2) the level of involvement of the drafter of the application in the execution of the search; (3) the extent of the search team's reliance on the defective warrant "as opposed to their knowledge of the investigation and the contemplated limits of the [court]'s authorization"; and (4) evidence that the search team seized items unrelated to "the crimes for which [there was] probable cause[.]"  *See Rosa*, 626 F.3d at 64–66; *see also Wey*, 256 F. Supp. 3d at 397 (delineating relevant factors from *Rosa*).

Additionally, "[w]hile [the Court] may [not] rely on unincorporated, unattached supporting documents to cure a constitutionally defective warrant, those documents are still relevant to [the] determination of whether the officers acted in good faith, because they contribute to [the] assessment of the officers' conduct[.]"  *Rosa*, 626 F.3d at 64; *see also United States v. Thomas*, 908 F.3d 68, 70 (4th Cir. 2018) ("Our precedents make clear that in assessing an officer's objective good faith in executing a search warrant, we may consider facts known to the officer, but inadvertently omitted from a warrant affidavit[.]"); *United States v. Farlee*, 757 F.3d 810, 819 (8th Cir. 2014) ("[W]hen assessing the officer's good faith reliance on a search warrant under the *Leon* good faith exception, [the court] can look outside of the four corners of the affidavit and consider the totality of the circumstances, including what the officer knew but did not include in the affidavit."); *United States v. Martin*, 297 F.3d 1308, 1318 (11th Cir. 2002)

(noting that the court "can look beyond the four corners of the affidavit and search warrant to determine whether [law enforcement] reasonably relied upon the warrant").

### i.  July 2, 2014 Searches

Plaintiff first alleges that the July 2 Search Warrants were insufficiently particular because they referred to a "conspiracy to bribe, intimidate, and tamper with a witness" but only in relation to "paper notes" that were to be seized, but no other category of evidence.  (Pl's Mem 37; JEX 83 at 2.)[139]

While Plaintiff is correct that the relevant offenses are referred to in a general manner as a "conspiracy to bribe, intimidate, and tamper with a witness," a warrant need not refer to the title, chapter, and section of the statute defining the suspected crimes to be sufficiently particular.  *See United States v. Hoey,* No. 11-CR-337, 2014 WL 2998523, at *10 (S.D.N.Y. July 2, 2014) (finding warrant that provided that a list of items was "evidence of illegal drug possession" was sufficiently particular); *cf. Wey*, 256 F. Supp. 3d at 384 (finding warrants insufficiently particular where they "neither cite[d] criminal statutes *nor in any way describe[d]* any suspected criminal conduct" (emphasis added)).

As to the question of whether the crimes are sufficiently related to the categories of evidence sought, the Court finds that the July 2 Search Warrants are, due to grammatical infelicities, ambiguous.  The July 2 Search Warrants read in relevant part:

> [Officers are directed to] search and seize: (1) cell phone with the number (914)325-1500; (2) [recordings from the surveillance system at the location to be searched]; (3) electronic audio recording and storage devices (including, but not limited to an MP3 player); (4) electronic storage devices (including, but not limited to Compact

---

[139] The Parties' briefs are unclear on this point, but the Court presumes that Plaintiff challenges only the July 2 Search Warrants for his home and office, (*see* JEX 83, 84), and not his van, (*see* JEX 85), as the record indicates that no items were recovered from Plaintiff's van and it was later returned to Plaintiff, (JEX 447 at 25).

The July 2 Search Warrants do not incorporate Detective Nagle's affidavits.  (*See* JEX 83 at 2; JEX 84 at 2.)

> Discs (CDs and DVDs), thumb drives, scan disk memory devices, and computer hard drives); (5) office computer of George Galgano, and Eric Sharp, and laptop computers; (6) transcripts of recorded communications between [McQuaid] and [Cianflone] and [K.L.]; and (7) paper notes relating outlining and describing [sic] a conspiracy to bribe, intimidate, and tamper with a witness.

(JEX 83 at 2.)[140]  As Plaintiff asserts, the most grammatically appropriate reading of this sentence is that the final participial phrase "relating outlining and describing a conspiracy" modifies only "paper notes."  However, although not the most grammatically correct, the participial phrase may also be read to modify each member of the list, instead of only the final part.  This interpretation is buttressed by two features of the sentence.  First, the sentence is the entire description of the evidence the PCDAO sought to seize and search, which raises the inference that the phrase should be read to modify the entirety of the sentence.  Second, the seven-part list that makes up the body of the sentence is structured as a series of parallel noun phrases in a single paragraph, which ends with the participial phrase; this also suggests that an appropriate, albeit ungrammatical, reading of the sentence would be to read the phrase to modify each part.  Taken together, these structuring decisions indicate that a logical reading is that the participial phrase modifies each of the parts of the list because it is clear that the phrase is to provide the reason that all of the previous items listed are being seized and searched.  While this reading does not comply with grammatical niceties, "[a] warrant need not necessarily survive a hyper-technical sentence diagraming and comply with the best practices of *Strunk & White* to satisfy the particularity requirement."  *United States v. Otero*, 563 F.3d 1127, 1132 (10th Cir. 2009); *see also United States v. Fiorito*, 640 F.3d 338, 346 (8th Cir. 2011) ("The particularity requirement is a standard of practical accuracy rather than a hyper[-]technical one." (quotation

---

[140] Because the three July 2 Search Warrants are largely identical, (*compare* JEX 83 at 2, *with* JEX 84 at 2), the Court cites only to the Search Warrant for Plaintiff's office.

marks omitted)).[141]  However, because this interpretation requires reading for sense in a sentence

that is, on its face, non-sensical, the Court concludes that the July 2 Search Warrants are

ambiguous as to whether the participial phrase should be read to modify the entire list and thus

link the evidence sought to the suspected crimes at issue.

Plaintiff also objects that the July 2 Search Warrants impermissibly include "general

categories of electronic devices" to be seized.  (Pl's Mem 37.)  A warrant may permissibly

include categories of items where those categories are tied to specific offenses.  *See Jacobson*, 4

---

[141] A comparison of the July 2 Search Warrants to warrants other courts have found insufficiently particular also suggests that this reading is plausible.  For example, in *United States v. Cwibeker*, No. 12-CR-632, 2014 WL 7423106, (E.D.N.Y. Dec. 31, 2014), the warrant attachment at issue was eight pages long, and the list of evidence sought, although drafted as a single sentence, was included in twenty-six separate paragraphs and sub-paragraphs that stretched across seven pages, (*see generally* Dkt. No. 33-3 (12-CR-632 Dkt., E.D.N.Y.)).  The sole reference to a suspected crime in the search warrant occurred on the eighth page in the final sub-paragraph and only applied to computerized data.  (*Id.* at 11.)  Moreover, previous paragraphs had directed officers to seize "[a]ll contracts, agreements, papers, and affiliated records" and "[f]inancial books and records."  (*Id.* at 5–6.)  Rejecting the government's argument that the warrant was sufficiently particularized, the *Cwibeker* court explained that "[a]pplying a clause contained in a subsection of [the final paragraph] to paragraphs one through ten requires a tortured reading" and found that because "the limitation falls within a paragraph related solely to *computerized or digital data* . . . an officer tasked with conducting a *physical search* might well miss this supposed limit."  *Cwibeker*, 2014 WL 7423106 at *6 (emphasis added) (quotation marks and citation omitted).  The *Cwibeker* court also pointed out that the warrant's authorization in previous paragraphs to seize broad categories of documents without reference to a specific crime was problematic.  *Id.* at *6–7.

The July 2 Search Warrants exhibit none of these infirmities: the list at issue is structured as a single paragraph; the entire paragraph is less than a half-page in length; all of the items in the list are physical objects to be seized; and each category of items is carefully cabined both by reference to specific examples and by the final reference to the suspected crimes.  *Cf. Zemlyansky*, 945 F. Supp. 2d at 454 (finding a two-page warrant insufficiently particular where it included nine paragraphs describing evidence sought but the only reference to suspected criminal activity occurred in a sub-paragraph of the final paragraph that applied only to electronic—and not physical—evidence); *United States v. Vilar*, No. 05-CR-621, 2007 WL 1075041, at *22–23 (S.D.N.Y. Apr. 4, 2007) (determining that a warrant was insufficiently particular where the warrant at issue was three pages long and made up of seventeen discrete paragraphs, contained a single "oblique reference" to the suspected crimes at issue only in the second-to-last paragraph, and included a "catch-all paragraph" authorizing officers to seize a "virtually unlimited" set of corporate records).

F. Supp. 3d at 524 ("The reference to particular offenses and the use of an illustrative list of items to seize sufficiently particularized the warrants." (citing *United States v. Riley*, 906 F.2d 841, 844–45 (2d Cir. 1990))); *United States v. Bonczek*, No. 08-CR-361, 2008 WL 4615853, at *12 (S.D.N.Y. Oct. 16, 2008) (finding "the use of 'including but not limited to' in" the warrant at issue unexceptionable because "the language of a warrant [as a whole] should be construed in conjunction with an illustrative list of seizable items"), *aff'd*, 391 F. App'x 21 (2d Cir. 2010). Because the Warrants are ambiguous as to whether the list of items to be seized is, in fact, modified by the phrase "conspiracy to bribe, intimidate, and tamper with a witness," the Court also concludes the July 2 Search Warrants are also insufficiently particularized on this basis.

Having found the July 2 Warrants to be insufficiently particularized, the Court must next determine whether the good faith exception applies. The Parties have not briefed this issue at length, but the Court concludes that because probable cause for the warrants existed, *see* § II.B.2.b.ii *supra*, the only basis for finding that the good faith exception should not apply is that "the warrant [was] so facially deficient that reliance upon it [was] unreasonable[.]" *Purcell*, 967 F.3d at 180.

In determining whether the good faith exception should apply, the Court will review Nagle's affidavit in addition to the warrant itself. *See Rosa*, 626 F.3d at 64 ("While [the Court] may [not] rely on unincorporated, unattached supporting documents to cure a constitutionally defective warrant, those documents are still relevant to [the] determination of whether the officers acted in good faith, because they contribute to [the] assessment of the officers' conduct[.]") In his unincorporated affidavit, Nagle provided a timeline of the events in the K.L. investigation, beginning with her coming forward on January 29, 2014, and also noted that a

motion was pending to consolidate K.L.'s case with M.A.'s case. (JEX 83 at 4–10.)[142] Nagle

stated in his affidavit that there was probable cause to believe that Plaintiff had engaged in

several offenses, including:

> Bribing a Witness, Penal Law § 215.00, D felony, Conspiracy in the Fourth Degree,
> Penal Law § 105.10, E Felony, Tampering With a Witness in the Third Degree,
> Penal Law § 215.11, E felony; Intimidating a Victim or Witness in the Third
> Degree, Penal Law § 215.15, E felony, Conspiracy in the Fifth Degree, Penal Law
> § 105.05(1), A misdemeanor, and other associated offenses.

(*Id.* at 4.) For the various categories of items sought by the warrants, Nagle provided evidence

giving rise to probable cause for their seizure. (*Id.* at 10–20.)

Nagle stated that "probable cause exists to search the above[-]captioned [premises] . . .

[and] to seize" the categories of evidence specified in the warrant. (*Id.* at 20.) The July 2 Search

Warrants were submitted, approved, and executed on July 2, 2014, (*see* JEX 83 at 2; JEX 447 at

24–28, 54–58, 61; JEX 457 at 3–8), around two days after PCDAO and the CPD had determined

that Lia and McQuaid were compromised as confidential informants, (JEX 447 at 22).

Based on the contents of the affidavits, the Court has little difficulty in holding that

although the July 2 Search Warrants were facially defective, the good faith exception applies.

Again, the July 2 Search Warrants were drafted, submitted, and executed around two days after

the CPD and PCDAO became aware that McQuaid and Lia were compromised as confidential

informants. (*See* JEX 447 at 22; JEX 83 at 2.) The affidavits were drafted by Gil, who had been

involved in the investigation since its inception. *See* § I.A.5.p *supra*. The affidavits included a

detailed statement of the suspected offenses and provided underlying evidence that supports

---

[142] Because Nagle's affidavits in support of the July 2 Search Warrants for Plaintiff's
home and office are identical in all material respects as to the statements discussed below, the
Court will cite only to Nagle's affidavit in support of the search warrant for Plaintiff's office.
(*See* JEX 83.)

probable cause to seize and search the categories of items listed in the Warrants.  (JEX 83 at 4, 10–20.)  Gil briefed the officers executing the warrants on the scope of the warrants prior to their execution, (JEX 14 at 303:16–304:14); he was also present at the search of Plaintiff's office, (*see* Defs' 56.1 ¶ 719; Pl's Resp. 56.1 ¶ 719); and both searches were led by CPD officers who reported directly to Nagle and who had been involved in the investigation from its inception and were aware of all aspects of the case discussed in Nagle's affidavit, (*see generally* JEX 124, 447).  Finally, there is no evidence in the record that the officers exceeded the scope of the July 2 Search Warrants and Nagle's unincorporated affidavits while executing the searches.

Thus, the Court concludes that there is no evidence in the record that the infirmities in the July 2 Search Warrants resulted from deliberate, reckless, or even grossly negligent conduct; rather those infirmities resulted from Gil's simple negligence in failing to include a statement incorporating Nagle's affidavits into the July 2 Search Warrants.  *Cf. United States v. Romain*, No. 13-CR-724, 2014 WL 6765831, at *7 (S.D.N.Y. Dec. 1, 2014) (finding that the good faith exception applied to a facially deficient warrant that omitted any reference to a suspected crime and did not set out a time limitation for the search of electronic materials because the affidavit provided sufficient probable cause and "[t]he [w]arrant's omission of an incorporation of the [a]pplication and the supporting documents does not, in the absence of any other indicia of deficiency or bad conduct, indicate flagrant or culpable conduct on the part of the [g]overnment as to require deterrence" (quotation marks omitted)), *aff'd*, 678 F. App'x 23 (2d Cir. 2017); *United States v. Cyr*, No. 14-CR-19, 2014 WL 6386805, at *5 (D. Vt. Nov. 14, 2014) (finding that the good faith exception applied to a facially deficient warrant that omitted any reference to a suspected crime and failed to provide any time period for the search of data from electronic devices given that the affiant's "conduct violating the Fourth Amendment was an accident[] [and

he] was not sufficiently culpable such that the deterrent value of excluding the evidence outweigh[ed] the cost to the causes of truth and justice").

### ii. 2015 Searches of Plaintiff's Seized Electronic Devices

As to the May 2015 searches of his seized devices, Plaintiff argues that the warrants were overbroad because they "placed no restriction . . . on the content" that could be searched and also insufficiently particular because they lacked a "temporal scope" for limiting the results of any such search. (Pl's Mem 37.) Additionally, Plaintiff points out that Gil sought another warrant ex parte to search the devices, which was denied with leave to refile with notice. (*Id.* at 38.) Plaintiff also argues that Gil relied on Judge Zuckerman's order to "generally" search his devices, even though Judge Zuckerman had not addressed whether the warrants passed constitutional muster. (*Id.*)

The Court finds Plaintiff's argument somewhat obscure, but interprets it as raising two issues. First, Plaintiff appears to argue, based on Gil's seeking another warrant or an amended warrant ex parte, that the PCDAO recognized that the July 2 Search Warrants were facially deficient in that they did not authorize subsequent electronic searches of any of the seized devices. Second, Plaintiff argues that the searches of Plaintiff's devices as conducted by Gil in May 2015 were overbroad and insufficiently particular. The Court interprets both of these arguments as calling into question whether, given that the July 2 Search Warrants were facially deficient, the good faith exception applies to the subsequent searches of Plaintiff's electronics.

The Court agrees with Plaintiff that the July 2 Search Warrants are facially deficient because they fail to adequately indicate that law enforcement will undertake subsequent searches of Plaintiff's electronic devices and do not provide any limits on those searches. As relevant here, the July 2 Search Warrants state that "[Officers are directed to] *search* and seize" the listed devices, (JEX 83 at 2), but it is unclear on the face of the Warrants for which crimes law

enforcement officials will be attempting to locate evidence, (*see id*.)  The July 2 Search Warrants also provide no guidance as to the temporal scope of any such search or any limits as to the files to be searched.  (*See id*.)

As with the July 2 searches, the Court notes that because probable cause existed for the July 2 Search Warrants, the only possible basis for concluding that the good faith exception does not apply to the searches of Plaintiff's electronics is that "the warrant [was] so facially deficient that reliance upon it [was] unreasonable[.]"  *Purcell*, 967 F.3d at 180.

Again, the Court will begin with Nagle's affidavits in assessing whether the good faith exception applies.  *See Rosa*, 626 F.3d at 64 ("While [the Court] may [not] rely on unincorporated, unattached supporting documents to cure a constitutionally defective warrant, those documents are still relevant to [the] determination of whether the officers acted in good faith, because they contribute to [the] assessment of the officers' conduct[.]")  Nagle's affidavits addresses the defects on the face of the July 2 Search Warrants.  Nagle described the timeline of the K.L. investigation and provided the names of all relevant parties.  (JEX 83 at 4–10.)  Nagle also explained the evidence giving rise to probable cause to search the devices to be seized for evidence of the suspected crimes, (*Id.* at 10–20), and indicated that the CPD and PCDAO would "search the above[-]captioned [premises] . . . [and] seize, *and conduct subsequent searches of*" the categories of evidence specified in the warrant for evidence "relating outlining and describing [sic] a conspiracy to bribe, intimidate, and tamper with a witness[,]" (*id.* at 20 (emphasis added)).  Nagle also advised the court that Plaintiff was a "licensed attorney" and stated:

> it is reasonable to believe that [Plaintiff] may have mixed and hidden communications and evidence sought within this application with otherwise privileged information.  Moreover, the electronic storage devices, recording devices, CDs/ DVDs, video recordings, and hard drives may contain privileged and

non-privileged correspondence and communications.  Every effort will be taken by law enforcement officers executing the requested warrant to not seize and review privileged communications.

(*Id.*)

The Court incorporates its discussion of the *Rosa* factors above, as the same factors are relevant here.  *See* § II.B.2.d.i *supra*.  The Court also notes, as relevant here, that it is undisputed that Gil submitted keyword search terms for the NYSP to use in searching Plaintiff's laptop computer and devices after receiving Judge Zuckerman's May 1, 2015 order.  (Pl's 56.1 ¶¶ 374–75; Defs' Resp. 56.1 ¶¶ 374–75.)  The record does not disclose whether Gil provided any time limits on the searches.  The record also includes no evidence that PCDAO received any other documents than the Galgano Spreadsheet that included information that predated the beginning of the M.A. and K.L. investigations.

"[C]ourts [have] developed a . . . flexible approach to the execution of search warrants for electronic evidence, holding the government to a standard of reasonableness."  *United States v. Metter*, 860 F. Supp. 2d 205, 214 (E.D.N.Y. 2012).  "The Second Circuit has 'not required specific search protocols or minimization undertakings as basic predicates for upholding digital search warrants.'"  *United States v. Lustyik*, 57 F. Supp. 3d 213, 229 (S.D.N.Y. 2014) (quoting *Galpin*, 720 F.3d at 451); *see also United States v. Alston*, No. 15-CR-435, 2016 WL 2609521, at *7 (S.D.N.Y. Apr. 29, 2016) ("Courts in this District have repeatedly declined to 'impose ex ante restrictions pertaining to the later execution of [a] warrant,' and have declined to find searches conducted without such protocols to be impermissible[.]" (first alteration in original) (italics omitted) (quoting *In the Matter of a Warrant for All Content and Other Information Associated with the Email Account xxxxx@gmail.com Maintained at a Premises Controlled by Google, Inc.*

*("In Re Gmail")*, 33 F. Supp. 3d 386, 398 (S.D.N.Y. 2014), *as amended* (Aug. 7, 2014), and then

citing *Romain*, 2014 WL 6765831, at \*9).[143]

      The Court determines that, although the record is sparse on this issue, the searches Gil

conducted were not overbroad or insufficiently particular.  To the extent that Plaintiff argues that

the searches were overbroad or insufficiently particular because they were insufficiently

described in the July 2 Search Warrants, the Court finds that argument unavailing.  As noted

above, courts in this District have declined to require law enforcement officials to adhere to any

particular protocol or procedure; rather the question is whether law enforcement's description

was reasonable under the circumstances.  Here, Gil noted that the PCDAO would be searching

Plaintiff's devices for evidence of the alleged crimes and, in recognition of Plaintiff's status as an

attorney, would take steps to avoid compromising any privileged information.  Under the

circumstances, including the exigencies Gil faced and the limited information available to him as

---

[143] As relevant here, the Second Circuit has explained that, "the ability of computers to store massive volumes of information presents logistical problems in the execution of search warrants [because] [i]t would be impractical for agents to occupy an individual's home or office, or seize an individual's computer, for such long periods of time." *United States v. Ganias*, 755 F.3d 125, 135 (2d Cir. 2014), *on reh'g en banc*, 824 F.3d at 199.  Because of these practical difficulties, "the creation of mirror images for offsite review is constitutionally permissible in most instances, even if wholesale removal of tangible papers would not be." *Id.*  Law enforcement officers' "off-site review of . . . [stored electronic data] . . . is . . . subject to the rule of reasonableness[,]" *id.* at 136, and "courts have routinely upheld the seizure or copying of hard drives and other storage devices in order to effectuate a proper search for the categories of documents or files listed in a warrant[,]" *In Re Gmail*, 33 F. Supp. 3d at 392 (collecting cases).

      Once law enforcement has seized electronic evidence, "the Fourth Amendment requires the government to complete its review, i.e., execute the warrant, within a 'reasonable' period of time." *Metter*, 860 F. Supp. 2d at 215 (italics omitted).  While it may be permissible for law enforcement officials to retain electronic data while completing "off-site sorting . . .[,] this accommodation does not . . . authorize [retention of] all non-responsive documents indefinitely . . . [,]" *Ganias*, 755 F.3d at 140, and law enforcement officers may not "retain . . . data with no plans whatsoever to begin review of that data to determine whether any irrelevant, personal information was improperly seized[,]" *Metter*, 860 F. Supp. 2d at 215 (emphasis omitted).

to where relevant evidence would likely be located, the Court finds that this description was sufficient.

To the extent that Plaintiff argues that the searches were overbroad and insufficiently particular as executed in May 2015, the Court also finds that this argument fails.  Except for the Galgano Spreadsheet, there is no evidence in the record as to the files that the PCDAO received in response to Gil's request.  Plaintiff's claim that the Galgano Spreadsheet is, in and of itself, evidence that Gil engaged in an impermissibly overbroad or under-particularized search is not supported by the record.  It is undisputed that Gil provided keywords for the NYSP to use when searching the data recovered from Plaintiff's devices, and, given that it was and is undisputed that Plaintiff was exchanging text messages with McQuaid for several months concerning K.L., it is unsurprising that a spreadsheet containing those texts would hit on one or more of the keywords that Gil supplied.  It is unclear from the record whether Gil also provided a time limitation, but the Court declines to presume, as Plaintiff argues, that he failed to do so based on the fact that PCDAO received the Galgano Spreadsheet in response to his requests because, even if Gil did include a date limit on the keyword searches to be conducted, the Galgano Spreadsheet would still have been returned because it contained text messages with keywords Gil would have selected and thus must have been a back-up created within the timeframe of the K.L. investigation.

Moreover, even assuming that Gil did not include a time limitation, the cases Plaintiff cites do not support his claim that Gil was required to do so.  In *Wey*, the Court was confronted with a warrant and affidavit that lacked "any practical tool to guide the searching agents in distinguishing meaningfully between materials of potential evidentiary value and those obviously devoid of it," because they allowed agents to seize any document or device that "pertain[ed] in

163

some way to the occupant or owner of the premises" being searched and then engage in further

searches, without limitation, of any files contained on any device. 256 F. Supp. 3d at 386. Here,

the Court has already concluded that, based on the contents of Nagle's affidavit, the good faith

exception applies to the facial deficiencies in the July 2 Search Warrants as to the initial seizure

of Plaintiff's devices, *see* § II.B.2.d.i *supra*, and, similarly, the operative affidavit also provides

that any subsequent searches of the contents of the seized devices will be solely for evidence

"relating outlining and describing [sic] a conspiracy to bribe, intimidate, and tamper with a

witness[,]" (JEX 83 at 20). The lack of a date range is not dispositive given these clear

constraints and the complex circumstances of the underlying alleged crimes, because "[f]or

overbreadth and particularity purposes, no controlling authority [in this Circuit] requires a

specific time frame." *Levy*, 2013 WL 664712, at *11; *United States v. Disla Ramos*, No. 22-CR-

431, 2022 WL 17830637, at *11 (S.D.N.Y. Dec. 21, 2022) (noting that "there is no clearly

established law in this Circuit with respect to when and to what degree time limitations are

required"); *Nejad*, 436 F. Supp. 3d at 729 ("While a temporal limitation is *one indicia* of

particularity, courts in this Circuit have recognized that the complexity and duration of the

alleged criminal activities may render a time frame less significant than in a case that required a

search for a small set of discrete items related to one or only a few dates[.]" (emphasis in

original) (alteration adopted) (citations and quotations marks omitted)); *United States v. Nguyen*,

No. 13-CR-6044, 2014 WL 1512030, at *20 (W.D.N.Y. Apr. 7, 2014) (declining to determine

whether the failure to include a time frame rendered a warrant invalid because of "the absence

of a clear rule in this Circuit" supported the conclusion that the officers acted in good faith

reliance on that warrant), *report and recommendation adopted*, No. 13-CR-6044, 2014 WL

1795045 (W.D.N.Y. May 6, 2014).

Thus, the Court concludes that the good faith exception applies to the subsequent searches of Plaintiff's electronic devices because of Gil's simple negligence in failing to include a sentence incorporating the affidavit into the warrant.[144]

### e.  Execution of July 2, 2014 Search Warrant for Plaintiff's Office

Plaintiff claims that the seizure of his cell phone by an officer during the execution of the July 2 Search Warrant for his office was unconstitutional because the officer did not have a warrant and there were no circumstances that would have allowed for a warrantless search.  (Pl's Mem 39.)  The ICDs and Nagle assert that summary judgment must be denied because Plaintiff has proffered no admissible evidence that any of the ICDs or Nagle searched Plaintiff.  (ICDs' Opp'n 34–35; Nagle's Opp'n 28–29; ICDs' Mem 33.)  Nagle additionally argues that any search of Plaintiff's person was lawful because the July 2 Search Warrants authorized the seizure of

---

[144] Plaintiff appears to object that Gil could not possibly rely on the July 2 Search Warrants to conduct the searches of his electronics because Gil later applied for a separate search warrant, possibly because he believed "the original search warrant did not specifically authorize the testing of the seized items[.]"  (JEX 470 at 2.)  However, this argument entirely misses the point because the good faith inquiry considers the knowledge of law enforcement officials at the time they were applying for the warrant based on the information included in any unincorporated affidavits or available based on the totality of the circumstances.  *See Rosa*, 626 F.3d at 64 ("While [the Court] may [not] rely on unincorporated, unattached supporting documents to cure a constitutionally defective warrant, those documents are still relevant to [the] determination of whether the officers acted in good faith, because they contribute to [the] assessment of the officers' conduct[.]"); *see also Thomas*, 908 F.3d at 70 ("Our precedents make clear that in assessing an officer's objective good faith in executing a search warrant, we may consider facts known to the officer, but inadvertently omitted from a warrant affidavit[.]"); *Farlee*, 757 F.3d at 819 ("[W]hen assessing the officer's good faith reliance on a search warrant . . . , [the court] can look outside of the four corners of the affidavit and consider the totality of the circumstances, including what the officer knew but did not include in the affidavit."); *Martin*, 297 F.3d at 1318 (explaining that the court "can look beyond the four corners of the affidavit and search warrant to determine whether [law enforcement] reasonably relied upon the warrant").

Moreover, even if Plaintiff is correct that the Court should take into account Gil's subsequent conduct, there is an entirely separate question in this case, apparently one of first impression, as to the effect that a subsequent court order authorizing a later search of seized devices without passing on the constitutionality of the underlying warrants would have on the good faith analysis.  *See* § I.A.6 *supra*.  The Court declines to address that question because it is unnecessary to do so to resolve the disputes in this case.

Plaintiff's phone and because there was probable cause to search Plaintiff as officers had reason to believe that he would be in possession of his phone.  (Nagle's Opp'n 29.)

"The general touchstone of reasonableness which governs Fourth Amendment analysis governs the method of execution of the warrant."  *United States v. Ramirez*, 523 U.S. 65, 71 (1998) (citation omitted).  "If the scope of the search exceeds that permitted by the terms of a validly issued warrant . . . , the subsequent seizure is unconstitutional without more."  *Horton v. California*, 496 U.S. 128, 140 (1990).  "A warrant must be executed reasonably; a warrant generally authorizes only what its terms expressly provide; and a warrant's execution terms represent the magistrate's neutral determination of how a warrant is to be executed.  A seizure that flouts the plain terms of its authorizing instrument is therefore unreasonable."  *Simon v. City of New York*, 893 F.3d 83, 95 (2d Cir. 2018).  To determine "the permissible scope of a search that has been authorized by a search warrant," the Court consider "the place that the magistrate judge who issued the warrant intended to be searched, not to the place that the police intended to search when they applied for the warrant."  *United States v. Voustianiouk*, 685 F.3d 206, 211 (2d Cir. 2012).  "As a general matter, police officers have the authority to detain and 'frisk' individuals whom they encounter while executing a search warrant, even if they have no particularized suspicion regarding the persons being searched."  *Collier v. Locicero*, 820 F. Supp. 673, 678 (D. Conn. 1993) (citing *Michigan v. Summers*, 452 U.S. 692, 705 (1981), and *Rivera*, 928 F.2d at 606).

Here, Plaintiff alleges that an unidentified officer searched him and his phone was seized while his offices were being searched.  A search of Plaintiff's person, including a frisk, was permissible as a self-protective measure.  *See United States v. Barlin*, 686 F.2d 81, 87 (2d Cir. 1982) (holding that a search of person and handbag was a "minimal intrusion" and therefore

permissible as a self-protective measure where the subject of a search entered a premises while the search was underway).[145]  The subsequent seizure of his phone was explicitly authorized by the July 2 Search Warrant.  (*See* JEX 83 at 2.)  Thus, Defendants are granted summary judgment on this claim.[146]

### 3.  Malicious Prosecution

Plaintiff brings malicious prosecution claims against all Defendants as to the two grand jury proceedings and subsequent indictments.  (SAC ¶¶ 241–247, 276–283.)  As a threshold matter, the Court notes that Levy has been granted prosecutorial immunity as to any conduct that could give rise to these claims, so summary judgment is granted for him as to this claim.  *See* § II.B.1 *supra*.  For reasons discussed at § II.B.3.a.i *infra*, the Court holds that Gil is not

---

[145] The Court notes that in *Bailey v. United States*, 568 U.S. 186 (2016), the Supreme Court limited this exception to "the area in which an occupant poses a real threat to the safe and efficient execution of a search warrant."  *Id.* at 201.  Because it is undisputed that Plaintiff was inside his office at the time of the execution of the search warrant and thus an occupant of the premises to be searched, (*see* JEX 447 at 26), the Court finds that the officer's search of Plaintiff falls clearly within the now-circumscribed ambit of the exception,  *Bailey*, 568 U.S. at 193–94 (explaining that law enforcement officers may detain "occupants . . .  found within or immediately outside [the premises] at the moment . . . officers execute[] the search warrant").

[146] Because Plaintiff's claim fails as a matter of law no matter which law enforcement officer conducted the search, the Court declines to address the ICDs' argument that Plaintiff has failed to demonstrate the personal involvement of any Defendant in the execution of the search. (ICDs' Mem 33.)

While it is undisputed that Levy and Lopez were not present at Plaintiff's offices, (Defs' 56.1 ¶¶ 720–21; Pl's Resp. 56.1 ¶¶ 720–21), it is also undisputed that Gil and Nagle were present, (Defs' 56.1 ¶ 719; Pl's Resp. 56.1 ¶ 719; Pl's 56.1 ¶ 369; Defs' Resp. 56.1 ¶ 369). Nagle has testified that he was not the officer who searched Plaintiff.  (JEX 19 at 79:20–80:6.) Plaintiff has stated that he cannot identify the officer who searched him.  (JEX 9 at 327:7–20.) The record is unclear as to whether Gonzalez was present.  (*See generally* Pl's 56.1; Defs' 56.1.)

These factual issues would preclude summary judgment on the basis of personal involvement, as there is a question of material fact as to who searched Plaintiff, and the record provided by the Parties does not rule out that the finder of fact could determine that at least two Defendants—Nagle and Gil—were the officer who conducted the search.

absolutely immune from liability for this cause of action.  Plaintiff's claims against Gonzalez, Lopez, and Nagle also survive at this juncture, pending the analysis below.

The ICDs argue that summary judgment must be granted on Plaintiff's malicious prosecution claim because probable cause, or at a minimum arguable probable cause, existed for both indictments, there was no final determination indicative of Plaintiff's innocence with respect to the first indictment, and there was no deprivation of Plaintiff's liberty with respect to the second indictment.  (ICDs' Mem 33–35.)  The ICDs additionally argue that both malicious prosecution claims fail as to Lopez and Gonzalez because they did not initiate or continue the prosecution.  (*Id.* at 35.)[147]

"While the tort of malicious prosecution protects against the consequences of wrongful prosecution, public policy favors bringing criminals to justice, and accusers must be allowed room for benign misjudgments.  The law therefore places a heavy burden on malicious prosecution plaintiffs[.]"  *Smith–Hunter v. Harvey*, 734 N.E.2d 750, 752 (N.Y. 2000); *see also Rothstein v. Carriere*, 373 F.3d 275, 282 (2d Cir. 2004) (same).  "To state a § 1983 malicious prosecution claim a plaintiff must show a violation of his rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law."  *Rodriguez v. City of New York*, 623 F. Supp. 3d 225, 238 (S.D.N.Y. Aug. 22, 2022) (quotation marks omitted) (quoting *Cornelio v. Connecticut*, 32 F.4th 160, 179 (2d Cir. 2022)).  Under New York law, a plaintiff asserting malicious prosecution must demonstrate: "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation

---

[147] Nagle raises the same arguments in his briefing.  (Nagle's Mem 12, 21–23, 33–36.)

for the defendant's actions." *Dettelis v. Sharbaugh*, 919 F.3d 161, 163–64 (2d Cir. 2019) (citation omitted).

In addition, to prevail on a cause of action for malicious prosecution under § 1983, the plaintiff must establish that "there was a . . . sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000); *see also Roman v. City of Mount Vernon*, No. 21-CV-2214, 2022 WL 2819459, at *10 (S.D.N.Y. July 19, 2022) ("In addition to the elements of a state-law malicious prosecution claim, however, to state a federal malicious prosecution claim under § 1983, a plaintiff must also have suffered a post-arraignment deprivation of liberty implicating his Fourth Amendment rights.").

Finally, "the existence of probable cause is a complete defense to a claim of malicious prosecution in New York, and indictment by a grand jury creates a presumption of probable cause." *Soto v. City of New York*, 132 F. Supp. 3d 424, 452 (E.D.N.Y. 2015) (alteration omitted) (quoting *Lewis v. City of New York*, 591 F. App'x 21, 22 (2d Cir. 2015) (summary order)).

Because Plaintiff alleges malicious prosecution as to both the First and Second Grand Juries, the Court will consider each in turn.

### a.  First Grand Jury and First Indictment

#### i.  Initiation or Continuation

The ICDs argue that Plaintiff cannot establish that Lopez or Gonzalez initiated or continued the first prosecution against Plaintiff because Gil personally reviewed all of the evidence prior to seeking to present to the First Grand Jury.  (ICDs' Mem 35.)

Nagle similarly argues that he did not initiate or continue either prosecution because Gil drafted the affidavits to all of the Warrants at issue and Nagle relied on Gil and other officers for

any facts about which he did not have personal knowledge contained in the affidavits.  (Nagle's Mem 34–35.)

Plaintiff asserts that Gonzalez and Lopez did initiate and continue the First Grand Jury prosecution because Gonzalez submitted affidavits in support of the search and eavesdropping warrants that contained material misrepresentations and testified at the grand jury and Lopez "manipulated false statements" from Lia during his interviews of her in June 2014 and also "lied" to the grand jury about his interviews of Lia.  (Pl's Opp'n 51–52.)  Plaintiff also argues that Nagle's arguments fail because the record is clear that he was an active participant in the investigation and could not reasonably rely on reports from other officers if those reports were obviously false.  (Pl's Opp'n 69–73.)

"Although there is a presumption that a prosecutor exercises independent judgment in deciding whether to initiate and continue a criminal proceeding, a plaintiff may overcome that presumption by demonstrating that the defendant played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act."  *Marom v. Town of Greenburgh*, No. 13-CV-4733, 2017 WL 1064682, at *2 (S.D.N.Y. Mar. 20, 2017) (citation and quotation marks omitted).  Regarding claims against police officers, "courts have found a triable issue of fact as to the initiation element where the defendant-officer brought formal charges and had the person arraigned, filled out complaining and corroborating affidavits, swore to and signed a felony complaint, or created false information and forwarded it to prosecutors."  *Id.* (citations omitted); *see also Bailey v. City of New York*, 79 F. Supp. 3d 424, 449 (E.D.N.Y. 2015) ("Showing that the police 'failed to make a complete and full statement of facts to the [prosecutor], misrepresented or falsified evidence, withheld evidence or otherwise acted in bad faith' satisfies the initiation element of malicious prosecution.") (quoting *Manganiello v. City of*

170

*New York*, 612 F.3d 149, 160 (2d Cir. 2010)); *Blake v. Race*, 487 F. Supp. 2d 187, 211 (E.D.N.Y. 2007) (finding initiation element met where the defendant-officers "allegedly fed the facts to [a police informant], thereby providing the unknowing D[istrict] A[ttorney] with what may be considered a fabricated eyewitness, who made the line-up identification and provided testimony").[148]

The Court has little difficulty in determining that Gil's decision was not influenced by Gonzalez, Lopez, or Nagle. As an initial matter, the Court has already considered Plaintiff's arguments concerning the misrepresentations by Gil, Gonzalez, and Nagle in the June 6 Eavesdropping Warrant and July 2 Search Warrants and found that none of them were material. *See* § II.B.2.b *supra*. Additionally, given that Gil drafted the very misrepresentations to which Plaintiff objects, Plaintiff must demonstrate that Gil was unaware that Nagle or Gonzalez's statements were misrepresentations, but Plaintiff has brought forward no admissible evidence to this effect. Instead, the undisputed record is clear that Gil drafted all of the warrants, warrant applications, and progress reports, (Defs' 56.1 ¶ 1027; Pl's 56.1 ¶ 1027), was present for the May 5 controlled call, (Defs' 56.1 ¶ 247; Pl's Resp. 56.1 ¶ 247), listened to the other controlled calls while preparing the affidavits, warrant applications, and progress reports, (JEX 75 at 3–4; JEX 80 at 3–4; JEX 82 at 4), observed the interviews on June 29, 2014 (JEX 15 at 173:3–7), and observed the execution of the July 2 Search Warrant at Plaintiff's office, (Defs' 56.1 ¶ 719; Pl's Resp. 56.1 ¶ 719).

---

[148] As at least one other court in this District has, the Court assumes without deciding that the standard for investigators employed by a district attorney's office is the same as that for police officers employed by a different agency. *See Mitchell v. Victoria Home*, 434 F. Supp. 2d 219, 227 (S.D.N.Y. 2006) (applying malicious prosecution caselaw concerning police officers to a claim involving an investigation and subsequent prosecution by New York State Medicaid Fraud Control Unit investigators and prosecutors).

As to Plaintiff's claims concerning Lopez, Plaintiff has pointed to no evidence to support his claim that Lopez "manipulated" Lia's testimony, except that Lopez typed up Lia's statement on June 25, 2014—when she was high on heroin—and then asked her leading questions concerning the June 25 statement while interviewing her on June 29—when she was again high. (*See* JEX 17 103:4–7, 108:19–23, 117:5–7; Defs' 56.1 ¶ 682; Pl's Resp. 56.1 ¶ 682.)  However, even if these actions in fact supported Plaintiff's claim that Lopez engaged in wrongful acts, there is evidence in the record that Gil was fully aware of Lopez's actions at the time they occurred.  Gil reported to Judge Molea in his June 26 progress report that Lia "was shooting heroin into her arm" prior to being interviewed by Lopez on June 25.  (JEX 82 at 6.) Additionally, Gil was present at the CPD on June 29, 2014 while Lopez was interviewing Lia. (JEX 15 at 173:3–7.)

Thus, the Court concludes that, given the depth and breadth of Gil's knowledge of the investigation—which he swore to under oath on multiple occasions—and the lack of *any* evidence that Gonzalez, Lopez, or Nagle withheld or distorted any information or exerted any pressure on Gil to initiate the prosecution, Gonzalez, Lopez, and Nagle did not unduly influence Gil's decision to prosecute Plaintiff.  The Court declines to consider the Parties' remaining contentions as to Gonzalez, Lopez, and Nagle and grants summary judgment for them as to this claim.  *See Hartman v. Moore*, 547 U.S. 250, 263 (2006) ("[W]here [an] allegation of misconduct is directed at police, a malicious-prosecution claim cannot stand if the decision made by the prosecutor to bring criminal charges was independent of any pressure exerted by police." (citation omitted)); *Bailey*, 79 F. Supp. 3d at 449 ("A successful claim against a police officer requires some showing that the defendant distorted the process by which plaintiff was brought to trial, and an officer who does no more than disclose to a prosecutor all material information

172

within his knowledge is not deemed to be the initiator of the proceeding." (quotation marks omitted)).

However, that does not end the inquiry because Gil's deep and continuous involvement with the investigation into McQuaid and Plaintiff during the lead-up to the First Grand Jury means that he cannot be granted absolute immunity for his decision to initiate the prosecution of Plaintiff, given that he relied almost entirely on the evidence he collected in his investigative role.  Because it is evident, based on the Court's analysis of the warrants in § II.B.2 *supra*, that there were misrepresentations in the affidavits Gil drafted and issues with the warrants that he also wrote, the Court determines that Gil is not absolutely immune for his initiation of the prosecution and will therefore evaluate the remaining elements of Plaintiff's malicious prosecution claim as to the First Grand Jury.  *See Hill*, 45 F.3d at 662 ("[Absolute] immunity does not protect efforts to manufacture evidence that occur during the investigatory phase of a criminal case."); *Harris v. Tioga County*, No. 17-CV-932, 2023 WL 2604125, at *20 (N.D.N.Y. Mar. 23, 2023) (holding, at summary judgment, that the Tioga County District Attorney was not absolutely immune for the decision to initiate the prosecution of plaintiff where the record revealed he had participated in "obtaining false witness statements and participating in the fabrication of material physical evidence for the purpose of obtaining probable cause" (citing *Milstein v. Cooley*, 257 F.3d 1004, 1011 (9th Cir. 2001)); *accord McGhee v. Pottawattamie County*, 547 F.3d 922, 933 (8th Cir. 2008) ("[Absolute] immunity does not extend to the actions of a [prosecutor] who violates a person's substantive due process rights by obtaining,

173

manufacturing, coercing[,] and fabricating evidence before filing formal charges, because this is not a distinctly prosecutorial function." (quotation marks omitted)).[149]

### ii.  Termination of Proceedings in Plaintiff's Favor

Defendants argue that Plaintiff has failed to demonstrate that the First Grand Jury terminated in his favor.  (ICDs' Mem 34.)  Plaintiff responds that he has made a sufficient showing because the prosecution ended without a conviction.  (Pl's Opp'n 49.)

The Supreme Court recently held that "for purposes of the Fourth Amendment claim under § 1983 for malicious prosecution, a plaintiff need only show that his prosecution ended without a conviction."  *Thompson v. Clark*, 596 U.S. 36, 39 (2022).  Thus, the Court concludes that because the First Indictment was dismissed, Plaintiff has sufficiently demonstrated that the proceeding terminated in his favor.  *See Delanuez v. City of Yonkers*, No. 20-CV-4476, 2022 WL 16540682, at *8 (S.D.N.Y. Oct. 28, 2022) (holding that the plaintiff satisfied the favorable termination of proceedings element where the indictment against him was dismissed); *cf. Perez v. City of New York*, No. 20-CV-1359, 2022 WL 4236338, at *13–14 (S.D.N.Y. Sept. 14, 2022) (holding that the plaintiff had demonstrated a termination of proceedings in her favor where her case was resolved by an adjournment in contemplation of dismissal).

### iii.  Deprivation of Liberty

Defendants do not dispute that Plaintiff suffered a deprivation of liberty as to the First Grand Jury.  (ICDs' Mem 33–35.)  Nor could they, as Plaintiff was required to attend court proceedings after he was indicted.  *See, e.g.*, *Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir.

---

[149] Because the Court determines that Gil had probable cause to prosecute Plaintiff, the Court does not reach the question of whether Levy should be granted absolute immunity for his involvement in the initiation of the 2014 prosecution.

2003) (explaining that "the requirements of attending criminal proceedings and obeying the conditions of bail suffice" to establish a deprivation of liberty).

iv.  Presumption of Probable Cause

The ICDs argue that probable cause is presumed to exist because the First Grand Jury returned an indictment, even though the indictment was later dismissed.  (ICDs' Mem 23.) Plaintiff responds that, where an indictment is dismissed for a "total lack of evidence," the presumption of probable cause does not arise.  (Pl's Opp'n 33.)

"Where . . . a grand jury indicted the plaintiff on the relevant criminal charge, New York law creates a presumption of probable cause[.]"  *Bermudez v. City of New York*, 790 F.3d 368, 377 (2d Cir. 2015) (citing *Green v. Montgomery*, 219 F.3d 52, 60 (2d Cir. 2000)).  "New York courts have generally recognized that dismissal of an indictment does not negate the presumption of probable cause."  *Soto*, 132 F. Supp. 3d at 454 (citing *Hernandez v. City of New York*, 953 N.Y.S.2d 199, 201 (App. Div. 2012), *Lawson v. City of New York*, 922 N.Y.S.2d 54, 55 (App. Div. 2011), and *Eisenkraft v. Armstrong*, 567 N.Y.S.2d 840, 841 (App. Div. 1991)).

Courts have found that the presumption holds where the indictment was dismissed for procedural error pursuant to N.Y. Crim. Proc. Law § 210.35(5).  *See Soto*, 132 F. Supp. 3d at 454 (noting that "dismissals for procedural violations do not preclude the presumption of probable cause"); *see also Norwood v. Mason*, 524 F. App'x 762, 764, 766 (2d Cir. 2013) (summary order) (affirming the determination that the presumption of probable cause applied where the indictment had been dismissed for legally insufficient instructions to the grand jury); *Cornell v. Kapral*, 483 F. App'x 590, 592 (2d Cir. 2012) (summary order) (noting that "the fact that the indictment was subsequently dismissed on procedural grounds does not vitiate the presumption of probable cause that arises from the issuance of the indictment").  The presumption also applies where an indictment is dismissed for insufficient evidence because "the standard for probable

175

cause is lower than that for conviction, and innocent behavior frequently will provide the basis

for a showing of probable cause[.]"  *Minott v. Duffy*, No. 11-CV-1217, 2014 WL 1386583, at

*17 (S.D.N.Y. Apr. 8, 2014) (quotation marks omitted); *see also Bertuglia v. City of New York*,

133 F. Supp. 3d 608, 626 (S.D.N.Y. 2015) ("[D]ismissals of indictments based on insufficient

evidence for the prosecution to make out a prima facie case do not vitiate the presumption of

probable cause from a grand jury indictment."), *aff'd sub nom. Bertuglia v. Schaffler*, 672 F.

App'x 96 (2d Cir. 2016) (summary order).

Because Judge Zuckerman dismissed the indictment pursuant to N.Y. Crim. Proc. Law

§ 210.35(5) due to defects in the First Grand Jury presentation, the Court concludes that the

presumption of probable cause still arises from Plaintiff's indictment by the First Grand Jury.

*See Soto*, 132 F. Supp. 3d at 454; *see also Norwood*, 524 F. App'x at 766.[150]

<u>v.  Probable Cause to Prosecute</u>

"Probable cause, in the context of a malicious prosecution claim, 'consists of such facts

and circumstances as would lead a reasonably prudent person in like circumstances to believe

plaintiff guilty.'"  *Stukes v. City of New York*, No. 13-CV-6166, 2015 WL 1246542, at *5

(E.D.N.Y. Mar. 17, 2015) (quoting *Colon v. City of New York*, 455 N.E.2d 1248, 1250 (N.Y.

1983)).  The Court "considers the 'facts known or reasonably believed at the time the

prosecution was initiated[.]'"  *Soto*, 132 F. Supp. 3d at 452 (quoting *Castro v. County of Nassau*,

739 F. Supp. 2d 153, 169 (E.D.N.Y. 2010)).

---

[150] Plaintiff relies primarily on *Cox v. County of Suffolk*, 827 F. Supp. 935 (E.D.N.Y. 1993) and cases that cite to it to argue that "where a grand jury indictment is reviewed by a state judge and dismissed due to total lack of evidence in support of one of the elements of the crime charged, the presumption of probable cause raised by that indictment will fall."  *Id.* at 939. However, *Cox* is inapposite because Judge Zuckerman found when dismissing the First Indictment that "the evidence presented, viewed in the light most favorable to the People, does establish every element of the offenses charged[.]"  (JEX 33 at 13.)

Because, as discussed above, Plaintiff's indictment results in a presumption of probable cause, Plaintiff bears "the burden of proof in rebutting [that] presumption[.]" *Bertuglia*, 133 F. Supp. 3d at 627 n.10 (citing *Savino v. City of New York*, 331 F.3d 63, 73 (2d Cir. 2003)). Plaintiff must adduce "evidence sufficient for a reasonable jury to find that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith[.]" *Zahrey v. City of New York*, No. 98-CV-4546, 2009 WL 54495, at *9 (S.D.N.Y. Jan. 7, 2009) (quotation marks omitted), *amended on reconsideration in part*, 2009 WL 1024261 (S.D.N.Y. Apr. 15, 2009).  However, evidence of fraud or misrepresentation at some point prior to the indictment being issued is not, in and of itself, sufficient because "rebutting the presumption . . . requires the plaintiff to establish what occurred *in the grand jury*, and to further establish that those circumstances warrant a finding of misconduct sufficient to erode the 'premise that the Grand Jury acts judicially[.]'" *Rothstein*, 373 F.3d at 284 (emphasis added) (quoting *Colon*, 455 N.E.2d at 1250).  Put another way, Plaintiff must demonstrate that the alleged fabrication was "both material, i.e., 'likely to influence a jury's decision,', and 'the legally cognizable' cause of the post-arrangement deprivation of liberty." *Richardson v. City of New York*, No. 02-CV-3651, 2006 WL 2792768, at *7 n.4 (E.D.N.Y. Sept. 27, 2006) (emphasis and italics omitted) (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997), and *Zahrey*, 221 F.3d at 350); *see also Jovanovic v. City of New York*, No. 04-CV-8437, 2010 WL 8500283, at *7 (S.D.N.Y. Sept. 28, 2010) (same).

"If the presumption of probable cause is rebutted, a malicious prosecution claim is still subject to the defense that commencement of the criminal proceeding was supported by probable cause, but the defendants must prove that they had probable cause without the benefit of the presumption." *Morse v. Spitzer*, No. 07-CV-4793, 2013 WL 359326, at *5 (E.D.N.Y. Jan. 29,

2013) (citing *Manganiello*, 612 F.3d at 163); *see also Greene v. City of New York*, No. 08-CV-243, 2017 WL 1030707, at *21 (E.D.N.Y. Mar. 15, 2017) ("[T]he existence of probable cause independent of the allegedly falsified evidence is a defense to a malicious prosecution claim." (quotation marks omitted)); *cf. Soto*, 132 F. Supp. 3d at 452–53 (determining whether probable cause existed for a charge to which the presumption of probable cause did not attach because the grand jury had failed to vote a true bill).

"Even if probable cause to [prosecute] is ultimately found not to have existed, an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause' to [prosecute]." *Escalera*, 361 F.3d at 743. "Arguable probable cause exists 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" *Id.* (quoting *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)).

Finally, "where there is no dispute as to what facts were relied on to demonstrate probable cause, the existence of probable cause is a question of law for the court." *Walczyk*, 496 F.3d at 157 (citing *Stewart v. Sonneborn*, 98 U.S. 187, 194 (1878)); *see also Morse*, 2013 WL 359326, at *6 (finding summary judgment appropriate because "while the parties vigorously dispute[d] the *significance* of the facts that were known to [the defendants] at the time they initiated criminal proceedings against [the plaintiff], there [was] no dispute as to what facts the defendants actually relied upon to establish probable cause" (emphasis in original)).

Plaintiff alleges that Gil elicited a number of affirmative misrepresentations from witnesses during the First Grand Jury. The Court will evaluate each of Plaintiff's allegations against the facts available to Gil at the time of the First Grand Jury. The Court will then examine

whether any actual misrepresentations were material to procuring the indictment. *See Jovanovic*, 2010 WL 8500283, at *6 (explaining that "[t]he presence of false testimony is not enough to raise an issue of material fact; there must be a demonstration of bad faith—something more than a mere inconsistency—to defeat the Grand Jury presumption" (citing *Savino*, 331 F.3d at 72, and *McClellan v. Smith*, 439 F.3d 137, 146 (2d Cir. 2006))).[151]

Plaintiff first points out that Gil "elicited false testimony from Cianflone, including by having her read a fabricated transcript [of the May 5, 2014 controlled call] before the Grand Jury as if it were an accurate transcription." (Pl's Opp'n 34.)  The record reflects that Gil introduced what he termed a "partial transcript" of the May 5, 2014 call, (JEX 259f at 72:19), which did not include all of the statements that are audible on the recording of the May 5 controlled call, (*compare* JEX 279 at 2–3, *with* § I.A.5.e *supra*).  The Court has already discussed Gil's efforts to transcribe the call in the context of the corrected affidavit analysis for the June 6 Eavesdropping Warrant and incorporates that analysis here.  *See* § II.B.2.b.i *supra*.  Gil's use of this transcript was indisputably a misrepresentation of the content of the call, but the Court again notes that, even drawing all inferences in Plaintiff's favor, this "transcript" was the result of negligence or incompetence on Gil's part, rather than bad faith.  As Defendants rightly point out, Gil correctly transcribed a clearly exculpatory statement—"[Plaintiff]'s not looking to get disbarred for some kind of bullshit . . ."—and had Cianflone read that statement to the First Grand Jury.  (JEX 259f

---

[151] The Court notes that Plaintiff also appears to argue that the Court should consider other alleged evidence of a lack of probable cause based on the Defendants' behavior outside of the First Grand Jury, (Pl's Opp'n 33–34), but the caselaw is clear that, in order to rebut the presumption of probable cause, Plaintiff must "establish what occurred *in the grand jury,* and . . . further establish that those circumstances warrant a finding of misconduct[,]" *Rothstein*, 373 F.3d at 284 (emphasis added).  Thus, the Court will consider those facts that occurred prior or subsequent to the proceedings in the First Grand Jury only as they are relevant to assessing Plaintiff's allegations concerning Gil's statements and omissions *in* the First Grand Jury.

at 78:23–24.)  Gil also informed the First Grand Jury that the recording was difficult to hear, had

Cianflone explain how she came to the conclusion that the transcript was accurate, provided the

First Grand Jury a copy of the recording, and informed them that he would provide headphones

during deliberations if needed so that they could review the call.  (*Id.* at 73:23–74:1, 74:7–11,

80:24–81:3.)[152]

      Next, Plaintiff asserts that Gil "put words in McQuaid's mouth, eliciting false testimony

by getting him to agree that during the April 30[, 2014 controlled] call he said 'the lawyer'

would act as a 'go between[.]'"  (Pl's Opp'n 34.)  However, the Court notes that the record does

not support Plaintiff's argument.  Gil played the recording of the April 30, 2014 controlled call

for the First Grand Jury on August 12, 2014.  (JEX 259f at 71:11–19.)  Then, when questioning

McQuaid on August 14, 2014, he referenced McQuaid's April 30 call with Cianflone and asked

McQuaid whether he had "said something to the effect of the money is coming from the

defendant and his lawyer was a go between?"  (JEX 259h at 37:18–20.)  McQuaid confirmed

that he had, and then Gil followed up: ". . . at this time when you were talking to Donna, you

were telling Donna that it wasn't coming from the lawyer, but you were going through a friend;

is that right?"  (*Id.* at 37:21–38:2.)  McQuaid then again confirmed that this was the case.  (*Id.* at

38:3.)  The Court finds, as it did in the context of the June 6 Eavesdropping Warrant, *see*

§ II.B.2.b.i, that this exchange does not misrepresent the content of the April 30, 2014 call.

      In addition, Plaintiff argues that Gil "elicited false testimony from McQuaid that

[Plaintiff] downloaded the April 30[, 2014] controlled call on May 1[, 2014,] when there was no

---

[152] The Court notes that Gil's decision to introduce Plaintiff's May 8 through May 12 text messages to McQuaid is also evidence that Gil's misrepresentation of the May 5 controlled call to the Grand Jury was a result of negligence or incompetence, not bad faith.  These messages collectively can be read to exculpate Plaintiff, but Gil nevertheless introduced all of them to the First Grand Jury on August 19, 2014.  *See* § I.A.6 *supra*.

evidence of that" fact available to Gil.  (Pl's Opp'n 34.)  The record does not support Plaintiff's claim.  Although McQuaid expressed some confusion as to where he met Plaintiff on May 1, Gil refreshed McQuaid's recollection by referencing his location history, and then McQuaid testified that one of Plaintiff's associates downloaded the file onto Plaintiff's computer.  (*See* JEX 259h at 39:18–41:6.)  Thus, Plaintiff's argument must be that McQuaid was lying when he testified that he witnessed Plaintiff's associate download the file onto Plaintiff's computer on May 1, but Plaintiff has provided no evidence to support that position.  Thus, because Plaintiff bears the burden to rebut the presumption of probable cause, the Court determines that there was no actionable misrepresentation.

Plaintiff further claims Gil knew that Plaintiff had never "dangled" an apartment in front of McQuaid and Lia, but still elicited testimony to this effect from a CPD officer.  (Pl's Opp'n 34.)  The Court has already discussed this issue at considerable length above in examining the June 6 Eavesdropping Warrant and incorporates that analysis here.  *See* § II.B.2.b.i.  As the Court has previously determined, a reasonable inference could be drawn from Plaintiff's text messages that he was enticing Lia to provide her Facebook password by indicating there was a rent-free apartment available for McQuaid and Lia.  *Id.*  Moreover, in the line of questioning Plaintiff identifies, Gil reviewed all of the relevant text messages before referring to Plaintiff "dangling the stick of an apartment in front of . . . McQuaid."  (JEX 259c at 59:2–65:22.)  Thus, the Court concludes there is no actionable misrepresentation.

Plaintiff next avers that Gil knew that Plaintiff "had not used Lia's Facebook credentials to contact K.L." yet he elicited false testimony to this effect from a CPD officer.  (Pl's Opp'n 34.)  A review of the record does not support Plaintiff's claim.  Gil did not elicit testimony that Plaintiff *had used* Lia's Facebook credentials to contact K.L., he elicited testimony that Plaintiff

*could use* the credentials to contact K.L. while K.L. would believe that she was communicating with her sister.  (*See* JEX 259c at 68:22–69:9.)  Gil also elicited testimony that the investigators believed that Plaintiff was using the credentials to "obtain information to interfere with an ongoing criminal investigation and court proceedings in regards to the case involving [K.L.]." (*Id.* at 69:24–70:18.)  But, even drawing all inferences in Plaintiff's favor, this statement does not suggest that the detective suspected or assumed that Plaintiff had, in fact, contacted K.L. while using Lia's Facebook account.  Thus, Plaintiff has not identified an actionable misrepresentation.

Beyond the foregoing, Plaintiff argues that Gil was aware that there was no new or changed "angle" discussed in any text messages between Plaintiff and McQuaid in June 2014, but elicited false testimony to this effect from a CPD officer.  (Pl's Opp'n 34–35.)  The Court has discussed this claim at length in connection with the July 2 Search Warrants, *see* § II.B.2.b.ii *supra*, and incorporates that analysis here.  The Court will only add that Plaintiff argues that Gil elicited false testimony by asking "when that third call was made, was that made after the intercept or text message to change the angle?"  (JEX 259e at 30:20–22.)  However, Gil had previously directed Nagle to read the message at issue to the Grand Jury, so it would have been clear from context that Gil was referring to that message.  (*Id.* at 28:15–20.)  To the extent that Plaintiff argues that Gil misrepresented the text in the phrasing of his question, the Court notes that a fair inference from McQuaid's text message, which stated "that angl[e] u came up[]wit[h] is good," (Defs' 56.1 ¶ 562; Pl's Resp. 56.1 ¶ 562), was that McQuaid was referencing a new or changed angle from that which he was previously taking.  Thus, the Court concludes that Plaintiff has failed to identify an actionable misrepresentation.

Plaintiff also claims that Gil elicited false testimony from McQuaid that Plaintiff had expressed an interest in paying for information from K.L. on several occasions in late May 2014, prior to McQuaid mentioning the new "angle" on June 7, 2014 and then informing K.L. that she could be paid for providing information about the PCDAO.  (Pl's Opp'n 35.)  The thrust of Plaintiff's argument is somewhat obscure, but the Court interprets it to be that, first, Gil elicited false testimony from McQuaid about meetings that McQuaid may or may not have had with Plaintiff in late May 2014 and, second, this testimony, although false, contradicted Gil's position that Plaintiff had developed the new "angle" in early June 2014.  Plaintiff's argument is unavailing on both fronts.  As to the first claim, Gil did elicit from McQuaid that he met with Plaintiff several times in late May 2014, and the record confirms that PCDAO was aware, based on surveillance, that at least some of these meetings had, in fact, occurred.  (JEX 259h at 57:1–13, 61:18–65:8.)  *See also* §§ I.A.5.j–n *supra*.  As to McQuaid's testimony concerning what was discussed at those meetings, the Court notes that Plaintiff has pointed to no evidence that indicates that McQuaid testified falsely or, more importantly, that Gil was aware that McQuaid intended to and did testify falsely.  Because Plaintiff bears the burden here, the Court will not infer that Gil was aware that McQuaid intended to or did testify falsely in the absence of any evidence supporting this inference.

As to Plaintiff's second argument, McQuaid testified that during the late May meetings, Plaintiff suggested both that K.L. could be paid not to testify and be paid for information.  (JEX 259h at 62:5–9, 68:2–22.)  McQuaid also testified that during at least one of these meetings, he was confused as to what exactly Plaintiff's plan was.  (*Id.* at 76:3–12.)  Thus, the Court concludes that Plaintiff has failed to establish an actionable misrepresentation, as McQuaid did testify that the plan was unclear and, thus, a fair inference is that McQuaid's text referencing an

"angle" that Plaintiff had directed him to take was McQuaid confirming he understood how Plaintiff wanted him to approach the issue of whether K.L. would be paid not to testify or to provide information.

Finally, Plaintiff asserts that Gil made a material omission concerning the reliability of McQuaid and Lia by failing to disclose to the Grand Jury that they had used heroin immediately prior to being questioned on June 25, 2014.  (Pl's Opp'n 35.)[153]  However, the Court concludes that Gil's failure to elicit this testimony is not relevant as to McQuaid because McQuaid testified before the First Grand Jury so the Grand Jurors could evaluate his credibility in his responses to Gil's questions.  (*See generally* JEX 259h; JEX 259j.)  As to Lia, the Court likewise concludes that this failure is irrelevant because Gil played the recording of Lia's June 29, 2014 interview for the Grand Jurors so that they could directly consider the weight to lend her statements, including whether to discount Lia's testimony if she was under the influence of narcotics at the time of that interview.  (*See* JEX 259i at 53:17–56:9) (Dkt. No. 744-15).)[154]

---

[153] In addition to the alleged misrepresentations, Plaintiff asserts that Gil failed to adhere to proper New York Grand Jury procedure when he presented "prejudicial and irrelevant evidence concerning actions taken by the Westchester County District Attorney's Office . . . that had nothing to do with the allegations brought by the PCDAO," (Pl's Mem 35), and improperly elicited opinion testimony from lay witnesses, (*id.* at 35–36).  Plaintiff further argues that the Court should consider these actions as evidence that Gil "engaged in bad faith before the [F]irst [G]rand [J]ury . . . to implicate" Plaintiff.  (*Id.* at 36.)

These allegations are unpersuasive, as Plaintiff does not contest the truthfulness of Gil's statements, but rather whether Gil followed proper grand jury procedure.  *See, e.g.*, *Bertuglia*, 133 F. Supp. 3d at 627 (holding that plaintiffs could not rely on the dismissal of an indictment for severe procedural error to rebut the presumption of probable cause, even though the judge had "criticized the prosecution's presentation of bad act evidence and examination of witnesses before the grand jury"); *Soto*, 132 F. Supp. 3d at 438, 452–456 (evaluating whether the presumption of probable cause was rebutted solely by an alleged misrepresentations where the indictment had been dismissed for serious procedural error).

[154] The Court notes that there is a much closer question as to whether Gil should have disclosed to the First Grand Jury that Lia may have been high during the June 29, 2014 interview.  However, Plaintiff does not object to the introduction of the June 29 statement and

The Court thus determines that Plaintiff has identified a single actionable misrepresentation that occurred during Gil's presentation before the First Grand Jury, which occurred when Gil directed Cianflone to read the inaccurate "transcript" of the May 5, 2014 controlled call to the Grand Jury.  This misrepresentation is sufficiently serious to rebut the presumption of probable cause because, drawing all inferences in Plaintiff's favor, it was more inculpatory than an accurate transcript of the call would have been and could have been material to the decision reached by the First Grand Jury.  Thus, Plaintiff has successfully rebutted the presumption of probable cause.

However, the inquiry is not concluded, as the Court must now determine whether, in the absence of the presumption, probable cause still existed based on the available untainted evidence.  *See Morse*, 2013 WL 359326, at *5–6.  As with the June 6 Eavesdropping Warrant and July 2 Search Warrants, the Court has little difficulty in concluding that probable cause existed to convene the First Grand Jury and incorporates that analysis here.  *See* § II.B.2.b *supra*.

Gil had access to the same evidence when the First Grand Jury was convened as he possessed as of July 2, 2014.  The sole exception is that, on August 8, 2014, McQuaid signed a consent form allowing the PCDAO to search his phone and the recording device recovered from his car, which resulted in Gil gaining access to a recording of McQuaid's April 17, 2014 call with Plaintiff and to text messages Plaintiff sent to McQuaid on May 8 through 12, 2014 after he listened to the controlled calls McQuaid had recorded on April 30 and May 6, 2014.  (*See generally* JEX 291; JEX 378.)[155]  Gil played the recording of the April 17 call to the First Grand

---

has not pointed to any evidence in the record that, at the time that Gil introduced the statement, he or Lopez had any concerns that Lia was high during the interview.

[155] The Court has been unable to locate authority addressing whether evidence that comes into the possession of the prosecution while the Grand Jury is sitting but before an indictment is

Jury and also had McQuaid read all of the relevant messages Plaintiff sent to him from May 8 to May 12 into the record on August 19, 2014. (*See* JEX 292; JEX 293.)

The Court concludes that probable cause for the indictment still existed after this additional evidence became available and was provided to the First Grand Jury. Specifically, the April 17, 2014 call makes clear that McQuaid had informed Cianflone that his "friend" knew Plaintiff and thus provided support for the inference that when McQuaid told Cianflone on April 30 and May 5 that his friend who used the lawyer was offering money to K.L. not to testify, the lawyer McQuaid was referring to was Plaintiff. (*See generally* JEX 100; *see also* JEX 88.)

As to the May 8 through May 12 text messages, Gil introduced all of the messages to the Grand Jury that concerned Plaintiff's attempts to warn McQuaid that his statements could be understood as attempting to bribe and threaten K.L. (*See* JEX 259j at 63:16–68:23; *compare* JEX 292 at 3–4, *with* JEX 378 at 62–63.) Thus, Gil provided all potentially exculpatory material to the First Grand Jury. However, even drawing all inferences in Plaintiff's favor, these messages fail to vitiate probable cause because while it is the case that Plaintiff warned McQuaid that his statements could be understood as attempts to bribe and threaten K.L, Plaintiff's behavior after he sent those messages was inconsistent with any actual concern about McQuaid's statements, as he later directed McQuaid to continue to attempt to contact K.L. and only directed McQuaid to employ a different approach, or "angle," on June 7, after McQuaid had already told K.L. that she could be paid for not testifying.

Thus, the Court concludes that there was more than sufficient evidence to provide probable cause to prosecute Plaintiff. *See Morse*, 2013 WL 359326, at *6–9 (finding probable

---

voted is relevant to the probable cause inquiry; for the purposes of deciding the instant Motions, the Court assumes without deciding that evidence of this sort is relevant to the probable cause inquiry.

cause existed based on review of the record for untainted evidence).[156]  Accordingly, the Court grants summary judgment in favor of Gil as to this claim.

### vi.  Malice

Because Gil had probable cause for the First Indictment, the Court declines to address whether Gil acted with malice.  *See Watson v. Grady*, No. 09-CV-3055, 2015 WL 2168189, at *20 (S.D.N.Y. May 7, 2015) (declining to address malice where the court found the prosecution of the plaintiff was supported by probable cause), *aff'd sub nom. Watson v. Sims*, 648 F. App'x 49 (2d Cir. 2016) (summary order); *Soto*, 132 F. Supp. 3d at 451 (same).

### b.  Second Grand Jury and Second Indictment

As to the Second Grand Jury and Second Indictment, Plaintiff makes no argument as to *any* misconduct by Gonzalez, Lopez, Nagle or Gil that distorted information that Levy relied upon to make his decision.  (*See generally* Pl's Mem.)

The undisputed record reveals that, after the dismissal of the First Indictment, Levy directed Ortolano to conduct a review of the available evidence and, later, to respond to the WCDAO's request as to whether the PCDAO stood behind the July 2 Search Warrants.  *See* §§ I.A.7–8 *supra*.  Ortolano provided Levy with a detailed timeline of events during the investigation into Plaintiff and a draft memorandum that explained there were misrepresentations in the July 2 Search Warrants.  *See* § I.A.8 *supra*.  Then, during the secretly recorded meeting on May 12, 2015, Levy stated that, after receiving the timeline and Ortolano's memorandum concerning misrepresentations in the July 2 Search Warrant affidavits, he had personally reviewed the available evidence and that, based on that review, he intended to re-present the case to a second grand jury.  (Defs' 56.1 ¶¶ 854–55; Pl's Resp. 56.1 ¶¶ 854–55.)  The Court notes that

---

[156] Because Gil had probable cause to prosecute Plaintiff, the Court notes that Gil necessarily had arguable probable cause and so would also be granted qualified immunity.

many of the misrepresentations that Ortolano identified in her memorandum are identical to those that Plaintiff raises in his briefing here; thus, when Levy indicated he intended to prosecute, he was aware of the issues with evidence in the case and how that evidence had been acquired. (JEX 174 at 5:8–6:11, 35:5–14.) Ortolano also brought up specific issues with Lia and McQuaid's credibility that are arguably even more problematic than those that Plaintiff points to here in reference to Lopez's alleged misconduct. (*Id.* at 8:22–11:1, 25:9–27:24.) Nevertheless, Levy indicated he intended to re-present the case to a second grand jury. (*See generally id.*) It is difficult to conceive of clearer evidence that a prosecutor made an independent decision to initiate a prosecution than the recording of the May 12, 2015 meeting, and, as a result, the Court concludes that Plaintiff has failed to demonstrate that Gonzalez, Lopez, Nagle, or Gil in any way exerted influence on Levy's decision to re-present Plaintiff's case to the Second Grand Jury.

The Court also concludes that Levy is absolutely immune for his decision to convene the Second Grand Jury. As the Court has already determined, Plaintiff was not subject to malicious prosecution in the convening of the First Grand Jury, thus Plaintiff cannot rely on any actions Levy did or did not take during the pendency of that proceeding to support denial of absolute immunity as to the Second Grand Jury. Plaintiff has presented no facts that Levy was involved in any additional investigation once the First Indictment was dismissed. In fact, the record reveals, as the Court summarized above, that Levy engaged in activities for which absolute immunity is routinely granted: reviewing available evidence, determining whether to bring charges, and, ultimately, deciding what charges to bring. *See*, *e.g.*, *Hill*, 45 F.3d at 661 (noting that prosecutors are "immune for conduct in preparing for [prosecutorial] functions," including "evaluating and organizing evidence for presentation at trial or to a grand jury, or determining which offenses are to be charged" (citation omitted)).

188

Because Plaintiff cannot establish the initiation element of a malicious prosecution claim arising from the Second Grand Jury, the Court declines to consider the Parties' arguments concerning the remaining elements of this cause of action and grants summary judgment to Defendants.

### 4.  Fair Trial

Plaintiff also brings a fair trial claim.  (SAC ¶¶ 248–56.)  The ICDs argue that summary judgment must be granted on Plaintiff's fair trial claim because he has failed to demonstrate that any alleged fabricated evidence was intentionally, as opposed to negligently or mistakenly, created and forwarded to prosecutors.  (ICDs' Mem 36–37.)  The ICDs also claim that summary judgment is appropriate because Plaintiff has failed to show that he would not have been prosecuted absent the alleged fabricated evidence.  (*Id.* at 38–39.)  The ICDs assert that summary judgment must be granted as to Levy and Lopez, because they did not create any of the alleged fabricated evidence, and as to Gonzalez, because she did not knowingly forward any fabricated evidence.  (*Id.* at 39.)[157]

A criminal defendant's "right to a fair trial" is enshrined in the Due Process Clause of the Fourteenth Amendment.  *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 244 (2d Cir. 2020) (quoting *Ramchair v. Conway*, 601 F.3d 66, 73 (2d Cir. 2010)).  "This right is violated 'when a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors.'"  *Id.* (alterations adopted) (quoting *Ricciuti*, 124 F.3d at 130).  "[T]he harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983."  *Ricciuti*, 124 F.3d at 130.  Despite the "nomenclature, a criminal defendant's right to a fair trial protects more than the fairness of the trial itself," and, as

---

[157] Nagle raises the same arguments as to the fabrication of evidence and lack of proximate cause in his briefing.  (Nagle's Mem 37–40.)

relevant here, "a criminal defendant can bring a fair trial claim even when no trial occurs at all." *Frost*, 980 F.3d at 249; *see also Ricciuti*, 124 F.3d at 127, 130 (reversing dismissal of fair trial claim despite the fact that all criminal charges were dismissed before trial); *Polanco v. City of New York*, No. 14-CV-7986, 2018 WL 1804702, at *11 (S.D.N.Y. Mar. 28, 2018) ("Somewhat counterintuitively, a claim for denial of the right to a fair trial does not require that the underlying action actually proceeded to a trial on the merits."); *Soomro v. City of New York*, 174 F. Supp. 3d 806, 815 (S.D.N.Y. 2016) (fair trial claim does not require "an actual trial"). Indeed, "a [§] 1983 claim for the denial of a right to a fair trial based on an officer's provision of false information to prosecutors can stand even if the officer had probable cause to arrest the [§] 1983 plaintiff," meaning that "fair trial claims cover kinds of police misconduct not addressed by false arrest or malicious prosecution claims." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 277–78 (2d Cir. 2016). "Where the plaintiff asserts a [§] 1983 fair-trial claim based on fabricated evidence, all that is required is that the underlying criminal proceeding be terminated in such a manner that the lawsuit does not impugn an ongoing prosecution or outstanding conviction." *Smalls v. Collins*, 10 F.4th 117, 139 (2d Cir. 2021) (emphases omitted).

"To prove a [§] 1983 fair trial claim, a plaintiff must establish that (1) the officer created false information, (2) the officer forwarded the false information to prosecutors, (3) the false information was likely to influence a jury's decision, and (4) the plaintiff suffered a deprivation of life, liberty, or property as a result of the officer's actions." *Kee v. City of New York*, 12 F.4th 150, 168 (2d Cir. 2021) (citation omitted); *see also Bellamy v. City of New York*, 914 F.3d 727, 745 (2d Cir. 2019) ("When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial." (citation omitted)). "A prosecutor who fabricates evidence in his

190

investigative role, to whom it was reasonably foreseeable that such evidence would later be used in his advocacy role before the grand jury, is equally liable for an ensuing deprivation of liberty." *Morse v. Fusto*, No. 07-CV-4793, 2013 WL 4647603, at *5 (E.D.N.Y. Aug. 29, 2013), *aff'd*, 804 F.3d 538 (2d Cir. 2015).  A fair trial claim "accrues when the officer forwards the false information to . . . prosecutors."  *Collins v. City of New York*, 295 F. Supp. 3d 350, 371 (S.D.N.Y. 2018) (citation omitted).

"[Evidence] fabrication violates the right to a fair jury trial whether the officer fabricates tangible evidence or 'the officer's own account of his or her observations of alleged criminal activity,'" *id.* (quoting *Garnett*, 838 F.3d at 274); the Second Circuit equates "the fraudulent omission of factual information . . . with the affirmative perpetration of a falsehood," and disclaims any "plausible legal distinction between misstatements and omissions[,]" *Morse v. Fusto*, 804 F.3d 538, 550 (2d Cir. 2015).  For an alleged fabrication to be actionable, a plaintiff must demonstrate that the official knowingly fabricated and forwarded false evidence.  *See Ashley v. City of New York*, 992 F.3d 128, 143 (2d Cir. 2021) (the "fabrication element" requires "that the defendant knowingly make a false statement or omission"); *Ricciuti*, 124 F.3d at 130 ("Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable corruption of the truth-seeking function of the trial process." (quotation marks omitted)).

"Whether the fabricated evidence is likely to influence a jury's decision can be satisfied by showing that the fabricated evidence was material to the prosecutor's case."  *Appling v. City of New York*, No. 18-CV-5486, 2021 WL 695061, at *8 (E.D.N.Y. Feb. 23, 2021); *see also Harasz v. Katz*, 327 F. Supp. 3d 418, 435–36 (D. Conn. 2018) ("Fabricated evidence is material

when it may . . . affect a prosecutor's assessment of the strength of a case, a prosecutor's

decision to pursue charges, or a jury's verdict.")

A plaintiff must establish not only that the police fabricated evidence, but also that this

evidence caused his deprivation of liberty.  *See Moroughan v. County of Suffolk*, 514 F. Supp. 3d

479, 535 (E.D.N.Y. 2021) ("The Second Circuit has held that the fabricated evidence must cause

the deprivation of liberty." (citing, inter alia, *Zahrey*, 221 F.3d at 350–51)); *see also Hoyos v.*

*City of New York*, 650 F. App'x 801, 803 (2d Cir. 2016) (summary order) (explaining that "the

type of causation at issue in a fabrication of evidence claim is proximate cause, rather than

probable cause").  In this respect, the relevant inquiry is "whether the liberty deprivations that

occurred are legally traceable back even further to [the] earlier investigatory act of fabrication

. . . ."  *Zahrey*, 221 F.3d at 352; *see also Fowler-Washington v. City of New York*, No. 19-CV-

6590, 2023 WL 2390538, at *9 (E.D.N.Y. Mar. 7, 2023) ("Courts have found that . . . causation

. . . is satisfied where a plaintiff has shown that the plaintiff would not have been charged with a

particular crime absent the fabrication." (citing *Ricciuti*, 124 F.3d at 126–27 (itself holding that

the plaintiffs there sufficiently alleged causation where fabricated evidence resulted both in their

being charged with a more serious crime than the untainted evidence proved and in the inclusion

of an additional charge))).  "The existence of probable cause to arrest and prosecute is not a

complete defense to a fair trial claim. . . . [However] where independent probable cause exists for

the prosecution, plaintiff must show that the misconduct caused some deprivation above and

beyond . . . the prosecution itself."  *Hoyos v. City of New York*, 999 F. Supp. 2d 375, 392, 394

(E.D.N.Y. 2013) (citations omitted); *see also Ganek*, 874 F.3d at 91 (explaining that while

"probable cause for arrest is not a defense to a fabrication-of-evidence due process claim" a

plaintiff must demonstrate a harm independent of the deprivations supported by probable cause).

The Second Circuit has "recognized that a plaintiff's 'prosecution' can be a 'deprivation of liberty.'" *Barnes v. City of New York*, 68 F.4th 123, 129 (2d Cir. 2023) (quoting *Ashley*, 992 F.3d at 139). "A plaintiff can establish a deprivation of liberty through the number of court appearances a plaintiff made post-arraignment, constraints such as bail requirements, a period of incarceration, or travel restrictions." *Appling*, 2021 WL 695061, at *8.

As discussed above, *see* §§ II.B.2.b.i–ii *supra*, the Court determined that Gil included several actionable misrepresentations in the June 6 Eavesdropping Warrant affidavit and July 2 Search Warrant affidavits that he drafted and Gonzalez and Nagle signed. Specifically, the Court found that the affidavits misrepresented a portion of the content of the May 5 controlled call, a portion of the content of the May 19 controlled call, and several details concerning a controlled call on June 7.[158]

The Court concludes that the circumstances surrounding the drafting of the affidavits allow for the inference that Gil, Gonzalez, and Nagle knowingly created this evidence. It is undisputed that Gil drafted all of the affidavits, which Nagle and Gonzalez reviewed. Nothing in the record indicates that Nagle or Gonzalez objected to Gil's drafts before signing them, which the Court finds is sufficient to support an inference of knowing acquiescence, given that Nagle and Gonzalez swore under oath that the affidavits were truthful.

---

[158] The Court declines to consider the misrepresentation concerning the May 5 controlled call made in testimony before the First Grand Jury because it was derived from the underlying misrepresentations in the June 6 Eavesdropping Warrant and July 2 Search Warrant affidavits. The Court also declines to consider any alleged misrepresentations in testimony before the Second Grand Jury because these were either derived from the affidavits, or, in the case of questioning by a non-party ADA, who Plaintiff has not alleged was involved in the initial investigation (*see* Pl's Opp'n 37–39), precluded by absolute immunity. *See Bernard*, 356 F.3d at 506 (explaining that absolute immunity protects "the knowing presentation of perjured testimony to a grand jury, without any prosecutorial involvement in its earlier inducement").

However, Plaintiff's claim falters because the Court has already found that there was probable cause to prosecute him for the offenses alleged in the June 6 Eavesdropping Warrant affidavit and July 2 Search Warrant affidavits, *see* §§ II.B.2.b.i–ii *supra*, and Plaintiff has failed to allege any deprivation beyond the fact of the prosecution, *see Hoyos*, 999 F. Supp. 2d at 394 (finding that the plaintiff failed to plead causation where the defendants had probable cause for all charges independent of fabricated evidence); *see also Polanco*, 2018 WL 1804702, at *11 (granting summary judgment to the defendants where the alleged fabricated evidence related to only a single charge and other charges were supported by probable cause).  Thus, the Court grants summary judgment for Defendants on this claim.

### 5.  First Amendment Retaliation

Plaintiff has further alleged that he was prosecuted in retaliation for exercising his First Amendment right to speak publicly concerning the PCDAO's conduct in the Zaimi prosecution. (SAC ¶¶ 284–292.)  The ICDs argue that summary judgment must be granted on Plaintiff's claim because he cannot demonstrate but-for causation as there was probable cause to prosecute him.  (ICDs' Mem 40.)  Plaintiff argues that the ICDs have failed to establish that they had probable cause to prosecute him.  (Pl's Opp'n 77–78.)

"A plaintiff asserting a First Amendment retaliation claim must establish that: '(1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech.'"  *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) (quoting *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011)).

With respect to the first element, as the Supreme Court has said, "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."  *City of Houston v. Hill*, 482 U.S. 451, 461 (1987).  Thus, an individual's "right to criticize the police

194

without reprisal clearly satisfies the first prong of th[e] [First Amendment retaliation] test." *Kerman v. City of New York*, 261 F.3d 229, 242 (2d Cir. 2001).  To that end, the Second Circuit has held that speech directed at police officers is protected unless it is "likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest."  *Posr v. Ct. Officer Shield No. 207*, 180 F.3d 409, 415 (2d Cir. 1999) (citation omitted).

With respect to the third element, causality, the retaliatory motive must be a "but-for" cause of the alleged harm.  *Hartman*, 547 U.S. at 260.  In other words, "[i]t is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury."  *Nieves v. Bartlett*, 587 U.S. — , 139 S. Ct. 1715, 1722 (2019) (emphasis in original).  Thus, "[t]he existence of probable cause . . . will generally defeat a First Amendment retaliation claim."  *Rupp v. City of Buffalo*, No. 17-CV-1209, 2021 WL 1169182, at *7 (W.D.N.Y. Mar. 29, 2021) (citing *Mangino v. Incorporated Village of Patchogue*, 808 F.3d 951, 956 (2d Cir. 2015)); *Fabrikant v. French*, 691 F.3d 193, 215 (2d Cir. 2012) ("[The existence of probable cause] will also defeat a First Amendment claim that is premised on the allegation that defendants prosecuted a plaintiff out of a retaliatory motive, in an attempt to silence h[im].").  "This is because 'an individual does not have a right under the First Amendment to be free from a criminal prosecution supported by probable cause, even if that prosecution is in reality an unsuccessful attempt to deter or silence criticism of the government.'" *Mangino*, 808 F.3d at 956 (alteration adopted) (quoting *Fabrikant*, 691 F.3d at 215).  The probable cause analysis is governed by the same standards that apply in the context of the Fourth Amendment.  *See Fabrikant*, 691 F.3d at 214–15.

The Court assumes without deciding that Plaintiff engaged in protected speech when he made public statements beginning in late February 2014 concerning the Zaimi prosecution and gave his opinion about the PCDAO's political motivation in pursuing it.  (*See* Defs' 56.1 ¶ 1207; Pl's Resp. 56.1 ¶ 1207).  Plaintiff has also sufficiently demonstrated that Defendants took an adverse action against him by twice indicting him for bribery and witness tampering.  *See supra* §§ I.A.6–8.

However, Plaintiff's claim fails because probable cause existed to prosecute him.  The Court herein incorporates its analyses of probable cause as to the June 6 Eavesdropping Warrant, the July 2 Search Warrants, and the convening of the First Grand Jury in the previous sections of this opinion, *see supra* §§ II.B.2.b.i–ii; II.B.3.a.iv–v.[159]  Because Defendants had probable cause to arrest and prosecute Plaintiff, summary judgment is granted on this claim for Defendants.  *See Mozzochi v. Borden*, 959 F.2d 1174, 1179–80 (2d Cir. 1992) (holding that there was no First Amendment violation where the underlying arrest and prosecution were supported by probable cause independent of any alleged retaliatory motive); *Walsh v. City of New York*, No. 19-CV-9238, 2021 WL 1226585, at *5 (S.D.N.Y. Mar. 31, 2021) ("The existence of probable cause [generally] defeats a First Amendment claim premised on the allegation that defendants arrested a plaintiff based on a retaliatory motive." (alteration in original) (quoting *Caravalho v. City of New York*, 732 F. App'x 18, 23 (2d Cir. 2018) (summary order))); *Graziani v. Mulligan*, No. 11-CV-1603, 2012 WL 1565278, at *3 (D. Conn. May 2, 2012) (holding that "the plaintiff's

---

[159] The Court declines to separately consider whether there was probable cause for the Second Grand Jury because such an analysis would essentially re-capitulate the analysis undertaken in analyzing Plaintiff's Fourth Amendment claims.  The record is clear that the Defendants became aware of issues with the Warrants and with McQuaid and Lia's reliability, *see* § I.A.8 *supra*, but because the Court has already found that those issues did not vitiate probable cause in the context of the Warrants and the First Grand Jury, they would be insufficient to vitiate probable cause for the Second Grand Jury.

retaliation claims cannot be maintained if the arrest . . . [was] supported by probable cause independent of the defendants' motive" (citing *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 120 (2d Cir. 1995))).

### 6.  § 1983 Conspiracy and *Monell* Claims

Plaintiff alleges a § 1983 conspiracy claim against the ICDs and Nagle and also argues that the County is subject to *Monell* liability for Levy's actions.  (SAC ¶¶ 293–304.)  The ICDs argue that summary judgment should be granted on Plaintiff's § 1983 conspiracy claim because he has failed to prove an underlying constitutional violation or adduce any evidence demonstrating the existence of a conspiratorial agreement.  (ICDs' Mem 40.)[160]

Plaintiff argues that summary judgment should be granted on his *Monell* claim against the County because Levy violated Plaintiff's rights while acting as a final policymaker for the County.  (Pl's Mem 39–40; Pl's Reply 28–30.)  The County responds that Plaintiff has failed to establish a constitutional violation or, in the alternative, has failed to establish any basis to impute liability.  (County's Opp'n 13–32; County's Mem 16–44.)

"To prove a § 1983 conspiracy, a plaintiff must show: '(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages.'"  *Kalamaras v. County of Nassau*, No. 17-CV-1068, 2019 WL 4452281, at *19 (E.D.N.Y. Sept. 16, 2019) (quoting *Ciambriello v. County of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002)).  "However, because conspiracies are by their very nature secretive operations, they may have to be proven by circumstantial, rather than direct, evidence."  *Amato v. Hartnett*, 936 F. Supp. 2d 416, 440 (S.D.N.Y. 2013) (alteration

---

[160] Nagle raises the same arguments in his briefing.  (Nagle's Mem 40–42.)  The ICDs also argue that summary judgment must be granted on Plaintiff's failure to supervise claim against Levy because the Second Circuit recently abrogated that cause of action as against individual defendants.  (ICDs' Mem 39.)

adopted) (internal quotation marks omitted).  Additionally, "[i]t is well settled that a conspiratorial agreement can simply be a 'tacit understanding,' and a person 'can be a conspirator by agreeing to facilitate only some of the acts leading up to the substantive offense.'" *Peacock v. City of Rochester*, No. 13-CV-6046, 2016 WL 2347448, at *11 (W.D.N.Y. May 4, 2016) (first quoting *United States v. Sabhnani*, 599 F.3d 215, 244 (2d Cir. 2010), and then quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997)).  "[A]bsent an underlying constitutional violation on which to base a § 1983 conspiracy claim, a plaintiff's conspiracy claim fails as a matter of law." *Bertuglia v. City of New York*, 839 F. Supp. 2d 703, 728 (S.D.N.Y. 2012) (citation omitted).

"To state a claim under [§ 1983], the plaintiff must show that a defendant, acting under color of state law, deprived him of a federal constitutional or statutory right." *Sykes v. Bank of Am.*, 723 F.3d 399, 405–06 (2d Cir. 2013).  "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978). Thus, "to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008).

The fifth element reflects the notion that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997); *see also Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be

198

held liable when the municipality itself deprives an individual of a constitutional right.").  In other words, a municipality may not be liable under Section 1983 "by application of the doctrine of *respondeat superior*."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986); *see also Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity *itself* commits a wrong" (emphasis in original)). Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").

Because the Court has found that Plaintiff has failed to prove an underlying constitutional violation, which is a necessary predicate to both a § 1983 conspiracy and a *Monell* claim, the Court grants summary judgment to the Defendants on both of these claims.  *See DeRaffele v. City of New Rochelle*, No. 15-CV-282, 2017 WL 2560008, at *6 (S.D.N.Y. June 13, 2017) ("It is well established that a *Monell* claim cannot lie in the absence of an underlying constitutional violation."); *AK Tournament Play, Inc. v. Town of Wallkill*, No. 09-CV-10579, 2011 WL 197216, at *3 (S.D.N.Y. Jan. 19, 2011) ("[A]bsent an underlying constitutional violation on which to base a § 1983 conspiracy claim, a plaintiff's conspiracy claim fails as a matter of law."); *see also Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("*Monell* does not provide a separate cause of action . . . ; it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." (emphasis omitted)).

7.  State Law Claims

Plaintiff brings a replevin claim under New York state law seeking return of any of his property in Defendants' possession.  (SAC ¶¶ 305–15.)  Levy also brings counterclaims for defamation and libel.  (Answer ¶¶ 316–99 (Dkt. No. 383).)

In light of the Court's dismissal of Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over these state law claims.  *See* 28 U.S.C. § 1367(c)(3) ("[D]istrict courts may decline to exercise supplemental jurisdiction over a claim if . . . the district court has dismissed all claims over which it has original jurisdiction . . . .").  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) (quoting *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003)); *see also One Commc'ns Corp. v. JP Morgan SBIC LLC*, 381 F. App'x 75, 82 (2d Cir. 2010) (summary order) ("If all of a plaintiff's federal claims are dismissed, a district court is well within its discretion to decline to assert supplemental jurisdiction over any state law claims . . . ."); *Young v. Suffolk County*, 922 F. Supp. 2d 368, 397–98 (E.D.N.Y. 2013) (declining to exercise supplemental jurisdiction over state-law counterclaim after dismissing all federal claims).

III.  Conclusion

As discussed above, the Court grants summary judgment to Defendants on all of Plaintiff's federal claims.  The Court also declines to exercise supplemental jurisdiction over Plaintiff's state law replevin claim and Levy's state law defamation and libel counterclaims.  The

Clerk of Court is respectfully directed to terminate the pending Motions, enter judgment for

Defendants, and close this case.  (*See* Dkt. Nos. 504, 711, 714, 729, 731.)

SO ORDERED.

Dated:   April 15, 2024
         White Plains, New York

_____
            KENNETH M. KARAS
         United States District Judge